# EXHIBIT 1

# REPORT OF INVESTIGATION INTO ALLEGATIONS OF SEXUAL HARASSMENT BY GOVERNOR ANDREW M. CUOMO



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
LETITIA JAMES

|  |  |
|---|---|
| | Joon H. Kim |
| Anne L. Clark | Jennifer Kennedy Park |
| Yannick Grant | Abena Mainoo |
| | Rahul Mukhi |

Vladeck, Raskin & Clark, P.C.    Cleary Gottlieb Steen & Hamilton LLP

**August 3, 2021**

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ................................................................................................. 1

**BACKGROUND OF THE INVESTIGATION** ................................................................. 14
I.   Legal Authority Under N.Y. Executive Law § 63(8) .................................................. 14
II.  Summary of the Investigative Procedure ................................................................... 14

**FACTUAL FINDINGS** ...................................................................................................... 16
I.   Findings Related to Allegations of Governor Cuomo's Misconduct ........................... 16
   A.   Former and Current State Employees ................................................................... 16
      i.    Executive Assistant #1 ................................................................................. 16
      ii.   Trooper #1 ................................................................................................... 33
      iii.  Charlotte Bennett ........................................................................................ 44
      iv.   Lindsey Boylan ........................................................................................... 65
      v.    Alyssa McGrath ........................................................................................... 77
      vi.   Ana Liss ...................................................................................................... 81
      vii.  Kaitlin ......................................................................................................... 85
      viii. State Entity Employee #1. ........................................................................... 93
      ix.   State Entity Employee #2 ............................................................................ 97
   B.   Other Complainants ............................................................................................ 99
      i.    Virginia Limmiatis ...................................................................................... 99
      ii.   Anna Ruch ................................................................................................. 102
II.  The Governor's and the Executive Chamber's Response to Allegations .................... 103
III. The Culture and Practices of the Executive Chamber Under Governor Cuomo ......... 117
   A.   Normalization of the Governor's Sexual or Other Sex-/Gender-Based Conduct as a
        Preferred Alternative to Poor Treatment ............................................................ 119
   B.   Focus on Secrecy, Loyalty, and Fear of Retaliation ........................................... 125
   C.   Poor Enforcement of Sexual Harassment Training and Reporting Mechanism .......... 127

**RELEVANT LAW** ........................................................................................................... 130
I.   Background ........................................................................................................... 130
II.  Gender-Based Harassment ..................................................................................... 130
   A.   Employer Liability .............................................................................................. 134
   B.   Executive Chamber Policy .................................................................................. 135

III. Retaliation...................................................................................................... 136

   A.  Elements of a Claim.................................................................................. 137

   B.  Employer's Rationale and Pretext .......................................................... 140

   C.  Executive Chamber Policy....................................................................... 140

   D.  Individual Liability ................................................................................. 141

**THE INVESTIGATION'S CONCLUSIONS**.................................................... 142

  I.  The Governor Engaged in Conduct that Constituted Sexual Harassment Under Federal and State Law ................................................................................ 142

  II.  The Executive Chamber's Failure to Report and Investigate Allegations of Sexual Harassment Violated Their Own Internal Policies ................................. 149

   A.  The Executive Chamber's Handling of Charlotte Bennett's Complaint ........................ 149

   B.  The Executive Chamber's Handling of Other Complaints ............................................ 153

III. The Response to Lindsey Boylan's Allegation of Sexual Harassment Constituted Unlawful Retaliation................................................................................ 155

IV. The Culture and Environment of the Executive Chamber Contributed to the Conditions that Led to Sexual Harassment and the Problematic Responses to Allegations of Harassment.................................................................................. 161

**CONCLUSION** ................................................................................................ 165

# EXECUTIVE SUMMARY

We, the investigators appointed to conduct an investigation into allegations of sexual harassment by Governor Andrew M. Cuomo, conclude that the Governor engaged in conduct constituting sexual harassment under federal and New York State law.  Specifically, we find that the Governor sexually harassed a number of current and former New York State employees by, among other things, engaging in unwelcome and nonconsensual touching, as well as making numerous offensive comments of a suggestive and sexual nature that created a hostile work environment for women.  Our investigation revealed that the Governor's sexually harassing behavior was not limited to members of his own staff, but extended to other State employees, including a State Trooper on his protective detail and members of the public.  We also conclude that the Executive Chamber's culture—one filled with fear and intimidation, while at the same time normalizing the Governor's frequent flirtations and gender-based comments—contributed to the conditions that allowed the sexual harassment to occur and persist.  That culture also influenced the improper and inadequate ways in which the Executive Chamber has responded to allegations of harassment.[1]

## The Governor's Sexually Harassing Conduct

The Governor's sexually harassing conduct, established during our investigation and described in greater detail in the factual findings of this Report, includes the following:

- *Executive Assistant #1.*[2]  Since approximately late 2019, the Governor engaged in a pattern of inappropriate conduct with an executive assistant ("Executive Assistant #1"), who is a woman.  That pattern of conduct included:  (1) close and intimate hugs; (2) kisses on the cheeks, forehead, and at least one kiss on the lips; (3) touching and grabbing of Executive Assistant #1's butt during hugs and, on one occasion, while taking selfies with him; and (4) comments and jokes by the Governor about Executive Assistant #1's personal life and relationships, including calling her and another assistant "mingle mamas,"[3] inquiring multiple times about whether she had cheated or would cheat on her husband, and asking her to help find him a girlfriend.  These offensive interactions, among others, culminated in an incident at the Executive Mansion in November 2020 when the Governor, during another close hug with

---

[1] As set forth below in the Relevant Law section, discrimination in the workplace on the basis of sex or gender and retaliation for complaints about such discrimination violate Title VII of the Civil Rights Act of 1964, Section 1983 (42 U.S.C. § 1983), and New York State Human Rights Law (N.Y. Exec. Law § 290, *et seq.*).

[2] Many of the individuals we interviewed during our investigation expressed concern and fear over retaliation and requested that, to the extent possible, their identities not be disclosed.  Thus, we have sought to anonymize individuals as much as possible, while ensuring the Report's findings and the bases for our conclusions can be fully understood.  We have not anonymized individuals whose identities are already publicly known, individuals whose conduct is implicated in the sexual harassment and retaliation allegations, or those who did not raise any concerns about retaliation.  In certain instances, we have named individuals in one context but sought to anonymize them in others where, in our judgment, the specific identity was not necessary to understand the context.

[3] Executive Assistant #1 Tr. 95:9–16; Alyssa McGrath Tr. 50:15–52:3.  Where on-the-record testimony was taken of witnesses, we cite to the page and line numbers of the transcripts.  This Report also includes information obtained from interviews conducted, as well as documents collected during the investigation, some of which are attached to an Appendix and cited to as Exhibits ("Ex.").

Executive Assistant #1, reached under her blouse and grabbed her breast.  For over three months, Executive Assistant #1 kept this groping incident to herself and planned to take it "to the grave,"[4] but found herself becoming emotional (in a way that was visible to her colleagues in the Executive Chamber) while watching the Governor state, at a press conference on March 3, 2021, that he had never "touched anyone inappropriately."[5]  She then confided in certain of her colleagues, who in turn reported her allegations to senior staff in the Executive Chamber.

- *Trooper #1.*  In early November 2017, the Governor briefly met a New York State Trooper ("Trooper #1"), a woman, at an event on the Robert F. Kennedy Bridge (the "RFK Bridge," also known as the Triborough Bridge).  After meeting Trooper #1, he spoke with a senior member of his protective detail ("Senior Investigator #1") about seeking to have Trooper #1 join the Protective Services Unit ("PSU"), the unit of the New York State Police that is in charge of protecting the Governor and works in close vicinity of the Governor.  Trooper #1 was then hired into the PSU, despite not meeting the requirement to have at least three years of State Police service to join the PSU.  In an email to Trooper #1 shortly after the RFK Bridge event, Senior Investigator #1 noted, attaching a vacancy notice with a two-year service requirement (as opposed to three years), "Ha ha they changed the minimum from 3 years to 2.  Just for you."[6]

  After Trooper #1 joined the PSU, the Governor sexually harassed her on a number of occasions, including by:  (1) running his hand across her stomach, from her belly button to her right hip, while she held a door open for him at an event; (2) running his finger down her back, from the top of her neck down her spine to the middle of her back, saying "hey, you,"[7] while she was standing in front of him in an elevator; (3) kissing her (and only her) on the cheek in front of another Trooper and asking to kiss her on another occasion, which she deflected; and (4) making sexually suggestive and gender-based comments, including (a) asking her to help him find a girlfriend and describing his criteria for a girlfriend as someone who "[c]an handle pain,"[8] (b) asking her why she wanted to get married when marriage means "your sex drive goes down,"[9] and (c) asking her why she did not wear a dress.  Trooper #1 found these interactions with the Governor not only offensive and uncomfortable, but markedly different from the way the Governor interacted with members of the PSU who were men, and she conveyed these incidents contemporaneously to colleagues.  Several other PSU Troopers corroborated Trooper #1's allegations, including some

---

[4] Executive Assistant #1 Tr. 182:23–24, 187:8–13.

[5] *New York Gov. Andrew Cuomo COVID-19 Press Conference Transcript March 3: Addresses Sexual Harassment Allegations*, Rev (March 3, 2021), https://www.rev.com/blog/transcripts/new-york-gov-andrew-cuomocovid-19-press-conference-transcript-march-3-addresses-sexual-harassment-allegations.

[6] Ex. 1 (November 17, 2017 email).

[7] Trooper #1 Tr. 87:20–88:4.

[8] *Id.* at 103:14–19.

[9] *Id.* at 85:12–14.

who had personally witnessed some of the touching and comments as well as the gender-based difference in the way the Governor treated Troopers.

- *Charlotte Bennett.*  In a series of conversations in 2020 with an aide, Charlotte Bennett, the Governor made inappropriate comments, including, among many other things:  (1) telling Ms. Bennett, in talking about potential girlfriends for him, that he would be willing to date someone who was as young as 22 years old (he knew Ms. Bennett was 25 at the time); (2) asking her whether she had been with older men; (3) saying to her during the pandemic that he was "lonely" and "wanted to be touched";[10] (4) asking whether Ms. Bennett was monogamous; (5) telling Ms. Bennett, after she told him that she was considering getting a tattoo for her birthday, that if she decided to get a tattoo, she should get it on her butt, where it could not be seen; (6) asking whether she had any piercings other than her ears; and (7) saying that he wanted to ride his motorcycle into the mountains with a woman. These comments by the Governor—as evidenced contemporaneously in numerous text exchanges Ms. Bennett had with others—followed and coincided with discussions she previously had with the Governor about her having been a survivor of sexual assault and made her extremely uncomfortable.  They made her so uncomfortable that, following a series of exchanges with the Governor in June 2020, Ms. Bennett reported the interactions to the Governor's Chief of Staff.  While the Executive Chamber moved Ms. Bennett to a different position where she would not need to interact with the Governor in response to Ms. Bennett's allegations, the Executive Chamber did not report the allegations at the time to the Governor's Office of Employee Relations ("GOER"), the State agency tasked with conducting harassment investigations for State agencies, and did not otherwise conduct any formal investigation.  Instead, the Executive Chamber's senior staff sought to implement a practice whereby individual staff members who were women were not to be left alone with the Governor.

- *State Entity Employee #1.*  In September 2019, the Governor attended an event in New York City sponsored by a New York State-affiliated entity.  Following a speech by the Governor, he posed for pictures with other attendees, including with an employee of that State-affiliated entity ("State Entity Employee #1"), who was a woman.  While the picture was being taken, the Governor put his hand on State Entity Employee #1's butt, tapped it twice, and then grabbed her butt.  State Entity Employee #1 was "shocked"[11] at the time, and discussed it with a number of friends, family, and co-workers.  Following the advice of a friend, she also contemporaneously memorialized the Governor's inappropriate touching.[12]

- *Virginia Limmiatis.*  In May 2017, Virginia Limmiatis attended a conservation event in upstate New York on behalf of her employer ("Energy Company") at which the Governor spoke.  After the event, Ms. Limmiatis stood in a rope line to meet with the

---

[10] Bennett Tr. 166:20–167:9; Ex. 2; Ex 3.

[11] State Entity Employee #1 Tr. 44:3–17.

[12] Ex. 4 (email dated the day after the incident with the Governor).

Governor, along with other attendees.  She wore a shirt that had the name of the Energy Company written across the chest.  When the Governor reached Ms. Limmiatis, he ran two fingers across her chest, pressing down on each of the letters as he did so and reading out the name of the Energy Company as he went.  The Governor then leaned in, with his face close to Ms. Limmiatis's cheek, and said, "I'm going to say I see a spider on your shoulder,"[13] before brushing his hand in the area between her shoulder and breasts (and below her collarbone).  Ms. Limmiatis was shocked, and immediately informed a number of other attendees of what had happened.  Ms. Limmiatis came forward in this investigation after she heard the Governor state, during the March 3, 2021 press conference, that he had never touched anyone inappropriately.[14]  As Ms. Limmiatis testified to us, "He is lying again.  He touched me inappropriately.  I am compelled to come forward to tell the truth . . . .  I didn't know how to report what he did to me at the time and was burdened by shame, but not coming forward now would make me complicit in his lie, and I won't do it."[15]

- *Lindsey Boylan*.  During the period in which Lindsey Boylan served as Chief of Staff to the CEO of the Empire State Development Corporation ("ESD") and later as Deputy Secretary for Economic Development and Special Advisor to the Governor, the Governor, among other things, engaged in the following harassing conduct on the basis of her gender:  (1) commented on her appearance and attractiveness, including comparing her to a former girlfriend and describing her as attractive; (2) paid attention to her in a way that led her supervisor at ESD to say that the Governor had a "crush"[16] on her and to ask her whether she needed help in dealing with the Governor's conduct; (3) physically touched her on various parts of her body, including her waist, legs, and back; (4) made inappropriate comments, including saying to her once on a plane, words to the effect of, "let's play strip poker";[17] and (5) kissed her on the cheeks and, on one occasion, on the lips.  Our investigation identified corroboration for Ms. Boylan's allegations, including ones the Governor and the Executive Chamber denied.  Following Ms. Boylan's public allegation of sexual harassment against the Governor in December 2020 (at a time when she was running for public office), the Governor and the Executive Chamber actively engaged in an effort to discredit her, including by disseminating to the press confidential internal documents that painted her in a negative light and circulating among a group of current and former Executive Chamber employees (although not ultimately publishing) a proposed op-ed or letter disparaging Ms. Boylan that the Governor personally participated in drafting.

---

[13] Limmiatis Tr. 32:11–16.

[14] *New York Gov. Andrew Cuomo COVID-19 Press Conference Transcript March 3: Addresses Sexual Harassment Allegations*, Rev (Mar. 3, 2021), https://www.rev.com/blog/transcripts/new-york-gov-andrew-cuomocovid-19-press-conference-transcript-march-3-addresses-sexual-harassment-allegations.

[15] Limmiatis Tr. 58:11–18.

[16] Zemsky Tr. 28:12–20.

[17] Boylan Tr. 126:9–10; Zemsky Tr. 33:14–37:14.

- *Alyssa McGrath.*  In his interactions with another executive assistant, Alyssa McGrath, the Governor made inappropriate comments and engaged in harassing conduct, including:  (1) regularly asking about her personal life, including her marital status and divorce; (2) asking whether Ms. McGrath would tell on Executive Assistant #1 if she were to cheat on her husband—and whether Ms. McGrath herself planned to "mingle" with men—on the two women's upcoming trip to Florida, and then calling the two women "mingle mamas";[18] and (3) staring down her loose shirt and then commenting on her necklace (which was inside her shirt) when Ms. McGrath looked up.

- *Kaitlin.*  The Governor met Kaitlin (whose last name has not been publicly reported) at a fundraising event on December 12, 2016.  He had pictures taken with her in a dance pose (as the photographs from the event show), which made Kaitlin uncomfortable.[19]  Nine days later, the Executive Chamber reached out to Kaitlin to hire her to work with the Governor.  Kaitlin was hired and approved to receive a salary of $120,000 (which was so high that it was laughed at during Kaitlin's interview for the position).  During the year she worked at the Executive Chamber, the Governor:  (1) instructed her to act like a "sponge" to soak up knowledge, then proceeded to call her by the name "sponge," which she found to be embarrassing, condescending, and demeaning;[20] (2) asked about how certain members of his senior staff, known as the "mean girls"[21] were treating her; (3) commented on her appearance on a number of occasions, including saying that an outfit she wore made her look like a "lumberjack"[22] and commenting on her not being "ready"[23] for work if she was not wearing makeup or was not dressed nicely; and (4) on one occasion, asked her to look up car parts on eBay on his computer, which she had to bend over to do, while wearing a skirt and heels, as the Governor sat directly behind her in his office, which made her feel uncomfortable.  Kaitlin's colleagues at the State agency she moved to after she left the Executive Chamber witnessed and corroborated the impact that her experiences at the Executive Chamber had on her, including becoming visibly distressed whenever she had to return to the Executive Chamber's offices for work.

- *Ana Liss.*  During the time that Ana Liss worked as an aide in the Executive Chamber from 2013 to 2015, the Governor:  (1) addressed her almost exclusively as "sweetheart" or "darling";[24] (2) on occasion, kissed her on the cheeks and hand, touched and held her hands, and slid his hand around her lower waist; (3) commented

---

[18] Alyssa McGrath Tr. 50:13–52:3.

[19] Ex. 5 (photographs from event).

[20] Kaitlin Tr. 77:14–17, 78:2–10.

[21] *Id.* at 71:11–15.

[22] *Id.* at 83:20–24.

[23] *Id.* at 86:18–23.

[24] Liss Tr. 92:4–9.

on how she looked "lovely";[25] and (4) asked whether she had a boyfriend.  Ms. Liss noted that these interactions were, in her view, inappropriate.  She did not complain about or raise these incidents while employed in the Executive Chamber because, she found, "[F]or whatever reason, in his office the rules were different.  It was just, you should view it as a compliment if the Governor finds you aesthetically pleasing enough, if he finds you interesting enough to ask questions like that.  And so even though it was strange and uncomfortable and technically not permissible in a typical workplace environment, I was in this mindset that it was the twilight zone and . . . the typical rules did not apply."[26]

- *State Entity Employee #2.*  On March 17, 2020, a then-Director at New York State's Department of Health ("State Entity Employee #2"), who is also a doctor, participated in a press conference with the Governor, during which she performed a live COVID-19 nasal swab test on the Governor.  As they were preparing for the press conference (outside the presence of the press), the Governor requested that State Entity Employee #2 not put the swab up his nose "so deep that you hit my brain."[27]  State Entity Employee #2 replied that she would be "gentle but accurate"[28] in conducting the swab test, to which the Governor responded, "[G]entle but accurate, I've heard that before."[29]  State Entity Employee #2 felt that the Governor intended to convey a "joke of an implied sexual nature."[30]  Then, at the press conference, in front of the press and cameras, the Governor stated, "Nice to see you, Doctor—you make that gown look good."[31]  State Entity Employee #2 found the Governor's comments offensive and that they would not have been made to an accomplished physician who was a man.

- *Anna Ruch.*  On September 14, 2019, at the wedding party of one of the Governor's senior aides, the Governor approached a guest, Anna Ruch, shook her hand, and then quickly moved his hands to her back, touching her bare skin where there was a cutout in her dress.  Ms. Ruch, feeling uncomfortable, grabbed the Governor's wrist and removed his hand from her back.  At that point, the Governor remarked, "Wow, you're aggressive," after which the Governor cupped her face in his hands and said, "can I kiss you?"  Without waiting for a response, and as Ms. Ruch tried to move and turn her face away, the Governor kissed her left cheek.  Pictures taken by Ms. Ruch's friend captured the Governor's kiss and Ms. Ruch's uncomfortable reaction.[32]

---

[25] Liss Tr. 102:14–19.

[26] *Id.* at 80:11–22.

[27] State Entity Employee #2 Tr. 159:3–6.

[28] *Id.* at 159:14–17.

[29] *Id.* at 159:18–20.

[30] *Id.* at 160: 23–161:2.

[31] *Andrew Cuomo New York May 17 COVID-19 Press Conference Transcript*, Rev (May 17, 2020), https://www.rev.com/blog/transcripts/andrew-cuomo-new-york-may-17-covid19-press-conference-transcript.

[32] Ex. 6 (photographs).

Ms. Ruch immediately informed friends of what had happened and how upset she was at the Governor's physical contact.[33]

**The Governor's Testimony**

In his testimony, the Governor denied inappropriately touching Executive Assistant #1, Trooper #1, State Entity Employee #1, or Ms. Limmiatis in the way they described, and he generally denied touching anyone inappropriately.  The Governor did state that he often hugs and kisses people, mostly on the cheek and sometimes on the forehead.  While he admitted that he "may"[34] have kissed certain staff members on the lips, without remembering who (at least one other staff member admitted in testimony that the Governor had in fact kissed her on the lips),[35] the Governor testified that he had not kissed Executive Assistant #1 or Ms. Boylan.[36]  With respect to Executive Assistant #1, the Governor testified that he did regularly hug her, but claimed that it was Executive Assistant #1 who was the "initiator of the hugs," while he was "more in the reciprocal business."[37]  He testified that he "would go along" with tight hugs that Executive Assistant #1 initiated because he did not "want to make any one feel awkward about anything."[38]

With respect to his conversations with Ms. Bennett, the Governor testified that he had "tread[ed] very lightly, because with a victim of sexual assault—and she was clearly fragile and in a delicate place—[he] was very careful" in his conversations with her.[39]  He denied saying he would be willing to date "anyone over 22,"[40] saying anything related to age differences in relationships, stating that he was "lonely" and wanted to be "touched,"[41] talking about "monogamy,"[42] discussing a potential tattoo on the butt,[43] or discussing riding into the mountains in his motorcycle with a woman.  He variously described those conversations as not having happened or having been misinterpreted by Ms. Bennett.  The Governor asserted in his testimony that Ms. Bennett, because of her experience as a sexual assault survivor, "processed what she

---

[33] Interviews of other women who have worked in the Executive Chamber revealed that a number of them had interactions with the Governor that they considered to be inappropriate or that made them uncomfortable.  As those women did not wish to come forward publicly and did not experience the pattern that some of the employees described above endured, we have not specifically summarized each of these women's experiences and instead have included representative conduct in the factual findings below.

[34] Andrew Cuomo Tr. 218:19–222:3.

[35] Annabel Walsh, a former staff member, testified that she recalled having kissed the Governor on the lips on occasion and that she did not find the kisses uncomfortable.  Walsh Tr. 103:21–105:25.

[36] Andrew Cuomo Tr. 222:4–223:15.

[37] *Id.* at 381:7–382:10.

[38] *Id.* at 383:17–19.

[39] *Id.* at 271:13–17.

[40] *Id.* at 297:8–15.

[41] *Id.* at 303:4–304:24.

[42] *Id.* at 308:16–22.

[43] *Id.* at 314:3–315:24.

heard through her own filter," and that "it was often not what was said and not what was meant."[44]

The Governor did not dispute that he sometimes commented on staff members' appearance and attire (although generally only to compliment), and stated that, being "old fashioned," he sometimes used terms of endearment such as "honey," "darling," or "sweetheart."[45]  He also did not dispute that he gave regular hugs and kisses on the cheek and forehead.  But he did dispute the way in which those actions had been interpreted by the complainants.  Moreover, in his testimony, the Governor suggested that the complainants were—and must be—motivated by politics, animosity, or some other reason.  He also expressed his view that this investigation itself—and the investigators conducting the investigation—were politically motivated, an assertion that we saw in the documentary evidence and other witnesses' testimony was part of the planned response to the investigation almost as soon as it commenced.

Where the Governor made specific denials of conduct that the complainants recalled clearly, as discussed in greater detail below in the factual findings, we found his denials to lack credibility and to be inconsistent with the weight of the evidence obtained during our investigation.  We also found the Governor's denials and explanations around specific allegations to be contrived.  For example, he testified that:  Executive Assistant #1 was the one who initiated the hugs, not him; Ms. Bennett was the one who raised the topic of potential girlfriends, not him; and he called Executive Assistant #1 and Ms. McGrath "mingle mamas," but he never talked to them about whether they cheated on their spouses.[46]  The Governor's blanket denials and lack of recollection as to specific incidents stood in stark contrast to the strength, specificity, and corroboration of the complainants' recollections, as well as the reports of many other individuals who offered observations and experiences of the Governor's conduct.

**Impact of the Governor's Conduct on the Complainants**

As for the impact of the Governor's conduct on the complainants, each complainant found his conduct to be some combination of humiliating, uncomfortable, offensive, or inappropriate.  Executive Assistant #1 described her response to the Governor's intimate hugs as follows:  "I felt that he was definitely taking advantage of me.  The fact that he could tell I was nervous.  He could tell that I wasn't saying anything because he had gotten away with it before."[47]  Ms. Bennett summarized her reaction to one of the inappropriate conversations the Governor had with her as follows:  "I was scared and I was uncomfortable . . . .  But I was really . . . focused almost just on the question he was asking me, because . . . otherwise I would have been like really freaking out."[48]  In a text exchange with a close friend contemporaneously with one conversation with the Governor, Ms. Bennett texted, "Something just happened and I can't even type it out . . . GOING TO BURST INTO TEARS . . . .  Yes, [I'm] like shaking . . . I'm so

---

[44] *Id.* at 255:23–256:2.

[45] *Id.* at 242:22–243:3.

[46] *Id.* at 371:14–372:8, 373:24–374:9.

[47] Executive Assistant #1 Tr. 114:23–115:4.

[48] Bennett Tr. 173:24–174:16.

upset and so confused."[49]  For those who worked in State government, the Governor's conduct adversely impacted their work environment and the professional and personal fulfillment they each sought from their jobs.  As Trooper #1 put it, in describing her reaction to the Governor running his hand across her stomach, "I felt . . . completely violated because to me . . . that's between my chest and my privates."[50]  She continued, "But, you know, I'm here to do a job."[51]  As Ms. Boylan described her interactions with the Governor, "[I]t was deeply humiliating on some level.  . . . I was really senior and I had worked my whole life to get to a point where I would be taken seriously and I wasn't being taken seriously and I worked so hard to be some little doll for the Governor of New York, and that was deeply humiliating."[52]

**The Culture of the Executive Chamber That Contributed to the Harassment**

The complainants also described how the culture within the Executive Chamber—rife with fear and intimidation and accompanied by a consistent overlooking of inappropriate flirtations and other sexually suggestive and gender-based comments by the Governor—enabled the above-described instances of harassment to occur and created a hostile work environment overall.  As Ms. Bennett described the culture, "It was extremely toxic, extremely abusive.  If you got yelled at in front of everyone, it wasn't any special day . . . . It was controlled largely by his temper, and he was surrounded by people who enabled his behavior . . . ."[53]  As a result, when the Governor said inappropriate things, Ms. Bennett said, "I was uncomfortable, but I also was acutely aware that I did not want him to get mad."[54]  Executive Assistant #1 felt similarly: "I think that he definitely knew what he was doing and it was almost as if he would do these things and know that he could get away with it because of the fear that he knew we had."[55]  In describing the dichotomy between fear and flirtation, Ms. Boylan said, "That was his light—I would say that was his 'if he-liked-you' toxicity.  For most people, when you're around, you saw the 'if-he-hated you' toxicity."[56]

Ms. McGrath summarized the impact of the culture within the Executive Chamber as follows:

> [W]hat makes it so hard to describe every single inappropriate incident is the culture of the place.  On the one hand, he makes all this inappropriate and creepy behavior normal and like you should not complain.  On the other hand, you see people get punished and screamed at if you do anything where you disagree with him or his

---

[49] Ex. 7 (June 5, 2020 text exchange between Ms. Bennett and a friend regarding a conversation with the Governor) .

[50] Trooper #1 Tr. 92:7–12.

[51] *Id.* at 94:9–15.

[52] Boylan Tr. 91:12–23.

[53] Bennett Tr. 82:7–16.

[54] *Id.* at 173:24–174:4.

[55] Executive Assistant #1 Tr. 79:20–80:5.

[56] Boylan Tr. 80:7–10.

top aides.  I really just wanted to go to work and be recognized for
my work and nothing else.[57]

Even the State Troopers in the PSU developed an understanding that they could not upset the
Governor without severe consequences.  As Trooper #1 noted, she knew—as did many other
Troopers we interviewed—of "horror stories about people getting kicked off the detail or
transferred over like little things" that upset the Governor.[58]  As she put it, "Everyone knows he's
very vindictive."[59]

**The Executive Chamber's Improper and Retaliatory Response to Allegations of
Harassment**

        The evidence obtained in our investigation revealed that the complainants' fears of
retaliation were justified.  In response to Ms. Boylan's allegation of sexual harassment, first
made in a tweet on December 13, 2020, the Executive Chamber engaged in a series of responsive
actions that were intended to discredit and disparage Ms. Boylan.  Among other things, senior
staff within the Executive Chamber—along with a group of outside advisors—engaged in a
series of retaliatory actions, including:  (1) disseminating to the press previously confidential and
privileged files that related to complaints that had been made against Ms. Boylan prior to her
departure from the Executive Chamber; and (2) preparing a proposed op-ed, originally drafted by
the Governor, that contained personal and professional attacks on Ms. Boylan and then sharing
(both written drafts and the substance) with a number of current and former Executive Chamber
employees.  Those involved have justified these actions as necessary to respond to what they
viewed as misleading statements made by Ms. Boylan about the reasons for her departure, and an
appropriate response to what they believed were improper political and retaliatory motives for
her allegations.  However, the confidential internal documents were released to reporters only
after Ms. Boylan made allegations of sexual harassment against the Governor, and we do not
find credible the claim that they were released only to rebut other statements Ms. Boylan had
made days earlier about the manner in which she departed the Executive Chamber.[60]  As for the
draft letter attacking Ms. Boylan, although it was never actually published (in part because, as
the evidence revealed, many who reviewed it found that it constituted victim shaming that they
found inadvisable), its substance was shared with a significant number of current and former
Executive Chamber employees who were not otherwise aware of the information in it.[61]  As set

---

[57] Alyssa McGrath Tr. 199:17–200:2.

[58] Trooper #1 Tr. 93:24–94:3.

[59] *Id.* at 139:8–10.

[60] As discussed in greater detail below, those involved in the decision to disseminate the internal documents relating
to Ms. Boylan have stated that they consulted with certain counsel (including the Director of GOER) on that
decision, and the Executive Chamber has asserted privilege over the substance of certain of those communications.
However, we understand from the testimony of the Director of GOER that he was never shown the documents
themselves and simply provided generic disclosure advice.  Volforte Tr. 134:2–24.  None of the witnesses we
interviewed recalled any discussions or considerations of whether disclosing the files might constitute retaliation.

[61] Senior staff also pressured former employees to surreptitiously record telephone conversations with, respectively,
Ms. Boylan and Kaitlin (who had tweeted in support of Ms. Boylan), potentially in the hopes of obtaining additional
information to use against any women who might speak out.  As the recordings were not helpful to the Executive
Chamber (Melissa DeRosa, the Secretary to the Governor, admitted, "I did not think it went well," DeRosa Tr.

forth in greater detail below, we conclude that the responses to Ms. Boylan's public allegation of sexual harassment against the Governor constituted unlawful retaliation, in that it was conduct that would "dissuade a reasonable worker from making or supporting a charge of discrimination."[62]

Similarly, when Ms. Bennett reported interactions with the Governor that had made her so uncomfortable that she said she no longer wanted to interact with him, the Executive Chamber's senior staff did not report it to GOER—nor did they conduct any investigation, even though both the Governor's Chief of Staff at the time, Jill DesRosiers, and Special Counsel at the time, Judy Mogul, found Ms. Bennett to be credible.  Ms. DesRosiers and Ms. Mogul also found Ms. Bennett's June 2020 allegations—including that the Governor seemed to be "grooming" her,[63] asked her if she had been with an older man, asked about age differences in partners, asked her to find him a girlfriend, said that he would be fine with someone as young as 22, told her to get her tattoo on her butt where it could not be seen, said he was lonely and wanted to be touched, said he wanted to ride his motorcycle into the mountains with a woman, and called her Daisy Duke—to be sufficiently serious to implement an informal protocol to try to protect the Governor from being alone with young women on the Executive Chamber staff.  Nonetheless, they decided that no report to GOER or investigation was warranted.  They rationalized this decision by citing to Ms. Bennett's statement that she did not "want to make waves" and the view that she had "acted before anything happened."[64]  But the allegations involved sexually suggestive conversations, and any claim to not see that in the Governor's comments we find to be not credible.  In fact, Ms. Bennett plainly had felt so uncomfortable about it that she specifically reported it (despite all the attendant risks), and asked to be moved so that she would no longer have to interact with the Governor.  Such circumstances warranted a report to GOER and an investigation, and Ms. Bennett's desire not to make waves (driven, as she has testified and as shown by contemporaneous texts, by fear of the Governor and retaliation) is not determinative even under the Executive Chamber's own policies.  The New York State Employee Handbook (the "Employee Handbook") clearly states:

> An employee with supervisory responsibility has a duty to report any discrimination that they observe or otherwise know about.  A supervisor who has received a report of workplace discrimination has a duty to report it to GOER, or in accordance with the employing agency's policy, even if the individual who complained requests that it not be reported.[65]

---

620:23–25), senior staff testified that they destroyed the recordings.  The former employees who made the recordings produced copies of the recordings to us.

[62] *Hicks v. Baines*, 593 F.3d 159, 169 (2d Cir. 2020).  The New York State Employee Handbook, which applied to the Executive Chamber, correctly recited the legal standard for retaliation in prohibiting "any action, more than trivial, that would have the effect of dissuading a reasonable person from making or supporting an allegation of discrimination."  Ex. 8 at 39 (New York State Employee Handbook (May 2020)).

[63] Ex. 2 (handwritten notes from Ms. Mogul from conversation with Ms. Bennett, noting "blatant example of grooming").

[64] Ex. 2.

[65] Ex. 8 at 41–42 (Employee Handbook).

As discussed below, we find that the Executive Chamber failed to comply with its own internal policies in the way it handled Ms. Bennett's complaint.

**Assessments of the Governor's Conduct by Those Familiar with the Executive Chamber**

Although certain current and former members of the Executive Chamber did not take issue with the Chamber's culture and expressed surprise at the harassment allegations that have emerged publicly, many recognized a particularly "toxic" and "emotionally abusive" environment within the Executive Chamber under Governor Cuomo's administration. In fact, in discussions among themselves after certain of the sexual harassment allegations had become public, a number of current and former senior staff members recognized the impact that the culture had in enabling the alleged harassment. One former senior staff member expressed to us the shock and dismay she felt at the "abuse" individuals in the Executive Chamber endured, as well as deep discomfort with the example of leadership that was being set by the Governor's inner circle of advisors.

In a text exchange between another former senior staff member and a current senior staff member of the administration after Ms. Bennett's allegations became public, a former staff member noted, "What's crazy is if you or I did what is alleged we'd be fired on the spot no questions asked . . . and it would be the right thing too," to which the current staff member answered, "that's the damn truth."[66] The two continued the next day, after discussing Ms. Boylan's allegations: "The admin knows its true!!" / "Yes they are already at true equals resign. Our side have lost their way."[67] And on February 28, 2021, after the Governor's response to Ms. Bennett's allegations saying that he was "trying to be a mentor to her," the former senior staff member wrote: "I believe her 100% . . . [a]nd his stmt was gross. Trying to mentor . . . [y]ou creep."[68] That same former senior staff member noted on March 2, 2021, "Hopefully when this is all done people will realize the culture—even outside the sexual harassment stuff—is not something you can get away with . . . you can't berate and terrify people 24/7."[69] On March 8, 2021, another senior staff member wrote to herself the following:

> I'm disgusted that Andrew Cuomo—a man who understands subtle power dynamics and power plays better than almost anyone in the planet—is giving this loopy excuse of not knowing he made women feel uncomfortable. Either he knew exactly what he was doing (likely) or he is so narcissistic that he thought all women wanted these kinds of questions (crazy excuse even to write it). . . . There are several orders of victims in this issue: first and foremost the women who experienced these things with him. Second though, and unrecognized are the staff. We are almost uniformly good people who killed ourselves . . . to accomplish his agenda—for his political

---

[66] Ex. 9.

[67] Ex. 10.

[68] Ex. 11.

[69] Ex. 12; *see also* Ex. 13.

glory, and for the feeling that he would make decisions with public service as his driving goal.  I feel cheated out of that.[70]

*       *       *

During the course of our investigation, we interviewed dozens of individuals, who were comprised of complainants, current and former members of the Executive Chamber, State Troopers, other State employees, and others who interacted regularly with the Governor.  We have reviewed thousands of documents, including emails, texts, and pictures.  We also took sworn testimony from the complainants, as well as the Governor, his senior staff and other key advisers, and other potentially relevant witnesses.

Based on the investigation, and as set forth in greater detail below, we reach the conclusion that the Governor sexually harassed a number of State employees through unwelcome and unwanted touching, as well as by making numerous offensive and sexually suggestive comments.  We also conclude that such behavior by the Governor was part of a pattern that extended to his interactions with women outside of State government, and was enabled and facilitated by a culture within the Executive Chamber of secrecy, loyalty to the Governor, and fear, as well as the normalization of inappropriate comments and interactions by the Governor. Finally, we conclude that the Executive Chamber's response to a number of the sexual harassment allegations violated its internal policies and that its response to one complainant's sexual harassment allegation constituted unlawful retaliation.

---

[70] Ex. 14 (redacted diary entry of senior staff member).

## BACKGROUND OF THE INVESTIGATION

On March 1, 2021, the Office of the Governor of the State of New York (the "Executive Chamber") made a referral pursuant to N.Y. Executive Law section 63(8) ("Section 63(8)") for the New York State Attorney General ("NYAG"), Letitia James, to select independent lawyers to investigate "allegations of and circumstances surrounding sexual harassment claims made against the Governor" (the "Referral").[71]

In this section, we set forth the legal authority under Section 63(8) for this investigation, as well as the steps we[72] took to conduct a full, fair, and independent investigation.

## I.   Legal Authority Under N.Y. Executive Law § 63(8)

Section 63(8) permits the NYAG, with the approval of the Governor and when directed by the Governor, to "inquire into matters concerning the public peace, public safety and public justice."[73]  Section 63(8) grants the NYAG, and any deputy or officer so designated by the NYAG, a broad scope of investigative powers.  For example, a deputy or other officer designated by the NYAG may subpoena witnesses, compel their attendance, examine them under oath, and require any relevant books, records, or other materials to be turned over, if (1) the Governor empowered the NYAG to inquire into a matter of "public peace, public safety and public justice," as interpreted in the usual and ordinary sense of those phrases,[74] and (2) there is a "reasonable relation" between the subpoena and "the proper discharge of the executive function" by the Governor.[75]

## II.   Summary of the Investigative Procedure

The NYAG appointed the investigative team on March 8, 2021, pursuant to the Referral. The NYAG deputized Joon H. Kim, Jennifer Kennedy Park, Abena Mainoo, and Rahul Mukhi of Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") and Anne L. Clark and Yannick Grant of Vladeck, Raskin & Clark, P.C. ("Vladeck") as Special Deputies to the First Deputy Attorney General to conduct the investigation.  A number of other attorneys from Cleary

---

[71] Ex. 15 (March 1, 2021 referral letter).

[72] For the avoidance of doubt, "we" and "us," as used throughout this Report (unless otherwise specified) refers to the Special Deputies and Special Assistants to the First Deputy Attorney General, as appointed for the purposes of this Section 63(8) investigation by the NYAG.

[73] N.Y. Exec. Law § 63(8).

[74] *Matter of Di Brizzi (Proskauer)*, 303 N.Y. 206, 214 (1951).

[75] *See Matter of Sigety v. Hyne*s, 38 N.Y.2d 260, 266 (1975).  Investigations under Section 63(8) have included investigations into New York's nursing home industry, *see Sigety*, 38 N.Y.2d at 263, New York's industry for private proprietary homes for adults, *see Matter of Friedman v. Hi-Li Manor Home for Adults*, 42 N.Y.2d 408, 415–16 (1977) (finding the Deputy Attorney-General had authority to issue subpoenas for the investigation and the subpoena was not overbroad), and "the relationship between organized crime and any unit of Government anywhere in the state," *Di Brizzi*, 303 N.Y. at 221.

Gottlieb and Vladeck were appointed as Special Assistants to the First Deputy Attorney General to assist with the investigation.[76]

Over the course of our investigation, we issued over 70 subpoenas for documents and other information, and received over 74,000 documents.

We also interviewed 179 individuals and took testimony under oath from 41 of them.[77] These individuals included women who have made allegations of sexual harassment or other inappropriate conduct against the Governor, current and former members of the Executive Chamber, current and former members of the New York State Police (including PSU), Governor Cuomo, and other individuals who we believed could have relevant information.

We received communications from the general public through a tip line consisting of an email address, voice mailbox, and text message line created for the investigation.[78]  In total, we received approximately 280 potential tips from members of the public.  We reviewed and tracked each potentially relevant communication and took appropriate action, including following up on individuals who had provided potentially relevant information.[79]

On March 9, 2021, in conjunction with our fact-finding work, we provided notice to the Executive Chamber of its obligation to preserve all documents potentially relevant to the investigation.[80]

We also made efforts to protect the confidential and sensitive nature of our investigation and its independence during the investigation.  Cleary Gottlieb and Vladeck established internal information barriers and other policies to limit access to substantive information regarding the investigation to members of the investigative team and necessary staff.  Further, while Section 63(8) required us to periodically report to the Office of the NYAG,[81] and we consulted on issues relating to the Office's practices and procedures, we made all substantive decisions regarding how to conduct the investigation, as well as all decisions regarding the analysis and conclusions reached in this Report, independently.

---

[76] Special Assistants to the First Deputy Attorney General who assisted in the investigation included Andrew Weaver, Avion Tai, Soo Jee Lee, Lorena Michelen, Ye Eun (Charlotte) Chun, Hyatt Mustefa, Lilianna Rembar (law clerk), and Nikkisha Z. Scott from Cleary Gottlieb and Ezra Cukor and Emily Miller from Vladeck.

[77] For certain individuals, we both conducted an interview and took the testimony of the individual.

[78] AG Independent Investigation, https://www.agindependentinvestigation.com/ (last accessed July 22, 2021).

[79] Much of the information provided to us by members of the public was outside the scope of our investigation, and some of the information was referred as appropriate to the Office of the NYAG for further consideration.

[80] Prior to that, the NYAG had also sent a preservation notice on March 1, 2021.

[81] *See* N.Y. Exec. Law § 63(8) ("Each deputy or other officer appointed or designated to conduct such inquiry shall make a weekly report in detail to the attorney-general . . . .").

## FACTUAL FINDINGS

As noted above, we interviewed, and reviewed the records related to, individuals who have made allegations, publicly or otherwise, of sex-based harassment or other related misconduct by Governor Cuomo, as well as potential witnesses to such allegations, including Governor Cuomo.

### I.   Findings Related to Allegations of Governor Cuomo's Misconduct

A number of individuals have made allegations of improper conduct by Governor Cuomo, as detailed below.  These individuals include several current or former members of the Executive Chamber, employees of other State agencies and State-affiliated entities, and members of the public.  We summarize below our factual findings with respect to the complainants' allegations.

### A.   Former and Current State Employees

### i.   Executive Assistant #1

Executive Assistant #1 works in the Executive Chamber and has provided administrative assistance to various members of the Executive Chamber.[82]  Executive Assistant #1's responsibilities have included, among other things, assisting the Governor in managing incoming and outgoing telephone calls, taking dictation, drafting and editing documents, and performing other similar administrative tasks, including at the Executive Mansion on the weekend.[83]

**Interactions with the Governor**

Over the course of Executive Assistant #1's employment in the Executive Chamber, the Governor engaged in conduct that demonstrated an increasing familiarity and intimacy with Executive Assistant #1.  The Governor's behavior ranged from playful banter about Executive Assistant #1's potential romantic relationships to looking through Executive Assistant #1's social media posts and asking about the marital status and social and dating lives of Executive Assistant #1 and her friend, Alyssa McGrath, who also served as an executive assistant in the Executive Chamber.[84]

As described in greater detail below, over time, the Governor's behavior toward Executive Assistant #1 escalated to more intimate physical contact, including regular hugs and kisses on the cheek (and at least one kiss on the lips), culminating in incidents where the Governor grabbed Executive Assistant #1's butt while they took a selfie in the Executive Mansion, and where the Governor, during a hug, reached under Executive Assistant #1's blouse and grabbed her breast.

---

[82] Executive Assistant #1 Tr. 14:3–6, 19:9–25.

[83] *Id.* at 21:6–22:25, 102:21–103:5.

[84] In her testimony, Ms. McGrath corroborated much of Executive Assistant #1's sworn testimony.  Ms. McGrath's own allegations regarding Governor Cuomo are detailed later in the Report.

*Development of Relationship and Suggestive Comments.*  When Executive Assistant #1 first began to work in the Executive Chamber, one of the Governor's long-term executive assistants commented to her, after looking Executive Assistant #1 "up and down," that the Governor would "steal" Executive Assistant #1 from her assigned supervisor.[85]  Executive Assistant #1 interpreted this to mean that:  "I was a young female, how she looked at me she must have thought I was attractive and the Governor was going to see me and think that I was attractive and want to pull me in to do work for him."[86]  The first day Executive Assistant #1 met the Governor (and after Executive Assistant #1 had introduced herself to the Governor earlier), he walked by her desk on his way out of the office, turned around, and looked Executive Assistant #1 up and down before saying, "Nice to meet [you]."[87]  Executive Assistant #1 testified that she felt that the Governor would look her up and down on a regular basis.[88]

While Executive Assistant #1 had been formally assigned to assist other members of the Executive Chamber during her time as an executive assistant, she also began to assist the Governor more directly and at the Executive Mansion starting in or around November 2019.[89]

Executive Assistant #1 testified that the Governor commented on Executive Assistant #1's appearance and clothing, including telling her she "looked good for [her] age and [for] being a mother" (she is in her early 30s), "it's about time that you showed some leg" when she wore a dress, and "I don't like your hair like that" when she wore her hair up.[90]  During his testimony, the Governor denied making such comments and that he would "never say" such comments.[91]  The Governor in turn testified that he found Executive Assistant #1 to be "very chatty," "affectionate," "friendly," "flirtatious," and "outgoing."[92]

On one occasion, when Executive Assistant #1 was working at the Executive Mansion on a weekend, she commented that it was warm in the room.[93]  The Governor suggested in response that Executive Assistant #1 take off her zip-up hoodie, which she had been wearing on top of a light tank top.[94]  When Executive Assistant #1 replied that she could not take off her hoodie because it would be inappropriate, the Governor again asked that she take off the hoodie.[95]  A

---

[85] Executive Assistant #1 Tr. 99:5–17.  The long-term executive assistant did not specifically recall making such a comment, but stated that if she had, it would have been based on Executive Assistant #1's competence.

[86] *Id.* at 99:18–25.

[87] *Id.* at 100:19–101:21.

[88] *Id.* at 77:16–23.

[89] *Id.* at 21:6–22:25, 76:23–24.

[90] *Id.* at 74:14–76:15.

[91] Andrew Cuomo Tr. 375:16–377:10.

[92] *Id.* at 364:4–14.

[93] Executive Assistant #1 Tr. 76:23–77:12.

[94] *Id.*

[95] *Id.*

colleague of Executive Assistant #1 was present and corroborated the incident.  Governor Cuomo denied any recollection of this interaction.[96]

The Governor also regularly engaged in banter and friendly conversation with Executive Assistant #1 regarding her marital status, personal life, and relationships.  On one occasion, while Executive Assistant #1 was assisting him in his office in the Executive Mansion, the Governor asked Executive Assistant #1 whether she had ever had a boyfriend while married.[97] Executive Assistant #1 replied that she had not.[98]  The Governor then asked whether Executive Assistant #1 had kissed or "fooled around" with anyone other than her husband.[99]  Executive Assistant #1 continued to answer in the negative until the Governor moved on to another topic.[100] In or around November 2020, while the two were in his office at the Capitol, the Governor again asked Executive Assistant #1, "[H]ave you ever had sex with anyone other than your husband?"[101]  Executive Assistant #1 responded she had not.[102]  On occasions when Executive Assistant #1 was working on a weekend for the Governor, he would also say things like, "I hope your husband isn't mad that you're here today," or ask Executive Assistant #1 about the status of her marriage.[103]

The Governor's comments became increasingly suggestive, including one in or around late 2019 or early 2020, when the Governor said to Executive Assistant #1 something to the effect of, "If you were single, the things I would do to you."[104]  Later, in or around January or February 2020, he asked Executive Assistant #1 about the status of Ms. McGrath's divorce proceedings.[105]  Executive Assistant #1 responded that she was trying to keep Ms. McGrath preoccupied, and showed the Governor a photograph of her and Ms. McGrath on Executive Assistant #1's Instagram account "going out" in Saratoga Springs.[106]  In response, the Governor commented that he wished he could also "go out" and socialize with the two women, but that it would be difficult for him to do as a public figure.[107]  In his testimony, the Governor denied making this statement and said he may have instead said he would love to go to Saratoga Springs because it is beautiful.[108]

---

[96] Andrew Cuomo Tr. 378:9–379:8.

[97] Executive Assistant #1 Tr. 89:6–20.

[98] *Id.*

[99] *Id.* at 89:21–25.

[100] *Id.* at 89:25–90:7.

[101] *Id.* at 90:8–19.

[102] *Id.*

[103] *Id.* at 87:19–88:7.

[104] *Id.* at 88:2–18.

[105] *Id.* at 84:12–85:19.

[106] *Id.*

[107] *Id.*  Ms. McGrath confirmed she had heard about this exchange from Executive Assistant #1.  Alyssa McGrath Tr. 105:18–106:11.

[108] Andrew Cuomo Tr. 396:10–21.

In early 2020, Executive Assistant #1 and Ms. McGrath were assisting the Governor in preparing "State of the State" books when the Governor engaged the two women in a conversation about a trip to Florida that the two women planned to take together in April.[109]  The Governor asked Ms. McGrath, who was separated from her husband at the time, whether she planned to go and "mingle" with men during the Florida trip.[110]  The Governor then asked Ms. McGrath whether she would "tell on" Executive Assistant #1 if Executive Assistant #1 cheated on her husband while in Florida.[111]  The Governor proceeded to refer to both women as "mingle mamas" for the remainder of the day.[112]  A March 2, 2020, text message from Ms. McGrath to Executive Assistant #1 also references "mingle mama."[113]  The Governor admitted in his testimony that he had called Executive Assistant #1 and Ms. McGrath "mingle mamas," but testified that it was in response to Executive Assistant #1 and Ms. McGrath stating that they were "single and ready to mingle."[114]

On a handful of occasions after he had broken up with his long-term partner, the Governor told Executive Assistant #1 that he was single and lonely, and asked whether she knew anyone who could be his girlfriend, while commenting that he would have to date someone in her late 30s or early 40s due to concerns about how dating someone younger might look to the public.[115]  Executive Assistant #1 told him that she was sorry to hear that he was lonely, and "just [sat] there and listen[ed]."[116]  The Governor denied having had this conversation,[117] although a number of people have informed us that the Governor talked to them about finding a girlfriend.[118]

With respect to these type of personal conversations, Governor Cuomo generally denied the most suggestive of the comments—such as wishing he could "go out" with Executive Assistant #1 and Ms. McGrath[119] or telling Executive Assistant #1 that it was "about time" she showed off her legs[120]—and testified that it was Executive Assistant #1 who volunteered information about her social and marital life, and that he participated only to go along with her

---

[109] Executive Assistant #1 Tr. 95:9–97:23.  Executive Assistant #1 recalled the interaction occurring sometime around January 2020, *id.* at 96:2–11, while Ms. McGrath recalled the interaction occurring in late February.  Alyssa McGrath Tr. 51:5–10.

[110] *Id.* at 50:22–52:3.

[111] Executive Assistant #1 Tr. 95:9–20; Alyssa McGrath Tr. 51:21–52:3.  Ms. McGrath responded jokingly with something like, "What happens in Florida stays in Florida."  *Id.* at 51:21–52:3.

[112] *Id.* at 52:1–3.

[113] Ex. 16 ("What did he write lol mingle mama [emoji]").

[114] Andrew Cuomo Tr. 371:14–372:8.

[115] Executive Assistant #1 Tr. 85:22–87:4.  As noted earlier, Executive Assistant #1 is in her early thirties.  *See id.* at 76:12–15.

[116] *Id.* at 87:5–10.

[117] Andrew Cuomo Tr. 374:10–375:15.

[118] *See, e.g.*, Bennett Tr. 167:24–168:25; Cohen Tr. 150:4–151:19; Trooper #1 Tr. 103:11–19.

[119] Andrew Cuomo Tr. 396:13–21.

[120] *Id.* at 377:4–10.

conversations.[121]  Executive Assistant #1 denied that this was the case, and specifically noted that she only spoke about her romantic relationships when the Governor asked, rather than volunteering such information. As noted elsewhere in the report, Ms. McGrath corroborated Executive Assistant #1's recounting of these types of conversations generally, as do many others who have told us about questions from the Governor about personal lives and relationship statuses—and the specific conversations in which Ms. McGrath and Executive Assistant #1 were both participants or about which Executive Assistant #1 informed Ms. McGrath soon after the conversation.

*Physical Contact by Governor Cuomo.*  Executive Assistant #1 testified that the Governor touched her on several occasions.  Some of the touching occurred as part of general interactions involving hugs, greetings, and taking photographs (although often more aggressive than commonplace physical contact), while other incidents involved intentional touching and grabbing of private parts, including the butt and the breast.

At the annual Executive Chamber employee holiday party in 2018, for example, the Governor approached Ms. McGrath and Executive Assistant #1 and suggested that the three of them take a photograph.[122]  The Governor took a similar photograph with the two women at the annual holiday party in 2019 as well.[123]  At the 2019 holiday party, before taking the photograph, the Governor kissed Ms. McGrath on the forehead and kissed Executive Assistant #1 on the cheek, then posed for a photograph with his hands firmly around both women's ribcages, just below their breasts.[124]

In or around the end of 2019, on the first day Executive Assistant #1 was working at the Executive Mansion alone with the Governor, Governor Cuomo gave Executive Assistant #1 a private tour of the Mansion.[125]  As the Governor and Executive Assistant #1 were looking at photographs during the tour at one point, Governor Cuomo "almost pushed his hand along [Executive Assistant #1's] butt," but in a way that was not clear whether he had intended to do so.[126]

---

[121] *See, e.g., id.* at 394:13–396:9.

[122] Alyssa McGrath Tr. 91:14–92:17; Ex. 17 (photograph of Executive Assistant #1 and Ms. McGrath with the Governor at 2018 holiday party); Ex. 18 (same); Ex. 19 (same).  Ms. McGrath testified that she was surprised that the Governor had approached them, as there were many people at the party.  Alyssa McGrath Tr. 94:3–9.  Executive Assistant #1 was not assisting the Governor on a regular basis at the time of the photograph.  Executive Assistant #1 Tr. 155:13–157:5.

[123] Executive Assistant #1 Tr. 157:11–160:24.  An Executive Chamber staff member noted that she believed Executive Assistant #1 and Ms. McGrath had wanted a picture with the Governor at the party and were proud of the ones that were taken.

[124] Ex. 20 (photograph of Executive Assistant #1 and Ms. McGrath with the Governor at 2019 holiday party); Ex. 21 (same); Ex. 22 (photograph of Ms. McGrath and the Governor at 2019 holiday party); Ex. 23 (photograph of Executive Assistant #1 and Ms. McGrath with the Governor at 2019 holiday party).

[125] Executive Assistant #1 Tr. 93:11–95:3.  Executive Assistant #1 recalled that, during this tour, Governor Cuomo noted a photograph in the living room of an attractive woman wearing a tight red dress and said something like, "I remember her, she was a real . . . firecracker."  *Id.* at 93:23–14.

[126] *Id.* at 94:15–95:3.

As Executive Assistant #1 continued to provide assistance to the Governor at the Executive Mansion throughout 2020, the Governor began to request a hug from Executive Assistant #1 "almost every time" before she left the Mansion.[127]  Over time, the hugs felt "closer and tighter," to the point where:

> I knew I could feel him pushing my body against his and definitely making sure that he could feel my breasts up against his body.  And was doing it in a way that I felt was obviously uncomfortable for me and he was maybe trying to get some sort of personal satisfaction from it.[128]

Executive Assistant #1 could feel the Governor's hands running up and down her back during these hugs as well.[129]

During these close hugs, Executive Assistant #1 tried to lean her lower back away from the Governor's pelvic area, because she "didn't want any part of [her] body near his pelvic area" and "didn't want anything to do with whatever he was trying to do at that moment."[130]  And, when the Governor hugged her, he sometimes also kissed her.[131]  Most of the kisses were on her cheek—but, on at least one occasion in early 2020, the Governor quickly turned his head and kissed her on the lips.[132]  On another occasion, during another hug, the Governor began to rub his hands on Executive Assistant #1's lower back and said something like, "Does that feel good?"[133]  Executive Assistant #1 recalled freezing in place and not knowing what to say in response.[134]

Governor Cuomo denied any recollection of kissing Executive Assistant #1 on the lips.[135]  He testified, "I feel confident saying I've never kissed [Executive Assistant #1] on the lips," on the basis that he said he had had very limited interactions with her overall.[136]  Although the Governor testified that he did regularly hug Executive Assistant #1, he described her as "an affectionate person" and "a hugger" who was the "initiator of the hugs," while he was "more in

---

[127] *Id.* at 108:3–23.

[128] *Id.* at 111:9–15.

[129] *Id.* at 113:7–15.

[130] *Id.* at 112:11–113:6.  The close and intimate hugs are something that other individuals have told us the Governor has done.  Karen Hinton, an associate of the Governor from the time that the Governor was Secretary of Housing and Urban Development, has spoken publicly and told us about an incident in December 2000 when the Governor embraced her in a hotel room in a way that felt overly close and intimate.

[131] *Id.* at 108:18–23.

[132] *Id.* at 108:18–110:15.

[133] *Id.* at 114:7–20.  Governor Cuomo denied any recollection of saying this.  Andrew Cuomo Tr. 386:8–11.

[134] Executive Assistant #1 Tr. 114:7–20.

[135] Andrew Cuomo Tr. 384:25–385:12.

[136] *Id.* at 222:4–24, 224:22–25.

the reciprocal business."[137]  He testified that he "would go along" with tight hugs that Executive Assistant #1 initiated because he did not "want to make anyone feel awkward about anything."[138]

Executive Assistant #1 testified that although she noticed that the Governor did not hug or kiss her while they were around other people or in the Capitol, she initially tried to justify his behavior as merely being friendly.[139]  She also stated that she was generally a friendly and outgoing person, and interacted that way with the Governor as well.[140]  When the Governor kissed her on the lips or hugged her closely and aggressively, however, Executive Assistant #1 found that unwelcome and would try to pull away in the manner described above.[141]  Executive Assistant #1 testified that she did not act more forcefully in response because she believed if she said anything in response to the Governor's unwanted advances—or even slapped him—she would be escorted out by the State Police and likely fired from her job.[142]  The inappropriate interactions with the Governor left Executive Assistant #1 so nervous that she sometimes left with hives on her neck, a symptom she usually experiences when stressed or nervous.[143]  The Governor also recalled seeing Executive Assistant #1 with "blotches" on her neck, which he believed was caused by her nervousness at taking dictation from him.[144]  Executive Assistant #1 further testified that she felt the Governor understood that she was uncomfortable:  "I felt that [the Governor] was definitely taking advantage of me.  He was taking advantage.  The fact that he could tell that I was nervous.  He could tell that I wasn't saying anything because he had gotten away with it before."[145]

On December 31, 2019, Executive Assistant #1 was assisting the Governor in his office at the Executive Mansion when the Governor asked her to take a "selfie" photograph with him.[146]  Governor Cuomo stood next to Executive Assistant #1, on her left, as she took a selfie with her right hand.[147]  As Executive Assistant #1 held up the camera, the Governor moved his hand to grab her butt cheek and began to rub it.[148]  The rubbing lasted at least five seconds.[149]

---

[137] *Id.* at 381:5–384:13.  Governor Cuomo also testified that Executive Assistant #1 had told him that "she was Italian and Italians are very affectionate people."  *Id.* at 381:7–11.

[138] *Id.* at 381:23–383:19.

[139] Executive Assistant #1 Tr. 109:17–110:7.

[140] *Id.* at 165:19–23 ("I also thought that is one of [the] reasons why the Governor would like me working for him.  Because I wasn't so stoic and stiff.  That I would laugh.  I would joke back.").

[141] *Id.* at 110:16–113:6.

[142] *Id.*

[143] *Id.* at 115:12.  Executive Assistant #1 testified that, on one of these occasions, she ran into a member of the Executive Mansion's staff after leaving the Governor's office while feeling wide-eyed and while her hives were still present.  *Id.* at 115:13–116:9.  Executive Assistant #1 recalled that the staff member asked whether she was okay. *Id.*  We were not able to corroborate this interaction from interviews of Executive Mansion staff.

[144] Andrew Cuomo Tr. 400:14–402:3.

[145] Executive Assistant #1 Tr. 114:23–115:4.

[146] *Id.* at 119:4–120:18.

[147] *Id.* at 120:24–121:15.

[148] *Id.* at 119:4–120:18, 121:17–122:14.

[149] *Id.* at 121:16–122:14.

Executive Assistant #1 was shaking so much during this interaction that her initial selfies with the Governor were very blurry.[150]  At the Governor's suggestion, the two of them then sat down and took one more selfie, with the Governor's hands around Executive Assistant #1's waist.[151] The Governor then told Executive Assistant #1 to send the photograph to Ms. McGrath, and directed Executive Assistant #1 not to share the photograph with anyone else.[152]

Immediately following this interaction, Executive Assistant #1 left the Executive Mansion and called Ms. McGrath.[153]  Executive Assistant #1 testified that she was uncomfortable and "wanted to tell [Ms. McGrath] so bad what happened," but felt that she could not and was afraid to say anything specific.[154]  Instead, Executive Assistant #1 told Ms. McGrath that the Governor "was wild today," and said that the Governor had asked her to not share the photograph other than with Ms. McGrath.[155]

Executive Assistant #1 testified that she was terrified she would lose her job if she shared what had happened and it reached the ears of the Governor's senior staff.[156]  She stated:

> [T]he way he was so firm with [me] that I couldn't show anyone else
> that photo, I was just terrified that if I shared what was going on that
> it would somehow get around.  And if Stephanie Benton or Melissa
> [DeRosa] heard that, I was going to lose my job.  Because I knew
> that I certainly was going to be the one to go.[157]

Ms. McGrath, who received the photograph from Executive Assistant #1, confirmed in her testimony and through contemporaneous text messages that she received the photograph and was informed by Executive Assistant #1 that she was not to share the photograph with anyone else.[158] The Governor testified that he recalled taking a selfie with Executive Assistant #1, but said that

---

[150] *Id.* at 119:4–120:18, 121:11–122:14.  Executive Assistant #1 testified that she deleted the blurry photographs immediately because, when the Governor asked to see the photographs, she was embarrassed by how blurry they were and did not want him to see how nervous she was.  *Id.* at 123:3–10.  She cooperated with our efforts to attempt to recover the deleted photographs, but we were ultimately unable to retrieve them.

[151] *Id.* at 119:4–120:18, 122:18–123:2.

[152] *Id.* at 120:3–18.  We obtained a copy of the selfie taken while Governor Cuomo and Executive Assistant #1 were sitting.  Ex. 24.  We also received the text exchange after the photo was sent.  Ex. 25 (Ms. McGrath responding with, "Um where is my pic!! / I'm officially jealous!!!! / I need to be photoshopped in to the right of him [emoji]" / "Love this so much").  Executive Assistant #1 testified that she did not know why the Governor wanted her to send the photograph to Ms. McGrath, but guessed that the Governor "wanted to make [Ms. McGrath] jealous" or "wanted to see what her reaction was."  Executive Assistant #1 Tr. 123:20–124:4.

[153] Executive Assistant #1 Tr. 127:2–128:18.

[154] *Id.* at 127:2–128:18.

[155] *Id.*  Ms. McGrath recalled that Executive Assistant #1 said during the conversation that she was "extremely uncomfortable, extremely nervous," and shaking, and that she had needed to take multiple pictures because they were blurry.  Alyssa McGrath Tr. 128:2–20.

[156] Executive Assistant #1 Tr. 128:8–18.

[157] *Id.*

[158] Alyssa McGrath Tr. 130:8–17.  A text message from Executive Assistant #1 to Ms. McGrath on January 4, 2020, stating, "He brought up the selfie and definitely only supposed to stay between you and me" is attached as Ex. 26.

the selfie had been at her request, as he testified he does not like to take selfies.[159]  The Governor also testified that Executive Assistant #1 was the one who had wanted to send the photograph to Ms. McGrath to make her jealous.[160]  Notably, however, we learned during our interviews that Governor Cuomo had asked two other women in the Executive Chamber, on separate occasions, to take a selfie with him and then instructed each woman to send the selfie to a different woman in the Executive Chamber.  The Governor denied that his hand had been on Executive Assistant #1's butt during the selfie, and that he had asked Executive Assistant #1 to not share the selfie with anyone, contrary to the testimony of Executive Assistant #1 and contemporaneous text messages between her and Ms. McGrath.[161]

In late 2020, the Governor asked Executive Assistant #1 to compare heights with him and had her put her back against his front, rested his head on Executive Assistant #1's head, and commented to everyone in the room that he was a head taller than Executive Assistant #1.[162]  Executive Assistant #1 testified that she felt uncomfortable during the interaction, in part because the Governor's stomach was on her back and she did not "want any part of his pelvic area to be near me."[163]  The Governor denied this interaction ever occurred.[164]

On November 16, 2020, Stephanie Benton, the Director of the Governor's Offices, asked Executive Assistant #1 to assist the Governor at the Executive Mansion.[165]  The Blackberry PIN messages[166] that the PSU uses to announce visitors to the Executive Mansion confirm that Executive Assistant #1 was called to the Executive Mansion and arrived there on November 16.[167]  As Executive Assistant #1 finished her assignment and prepared to leave the Governor's personal office, on the second floor in the Mansion, and return to the Capitol, the Governor pulled Executive Assistant #1 in for a close hug.[168]

Executive Assistant #1 was conscious that the door to the Governor's office (facing out into the hallway on the second floor) was open at the time.[169]  Executive Assistant #1 stepped

---

[159] Andrew Cuomo Tr. 390:6–392:22.

[160] *Id.* at 390:6–13, 392:23–393:8.

[161] *Id.* at 392:10–18, 393:22–394:2.

[162] Executive Assistant #1 Tr. 82:15–84:11.

[163] *Id.*

[164] Andrew Cuomo Tr. 378:4–8.

[165] Executive Assistant #1 Tr. 139:13–140:12.  Executive Assistant #1 did not remember the exact date of the incident, but recalled that it was around when she was tasked with photographing a document, and provided a copy of the photograph to us that was dated November 16, 2020.

[166] BlackBerry PIN messages are messages that are sent from a Blackberry device to another Blackberry device using proprietary technology designed for Blackberry devices.  Moore Tr. 89:9–23.  While the Executive Chamber transitioned from Blackberry devices to iPhones in late 2019, Governor Cuomo and certain senior staff have retained their Blackberry devices.  *Id.* at 84:23–85:10, 87:6–24.

[167] *See* Ex. 27.

[168] Executive Assistant #1 Tr. 141:7–146:15.  The timing of specifically when the Governor closed the door relative to when he grabbed Executive Assistant #1's breast (whether it was immediately before or after grabbing the breast) is a factual point on which Executive Assistant #1's recollection has varied.  *Id.* at 152:3–14, 215:22–216:10.

[169] *Id.* at 142:16–143:5.

away from the Governor and said, "You're going to get us in trouble," to which the Governor replied, "I don't care," and slammed the door shut.[170]   Executive Assistant #1 testified that the Governor's demeanor at the time "wasn't like 'ha ha,' it was like, 'I don't care.'  . . .  It was like in this—at that moment he was sexually driven.  I could tell and the way he said it, I could tell."[171]

The Governor then returned to Executive Assistant #1 and slid his hand up her blouse, and grabbed her breast, "cupp[ing her] breast" over her bra.[172]   Executive Assistant #1 testified:

> I mean it was—he was like cupping my breast.  He cupped my breast.  I have to tell you it was—at the moment I was in such shock that I could just tell you that I just remember looking down seeing his hand, seeing the top of my bra and I remember it was like a little even the cup—the kind of bra that I had to the point I could tell you doesn't really fit me properly, it was a little loose, I just remember seeing exactly that.[173]

In response, Executive Assistant #1 pulled away from the Governor and said, "You're crazy."[174]   She testified:

> At that moment it was so quick and he didn't say anything and I just remember thinking to myself, oh my God, and I remember stopping and him not saying anything and I remember I walked out and he didn't say anything and I didn't say anything.
>
> I remember walking down the stairs, escorting myself out the front door, going back to my car, taking a deep breath and saying to myself, okay, everything that just happened I have to now pretend like it didn't just happen.  Go back to the Capitol and sit at my desk and continue with my afternoon.
>
> And I remember thinking to myself who—I knew what just went on, I knew and he knew too that was wrong.  And that I in no way, shape or form invited that nor did I ask for it.  I didn't want it.  I feel like I was being taken advantage of . . . .[175]

---

[170] *Id.* at 143:6–144:8.

[171] *Id.* at 144:10–13.

[172] *Id.* at 143:6–19, 149:11–150:5.

[173] *Id.* at 149:19–150:4.

[174] *Id.* at 143:18–144:13, 152:7–14.

[175] *Id.* at 145:5–146:11.

After taking some time in her car to collect herself, Executive Assistant #1 returned to work at the Capitol.[176]

Governor Cuomo denied having ever touched Executive Assistant #1's breasts.[177]  He testified: "To touch a woman's breast who I hardly know, in the Mansion, with ten staff around, with my family in the Mansion, to say 'I don't care who sees us.' . . . I would have to lose my mind to do such a thing."[178]  Executive Assistant #1's allegations are that the incident occurred in the smaller of the Governor's private offices on the second floor, which connects to his larger office and bedroom and away from the Mansion's first-floor common areas, and is separated from the second floor common area by doors;[179] nor was there any evidence that there were "ten" Mansion staff in the vicinity of his second-floor office that day.  Indeed, our understanding is that the total number of Mansion staff potentially on the premises at any given time would have included groundskeepers, chefs, and others who may not all be there at one time—nor would they be in the vicinity of his private second-floor office.

Executive Assistant #1 explained that she had not responded more forcefully or told anyone about the incident because she, among other things, feared losing her job.[180]  She testified:

> If I push him or if I try like—people say after the fact now that has been said in the paper, people that know that, why didn't you slap him.  I'm [not] going to assault the [G]overnor.  I would be taken away by the state police officers and I would be the one that would get in trouble and I would be the one to lose my job, not him. . . .
>
> I feel like I was being taken advantage of and at that moment that's when I thought to myself okay, I can't tell anyone.  Who am I going to tell[?]  My supervisor was Stephanie Benton, Stephanie Benton was the Governor's right-hand person and if I told her I was going to be asked to go somewhere else or transferred to [another] agency.
>
> And the sad part of this whole thing, I actually like my job.  I was proud to work, especially during this pandemic.  I generally enjoy working with my colleagues . . . that was an opportunity of a lifetime for me.[181]

---

[176] *Id.* at 144:14–145:17.

[177] Andrew Cuomo Tr. 398:16–19.

[178] *Id.* at 398:24–399:17.

[179] Executive Assistant #1 Tr. 142:24–143:5.  We have reviewed a floorplan of the Executive Mansion and confirmed visually, on a visit, that the private offices are in fact separated from the common areas by doors.

[180] *Id.* at 144:21–145:4, 145:18–146:15.

[181] Executive Assistant #1 Tr. 144:21–146:8.

The Governor, Ms. Benton, and Melissa DeRosa (Secretary to the Governor) also testified that Executive Assistant #1 told each of them that her job was her "dream job" and that she "get[s] up every morning loving to come to work."[182]

**Executive Assistant #1's Hesitation to Report Governor Cuomo's Conduct**

Executive Assistant #1 repeatedly testified that she felt she had to tolerate the Governor's physical advances and suggestive comments because she feared the repercussions if she did not.[183]  She did not feel she could tell anyone, including her colleagues and her direct supervisors.[184]  In addition, the Governor had specifically told her—with respect to the selfie they took together—that she was not to share it or tell anyone about it other than Ms. McGrath.[185]  Executive Assistant #1 testified that she needed the income (including the overtime pay received from working on weekends), particularly as she was going through a divorce and was focused on not risking losing her job.[186]

Executive Assistant #1's hesitance to report the Governor's conduct was also informed by her observation of the Executive Chamber's reactions to other women's allegations against the Governor.  In mid-to-late December 2020, Executive Assistant #1 personally witnessed what she felt were the Executive Chamber's efforts to discredit the allegations of Ms. Boylan against the Governor, including by repeatedly describing Ms. Boylan as "crazy" and by trying to get Ms. Boylan's personnel files to the press.[187]  Executive Assistant #1 recalled that Ms. DeRosa, Richard Azzopardi (the Senior Deputy Communications Director and Senior Advisor to the Governor at the time), and at times Linda Lacewell (the Superintendent of the Department of Financial Services) would be in Ms. DeRosa's office during that period.[188]  They described Ms. Boylan as crazy and having a political agenda, and talk about shutting down Ms. Boylan's allegations quickly.[189]  On or around December 13, 2020,[190] while Executive Assistant #1 was assisting the Governor at the Capitol, she observed that Mr. Azzopardi was asked to retrieve a box from Beth Garvey, Senior Counsel and Senior Advisor to the Governor at the time, which Executive Assistant #1 helped carry from the Counsel's Office to the Front Office in the

---

[182] Andrew Cuomo Tr. 369:11–16; Benton Tr. 421:7–18; DeRosa Tr. 851:25–852:13.  Governor Cuomo and Ms. Benton testified that Executive Assistant #1 told them—possibly around November 2020—that, following her separation from her husband, she was concerned about money and wanted to keep her job and be considered for overtime shifts.  Benton Tr. 421:19–422:7; Andrew Cuomo Tr. 365:11–370:10.

[183] *See, e.g.*, Executive Assistant #1 Tr. 111:21–112:10, 144:21–146:15.

[184] *Id.* 145:22–146:15.

[185] *Id.* at 120:3–18.

[186] *Id.* at 146:6–15, 190:8–23.

[187] *Id.* at 128:19–133:15.

[188] *Id.* at 129:13–19.

[189] *Id.*

[190] *See infra* Factual Findings, Section II.A (describing Executive Chamber's efforts to respond to Ms. Boylan's December 13, 2020 tweet alleging sexual harassment by the Governor).

Capitol.[191]  From the context of the discussions happening around that time, Executive Assistant #1 understood that the box contained documents relating to Ms. Boylan.[192]

Separately, in mid- or late December 2020, in the days immediately following Ms. Boylan's tweets alleging sexual harassment against the Governor, Executive Assistant #1 spoke with the Governor on two occasions during which he apparently referenced his conduct toward her.  In the first instance, Executive Assistant #1 was assisting the Governor with dictation in his office at the Capitol when he looked up at her and asked her not to "talk about anything to anyone else," because "people talk around here" and he could "get in a lot of trouble."[193]  Executive Assistant #1 testified that she understood the Governor's comment as "feeling [her] out about what [she] might say or what [she] might not say" and took his statement as a threat, and she feared that she would get in trouble if she spoke up about his conduct.[194]  Executive Assistant #1 recalled responding to the Governor with something like, "I don't say anything.  I don't say a word."[195]  On a different occasion, on an early morning after sexual harassment allegations against the Governor had been made public, the Governor called the office's main line and Executive Assistant #1 picked up.[196]  The Governor asked her how she felt he was being treated in the midst of these allegations.[197]  Executive Assistant #1 testified that she did not want to upset or disagree with the Governor, and so said she was sorry he was going through this and said she was sure it was hard.[198]  Executive Assistant #1 testified that the Governor thanked her and asked for her to get someone on the phone.[199]

However, things changed for Executive Assistant #1 as she read Ms. Bennett's allegations in late February, and—ultimately—as she heard the Governor's statement during his March 3 press conference that he had never touched anyone inappropriately.  Following the publication in the New York Times on February 27, 2021 of Ms. Bennett's allegations of misconduct by the Governor,[200] Executive Assistant #1 testified:

> I was going to take this to the grave.  There were conversations about
> Charlotte, that—could people believe her, did she have any ulterior

---

[191] Executive Assistant #1 Tr. 129:22–130:19.

[192] *Id.* at 120:22–130:7.  Executive Assistant #1 also recalled assisting Mr. Azzopardi with finding Wite-Out.  *Id.* at 130:8–19.  A review of Ms. Boylan's documents that were released to the press showed that the files had been redacted by hand.  Executive Assistant #1 also recalled that Ms. DeRosa and others were on calls with Judy Mogul and Steve Cohen that day.  *Id.* at 133:2–10.  At one point, Executive Assistant #1 was asked to leave for the day.  *Id.* at 131:8–20.

[193] *Id.* at 134:22–136:11.

[194] *Id.* at 134:22–136:6, 138:15–23.

[195] *Id.* at 135:16–17.

[196] *Id.* at 133:23–134:21.

[197] *Id.*

[198] *Id.*

[199] *Id.*

[200] *See* Jesse McKinley, *Cuomo Is Accused of Sexual Harassment by a 2nd Former Aide*, N.Y. Times (Feb. 27, 2021, last updated Mar. 16, 2021), https://www.nytimes.com/2021/02/27/nyregion/cuomo-charlotte-bennett-sexual-harassment.html.

> motive, and I couldn't be part of those conversations anymore, because what she was saying was the truth.  Those things actually did happen to me as well.[201]

She further testified:

> [A]ny time he touched me I felt like it was inappropriate.  He was my boss, let alone the Governor of the State of New York, so I definitely felt he abused his power and definitely knew that he had this presence about him, very intimidating, no one ever told him that he was wrong nor were you told to do so.  He definitely knew what he was doing was inappropriate.  So any time that he would do something to me he knew that at the end of the day if I told anyone, nothing was going to happen to him.  If anyone, it was going to happen to me.[202]

Executive Assistant #1 also testified:

> I remember being a young girl standing at the bus stop with my grandmother and looking at the Capitol and saying one day, Grandma, I'm going to work in there.  That she would be proud of me.
>
> . . . And I really do enjoy my work.  I do enjoy my job.  I did and I have, and what's happened to me is unfortunate and I don't think fair to me.  And I definitely knew that not only did he tell me not to say anything or share anything with anyone and it was definitely also known that if you say something[,] odds are you are going to be the one to go and I liked my job.[203]

On March 3, 2021, Executive Assistant #1 was at her desk in the Capitol when she—and other colleagues—watched on their computers the Governor give a press conference, from down the hall, during which he stated that he had never touched anyone inappropriately.[204]  Executive Assistant #1 found herself becoming emotional.[205]  Two other executive assistants ("Executive Assistants #2 and #3") noticed Executive Assistant #1 become visibly emotional after watching the press conference.[206]  Executive Assistant #2 asked Executive Assistant #1 whether she was okay, and Executive Assistant #1 confided in her two colleagues about some of the inappropriate

---

[201] Executive Assistant #1 Tr. 182:23–183:6.

[202] *Id.* at 183:6–19.

[203] *Id.* at 181:22–182:12.

[204] *Id.* at 182:13–22; *see also Cuomo: I Never Touched Anyone Inappropriately*, NBC News NOW (Mar. 3, 2021), https://www.youtube.com/watch?v=GYmmpg-3Xew.

[205] Executive Assistant #1 Tr. 183:6–9, 184:18–20.

[206] *Id.* at 183:6–9, 184:5–22.

contact the Governor had had with her.[207]  Both Executive Assistants #2 and #3 told us that, earlier on March 1, during a conversation about Ms. Bennett's allegations, Executive Assistant #1 had told them some details about how the Governor had touched her and had had inappropriate conversations with her.

Executive Assistant #3 informed us that Executive Assistant #1 was someone who was generally well liked and was someone who "loves her job and is good at it."  Both Executive Assistants #2 and #3 were upset at seeing Executive Assistant #1 in distress, and they both told her that they would support her.  Other witnesses also described noticing a general change in Executive Assistant #1's demeanor in March 2021.  One witness in particular noted that Executive Assistant #1 had previously been bubbly and outgoing, but was now noticeably more reserved and somber.

On Saturday, March 6, 2021, three days after the press conference during which the Governor denied touching anyone inappropriately and during which Executive Assistant #1 had a visible emotional reaction to the Governor's remarks, Executive Assistant #1 was "on call" to provide assistance to the Governor at the Executive Mansion.[208]  That morning, Ms. Benton called Executive Assistant #1 and asked whether Executive Assistant #1 was "on duty" for the weekend shift, which Executive Assistant #1 confirmed.[209]  Executive Assistant #1 did not hear back from Ms. Benton, but learned later that evening (at a birthday party for Ms. McGrath) that one of the other executive assistants (Executive Assistant #3) had been called to the Executive Mansion instead of her.[210]  She also learned—and Executive Assistant #2 and #3 confirmed to us—that Ms. Benton specifically asked Executive Assistant #3 not to tell Executive Assistant #1 that Executive Assistant #3 had been called instead of her.[211]

Our review of BlackBerry PIN messages between the Governor and Ms. Benton also show that Ms. Benton informed the Governor on March 6 that Executive Assistant #1 was "on call" that day, and the Governor specifically instructed Ms. Benton to ask for Executive Assistant #3 to come to the Executive Mansion instead of Executive Assistant #1.[212]  In its production of these PIN messages, the Executive Chamber redacted portions of the exchange as reflecting communications to and from internal counsel, but noted that the subject of the communications was the sexual harassment allegations raised against the Governor at the time.  Executive Assistant #3 also informed us that the work she did that day for the Governor involved the sexual harassment allegations that had been made against him.  Specifically, she informed us that she was asked, among other things, to type up handwritten notes the Governor had drafted in response to Ms. Bennett and Karen Hinton's allegations of sexual harassment against him.  Both the Governor and Ms. Benton testified that Executive Assistant #3 was the best among the

---

[207] *Id.* at 183:6–9, 184:18–186:24.

[208] *Id.* at 187:3–7.

[209] *Id.* at 104:20–105:22.

[210] *Id.*

[211] *Id.* at 104:20–105:22, 106:17–23.

[212] *See* Ex. 28 (Blackberry PIN messages between Ms. Benton and "Mark.2," *i.e.*, the Governor—"[Executive Assistant #1] is on call today. Want her now?" / "[Executive Assistant #3's] better?" / "I called [Executive Assistant #3]. She can do. I'm telling her to head there now.").

Executive Assistants in terms of dictation and typing, and speculated that that could have been the reason for the switch.[213]

During the birthday party for Ms. McGrath later that evening, Executive Assistant #1 shared with Executive Assistant #2 that the Governor had grabbed Executive Assistant #1 and reached up her shirt.  Executive Assistant #1 continued to be distraught throughout the party, and Executive Assistant #2 told her to come to her house that weekend.  The following day, on Sunday, March 7, 2021, Executive Assistant #1, her boyfriend, and Executive Assistant #3 went to Executive Assistant #2's house, where Executive Assistant #2's boyfriend, who works for the Federal Bureau of Investigation, suggested that Executive Assistant #1 speak with his friend, a lawyer.  The group gathered at Executive Assistant #2's house and then went to the office of the lawyer, whom Executive Assistant #1 ultimately retained.

Executive Assistants #2 and #3 also felt that, under the Employee Handbook, they were obligated to report what Executive Assistant #1 had told them within the Executive Chamber. On the morning of March 8, 2021, the two women called Ms. Mogul, who also dialed in Beth Garvey, at the time the Special Counsel and Senior Advisor to the Governor.  On the call, Executive Assistants #2 and #3 explained that the Governor had touched Executive Assistant #1 many times, had kissed her forcibly, and had put his hand up her shirt.  The two women also mistakenly reported that the Governor had pushed Executive Assistant #1 up against a wall, which Executive Assistant #1 had not said and which she denies.[214]  Executive Assistants #2 and #3 also told Ms. Mogul—prior to Ms. Garvey joining the call—that they believed Executive Assistant #1 and that they were very concerned.[215]  Ms. Mogul told the two women that she was sorry and that they "did the right thing" by reporting what they had heard.  The call was brief, lasting only about three to four minutes.[216]

The next day, on March 9, the Times Union published an article describing the allegations of an anonymous current aide in the Executive Chamber, who was alleging that the Governor had groped her while at the Executive Mansion.[217]  Executive Assistant #1 testified that she had not communicated with the press in advance of the March 9 article about her allegations and that she had been shocked at the publication of the Times Union article.[218]

---

[213] Andrew Cuomo Tr. 407:10–408:12; Benton Tr. 396:16–398:10.

[214] Executive Assistant #1 Tr. 191:21–192:12; Mogul Tr. 381:7–14 (testifying that to her recollection Executive Assistant #1's colleagues reported that the Governor "had forcefully thrown  her up against the wall and put his hand under  her shirt and felt her breast.")

[215] Mogul Tr. 381:15–24.

[216] *Id.* at 384:7–10.

[217] *See* Brendan J. Lyons, *Female Aide said Cuomo aggressively groped her at Executive Mansion*, Times Union (Mar. 10, 2021, updated Mar. 11, 2021), https://www.timesunion.com/news/article/Female-aide-said-Cuomo-aggressively-groped-her-at-16015863.php.

[218] Executive Assistant #1 Tr. 193:12–194:2.

Executive Assistant #1 subsequently did speak with the Times Union about her interactions with the Governor, which the Times Union published on April 7, 2021.[219]

On March 11, Ms. Garvey, who had been recently appointed Acting Counsel to the Governor, filed a report with GOER on behalf of Executive Assistant #1, noting that Executive Assistants #2 and #3 had contacted her and Ms. Mogul to report that Executive Assistant #1 had told them about inappropriate conduct by the Governor.

**Assessment**

We found Executive Assistant #1 to be credible both in demeanor and in the substance of her allegations.  The experiences she had with the Governor were difficult for her to recount, but she did so with care and seriousness.  She testified about what she could recall with specificity and she credibly noted things that she did not recall.  She did not overstate or seek to exaggerate the allegations, but simply recounted the incidents she remembered.  Her reaction to the March 3, 2021 statement by the Governor that he had never touched anyone inappropriately was one that her colleagues observed and one that corroborates her testimony that the Governor had in fact touched her inappropriately.  Executive Assistants #2 and #3 believed she was credible and corroborated her reaction to the Governor's March 3, 2021 public statement responding to the sexual harassment allegations.  Executive Assistant #1's allegations about conversations about her personal life, marital status, and finding the Governor a girlfriend are consistent with the experiences of many other witnesses, including other complainants, and many of her interactions with the Governor are independently corroborated by text exchanges with and the testimony of Ms. McGrath.

Governor Cuomo denied a number of Executive Assistant #1's allegations, but we found that his denials lacked persuasiveness, were devoid of detail, and were inconsistent with many witnesses' observations of his behavior toward Executive Assistant #1 and other women in the Executive Chamber.  In particular, we found that the Governor's testimony that Executive Assistant #1 was the one who offered personal information about herself without prompting and that she was the "initiator" of the close hugs—and that he was "more in the reciprocal business" of returning such hugs[220]—was not credible, based on a multitude of witnesses, including the Governor himself and members of his senior staff, who reported numerous instances in which the Governor initiated physical contact with another person or asked personal questions without prompting.

While certain witnesses within the Executive Chamber raised questions about whether Executive Assistant #1 welcomed the Governor's conduct toward her, based on their view of Executive Assistant #1's personality, we did not find that her outgoing personality—something that she acknowledged about herself—undermined her allegations that the Governor touched and spoke to her in an unwelcome and offensive way.

---

[219]  Brendan J. Lyons, *In her own words: Woman describes Cuomo's alleged groping at mansion*, Times Union (Apr. 7, 2021), https://www.timesunion.com/news/article/cuomo-alleged-groping-victim-mansion-incident-16078748.php.

[220]  Andrew Cuomo Tr. 381:25–382:10.

ii.    **Trooper #1**

Trooper #1 is a current member of the PSU, the unit of the State Troopers charged with protecting the Governor.[221]  Trooper #1 has been working for the New York State Police since March 2015.[222]  She became a Trooper in the PSU in January 2018.[223]

**Brief Meeting with the Governor and Transfer to PSU**

The circumstances under which Trooper #1 was transferred to the PSU, as well as statements by witnesses involved in her transfer, indicate that after meeting Trooper #1 briefly, the Governor played a role in having her hired for the PSU, even though she did not meet the minimum requirements for joining that unit at the time.[224]  On November 4, 2017, while working as a State Trooper in New York City, Trooper #1 received a call from her supervisor to go to an event on the Robert F. Kennedy Bridge ("RFK Bridge," also known as the Triborough Bridge) to assist with a press conference for the Governor, including by escorting the Governor's motorcade.[225]  Trooper #1 and a PSU Senior Investigator ("Senior Investigator #1") subsequently located the Governor's car and led the car to Randall's Island (which is under parts of the RFK Bridge).[226]  According to Trooper #1, her car and the Governor's car stopped on Randall's Island, and the Governor and Senior Investigator #1 exited their respective cars, at which point Trooper #1 also exited the car she was in.[227]  Trooper #1 said that she met the Governor and that she and the Governor engaged in small talk for a few minutes.[228]

Following her conversation with the Governor, Senior Investigator #1 approached Trooper #1 and told her that the Governor "wanted her on the detail tomorrow."[229]  The next day, the Senior Investigator sent Trooper #1 an email with the subject line "what did you say to him???????" and wrote that there was talk of "drafting" Trooper #1.[230]  Trooper #1 and Senior Investigator #1 continued to communicate with each other about Trooper #1 joining the PSU.[231]  Later in November 2017, Senior Investigator #1 communicated to Trooper #1 that she was not yet eligible to apply for the PSU due to a mandatory minimum requirement to have served as a State Trooper for three or more years, which Trooper #1 had not yet satisfied.[232]

---

[221] Trooper #1 Tr. 23:18–21.

[222] *Id.* at 15:13–15.

[223] *Id.* at 33:15–24.

[224] *Id.* at 20:23–26:22.

[225] *Id.* at 19:20–20:10.

[226] *Id.* at 22:3–7.

[227] *Id.* at  22:5–7.

[228] *Id.* at 22:8–21.

[229] *Id.* at 22:21–23:3.

[230] Ex. 29 (email from Senior Investigator #1 to Trooper #1 dated November 5, 2017).

[231] Trooper #1 Tr. 23:9–26:11.

[232] *Id.* at 23:21–24:5.

33

Shortly after that, Trooper #1 received a call from Senior Investigator #1, who asked her to submit an abstract and transfer memorandum to serve as her application for the PSU.[233] Senior Investigator #1 told Trooper #1 that the minimum requirement for troopers in the PSU had been changed from three years to two years specifically for Trooper #1.[234]  On November 17, 2017, Senior Investigator #1 forwarded her an email "canvas" for a Trooper position in the PSU, which stated that the position required only two years of experience.[235]  In forwarding the canvas, Senior Investigator #1 stated in an email to Trooper #1, "Ha ha, they changed the minimum from 3 years to 2.  Just for you."[236]  Trooper #1 subsequently submitted her transfer memorandum and abstract, interviewed for the PSU role,[237] and was hired as a Trooper in the PSU effective January 2018.[238]  Trooper #1 initially worked at the Governor's residence in Mount Kisco, New York, but in April 2019 was moved to a role on the Governor's travel team, serving as the Governor's driver on occasion.[239]

Senior Investigator #1 recalled the events relating to her hiring consistently with Trooper #1, noting that the requirements had been changed specifically to accommodate the hiring of Trooper #1 and that the Governor had been involved in the decision to hire her.  Senior Investigator #1 stated that he suggested to the Governor that the PSU hire Trooper #1.  Senior Investigator #1 stated that he did so because he was impressed with Trooper #1's performance at the event and because the PSU was seeking to increase diversity in the PSU, including having more women in the PSU.  Senior Investigator #1 said that after he learned that Trooper #1 did not meet the requirements to be on the PSU, he told Trooper #1 that he was not able to hire her.  Sometime after that, according to Senior Investigator #1, the Governor asked him what had happened with Trooper #1, and Senior Investigator #1 explained that she did not have enough experience.  Senior Investigator #1 subsequently received a call from a high-level staff member within the Executive Chamber who instructed him to "hire the female trooper from the bridge" and stated, with respect to the policy, "we are making adjustments for her."  Senior Investigator #1 subsequently asked Trooper #1 to apply, as reflected in the November 17, 2017 email he sent her.

When asked about his involvement in Trooper #1's transfer, the Governor recited several times that he "was on constant alert to recruit more women, Blacks, and Asians to the state police detail."[240]  He stated that he recalled meeting two women who were Troopers, including Trooper #1, at the RFK Bridge event and that he encouraged the State Police to talk to both

---

[233] *Id.* at 24:11–15, 28:5–21.

[234] *Id.* at 24:11–18.

[235] *Id.* at 25:5–16, 26:5–11.

[236] Ex. 1 (email from Senior Investigator #1 to Trooper #1 dated November 5, 2017 attaching PSU Transfer Canvas). We were able to obtain a copy of that email during our investigation, although it was not provided to us by the State Troopers despite our request for all documents relating to requirements or changes in requirements for joining the PSU.

[237] Trooper #1 Tr. 28:7–31:2.

[238] *Id.* at 33:15–24.

[239] *Id.* at 34:19–24, 41:3–15.

[240] Andrew Cuomo Tr. 424:16–18, 430:9–22.

women about joining the PSU to increase diversity.[241]  He testified that he was not, at any point, aware of any minimum requirements for serving on the PSU, although he noted that if there were any such requirements he would not support them because they would interfere with the need for greater diversity in the PSU.[242]

The Governor's statement that he supported Trooper #1's transfer to the PSU to increase diversity among PSU members is corroborated by Senior Investigator #1's statement that diversity was an important factor in PSU recruitment generally and Trooper #1's recruitment specifically.  However, the Governor's statement that he encouraged the PSU to hire two women who were at the RFK Bridge event or that he did not single out Trooper #1 was inconsistent with Senior Investigator #1's recounting of the event.  Senior Investigator #1 told us that although there was at least one additional woman (who was also a Trooper) present at the RFK Bridge event, he does not remember that Trooper speaking with the Governor.  Nor did Senior Investigator #1 recall the Governor or anyone from the Executive Chamber speaking to him about hiring the second woman.  To the contrary, Senior Investigator #1 stated that shortly after the event, the second Trooper remarked to him, "oh, you recruited [Trooper #1], but not me."

**Interactions with the Governor After Joining PSU**

Trooper #1 described the Governor's behavior toward her after she joined the PSU as generally "flirtatious" and "creepy."[243]  She did not observe the Governor acting in a similar way with State Troopers who were men.[244]

Trooper #1 described a series of interactions—both comments and physical touching—that she found to be inappropriate and offensive.  Trooper #1's testimony made clear that, although the Governor's conduct made her uncomfortable, she did not feel she could safely report or rebuff the conduct because, based on her experience and discussions with others in the PSU, she feared retaliation and believed her career success hinged on whether the Governor liked her.  She explained, "[w]ithin the PSU, it's kind of known that the Governor gives the seal of approval who gets promoted and who doesn't within PSU."[245]  She further explained that members of the PSU gave her pointers on how to keep the Governor happy, which included, "always have an answer, don't tell him no and whatever he wants, make it happen . . . ."[246]

*Offensive Comments by the Governor.*  One of the first inappropriate interactions with the Governor occurred in September 2018, when Trooper #1 spoke to the Governor outside of his Mount Kisco residence.[247]  Trooper #1 testified that she mentioned to the Governor that she was going to Albany the following weekend for her sister's wedding.[248]  The Governor then offered

---

[241] *Id.* at 425:19–427:11.

[242] *Id.* at 430:1–5.

[243] Trooper #1 Tr. 76:7, 19–22, 81:20–22.

[244] *Id.* at 76:11–14.

[245] *Id.* at 73: 22–25.

[246] *Id.* at 45:8–10.

[247] *Id.* at 76:22–77:7, 78:6–9.

[248] *Id.* at 77:7–10.

to give her a tour of the Mansion, "unless it [was] against protocols," and then "snickered" and walked away.[249]   Trooper #1 stated that she understood the Governor's reference to protocols and the way he said it to be suggestive.[250]   This interaction made Trooper #1 uncomfortable.[251]

Later, on August 13, 2019, the Governor asked Trooper #1 questions about her attire while she was driving him to an event.[252]   Specifically, the Governor asked her, "why don't you wear a dress?"[253]   Trooper #1 replied that it was because she wears a gun and would not have anywhere to put the gun if she wore a dress.[254]   According to Trooper #1, the Governor then asked her why she wore dark colors.[255]   At that point, the Detail Commander, who was also in the Governor's car, interjected and noted that PSU members wear business attire.[256]

After she left the car, Trooper #1 testified she received a PIN from the Detail Commander that said, "stays in the truck," which Trooper #1 understood to mean that she should not repeat conversations that occurred in the Governor's car.[257]   Trooper #1 noted that before she received this PIN, she had already told the Trooper in the tail car (the car that follows the car with the Governor) about the conversations in the Governor's car, including saying, "[O]h my god, can you believe the Governor asked me why I don't wear a dress?"[258]   She testified that after she received the PIN message, she realized she "messed up" by telling the Trooper in the tail car about the conversations in the Governor's car, and stated that the PIN message "silenced" her.[259]

This was not the only occasion on which the Governor commented on Trooper #1's attire.  Trooper #1 said that another time, when she was wearing a suit, the Governor commented that she looked like an "Amish person" and joked that her suit jacket was too big.[260]   Trooper #1, reflecting on the interaction, said she thought that it could have been interpreted as a suggestion that she wear "tighter clothes."[261]

---

[249] *Id.* at 77:12–15.  One Trooper told us that Trooper #1 once mentioned that the Governor had offered her a private tour of the Mansion, but his recollection was that this happened when Trooper #1 was at the Mansion.

[250] *Id.* at 77:15–78:4.

[251] *Id.*

[252] *Id.* at 57:25–58:17.

[253] *Id.* at 58:12–13.

[254] *Id.* at 58: 13–15.  Another Trooper we interviewed recalled Trooper #1 relaying to him this incident, and how she had tried to diffuse the situation by making a joke about where she would put her gun if she were wearing a dress.

[255] *Id.* at 58:15–17.

[256] *Id.* at 58:17–20.

[257] *Id.* at 59:7–16.  The Detail Commander said he did not recall the Governor asking Trooper #1 about her attire; nor did he recall sending a PIN with such a message.  Straface Tr. 149:20–150:8.

[258] Trooper #1 Tr. 59:19–23.

[259] *Id.* at 59:7–23, 60:7–8.

[260] *Id.* at 128:9–20.

[261] *Id.* at 128:18–20.

On another occasion, the Governor asked Trooper #1 why she would want to get married, noting that "it always ends in divorce, and you lose money, and your sex drive goes down."[262] Trooper #1 was uncomfortable, in particular with the reference to her sex drive, and did not want to engage with his comment, so she instead spoke about the positive aspects of marriage, before the conversation concluded soon thereafter.[263]

The Governor once invited Trooper #1 to go "upstairs" at the Executive Mansion in Albany.[264]  She stated that she was at the time working on the lower level of the command center (which is on the level below the Mansion), and that it was unclear whether the Governor was inviting her "upstairs" to the first floor of the Mansion or "upstairs" to the second floor, where the Governor's bedroom is.[265]  Trooper #1 stated that she declined the Governor's offer.[266] Trooper #1 testified that this type of incident "happened so frequent[ly] and it was . . . normalized."[267]

The Governor also once discussed age differences in relationships with Trooper #1 after he had ended his long-term relationship.[268]  After asking Trooper #1's age (late 20s), the Governor responded, "You're too old for me."[269]  Trooper #1 said that the Governor then asked her what age difference between the Governor and a romantic partner would be acceptable to the public, to which Trooper #1 responded, "Probably older than your daughters."[270]  Feeling uncomfortable, Trooper #1 tried to deflect the conversation by joking about becoming the Governor's matchmaker and asked what the requirements were.[271] According to Trooper #1, the Governor responded that for a girlfriend, he was looking for someone who "can handle pain."[272] The Governor then asked Trooper #1 what "the guys" were saying about his recent breakup.[273]

In December 2019, Trooper #1 attended a holiday party with another Trooper, who was also a woman and was a close friend of Trooper #1.[274]  After the party, the Governor asked Trooper #1 which PSU members she was close with and she identified the woman with whom she had attended the party.[275]  According to Trooper #1, the Governor in response instructed her

---

[262] *Id.* at 85:8–14.  At least two PSU Troopers we spoke with recalled that Trooper #1 later told them about this comment.

[263] *Id.* at 85:17–19.

[264] *Id.* at 79:25–80:13.

[265] *Id.* at 80:24–81:12.

[266] *Id.* at 80:19.

[267] *Id.* at 80:4–9.

[268] *Id.* at 102:22–104:2.

[269] *Id.* at 102:24–103:4.

[270] *Id.* at 103:3–8.

[271] *Id.* at 103:11–18.

[272] *Id.* at 103:18–19.

[273] *Id.* at 103:19–104:6.

[274] *Id.* at 82:4–17.

[275] *Id.* at 84:3–23.

not to tell this friend anything the Governor said to her.[276]  According to Trooper #1, the Governor then said, "as a matter of fact, don't tell anyone about our conversations."[277]

Over the course of her tenure on the PSU, Trooper #1 began to notice that the Governor sought her out at events.  For example, at the opening of the Moynihan Train Hall in January 2021, the Governor sought her out specifically to wish her a happy new year.[278]  In another instance, the Governor sought Trooper #1 out at an event in October or November 2020, which she found to be unusual because she was standing next to a photographer from the New York Post whom she felt the Governor would not want to have been photographed by.[279]  The Governor's attention towards Trooper #1 drew notice from other PSU members.  Trooper #1 said that at the Moynihan Train Hall event, another Trooper approached her and said, "Oh, as soon as he sees you, like he's in a good mood," or "[H]e[] beeline[d] right towards you."[280]  Trooper #1 further explained, "it's kind of just . . . a known thing if [the Governor] sees a good-looking female, it . . . puts him in a good mood."[281]

The Governor stated that he did not recall inviting Trooper #1 for a tour of the Mansion, inviting her upstairs at the Mansion, talking to Trooper #1 about finding him a girlfriend, or talking to Trooper #1 about age differences in relationships.[282]  The Governor testified that he did not recall ever talking to Trooper #1 about her clothing.[283]  Governor Cuomo stated that he has spoken to Trooper #1 about the fact that she is married or is about to get married, but he denied making any of the comments about marriage that Trooper #1 alleged he made, including the comment about marriage leading to a reduced sex drive.[284]

*Unwelcome Physical Contact.*  Over time, Governor Cuomo escalated his inappropriate behavior to unwelcome touching of different parts of Trooper #1's body.  The first time Trooper #1 recalls being touched in an unwelcome way by the Governor is when Trooper #1 was at the Governor's New York City office and was escorting him upstairs in the elevator with Senior Investigator #1.[285]  She stated that, as is typical when riding the elevator with the Governor, she stood in front of the door, and the Governor stood behind her.[286]  As Trooper #1, Senior Investigator #1, and the Governor were riding the elevator up, the Governor placed his finger on

---

[276] *Id.* at 84:23–25.  The Trooper friend told us that Trooper #1 did, in fact, tell her about this comment by the Governor.

[277] *Id.* at Tr. 84:25–85:4.

[278] *Id.* at 107:8–108:10.

[279] *Id.* at 108:18–109:12.

[280] *Id.* at 112:15–17.

[281] *Id.* at 112:18–21.

[282] Andrew Cuomo Tr. 438:6–17, 441:20–442:12.

[283] *Id.* at 441:2–5.

[284] *Id.* at 439:18–441:1.

[285] Trooper #1 Tr. 87:8–88:8.

[286] *Id.* at 87:16–18.

the top of her neck and ran his finger down the center of her spine midway down her back, and said to Trooper #1, "Hey, you."[287]

Trooper #1 also testified about a time when the Governor kissed her during the summer of 2019.[288]  Trooper #1 was stationed outside the Mt. Kisco residence and approached the Governor in the driveway to ask if he needed anything.[289]  At this point, the Governor responded, "Can I kiss you?"[290]  Trooper #1 testified, "I remember just freezing, being—in the back of my head, I'm like, oh, how do I say no politely because in my head if I said no, he's going to take it out on the detail.  And now I'm on the bad list."[291]  Unsure what to do, she replied, "Sure."[292]  The Governor then proceeded to kiss Trooper #1 on the cheek and said something to the effect of, "oh, I'm not supposed to do that" or "unless that's against the rules."[293]

Another member of the PSU observed the interaction and corroborated the kiss in an interview with us.  After the incident, he joked to Trooper #1 that the Governor had never asked to kiss him.[294]  Trooper #1 also informed a friend and colleague on the PSU about the incident shortly afterward.[295]  Trooper #1 found the kiss to be unwelcome and sought the advice of her colleague on what to do.[296]  The colleague (another woman who had been subjected to flirtatious comments from the Governor) suggested that the next time the Governor asked to kiss her, Trooper #1 should say that she was sick.[297]  Trooper #1 stated that in mid-to-late October 2019, the Governor again asked to kiss her, this time at an event at the Low Memorial Library.[298]  Trooper #1 stated that, at this event, the Governor approached her window while she was in the driver's seat of the tail car and asked if he could kiss her.[299]  Trooper #1, following her friend's

---

[287] *Id.* at 87:20–88:2.  Senior Investigator #1, who allegedly was present in the elevator, was distracted by his phone and had not seen the interaction, although he did recall that Trooper #1 talked about it after the incident.  *Id.* at 88:17–89:6.  Trooper #1 testified that she got out of the elevator on the 39th floor, walked downstairs to the 38th floor, and discussed the incident with the Trooper sitting at the desk on the 38th floor, who agreed with her that the incident had been "creepy."  *Id.* at 88:7–14.  The Trooper who Trooper #1 thought was sitting on the desk on the 38th floor did not recall this conversation, although he said it was possible it happened.  Two other witnesses said that Trooper #1 told them about this incident after it occurred.

[288] *Id.* at 96:16–97:15.

[289] *Id.* at 96:24–97:3.

[290] *Id.* at 97:3–4.

[291] *Id.* at 97:4–9.

[292] *Id.* at 97:10-11.

[293] *Id.* at 97:11–14.

[294] *Id.* at 97:17–22.  Specifically, the PSU member told us that he recalled joking that he had been on the PSU for years and the Governor had not said "hello" to him, while Trooper #1 received a kiss from the Governor in a matter of months.  The PSU member said that he did not make any comment about the kiss while the Governor was present, because, he believed, he could have been thrown off the detail for doing so.  He told us that after news of the sexual harassment allegations broke, he thought of this incident with Trooper #1.

[295] *Id.* at 97:23–98:2.

[296] *Id.* at 97:23–98:9.

[297] *Id.* at 98:2–8.

[298] *Id.* at 98:22–99:20.

[299] *Id.* at 99:11–20.

suggestion, told the Governor she was sick.[300]  She said that the Governor looked at her "almost in disgust that [she] had denied him," and then walked away.[301]

On September 23, 2019, while providing security assistance for an event in Belmont, Long Island as a member of the travel team, Trooper #1 held the door open for the Governor as he left the event.[302]  As the Governor walked by Trooper #1, he ran the palm of his left hand across her stomach in the direction opposite the direction that he was walking.[303]  The center of the Governor's hand was on Trooper #1's belly button, and he pushed his hand back to her right hip where she kept her gun.[304]  A Senior Investigator ("Senior Investigator #2") who was walking behind the Governor saw the Governor touch Trooper #1 in the stomach, and a number of PSU members recalled hearing about this incident from Trooper #1 after it happened.[305]  In her testimony, Trooper #1 described the way in which the Governor touched her stomach as follows:  "I felt . . . the palm of his hand on my bellybutton and . . . pushed back toward my right hip where my gun is . . . I would say [the bellybutton] was probably in . . . the center of his palm."[306]

The conduct made Trooper #1 feel "completely violated because to me, like that's between my chest and my privates."[307]  Although she was upset by the conduct, Trooper #1 did not feel she could do anything about it, explaining, "I felt completely violated.  But, you know, I'm here to do a job."[308]  Trooper #1 spoke to Senior Investigator #2 about it that day and the next day as they were "both still in shock about what happened."[309]  She also spoke with another PSU Trooper who is a woman about how the Governor had touched her and that Trooper "thought it was disgusting.  We were creeped out."[310]

Senior Investigator #2 fully corroborated Trooper #1's account.[311]  He told us he checked in with her later in the day and asked whether she wanted to do anything about the incident.[312]  Trooper #1 told Senior Investigator #2 that she did not want to report the incident.[313]  She

---

[300] *Id.* at 99:20–21.

[301] *Id.* at 99:20–23.

[302] *Id.* at 90:8–15.

[303] *Id.* at 90:13–91:5.  One PSU member who remembered hearing about this event from Trooper #1 said that he heard that the Governor asked Trooper #1 when he put his hand on her stomach if she was pregnant, which Trooper #1 denied.  *Id.* at 96:13–15.

[304] *Id.* at 90:23–91:3.

[305] *Id.* at 92:13–16.  One PSU member said that Trooper #1 told her about this incident the same day it happened.

[306] *Id.* at 91:22–92:8.

[307] *Id.* at 92:7–10.

[308] *Id.* at 94:12–15.

[309] *Id.* at 92:20–93:3.

[310] *Id.* at 94:9–10.

[311] *Id.* at 91:5–7.

[312] *Id.* at 92:19–93:10.

[313] *Id.*

explained that this was because (1) she was new to the travel team; (2) the Detail Commander (the head of the PSU at the time and someone who was viewed as loyal to the Governor) was with her when the Governor had quizzed Trooper #1 about her attire and had done nothing; and (3) she had heard that other PSU officers had been punished over insignificant instances in which they had upset the Governor.[314]  She was concerned that if she raised any issues about the Governor's conduct, she or Senior Investigator #2 would be punished for speaking out against the Governor.[315]  She explained:

> [F]rom my point of view, I'm a trooper, newly assigned to the travel team.  Do I want to make waves?  No.  And also, in the back of my mind, you know, [Detail Commander] had already previously witnessed me being asked why I don't wear a dress.  So if the detail commander is basically okay with that behavior, you know, [Detail Commander] never even checked on me or even said anything to me after that, other than stays in truck, don't repeat.  I wasn't even trying to put [Senior Investigator #2] in a position where—you know, I've heard horror stories about people getting kicked off the detail or transferred over like little things, like I'm not—I had no plans to report it.[316]

Trooper #1 told us that, even now, she remains fearful of speaking out about her experiences with the Governor.  She said,

> I feel like they [PSU leadership] don't even want to ask because nobody wants to be in the line of fire of the Governor.  Everyone knows he's very vindictive . . . I'm nervous that the Governor's going to know I spoke out, and I'm going to be retaliated against, you know . . . .  And everybody, for the most part, gets promoted because they're in the good graces of the Governor.  So if they stay quiet or give him information, they'll get promoted, or something good will happen to them.  That's just like the culture again in PSU.[317]

She also explained that she was worried about "exposing myself and . . . my privacy."[318]  However, she ultimately decided to speak out because "at the end of the day, if I could help

---

[314] *Id.* at 93:10–94:3.

[315] *Id.* at 93:9–96:2.  For example, Trooper #1 had heard that "back in the day, there was a senior who again asked the Governor, Hey, do you have any plans later?  And the Governor was like, Don't ask me what I plan on doing later . . . .  And the senior was basically bounced out of the truck to like the tail com which is basically the person who works the radio in the tail car and transferred out . . . .  It's just not something I was trying to explore."  *Id.* at 95:5–17.  The other PSU Troopers we interviewed corroborated the general belief that PSU members had been transferred or otherwise punished for doing or saying things that upset the Governor.

[316] *Id.* at 93:10–94:3.

[317] *Id.* at 139:5–140:6.

[318] *Id.* at 131:23–132:3.

validate these women, I think that's more important than . . . my own, you know personal life . . . ."[319]

During his testimony, the Governor stated that he does recall hugging Trooper #1[320] and said that he may have kissed her on the cheek at a Christmas party.[321]  However, he denied that he has ever purposely touched Trooper #1 on her stomach[322] or run his fingers down Trooper #1's back.[323]

**PSU and Executive Chamber's Misleading Press Response Regarding Trooper #1**

In December 2020, the New York State Police received a press inquiry about the circumstances of Trooper #1's transfer to the PSU.  The Times Union requested that the New York State Police "provide the date that [Trooper #1] joined the governor's security detail and her current status."[324]  The reporter explained that he was "[t]rying to pinpoint how she was picked to get on the detail" as he understood "that around the time she was appointed to the detail the requirement for four years on the job was changed to three."[325]  Although—as discussed above and as corroborated by the contemporaneous documents, Trooper #1 had in fact been allowed to join the PSU before meeting the time requirement for service as a Trooper to be eligible to join the PSU (three years)—the State Police (after consultation with the Executive Chamber) drafted a statement denying any exception being made for Trooper #1 and taking offense at the question even being asked.[326]  The response stated, with no mention of the Governor's role in bringing Trooper #1 onto the PSU and the fact that Trooper #1 had not met the three-year requirement, that:

> [Trooper #1] joined the Protective Services Unit in January 25, 2018, along with another Trooper with the same exact amount of experience.  Since June of 2012, State Police has required three years of Division service in order to qualify for appointment to the PSU.[327]  Her assignment was based on her performance while assisting the PSU at an event in November of 2017.  A Senior Investigator on the detail was impressed by her work and attitude, and recommended her as a possibility to fill an opening on the unit. PSU conducted a standard review of her work as a Trooper, which

---

[319] *Id.* at 132:3–7.

[320] Andrew Cuomo Tr. 435:15–19.

[321] *Id.* at 435:23–25.

[322] *Id.* at 438:1–5.

[323] *Id.* at 437:12–20.

[324] Ex. 30 (email chain between William Duffy and Brendan Lyons dated Dec. 18, 2020).

[325] *Id.*

[326] Ex. 31 (email chain between William Duffy, Kevin Bruen, Vincent Straface, and Kristin Lowman dated Dec. 18, 2020).

[327] Although the State Police accurately states that the requirement is 3 years, it fails to acknowledge that at the time of her appointment, she had not actually met that requirement.

> included interviews with her supervisors, who praised her work and
> agreed that she would be a good candidate for PSU . . . Any
> suggestion that [Trooper #1]'s assignment to the PSU and
> subsequent promotion was based on anything other than her hard
> work and abilities is false.  Such a suggestion an insult to [Trooper
> #1] and the New York State Police.[328]

During her testimony, Ms. DeRosa recalled the Times Union's inquiry about Trooper #1. She testified that her view was that the inquiry itself was sexist, leading to a heated exchange between Ms. DeRosa and Casey Seiler, the editor of the Times Union.[329]  Ms. DeRosa testified that she yelled at him, saying, "you guys are trying to reduce her hiring to being about looks. That's what men do."[330]  Ms. DeRosa testified that the Governor overheard her "getting animated" in her office during her conversation with Mr. Seiler.[331]  Ms. DeRosa testified that after she explained the situation to the Governor, the Governor called Mr. Seiler himself.[332]  Ms. DeRosa stated that the Governor told Mr. Seiler not to get mad at Ms. DeRosa for being animated, as "this is one of the topics that sends [Ms. DeRosa] off a cliff."[333] Ms. DeRosa testified that the Times Union ultimately decided not to write on the subject.[334]  As noted above, despite Ms. DeRosa's accusations of sexism, the Governor's call to Mr. Seiler, and the State Police's official response, the truth was, as Trooper #1 informed us and as the documents and other witnesses confirmed, Trooper #1 in fact had been allowed to transfer to the PSU (after meeting briefly with the Governor and at the Governor's urging) even though she did not meet the three-year service requirement for the PSU.  And then the Governor proceeded to engage in a pattern of sexually harassing conduct toward her.

**Assessment**

We found Trooper #1 to be credible in demeanor and in the substance of her allegations. Her allegations were corroborated by others who witnessed certain of the relevant conduct and contemporaneous documents, as well as accounts of interactions she had had with the Governor that she provided to a number of her colleagues at the time.  We found the level of detail and consistency in her account, and the circumstances of Trooper #1's allegations to be credible and supported by the other evidence we found in the investigation.

Trooper #1's allegations concerning her hiring were substantiated by Senior Investigator #1, who was involved in her transfer to the PSU, as well as by contemporaneous documents.  We did not find evidence to substantiate the Governor's claim that he had suggested on the day he

---

[328] Ex. 31 (email chain between William Duffy, Kevin Bruen, Vincent Straface, and Kristin Lowman dated Dec. 18, 2020).

[329] DeRosa Tr. 102:23–105:22.

[330] *Id.* at  103:19–21.

[331] *Id.* at 105:16–22.

[332] *Id.* at 106:4–7.

[333] *Id.* at 106:9–12.

[334] *Id.* at 104:6–8.

met Trooper #1 that the Senior Investigator #1 recruit two Troopers who were women.[335]  To the contrary, although he recognized that diversity was a goal that the PSU was pursuing at the time, Senior Investigator #1 stated that there was in fact another State Trooper who was a woman at the RFK Bridge event that day that he thought was good, and he recalled that she later joked that only Trooper #1 had been asked to join the PSU.

Trooper #1's allegations concerning her interactions with the Governor were also corroborated by numerous other witnesses.  Notably, some of Trooper #1's more serious allegations, including the unwelcome touching in September 2019 on the stomach, were witnessed by other State Troopers and were discussed with a number of other State Troopers who recall having those discussions with her and being disturbed by them.  Compared to that, the Governor's testimony about his involvement in her transfer to the PSU (where he answered many questions with a generalized statement about his emphasis on diversity in the PSU) and his blanket denials of any of the offensive conversations and physical contact lacked credibility.[336]

Importantly, Trooper #1 had no desire to make her allegations public or to bring them to anyone's attention.  In fact, we first reached out to Trooper #1 after we heard from others some of what she had experienced.  She felt and continues to feel great fear and anxiety that she will be retaliated against for disclosing these incidents of inappropriate conduct by the Governor.  She provided the information about these relevant incidents only because she was required to provide truthful information in response to our inquiries (including following a subpoena for testimony) and because she concluded it was the right thing to do in light of the other allegations by women that have been made against the Governor.

### iii.   **Charlotte Bennett**

Charlotte Bennett began working in the Executive Chamber in January 2019.[337]  Her first role was as a briefer, which involved organizing and researching materials on relevant topics for the Governor.[338]  In May 2019, Ms. Bennett was assigned to also serve as an executive assistant to the Governor.[339]  In this role, Ms. Bennett assisted the Governor in administrative tasks, including managing telephone calls, taking dictation, and for a period of time, traveling with the Governor.[340]  She testified that around the same time, she was promoted to the role of Senior Briefer.[341]  As an executive assistant to the Governor and a Senior Briefer, Ms. Bennett was often in frequent contact with the Governor, which provided an unusual level of access to the Governor for a non-senior staff member of the Executive Chamber.

---

[335] Andrew Cuomo Tr. 425:19–426:8.

[336] *Id.* at 424:16–18, 430:9–22, 431:16–432:4.

[337] Bennett Tr. 12:21.

[338] *Id.* at 13:25–14:25.

[339] *Id.* at 61:2–9.

[340] *Id.* at 61:10–13; 164:2–5.

[341] *Id.* at 60:14–19.

Ms. Bennett stated that for the first part of her employment, she was based in the New York City office and sometimes worked in Albany.[342]   After the outbreak of the COVID-19 pandemic, Ms. Bennett lived in a hotel and worked out of the Capitol building between March 23, 2020 and July 2020.[343]   Ms. Bennett left her role in the Executive Chamber in the fall of 2020.[344]

**Interactions with the Governor**

During Ms. Bennett's time in the Executive Chamber, she worked closely with the Governor in her role as both a briefer and as an executive assistant.  In doing so, Ms. Bennett developed what she initially felt was a good personal relationship with the Governor, something that other witnesses commented on as well.

As set forth in greater detail below, over the course of her interactions, the Governor engaged in conversations with Ms. Bennett on a number of personal topics, including her preferences in romantic or sexual relationships, her history as a sexual assault survivor, and his own romantic relationship status and preferences.  Governor Cuomo also made comments regarding Ms. Bennett's appearance at times.  Ms. Bennett testified that she increasingly felt uncomfortable with the Governor's behavior and in June 2020, reported his behavior to certain senior staff in the Executive Chamber.

*Early Interactions.*  Ms. Bennett testified that during her early interactions with the Governor in the summer of 2019, she did not feel as though he was behaving inappropriately and that, at the time, she saw him as a father figure.[345]   Reflecting back on the interactions, Ms. Bennett testified that she now feels that some of the Governor's questions about her personal life, as well as the personal attention he was paying her, were inappropriate, but it was "not obvious to [her] until it escalated to the point [that] it did."[346]

Ms. Bennett's first substantive interaction with the Governor occurred on May 9, 2019.[347] Annabel Walsh, Director of Scheduling for the Governor at the time, had asked Ms. Bennett to meet with the Governor the previous day to determine whether she would be a good fit as an executive assistant for the Governor.[348]   Ms. Bennett met with the Governor and Ms. Walsh, and he asked Ms. Bennett a series of introductory questions.[349]   Ms. Bennett became an executive assistant to the Governor shortly thereafter.[350]

---

[342] *Id.* at 17:22–25, 32:4–6, 33:17–25.

[343] *Id.* at 34:12–14.

[344] *Id.* at 234:11–235:9.

[345] *Id.* at 111:10–17.

[346] *Id.* at 111:10–112:2.

[347] *Id.* at 36:6–10.

[348] *Id.* at 36:16–22.

[349] *Id.* at 38:24–39:7.

[350] *Id.* at 39:20–24, 61:2–9.

On May 16, 2019, Ms. Bennett had a conversation with the Governor during which the Governor asked her about the length of her previous relationships and whether she "honored her commitments."[351]  That same day, she was in the Governor's office when he asked her whether she knew the song, "Danny Boy."[352]  Ms. Bennett recalled that the Governor had a copy of the lyrics with him that he handed to her as he asked her to memorize the lyrics.[353]  Ms. Bennett spent much of the day trying to memorize the lyrics to the song, and the Governor occasionally "would pop out" of the side door to his office that opened to Ms. Bennett's cubicle and ask her to start singing the song.[354]  That same day, Ms. Bennett sent a text message to a friend detailing the interaction.  She wrote, "was with Gov when you texted.  He asked me if I honored my commitments . . . asked me to name commitments.  Asked[] me how long my relationships were . . . He's making me learn the lyrics to Danny Boy.  And keeps coming out to quiz me and I've failed every time."[355]  She also sent a text message to a member of her family, writing, "Sorry. Gov is in. Can't talk rn . . . [h]e's making me memorize the lyrics to Danny Boy.  He keeps coming out to quiz me . . . ."[356]

The Governor then called Ms. Bennett into Ms. Benton's office, where Ms. Benton and Ms. DeRosa were also present, and asked Ms. Bennett to sing "Danny Boy."[357]  Ms. Bennett testified that she began to recite the lyrics, and Governor Cuomo stopped her and asked her to sing the lyrics instead.[358]  When Ms. Bennett resisted, the Governor began to sing the song, and Ms. Bennett attempted to join.[359]  Ms. Bennett noted that Ms. DeRosa remarked that this was "hazing."[360]  Once Ms. Bennett returned to her cubicle, a colleague told Ms. Bennett that the Governor had been testing Ms. Bennett for her temperament, confidence, ability to handle herself, anxiety, and memory.[361]

---

[351] *Id.* at 112:10–16, 129:9–15.

[352] *Id.* at 125:12–22.

[353] *Id.* at 125:20–25. One staff member recalled that earlier that day, the Governor was in the elevator with Dani Lever and the staff member when the Governor began to sing the song, "Danny Boy," possibly as a play on Ms. Lever's first name. The Governor then asked the staff member to print the lyrics to the song; the staff member printed the lyrics and handed them to Ms. Bennett because she was the executive assistant sitting outside of the Governor's office at the time.  Another junior staff member, who is a woman, also recalled the Governor asking her to sing "Danny Boy" with him.

[354] *Id.* at 126:7–16. A staff member who worked next to Ms. Bennett at the time testified that he saw Ms. Bennett with a print-out of the lyrics to Danny Boy, and she was mouthing the lyrics out and humming them while trying to memorize them.  Vicinanza Tr. 147:16–148:21.

[355] Ex. 32 (text messages between Ms. Bennett and a friend dated May 16, 2019).

[356] Ex. 33 (text messages between Ms. Bennett and a family member dated May 16, 2019).

[357] Bennett Tr. 126:20–127:25.

[358] *Id.* at 127:6–10.

[359] *Id.* at 127:10–25.

[360] *Id.* at 126:23–127:2.

[361] *Id.* at 128:6–13.  This was not the only time the Governor asked Ms. Bennett to sing for him or the Governor sang to her.  On January 1, 2020, Ms. Bennett wrote to the individual who she had replaced as executive assistant, "[h]e just asked me to sing bohemian rhapsody so. We aren't far off from a bedtime story."  The former executive assistant responded, "Good lord. The hazing never ends." Ex. 34 (text messages between Ms. Bennett and a former coworker dated Jan. 1, 2020).  In addition, on October 4, 2019, the Governor began a telephone call with

Beginning in the summer of 2019, Ms. Bennett began speaking to the Governor about her gym habits and he asked her on occasion how many pushups she could do.[362]  On August 9, 2019, Ms. Bennett sent a text message to her parents reporting that the Governor had invited Ms. Bennett to "lift [weights] together in his mansion gym" and that the Governor "started asking what I lift, etc. how many pushups I can do."[363]  That same day, Ms. Bennett posted to her Instagram story with the caption, "The governor invited me to lift weights with him.  Life complete. He challenged me to a push-up competition."[364]  Ms. Bennett also wrote to her parents that the Governor had asked her "do you have a bf [boyfriend]" and when she replied no, the Governor replied, "[T]hat's why.  [Y]ou could beat them all up."[365]  On October 14, 2019, the Governor asked Ms. Bennett to do pushups in front of him, and she did approximately 20 pushups in his office.[366]  Later that day, she sent a text message to her parents and wrote, "Did the pushups for him today . . . And I just kept going until he told me to stop and didn't slow down. He said ok stop stop . . . and he was like ok I'm intimidated. Not many women can do pushups like that. Actually, not many MEN can do pushups like that."[367]

On one occasion, the Governor persistently asked Ms. Bennett what people were saying about the size of his hands.[368]  Ms. Bennett testified that she understood the Governor was attempting to get her to say something about the size of his genitals.[369]  Ms. Bennett explained how difficult it was for her to navigate the situation, as she was uncomfortable and wanted to change the topic, but she also wanted to avoid angering the Governor.  She explained:

> [H]e wouldn't let it go and kept asking and talking about the size of his hands and was like kind of engaging me in this what became very uncomfortable interaction in which I was more scouring my brain for like a positive thing people had said to him about this job and it turned into him sticking to this point and like pointedly joking and asking me and talking about his hands and the size of them . . . [It] just like became him trying to get me to admit something sexually; what do people say about that kind of trying to get me to say more . . . I really was just trying to like thread this needle of not making him angry but also maintaining my—what I

---

Ms. Bennett by singing verses from "Do You Love Me?" by the Contours and asking whether she knew the song. Ex. 35 (transcript of conversation between Ms. Bennett and the Governor on Oct. 4, 2019).  An excerpted portion of the audio of the call is also publicly available at https://vimeo.com/582257128/adee5e6783.

[362] Bennett Tr. 116:12–117:13.  Ms. Benton testified that she once overheard the Governor and Ms. Bennett discuss how many pushups Ms. Bennett could do.  Benton Tr. 291:8–21.

[363] Ex. 36 (text messages between Ms. Bennett and her parents dated Aug. 9, 2019).

[364] Ex. 37 (Instagram story by Ms. Bennett dated Aug. 9, 2019).

[365] Ex. 36 (text messages between Ms. Bennett and her parents dated Aug. 9, 2019).

[366] Bennett Tr. 117:23–118:2, 119:9–16.  Ms. Bennett sent text messages about this incident to the executive assistant whom Ms. Bennett had replaced.  *See* Ex. 38 (text messages between Ms. Bennett and a former coworker dated October 14, 2019).

[367] *See* Ex. 39 (text messages between Ms. Bennett and her parents dated Oct. 14, 2019).

[368] Bennett Tr. 132:25–133:19.

[369] *Id.* at 135:15–19.

see as appropriate behavior.  Like I'm not crossing this boundary with you but I'm also not looking to get into a fight with you and losing my job. [370]

Sometime in or around November 2019, the Governor commented on Ms. Bennett's hair, which she had worn in a bun that day.[371]  Although the Governor typically greeted her when she greeted him in the morning, when she greeted him that day, he asked about or commented why she was wearing her hair in a bun and said nothing else.[372]  At the end of the day, the Governor asked Ms. Bennett again why she was wearing her hair in a bun.[373]  Ms. Bennett said that she became angry and yelled "you don't like my bun?!" and yelled to the other assistants, "he doesn't like my bun."[374]  After the Governor had left the office for the day, another colleague ("Staffer #1") went to Ms. Bennett to chat, and Ms. Bennett described what the Governor had said about her hairstyle.[375]  Ms. Bennett stated that the Governor referred to her as "bun" for the next month.[376]

Ms. Bennett remembered overhearing, at some point in 2019, Ms. Benton talking to the Governor and saying that she would be completing the sexual harassment training on behalf of the Governor.[377]  Ms. Bennett testified that she did not "remember the particular details of [Ms. Benton's] comments but it was a very obvious and jarring moment" for her.[378]  When this allegation by Ms. Bennett was made public in February 2021, the Executive Chamber issued a statement that Ms. Benton "categorically denies the exchange . . . this is not true."[379]  But in her sworn testimony, Ms. Benton admitted that she was the one who signed the 2019 sexual harassment training attestation form for the Governor, after they both claimed the Governor reviewed the training material.[380]  The Governor also testified that he does not specifically recall

---

[370] *Id.* at 133:9–134:23.

[371] *Id.* at 136:15–25.

[372] *Id.*

[373] *Id.* at 137:2–9.

[374] *Id.* at 137:15–138:5.

[375] Ms. Bennett also texted another colleague in the Executive Chamber that the Governor had only spoken to her twice that day and that "both times it was to tell me he didn't like how I did my hair . . . ." Ex. 40 (text messages between Ms. Bennett and Staffer #5 dated Nov. 18, 2019).

[376] Bennett Tr. 138:8–9.  Ms. Bennett testified that she had told a number of individuals about this incident at the time.  At least three witnesses recalled hearing about the incident prior to the publication of this allegation.

[377] *Id.* at 20:10–21:14.

[378] *Id.* at 21:5–14.

[379] Norah O'Donnell *et al.*, *Cuomo Accuser Alleges a Staffer Took Sexual Harassment training for the Governor.* CBS News (Mar. 6, 2021), https://www.cbsnews.com/news/cuomo-accuser-charlotte-bennett-sexual-harassment-training-staffer/.

[380] Andrew Cuomo Tr. 22:22–25, 28:15–30:4; Benton Tr. 103:16–25, 105:22–106:18; *see also* Ex. 41 (2019 attestation form with the Governor's name).  A review of the signature on the attestation form shows that the signature looks different from the Governor's signature on official documents.  *See. e.g.*, Executive Order No. 211, *Declaration of a State Wide Disaster Emergency Due to Gun Violence* (July 6, 2021), https://www.governor.ny.gov/sites/default/files/2021-07/EO%20211.pdf.

taking the sexual harassment training any year other than 2019.[381]  In response to our request for all certifications or records of completion of training for the Governor from January 1, 2013 to the present, the Executive Chamber has only been able to produce that one attestation form for 2019 for the Governor.

During his testimony, the Governor denied many of Ms. Bennett's allegations about their early interactions, including that he had required Ms. Bennett to learn and perform "Danny Boy";[382] that he had made comments about the size of his hands;[383] and that he had criticized Ms. Bennett's hair or called her "bun."[384]  The Governor acknowledged, however, that he and Ms. Bennett had discussed having a "push up competition."  He testified, "there was one time where I said because she got up to a very high number and I said 'Well, how do you—you're doing the pushup wrong.  How do you do a pushup? . . . [S]he did [a] push up.  And she did nose to floor.  I remember that because I was a little intimidated."[385]  Other than that, the Governor denied remembering any interactions with her prior to about January 2020, even though the contemporaneous texts—and testimony from many witnesses—establish that the Governor and Ms. Bennett frequently interacted before January 2020.[386]  The Governor also testified that he did not recall ever singing any part of a song to Ms. Bennett, including "Do You Love Me?" by the Contours, going so far as to say "I don't even know that song."[387]  However, a call that Ms. Bennett recorded for dictation purposes from October 4, 2019 begins with the Governor singing the chorus to that song several times to Ms. Bennett before beginning dictation.[388]

*January 19, 2020 Conversation.*  Ms. Bennett testified that, on January 19, 2020, she had a long conversation with the Governor in the Executive Mansion pool house after she was sent there to drop off a speech for the Governor.[389]

During the conversation, Ms. Bennett and the Governor discussed in detail her history as a survivor of sexual assault.[390]  Ms. Bennett recalled that the conversation began when the Governor asked her to "tell [him] something," and Ms. Bennett responded by discussing how hard the staff were working.[391]  Ms. Bennett then told the Governor that his signing of sexual assault legislation, "Enough is Enough," in 2015 changed her life.[392]  Ms. Bennett disclosed to the Governor that she had been sexually assaulted in college, that she had a difficult experience

---

[381] Andrew Cuomo Tr. 16:1–17:8.

[382] *Id.* at 272:3–13. The Governor stated that Danny Boy is a song that "we sing as a group" and that he might have asked her to Google the words to Danny Boy for him.  *Id.*

[383] *Id.* at 507:7–12.

[384] *Id.* at 277:10–23.

[385] *Id.* at 275:8–24.

[386] *Id.* at 258:17–259:20.

[387] *Id.* at 273:5–274:10.

[388] *See* Ex. 35 (transcript of conversation between Ms. Bennett and the Governor on October 4, 2019).

[389] Bennett Tr. 140:2–12, 142:6–150:19.

[390] *Id.*

[391] *Id.* at 142:23–143:7.

[392] *Id.* at 143:11–13.

reporting the assault, and that the experience motivated her to work in politics.[393]  Ms. Bennett testified that the Governor then asked her several questions about her experience, including about the details of her assault, and commented, "well, some people have it much worse."[394] Ms. Bennett testified that at one point, the Governor asked her if she knew what a "cone of silence" was and discussed with her that someone close to him had also been sexually assaulted.[395]  She further testified that the Governor advised her not to pursue work related to sexual assault as a career.[396]  Ms. Bennett said that, at the time, although she found some of the Governor's comments and questions to be insensitive, she appreciated that the Governor had taken an interest in her career.[397]

Ms. Bennett sent multiple contemporaneous text messages concerning the January 19, 2020 conversation with the Governor.  For example, that day, she texted her mother, "Had a really long convo w gov today. Talked about career etc . . . 2 hours. Told him about SMART[398] . . . He responded so well. Really impressed. He had a lot to say and was very emotional and serious but also asked a lot of questions."[399]  Ms. Bennett similarly wrote to her father that same day, reporting "[h]ad a long chat w gov today though. I kinda hate that it helps, but it does. An hour or two w him shouldn't erase all the bullshit but it helps. It was a long and emotional convo."[400]

The Governor acknowledged having this conversation with Ms. Bennett; indeed, this is the first substantive interaction with Ms. Bennett that the Governor claimed he recalled.[401]  Although his description of the interaction is largely consistent with Ms. Bennett's, unlike Ms. Bennett, the Governor testified that Ms. Bennett provided details of her sexual assault unprompted.[402]

*May 2020 Conversation.*  Ms. Bennett testified that the next notable interaction with the Governor happened in mid-May 2020, after she began working and living in Albany.[403]  During this interaction, the Governor spoke with Ms. Bennett about her time in Albany and asked her

---

[393] *Id.* at 143:15–144:18.

[394] *Id.* at 145:18–146:13.

[395] *Id.* at 144:23–145:7.

[396] *Id.* at 146:25–147:5.

[397] *Id.* at 143:15–24, 150:24–151:13.

[398] SMART is an organization Ms. Bennett founded as a student at Hamilton College to support survivors of sexual assault and harassment.  *See Letter to the Editor: a message from SMART*, The Spectator (Mar. 31, 2021), https://spec.hamilton.edu/letter-to-the-editor-a-message-from-smart-283fdde9d443.

[399] *See* Ex. 42 (text messages between Ms. Bennett and her mother dated Jan. 19, 2020).

[400] *See* Ex. 43 (text messages between Ms. Bennett and her father dated Jan. 19, 2020).  On January 28, 2020, Ms. Bennett texted the executive assistant whom she had replaced, writing, "things with gov have been so good," referring to the January 19, 2020 conversation.  *See* Ex. 44 (text messages between Ms. Bennett and former coworker dated Jan. 28, 2020); Bennett Tr. 152:13–16.

[401] Andrew Cuomo Tr. 258:13–259:20.

[402] Bennett Tr. 250:11–257:17.

[403] *Id.* at 153:2–4.

such questions as who she was "hitting on" and "who was hitting on [her]."[404]  During this conversation, Ms. Bennett spoke with the Governor about a speech that she was giving at her *alma mater,* Hamilton College, regarding sexual assault.[405]  While providing her feedback on her speech, the Governor  pointed at her and repeated, "[Y]ou were raped, you were raped, you were raped and abused and assaulted."[406]  Ms. Bennett testified she became uncomfortable and that she felt the Governor was testing her.[407]  Ms. Bennett attempted to change the subject by asking the Governor about the effect that dealing with the pandemic had had on him, and he became defensive.[408]  The Governor told Ms. Bennett that he was unhappy and stressed, and that he wanted to find a lady and drive off on his motorcycle into the mountains with her.[409]

Later that day, Ms. Bennett sent text messages to Staffer #2 about the interaction.  In those messages, Ms. Bennett wrote, "Asked if you were hitting on me . . . .  Said, 'you were raped.  You were raped and abused.  You were raped and abused and assaulted' maybe 17 times in a row and wouldn't stop. . . . The way he was repeating 'you were raped and abused and attacked and assaulted and betrayed' over and over again while looking me directly in the eyes was something out of a horror movie.  It was like he was testing me."[410]  She reported in the same chain of text messages, "We talked about what celebrities he wanted.  For his dream scenario.  Which is to hop on the back of his bike w a lady and head for the mountains.  And some other things . . . ."[411]

At Staffer #2's suggestion, the two met each other at the Capitol later that day, and Ms. Bennett went through her conversation with the Governor in greater detail, including that Governor Cuomo and Ms. Bennett had spoken about her upcoming speech at Hamilton and that the Governor had dwelled on Ms. Bennett's history as a survivor of sexual assault, repeatedly emphasizing that Ms. Bennett had been raped.

The Governor's characterization of this interaction differs from Ms. Bennett's.  First, he denied that he asked about which staff members were dating or having sex with one another,[412] and said that he had asked her only who she was "hanging out with" because he was concerned that she was not spending time with the other staff members in Albany and wanted to encourage

---

[404] *Id.* at 155:22–25.  A former colleague of Ms. Bennett recalled hearing from Ms. Bennett that the Governor had asked her about office gossip, including who was dating each other in the Executive Chamber.

[405] *Id.* at 156:14–15.

[406] *Id.* at 157:19–158:2.

[407] *Id.* at 158:3–10.

[408] *Id.* at 160:8–14.

[409] *Id.* at 159:13–160:24.

[410] Ex. 45 (text messages between Ms. Bennett and Staffer #2 dated May 15, 2020).

[411] Ex. 45 (text messages between Ms. Bennett and Staffer #2 dated May 15, 2020).  Staffer #2 stated that his reactions, including "WHAT THE FUCK" and "OH MY GOD," were his reactions to Ms. Bennett having had the unusual opportunity to have a long, personal conversation with the Governor, rather than about the content of Ms. Bennett's conversation with the Governor.  We did not find Staffer #2 credible on this point, given the plain text of the documents and general credibility issues regarding Staffer #2, including his failure to recall many events reported by other witnesses.

[412] Andrew Cuomo Tr. 270:7–11.

her to socialize with them.[413]  Second, although he testified that he had given Ms. Bennett advice about her speech, including advising her to say "I was raped at this school, but then I was violated a second time by the school when they victimized me a second time by denying my victimization,"[414] he denied that he said "you were raped" multiple times.[415]  The Governor acknowledged, however, that Ms. Bennett was "disturbed" by this conversation and "visibly did not like" the suggestions that he had made.[416]  The Governor further denied telling Ms. Bennett that he was "lonely," explaining that, at the time, he was talking to people about the "concept of loneliness in COVID," but was not referring to his own circumstances.[417]  The Governor also denied that he told Ms. Bennett that he wanted to ride into the mountains on a motorcycle with a woman, although, he stated, he may have said to his staff at some point that he wanted to drive to the Adirondacks on his motorcycle and leave his staff members to "figure it out."[418]

*June 5 and 6, 2020.*  Ms. Bennett testified that she had several interactions with the Governor on June 5, 2020, during which the Governor made comments that made her feel extremely uncomfortable.

One interaction occurred while Ms. Bennett was taking dictation for the Governor.[419]  Ms. Bennett recalled walking into the Governor's office with Executive Assistant #2 who was assisting with the dictation with both wearing masks.[420]  While he was dictating, the Governor paused to comment that Ms. Bennett looked like an alien from the movie *Predator* in her mask.[421]  According to Ms. Bennett, the Governor then commented, "if I were investigated for sexual harassment, I would have to say I told her she looked like a monster," and laughed.[422]

Ms. Bennett testified that, during a separate one-on-one interaction with the Governor that day, the Governor asked her how long it had been since she had hugged someone, and complained that he had not hugged anyone in a long time.[423]  Ms. Bennett understood that the Governor did not seem to be asking about platonic hugs, because when she responded that Governor Cuomo could hug his daughters, he responded with something like, "No, no, not like

---

[413] *Id.* at 264:9–24.

[414] *Id.* at 294:7–12.

[415] *Id.* at 298:16–299:12.

[416] *Id.* at 294:15–24.

[417] *Id.* at 303:20–25.

[418] *Id.* at 305:3–9.

[419] Bennett Tr. 163:21–164:6.

[420] *Id.* at 163:21–164:6.

[421] *Id.* at 164:16–23.

[422] *Id.* at 165:3–7.

[423] *Id.* at 166:25–167:20.

that—like a real hug."[424]  Ms. Bennett testified that the Governor then said he was lonely and that he wanted a girlfriend in Albany.[425]

In the same series of conversations, the Governor asked her if she had ever been with older men and whether she thought age mattered in relationships.[426]  According to Ms. Bennett, while she was trying to figure out how to answer the Governor's question, he cut her off and said, "I don't think [age differences] matter."[427]  The Governor then said that he would have a relationship with someone who was "22 and up," or "over the age of 22."[428]  Ms. Bennett noted that earlier that day she and the Governor had discussed the fact that she had recently turned 25.[429]  The Governor also asked Ms. Bennett if her last relationship had been monogamous.[430]  The Governor then explained to Ms. Bennett that she had trouble being monogamous in relationships (which was not something she herself had said) because of her past as a survivor of sexual assault, and that she required having "control" in relationships.[431]

At one point during this conversation, Ms. Bennett tried to change the topic by discussing a tattoo that she wanted to get for her birthday.[432]  The Governor  insisted that she get the tattoo on her butt rather than her shoulder, so that people would not see it if she were wearing a dress.[433]  The Governor also asked Ms. Bennett about her piercings, and asked if she had piercings anywhere other than her ears.[434]  Ms. Bennett described this conversation as "painfully awkward."[435]

---

[424] *Id.* at 167:2–9.

[425] *Id.* at 167:24–168:2.  At some point during the summer of 2020, likely before June 29, 2020, Ms. Bennett shared with Staffer #2 that the Governor had said or done something that had made her very uncomfortable.  Staffer #2 conveyed this information to Staffer #3.  Staffer #2's recollection was that the Governor had tasked Ms. Bennett with finding the Governor a girlfriend during the May 2020 conversation.

[426] *Id.* at 168:5–8.  A Trooper with whom Ms. Bennett frequently interacted when she worked for the Governor said that Ms. Bennett once told him that the Governor joked about her finding the Governor a girlfriend, and asked Ms. Bennett if she had ever had a relationship with someone older.

[427] *Id.* at 168:9–14.

[428] *Id.* at 168:14–23.  Another staff member of the Executive Chamber also recalled that Ms. Bennett told him, following her change in position to a health policy advisor role (which occurred in June 2020), that the Governor had told her that he would date a 22-year-old, which had made Ms. Bennett uncomfortable, and that Ms. Bennett had spoken to Ms. Mogul and Ms. DesRosiers about the comment, which resulted in Ms. Bennett being moved to the health policy position.  This staff member reported to his supervisor that Ms. Bennett had had a conversation with the Governor in which the Governor said he would be willing to date considerably younger women and that Ms. Bennett had spoken to Ms. Mogul and Ms. DesRosiers about the conversation.  His supervisor responded something along the lines of, "He shouldn't have said that," but did not indicate that she would take further action.

[429] *Id.* at 166:15–19.

[430] *Id.* at 169:2–10.

[431] *Id.* at 169:19–170:6.

[432] *Id.* at 171:14–21.

[433] *Id.* at 171:21–172:2.  At least one other staff member recalled hearing about Ms. Bennett's conversation with the Governor regarding her tattoo.

[434] *Id.* at 172:3–8.

[435] *Id.* at 172:8–10.

Ms. Bennett stated that during the June 5, 2020 interactions with the Governor, she was uncomfortable and afraid, saying:

> I felt really uncomfortable, but I was sensitive to the fact that I was—I was scared and I was uncomfortable, but I also was acutely aware that I did not want him to get mad.  I know him, I've seen his temper, I've heard it, I've worked with him for a year now, and I was trying my best to get through the conversation, and I was really like focused almost just on the question he was asking me, because I was—otherwise I would have been like really freaking out.  But I was really like very low energy and a little bit like almost glum, because he mentioned it the next day that I was very low energy in this conversation and asked me why.[436]

Ms. Bennett sent a series of text messages to a friend throughout that day and on the following day detailing the interaction and describing how alarmed she was by the Governor's statements.  She reported to the friend, among other things, "[t]alked about age differences in relationships" [437]; "we talked about my relationships and why I am skeptical of monogamy and my past and my tattoos and his ex etc etc."[438]; "[i]f I was fucking other ppl in in my recent relationships and how we talked about monogamy . . . [a]nd whether they hooked up w other ppl too or if it was just me"[439]; "[h]e said he was really lonely all alone can't meet anyone work sucks for him right now he can't even hug anyone.  Who did I last hug"[440]; "[a]nything under 22 isn't ok but other than that it's fine . . . He said age doesn't matter.  Asked me if it made a diff for me"[441]; "[t]old me to put tattoo on my butt.  Not my shoulder"[442]; and "[w]e had an entire conversation about how I have to control my relationships.  And like control the situation.  In order to feel safe and comfortable.  Post rape."[443]  In text messages dated June 5, 2020,  the day of this interaction, Ms. Bennett described the conversation with the Governor to the same friend as "the most explicit it could be" and wrote that she was "so upset and confused" and "shaking."[444]

---

[436] *Id.* at 173:24–174:16.  One staff member recalled seeing Ms. Bennett upset in the office around this time and that Ms. Bennett told her that she was upset because Ms. Benton had yelled at her for being in the Governor's office for too long.  Ms. Bennett's testimony was consistent with this account, and she recalled that, "The interaction with [the staff member] was very memorable because I felt like I don't act like that in the office and things don't rattle me quite—like Stephanie [Benton] could be mad at me and I wouldn't be crying, you know."  *Id.* at 176:7–12.  Although this staff member thought this interaction took place on June 12, 2020, based on Ms. Bennett's text messages, it appears this interaction likely took place on June 5.

[437] Ex. 46 (text messages between Ms. Bennett and a friend dated June 5, 2020).

[438] Ex. 47 (text messages between Ms. Bennett and a friend dated June 6, 2020).

[439] *Id.*

[440] *Id.*

[441] *Id.*

[442] *Id.*

[443] Ex. 48 (text messages between Ms. Bennett and a friend dated June 6, 2020).

[444] Ex. 46 (text messages between Ms. Bennett and a friend dated June 5, 2020).  The next day, Ms. Bennett texted this friend, "I need to talk to Jill."  Ex. 49 (text messages between Ms. Bennett and a friend dated June 6, 2020).

The next day, which was a Saturday, Ms. Bennett was asked to come into the office.[445] Ms. Benton and Ms. DeRosa were in the office that day, but they left after Ms. Bennett arrived, leaving her alone in the office with the Governor.[446]  Ms. Bennett testified that she was "freaking out," that she had been left alone with the Governor.[447]  The Governor called her into his office twice to ask her for help with his phone.[448]  That day, according to Ms. Bennett, the Governor also asked her if she had found him a girlfriend yet, referencing their conversation from the previous day.[449]  Ms. Bennett further testified that, as she was leaving, the Governor commented that Ms. Bennett, who was wearing long jean shorts, "look[ed] like Daisy Duke."[450]  Ms. Bennett sent a text message about the "Daisy Duke" comment to the friend with whom Ms. Bennett had been discussing the June 5, 2020 interaction.[451]

Ms. Bennett testified that she understood her June 5 conversations with the Governor to mean that the Governor was propositioning her for sex.[452]  As a result, Ms. Bennett no longer wanted to be in a role that required her to work with him.[453]

The Governor denied some, but not all, of Ms. Bennett's allegations about their conversations in June.  Overall, he described all of his interactions with Ms. Bennett in the context of his learning of her sexual assault, stating "with Charlotte I tread very lightly, because with a victim of sexual assault—and she was clearly fragile and in a delicate place—I was very careful about those conversations . . ."[454]  He stated that he does not recall making a comment about Ms. Bennett looking like the alien from *Predator*, nor did he remember making a comment about a "sexual harassment investigation."[455]  He also denied saying that he would date anyone over 22, saying, "[m]y daughters are over 22 years old. It just doesn't make any sense."[456]  He also testified that he did not talk with Ms. Bennett about her sex life and monogamy other than, as detailed below, asking her about her relationships with older men.[457]

Ms. Bennett testified that this was a reference to Ms. DesRosiers, to whom Ms. Bennett intended to report her concerns about the Governor's conduct and in fact ultimately did.  Bennett Tr. 186:13–20.

[445] Bennett Tr. 179:23–180:4.

[446] *Id.* at 180:23–181:2, 181:9–13.

[447] *Id.* at 179:18–20, 182:5.

[448] *Id.* at 182:6–17.

[449] *Id.* at 184:3–5.

[450] *Id.* at 184:8–18.

[451] *See* Ex. 50 (text messages between Ms. Bennett and a friend dated June 6, 2020).

[452] Bennett Tr. 173:2–4, 202:11–20.

[453] *Id.* at 202:11–20.

[454] Andrew Cuomo Tr. 271:13–19.

[455] *Id.* at 306:20–307:10.

[456] Andrew Cuomo Tr. 297:8–13.  The Governor's youngest daughter was, in fact, 22 at the time of the Governor's conversation with Ms. Bennett.

[457] *Id.* at 308:16–309:9.

Regarding some of the allegations, however, the Governor acknowledged that he had made statements similar to those described by Ms. Bennett, but disputed Ms. Bennett's characterization of his intent.  For example, the Governor admitted that he asked Ms. Bennett whether she did or does "have relationships with older men," and said that Ms. Bennett did not respond to the question.[458]  He said that he did so because he had heard rumors about Ms. Bennett's purported involvement with older individuals and wanted to "give her the opportunity to talk about" that without stating it directly.[459]  He further stated that he did tell Ms. Bennett to "find him a good candidate [for a girlfriend]," but said it was in response to Ms. Bennett raising that she had seen multiple women on social media express an interest in dating him.[460]  Regarding Ms. Bennett's allegation that the Governor told her to get a tattoo on her butt, the Governor stated that he did not use the word "butt," but that he did tell her to get the tattoo somewhere that people could not see it.[461]  He stated that he did so because someone had previously told him that that was good advice to give sexual assault victims who wanted to get tattoos.[462]  Finally, the Governor admitted that he referred to Ms. Bennett as "Daisy Duke" when she was wearing shorts in the office.[463]  He said that he did so because he thought that it was inappropriate that she was wearing shorts (although he acknowledged that they were not short shorts), and wanted to comment on it without doing so directly, noting that he wanted to be "sensitive" because of her history of sexual assault.[464]  The Governor also testified, that in his view, there was something "fragile" and "different" about Ms. Bennett,[465] and stated that "[s]he processed what she heard through her own filter.  And it was often not what was said and not what was meant."[466]

**Reporting Governor Cuomo's Conduct**

The following week, on June 10, 2020, distressed with the inappropriate and sexually suggestive conversations she had had with the Governor, Ms. Bennett reported his conduct to Ms. DesRosiers.[467]  Ms. Bennett recalled that the conversation with Ms. DesRosiers was short and that she relayed to Ms. DesRosiers briefly what had happened, including that the Governor had asked her if she had slept with older men and told her that he would sleep with younger

---

[458] *Id.* at 309:11–310:10.

[459] *Id.*

[460] *Id.* at 296:23–297:5.

[461] *Id.* at 315:20–25.

[462] *Id.* at 314:7–315:25.

[463] *Id.* at 278:5–9.

[464] *Id.* at 278:5–279:12.

[465] *Id.* at 281:21–283:5.

[466] *Id.* at 255:24–256:2.

[467] Bennett Tr. 202:21–203:10; Ex. 51 (text messages between Ms. Bennett and a friend dated June 10, 2020).

women.[468]  Ms. DesRosiers did not ask follow up questions about what had happened.[469]
Instead, Ms. DesRosiers told Ms. Bennett something to the effect of, "I'm sorry" and "that's
inappropriate," and offered to find Ms. Bennett a new position.[470]  Ms. Bennett told
Ms. DesRosiers that she did not want to be in a role that required her to interact with the
Governor; she was transferred to work in the health policy team that same week.[471]
Ms. DesRosiers did not recall informing Ms. Bennett that she was protected from retaliation, nor
explaining how Ms. Bennett could report the Governor's conduct.[472]

Ms. Bennett's text messages demonstrate that, going into the conversation with
Ms. DesRosiers, she anticipated that she would be punished for reporting the Governor's conduct
and was fearful of the Governor's reaction.  She wrote to a friend prior to the conversation,
"Basically I leave w[ith] a new job or no job."[473]  After the conversation with DesRosiers,
Ms. Bennett reported to the same friend that she had told Ms. DesRosiers, "I didn't want him to
find out and get mad."[474]

On June 29, 2020, Ms. Bennett disclosed to a group of Executive Chamber staff members
that the Governor had been inappropriate with her.[475]  We spoke to multiple staff members who
recalled this conversation.[476]  Staffer #3 recalled that Ms. Bennett explained to the group that the
Governor had asked her about her sex life and asked other inappropriate personal questions, as
well as bringing up her history as a sexual assault survivor.  Staffer #3 also recalled that
Ms. Bennett was visibly upset and crying during this conversation, and that everyone in the room
was also upset and tried to console Ms. Bennett.

---

[468] Bennett Tr. 202:23–25, 204:2–5.  Ms. DesRosiers testified that she remembers from that first conversation that
Ms. Bennett had an "exchange or interaction with the Governor that made her uncomfortable" and that "he had
talked about being lonely."  DesRosiers Tr. 222:21–223:5.

[469] Bennett Tr. 203:23–204:10; DesRosiers Tr. 225:20–226:4.  Ms. DesRosiers testified that she did not follow up
and ask many questions because she would have felt more comfortable having this conversation with another person
present, and that she intended to seek advice from counsel about how to proceed.  DesRosiers Tr. 226:12–20.
Although Ms. DesRosiers spoke to Ms. Mogul on June 10, 2020, she did not ask Ms. Bennett any other questions
about her interactions with the Governor until almost three weeks later, when Ms. DesRosiers learned that
Ms. Bennett told a group of staff members that the Governor had made her uncomfortable.  *Id.* at 231:9–13, 241:9–
15, 242:10–243:11, 246:3–8.

[470] Bennett Tr. 203:10–13, 204:7–8.

[471] *Id.* at 205:10–12, 207:21–208:20; DesRosiers Tr. 227:3–23.  Some witnesses noted that Ms. Bennett had been
interested in health policy work at the time.  One witness saw Ms. Bennett around the time and Ms. Bennett said,
regarding the job change, "Jill [DesRosiers] is amazing, Jill is so great."

[472] DesRosiers Tr. 227:3–23.

[473] Ex. 51 (text messages between Ms. Bennett and a friend dated June 10, 2020).

[474] Ex. 51 (text messages between Ms. Bennett and a friend dated June 10, 2020).  Around this same time,
Ms. Bennett sent a text message to another friend, saying, "might be switching roles/jobs. Staying in the executive
chamber but switching jobs.  [A] specific person was maybe not so appropriate to me."  Ex. 52 (text messages
between Ms. Bennett and a friend dated June 11, 2020).

[475] Bennett Tr. 109:7–110:5.

[476] Another staff member sent a text message to Ms. Bennett the next day, writing, "[t]hank you for telling me. i
hope you feel safe to tell me more things in the future. whatever those things may be."  Ex. 53 (text messages
between Ms. Bennett and a friend dated June 30, 2020).

The day after this conversation with Ms. Bennett, one of these staff members ("Staffer #4") spoke to Ms. DesRosiers about Ms. Bennett's allegations.  On June 30, 2020, after Ms. DesRosiers learned from Staffer #4 that Ms. Bennett had told a group of Executive Chamber employees the Governor had been "making moves" on her, Ms. DesRosiers relayed this to Ms. DeRosa, who directed Ms. DesRosiers to "get Judy [Mogul] and figure out what's going on."[477]  Ms. DesRosiers asked Ms. Bennett to have a follow-up conversation with Ms. DesRosiers and Ms. Mogul that same day.[478]  Ms. DesRosiers asked Ms. Bennett to tell Ms. Mogul everything about Ms. Bennett's interactions with the Governor, which Ms. Bennett did.[479]  Ms. Bennett testified that Ms. DesRosiers and Ms. Mogul did not notify her about the process for making a complaint during this meeting, did not state that they intended to report what Ms. Bennett had told them, and did not tell Ms. Bennett that she had any protections from retaliation.[480]  Later that day, Ms. Bennett texted a friend that she "[w]ent through every memorable convo I've ever had w the Governor E V E R" in the conversation with Ms. DesRosiers and Ms. Mogul.[481]

Ms. Mogul and Ms. DesRosiers, through their testimony and their detailed, contemporaneous handwritten notes, confirmed that Ms. Bennett told them about nearly all of the above-described incidents during the June 30, 2020 meeting.

As for Ms. Bennett's early interactions with the Governor, Ms. Mogul's and Ms. DesRosiers's notes from the June 30, 2020 meeting state that the Governor "asked [Ms. Bennett] if [she] commit[s] to things"; that the Governor and Ms. Bennett discussed a "push up contest"; and that the Governor criticized Ms. Bennett's hair when it was in a bun in a manner consistent with Ms. Bennett's testimony.[482]  Ms. Mogul's and Ms. DesRosiers's notes also reflect an understanding of Ms. Bennett's long conversation with the Governor in January 2020 that is similar to what Ms. Bennett has described.[483]  Ms. Mogul testified that she felt Ms. Bennett "had been credible" and described Ms. Bennett as "thoughtful and very sort of deliberate" as she described her interactions with the Governor.[484]

Ms. Mogul's notes state that Ms. Bennett, during the June 30, 2020 meeting, described her May 15, 2020 interaction with the Governor as a "turning point."[485]  Ms. DesRosiers and Ms. Mogul noted that the Governor asked her that day whether she was interested in fellow Executive Chamber staff members and whether she was going to "get married" to one male staff

---

[477] DeRosa Tr. 352:13–353:3; DesRosiers Tr. 242:14–244:11, 246:3–8.

[478] Bennett Tr. 215:13–17.

[479] *Id.* at 215:13–17.

[480] *Id.* at 218:11–21; DesRosiers Tr. 266:22–267:11.

[481] Ex. 54 (text messages between Ms. Bennett and a friend dated June 30, 2020).

[482] Ex. 2 (Ms. Mogul's notes of June 30, 2020 conversation); Ex. 3 (Ms. DesRosiers' notes of June 30, 2020 conversation).

[483] Ex. 2 (Ms. Mogul's notes of June 30, 2020 conversation); Ex. 3 (Ms. DesRosiers' notes of June 30, 2020 conversation).  Among other things, the notes reflect that Ms. Bennett saw it as a "very personal conversation" that they discussed Ms. Bennett's history of sexual assault, and that the Governor had referred to the "cone of silence."

[484] Mogul Tr. 60:2–4, 104:2–3.

[485] Ex. 2 (Ms. Mogul's notes of June 30, 2020 conversation).

member.[486]  Ms. Mogul and Ms. DesRosiers also both noted that Ms. Bennett told them that, during the May 15, 2020 interaction, the Governor complained to her that he "want[ed] to be touched," that he was "lonely" and "looking for a girlfriend," and that he wanted to "get on a motorcycle [and] take a woman into the mountains."[487]  Ms. Bennett also told Ms. Mogul and Ms. DesRosiers that the Governor "loudly and repeatedly" said to her, "you were raped! You were raped! You were raped!"[488]  Ms. Bennett described to Ms. Mogul and Ms. DesRosiers at the time that the conversation "didn't sit right" and that it "felt like a test" as if the Governor wanted to "get under [her] skin."[489]  Ms. DesRosiers testified that when Ms. Bennett was describing this interaction, Ms. Bennett got emotional and was "shaking a little bit."[490]

Ms. Mogul's and Ms. DesRosiers's notes also describe Ms. Bennett's extensive discussion with them about her interactions with the Governor on June 5 and 6, 2020 consistent with Ms. Bennett's testimony.  For example, Ms. Mogul's notes read, "mask kept sliding into face—made a comment like predator—if someone asked me—if I were being investigated for sexual harassment—she looks like a predator."[491]  Both Ms. Mogul and Ms. DesRosiers noted that the Governor asked Ms. Bennett to "find [him] a girlfriend."[492]  The two further wrote that the Governor asked Ms. Bennett about age difference in relationships and that the Governor commented, "as long as they are over 22," and both note that the Governor knew Ms. Bennett was 25.[493]  Ms. DesRosiers and Ms. Mogul both wrote that he said to Ms. Bennett again that he was "lonely."[494]  Ms. Mogul also noted, as Ms. Bennett testified, that the Governor asked Ms. Bennett about her sexual and romantic life, writing:

> [H]e asked me about how being sexually assaulted affected the way I was attracted to men . . . . [T]alked about monogamy - asked about recent hookups . . . . [H]e wanted to know who I had been seeing—

---

[486] Ex. 2 (Ms. Mogul's notes of June 30, 2020 conversation); Ex. 3 (Ms. DesRosiers' notes of June 30, 2020 conversation).

[487] *Id.*

[488] *Id.*

[489] *Id.*

[490] DesRosiers Tr. 254:14–17.

[491] Ex. 2 (Ms. Mogul's notes of June 30, 2020 conversation); Ex. 3 (Ms. DesRosiers' notes of June 30, 2020 conversation).

[492] Ex. 2 (Ms. Mogul's notes of June 30, 2020 conversation); Ex. 3 (Ms. DesRosiers' notes of June 30, 2020 conversation).

[493] Ex. 2 (Ms. Mogul's notes of June 30, 2020 conversation); Ex. 3 (Ms. DesRosiers' notes of June 30, 2020 conversation).

[494] Ex. 2 (Ms. Mogul's notes of June 30, 2020 conversation); Ex. 3 (Ms. DesRosiers' notes of June 30, 2020 conversation).

if I was sleeping w/ other people if they were sleeping w/ other people.[495]

Both similarly wrote in their notes that Ms. Bennett told them she had talked with the Governor about tattoos, with Ms. DesRosiers writing, "[a]t some point of the conversation they discussed a tattoo that CB wanted . . .  CB said she was going to get it on her back.  CB said AC said you should get on chest or ass. JM said[,] he said ass? CB said no he said butt."[496] Ms. Mogul and Ms. DesRosiers also wrote that the next day, June 6, 2020, the Governor asked Ms. Bennett again about finding him a girlfriend and told her that she looks like "Daisy Dukes."[497]

At the time of the conversation, Ms. Bennett wrote to a friend that Ms. Mogul was "nice and she is very well respected and I really appreciated the way she went about it."[498] Ms. Bennett testified that she no longer appreciates how Ms. Mogul handled the interaction, "mostly because it was just not how she's legally required to handle this."[499]

After the conversation with Ms. Bennett, Ms. Mogul spoke to the Governor and Ms. DeRosa about Ms. Bennett.[500]

Ms. Bennett testified that the next day, a staff member sent Ms. Bennett a copy of the Chamber's Equal Employment Opportunity Policy ("EEO Policy").[501]  The staff member later told her that Ms. Mogul had asked him for a copy on that day.[502]  Ms. Bennett said that after reading the policy, it seemed that this would have to be reported to GOER and an investigation conducted.

Ms. Bennett, concerned about the prospect of an investigation, followed up with Ms. Mogul and Ms. DesRosiers, and the three of them spoke again by phone.[503]  Ms. Bennett told the two women that she had read the policy and was "afraid that there was going to need to be an investigation."[504]  Ms. Bennett stated that she was "terrified" at this point:

---

[495] Mogul Tr. 98:15–23 ("she did tell me that he asked her about her sex life and the impact of the assault on her sex life."); Ex. 2 (Ms. Mogul's notes of June 30, 2020 conversation); Ex. 3 (Ms. DesRosiers' notes of June 30, 2020 conversation).

[496] Ex. 2 (Ms. Mogul's notes of June 30, 2020 conversation); Ex. 3 (Ms. DesRosiers' notes of June 30, 2020 conversation).

[497] Ex. 2 (Ms. Mogul's notes of June 30, 2020 conversation); Ex. 3 (Ms. DesRosiers' notes of June 30, 2020 conversation).

[498] Ex. 54 (text messages between Ms. Bennett and a friend dated June 30, 2020).

[499] Bennett Tr. 220:25–221:10.

[500] Mogul Tr. 88:13–89:6.  Ms. Mogul declined to reveal the substance of that conversation, citing privilege.  *Id.* at 89:7–10.

[501] Bennett Tr. 222:17–21.

[502] *Id.* at 229:3–7.

[503] *Id.* at 222:17–223:2.

[504] Mogul Tr. 104:25–105:5.

I didn't think any person I had talked to at any point, as nice as they were, were going to protect me from anything at all at any point . . . Well, I certainly expected to lose my job, and that was a real possibility is what I told my parents.  I was scared to even see [the Governor] in the hallway, which was a rare occurrence anyway.  I was honestly—I was just terrified.  I don't even—I feel like I sat next to senior staff as they worked and I have no concept of how far they'd go to protect him and didn't want to find out.[505]

According to Ms. Bennett, during the call, Ms. Mogul told her that the conduct Ms. Bennett described constituted "grooming" (a word Ms. Bennett used the previous day to describe the behavior)[506] but, according to Ms. Mogul, did not rise to the level of sexual harassment.[507]  Ms. Mogul then told Ms. Bennett that it sounded like Ms. Bennett had a "friendship" with the Governor and complimented Ms. Bennett on stopping the relationship before something inappropriate happened.[508]  Ms. Mogul said that because the conduct did not rise to the level of sexual harassment, Ms. Mogul was not required to escalate Ms. Bennett's complaint.[509]  Ms. DesRosiers's contemporaneous notes of the conversation reflect a similar back-and-forth between Ms. Bennett and Ms. Mogul:

JM says (not exact) Ok I want to get your mind at ease.  I am very familiar with the handbook.  I have read through my notes and reviewed the law and it sounds like based on what you shared that while there were conversations that became too personal and uncomfortable that most of your interactions were appropriate and that once the conversations became uncomfortable you took control of the situation.  And immediately, to go to JD to be moved out of the situation and that she moved you to do something else [*unclear*].  The conduct you described does not rise to the level of harassment and no further inquiry appears to be necessary at this time. Do you agree with what I just said?

CB. Yes.  And it's a relief.  I was worried that he AC [*crossed out*] would be mad he is a powerful person.  But yes agree w/ what you described.

JM—and from what you described would you say that most of your interactions were positive and support and that you considered AC a friend[.]

---

[505] Bennett Tr. 227:11–228:9.

[506] *Id.* at 223:3–224:10.

[507] *Id.* at 223:3–8.

[508] *Id.* at 223:3–23.

[509] *Id.* at 224:16–20.

> CB—yes and I still consider him my friend.
>
> JM—you are very courageous.[510]

Ms. Mogul confirmed that, based on what Ms. Bennett told her, she determined that a report to GOER was not necessary.[511]  Ms. Bennett testified that during this conversation, she was trying to be as agreeable as possible and convey to the Governor and Executive Chamber that she was not a threat.[512]

Ms. Mogul testified that, aside from transferring Ms. Bennett to the health policy team, the Executive Chamber instituted two other changes in response to Ms. Bennett's complaint. First, Ms. Mogul stated that the Chamber instituted "changes in staffing" so that "they would avoid situations where the Governor might be seen as being in a compromising situation with any woman."[513]  Ms. Mogul and Ms. DeRosa, who discussed these protocols with Ms. Mogul, described these changes in staffing as "really more for the Governor's protection."[514]  Second, in December 2020, Ms. Mogul advised another Executive Chamber staff member to conduct exit interviews of staff members who were leaving to determine whether any staff members, and in particular women, had any concerns.[515]

Ms. DeRosa testified that after she learned that Ms. Bennett had spoken to Ms. Mogul and Ms. DesRosiers to complain about the Governor's conduct, Ms. DeRosa became upset and confronted the Governor while traveling with him in a car.[516]  She told the Governor, "I can't believe that this happened.  I can't believe you put yourself in a situation where you would be having any version of this conversation."[517]  When asked about this confrontation with Ms. DeRosa, the Governor characterized Ms. DeRosa as having said that he should not have interacted with Ms. Bennett at all because she is a sexual assault survivor and he responded that he refused to write off a young woman just because she had been assaulted.[518]

Ms. Bennett stated that, on June 19, 2020, after she had transferred to the health policy team, she learned that a party for staff members had been planned at the Executive Mansion.[519] Although she was not on the initial email inviting staff members, Ms. Bennett says she received

---

[510] Ex. 3 (Ms. DesRosiers' handwritten notes from the June 30, 2020 conversation with Ms. Bennett).

[511] Mogul Tr. 106:22–107:4.  During her testimony, Ms. Mogul confirmed that she still believes that she correctly handled Ms. Bennett's complaint based on what Ms. Bennett told her at the time.  *Id.* at 368:24–369:5.

[512] Bennett Tr. 225:13–226:2.

[513] Mogul Tr. 254:6–17.

[514] DeRosa Tr. 423:3–21; Mogul Tr. 254:13–17.

[515] Mogul Tr. 252:18–25.

[516] DeRosa Tr. 383:8–388:23.

[517] *Id.* at 383:20–25.  Ms. DeRosa stated that after confronting the Governor, she got out of the car, which was stopped at a traffic light, and left.  *Id.* at 388:13–23.

[518] Andrew Cuomo Tr. 326:21–327:24.

[519] Bennett Tr. 211:2–4.

a call from Ms. Benton approximately two hours before the party began inviting her to attend.[520] Ms. Bennett decided to go "to make everything look like it was fine."[521]  When the Governor arrived, he hugged all of the staff members, including Ms. Bennett; she described the interaction as "bizarre and uncomfortable."[522]  Ms. Bennett sent an email to Ms. Benton and Ms. DeRosa complimenting them and saying that it was an "honor to know [them]." [523]  Ms. Bennett explained that she felt "disgusting" about sending the email, but that she did so out of desperation to "make it seem like everything was totally fine."[524]

**Departure from State Government**

Ms. Bennett testified that shortly after she transferred to the health policy team, she went on medical leave and quit her job approximately a month later.[525]  She stated that she decided to quit because, among other things, she had "lost her confidence," she was "teary [and] anxious" and ultimately "hated the fact . . . everything had to be about the Governor. . . . I had no interest. Not only did I have no confidence[,] but I had no interest in expending any energy as it related to him."[526]

After Ms. Bennett informed her supervisor in the Department of Health that she was quitting, she received a call from Ms. Mogul.[527]  During this call, Ms. Mogul offered to find Ms. Bennett another job and asked Ms. Bennett if her quitting had anything to do with her interactions with the Governor; Ms. Bennett replied that it did.[528]  Ms. Mogul also told Ms. Bennett she sounded "depressed" and told Ms. Bennett that the Executive Chamber could "support" her.[529]  Ms. Bennett explained that she felt "ambushed" and "pretty emotional and [] freaked out" as a result of this call.[530]  Ms. Bennett subsequently met with Ms. DesRosiers about her decision to quit, and Ms. DesRosiers also offered to find Ms. Bennett another job.[531]  During this conversation, Ms. Bennett again brought up her interactions with the Governor and Ms. DesRosiers cut her off, saying, "I'm so sorry [about] what happened with the team."[532]

---

[520] *Id.* at 211:4–10.

[521] *Id.* at 211:10–12.

[522] *Id.* at 212:14–16.

[523] *Id.* at 214:15–23.

[524] *Id.* at 214:16–215:2.

[525] *Id.* at 234:11–14.

[526] *Id.* at 235:10–16, 236:8–16.

[527] *Id.* at 235:5–9, 237:18–21.

[528] *Id.* at 238:7–239:2.

[529] *Id.* at 239:2–6.

[530] *Id.* at 239:6–7.

[531] *Id.* at 241:16–19.

[532] *Id.* at 241:23–242:5.

Ms. Bennett said that it felt as though Ms. DesRosiers was "rewriting history as the conversation was happening."[533]

In a December 8, 2020 message Ms. Bennett sent to Ms. Boylan following Ms. Boylan's first public allegation, Ms. Bennett summed up her experience with the Governor as follows:

> The verbal abuse, intimidation and living in constant fear were all horribly toxic—dehumanizing and traumatizing.  And then he came onto me.  I was scared to imagine what would happen if I rejected him, so I disappeared instead.  My time in public service ended because he was bored and lonely.  It still breaks my heart.[534]

**Assessment**

We found the level of detail and consistency in Ms. Bennett's account, her demeanor, and the circumstances of her allegations to be credible.  Ms. Bennett's allegations were supported by voluminous contemporaneous documents in the form of text messages that she sent to friends, family, and other staff members immediately after the key events she described, as well as other staff members who described hearing about incidents from Ms. Bennett contemporaneously.  In her contemporaneous texts, she described many key events in exactly the way she has described them to us in our investigation (and in a way that was inconsistent with the Governor's version of the facts).  Moreover, Ms. DesRosiers's and Ms. Mogul's testimony, as well as their contemporaneous notes, corroborate Ms. Bennett's description of her interactions with the Governor.  These notes specifically demonstrate that Ms. Bennett spoke consistently about these interactions, and her perception of them, long before any sexual harassment allegations against the Governor became public (indeed, at a time when she did not want them to be public).  Notably, former and current Executive Chamber staff who were interviewed generally did not question the credibility of Ms. Bennett, though some disputed her characterization of her interactions with Governor Cuomo as inappropriate.

Although the Governor admitted to making many of the comments Ms. Bennett alleged, we found his explanations and characterizations of those conversations, as well as his blanket claim that he was "always" careful with her because of her status as a survivor of sexual assault, unpersuasive.  We note that the Governor, during his testimony, asserted that Ms. Bennett's story changed "markedly" over time, specifically, after Ms. Boylan's allegations became public.[535]  It did not.  The Governor testified that, at the time Ms. Bennett reported his conduct to Ms. Mogul and Ms. DesRosiers, he was told only that Ms. Bennett reported that "[he] did not sexual[ly] harass her, [he] did not make inappropriate advances, she considered [him] a friend, and that [he] was paternalistic and a mentor."[536]  However, Ms. Mogul and Ms. DesRosiers's notes from the June 30, 2020 conversation contain detailed descriptions of Ms. Bennett's interactions with the Governor that closely track Ms. Bennett's testimony as well as the statements she has given to

---

[533] *Id.* at 242:6–7.

[534] Ex. 55 (Twitter direct message from Ms. Bennett to Ms. Boylan dated December 8, 2020).

[535] Andrew Cuomo Tr. 173:22–25.

[536] *Id.* at 174:14–17.

64

the press.[537]  We find the Governor's statements about his own knowledge of Ms. Bennett's complaints, as well as his general denials of any of the sexually suggestive comments (memorialized in numerous real-time texts and in Ms. Mogul's and Ms. DesRosiers' notes), are not credible.

### iv.    Lindsey Boylan

Lindsey Boylan is a former employee of the Empire State Development Corporation ("ESD") and former Deputy Secretary for Economic Development and Special Advisor to the Governor who has made public allegations of misconduct against the Governor.

In early 2015, Ms. Boylan joined ESD, a New York State agency, as Vice President for Business Development.[538]  Later that year, she was promoted to Chief of Staff to Howard Zemsky, the Chair and Chief Executive Officer of ESD.[539]  Ms. Boylan took on increasing responsibility within the Executive Chamber[540] and in or around the fall of 2017, began to join regular meetings with the Governor and his senior staff.[541]  In February 2018, Ms. Boylan officially joined the Executive Chamber and became Deputy Secretary for Economic Development and Special Advisor to the Governor.[542]

**Interactions with the Governor**

Ms. Boylan first met the Governor in 2014 when he spoke at Columbia Business School, before she joined ESD and while she was working as a municipal finance banker.[543]  The next day, Richard Bamberger (the Governor's former Communications Director) told Ms. Boylan the Governor had asked something to the effect of, "Why can't we get more people like that?" regarding Ms. Boylan.[544]

Ms. Boylan's next interaction with the Governor was as the new Chief of Staff to Mr. Zemsky, when she attended a January 6, 2016 event at Madison Square Garden.[545] Ms. Boylan noted that the Governor spent more time with her than she would have expected, and in greeting her clasped her hand in both of his hands, "wrapping his hands around both sides of

---

[537] Ms. Garvey, who was involved in issuing the Executive Chamber's press response to Ms. Bennett's allegations, testified that after speaking with Ms. Mogul it was her understanding that what Ms. Bennett had relayed to the New York Times was a "similar set of facts" to what she had told Ms. Mogul and Ms. DesRosiers months earlier, and Ms. Garvey "[did]n't think factually there was much in dispute."  Garvey Tr. 337:25–338:3, 342:13–16.

[538] Boylan Tr. 18:13–15.

[539] *Id.* at 19:3–12.

[540] *Id.* at 25:2–26:2.

[541] *Id.* at 42:16–43:12.

[542] *Id.* at 34:9–39:11.

[543] *Id.* at 61:20–62:8.

[544] Boylan Tr. 62:8–16.

[545] *Id.* at 63:2–10; Lindsey Boylan, *My story of working with Governor Cuomo*, Medium (Feb. 24, 2021), https://lindseyboylan4ny.medium.com/my-story-of-working-with-governor-cuomo-e664d4814b4e.

[her] hands" during the interaction, which she felt was "weird" and "creepy."[546]  It surprised Ms. Boylan because, in her mind, it showed "how little concern he had for acting inappropriately in front of camera[s]."[547]

Over time, Ms. Boylan noticed that the Governor seemed to be making comments about her regularly, including by commenting on her appearance and attractiveness, and would casually touch her on the lower back, waist, and legs.[548]  Ms. Boylan also testified that the Governor regularly told her that she was a "star," because she was good at what she did and also attractive.[549]  The Governor's conduct and the attention he was giving Ms. Boylan was noticed by others, including her supervisor, Mr. Zemsky, who testified that he told Ms. Boylan that he thought the Governor had a "crush" on her (a comment that Ms. Boylan also remembered).[550]  Mr. Zemsky recalled that the Governor "comment[ed] on Ms. Boylan's appearance relative to Hollywood actresses of the past," saying that she was even more attractive than those actresses.[551]  In light of the Governor's comments, which Mr. Zemsky thought were "uncomfortable" and "inappropriate," Mr. Zemsky asked whether Ms. Boylan wanted him to "get involved or try to make a change" in the Governor's behavior.[552]  Ms. Boylan responded at the time that she was "okay" and would "handle it."[553]

Ms. Boylan also noticed during that period that the Governor would check whether she would be attending particular events.  On November 1, 2016, Ms. DesRosiers, a senior staff member for the Governor at the time, emailed Mr. Zemsky, asking about Ms. Boylan's attendance at an upcoming event, and noting that she "[j]ust got that question."[554]  Ms. Boylan noted in a contemporaneous text exchange with her mother that this attention felt "creepy" and— as Mr. Zemsky had told her—"[the Governor] has a crush on me."[555]  The Governor testified that it would be "commonplace" for him to inquire about whether a staff member would be coming to a particular event or meeting.[556]  The Governor testified that he did not recall paying Ms. Boylan undue attention, although he stated that he could see himself "complimenting someone" on their appearance.[557]

[546] Boylan Tr. 63:15–64:18.

[547] Id. at 63:15–64:18.

[548] Id. at 78:2–79:6.  The Governor testified that he "may very well have touched her lower back," though he did not go out of his way to do so, and if he did, "it was incidental."  Andrew Cuomo Tr. 203:7–10, 206:6–16.

[549] Boylan Tr. 78:11–13.

[550] Id. at 98:21–100:17; Zemsky Tr. 28:12–20.  Ms. Boylan also testified that, after she resigned from the Executive Chamber and as she considered running for office, Bill Mulrow (former Secretary to the Governor) told her the Governor "loves you" and then corrected himself.  Boylan Tr. 178:19–20.

[551] Zemsky Tr. 17:13–19:4.

[552] Id. at 28:12–20.

[553] Id. at 28:12–29:4.

[554] Ex. 56.

[555] Ex. 57.

[556] Andrew Cuomo Tr. 78:9–80:7.

[557] Id. at 62:7–63:15.

Ms. Boylan attended the annual holiday party in 2016 for the agency heads and senior staff members in the State Capitol in Albany.[558]  At the party, which was held in a large space in the Capitol, she noticed that the Governor saw her from across the room.[559]  Subsequently, a staff member of the Executive Chamber called Ms. Boylan from an unlisted number and told her that the Governor wanted her to come for a tour of the second floor of the Capitol, where the Governor's office is located.[560]  Ms. Boylan testified that she "said okay because that's what you do,"[561] but that she felt "really scared" that she was in a "very clear predatory situation."[562]  The staff member then escorted Ms. Boylan to the Governor's office.[563]

According to Ms. Boylan, the Governor came into his office and walked over to Ms. Boylan.[564]  Ms. Boylan testified that the Governor showed her around his office, and pointed out a cigar box which he said was from Bill Clinton.[565]  Ms. Boylan felt that the Governor was pointing out the cigar box as an allusion to President Clinton and Monica Lewinsky.[566]  The Governor testified he does not specifically recall showing Ms. Boylan the cigar box, but that he regularly conducts a tour of his office and has done so "a thousand times" and that the "first stop in the normal trajectory is the [cigar] box with the card from president Clinton," though he denied the "implication of Monica Lewinsky" associated with the cigar box.[567]

Also in December 2016, the Governor told Ms. Boylan that she looked like Lisa Shields, a woman he had previously dated.  In an email dated December 14, 2016, Ms. Benton wrote to Ms. Boylan, "He said look up Lisa Shields. You could be sisters.  Except you're the better looking sister."[568]  Ms. Boylan testified that after making this comparison, the Governor sometimes referred to her as "Lisa."[569]  As Ms. Boylan described the experience:

> This, to me—like the tour of his office was, like, a watershed for me . . . I was trying and my professional overtures were met with stuff like this and sometimes they were, you know, quizzing me about information and sometimes it would be this and I would have no idea which it would be and I thought it was really brazen that that

---

[558] Boylan Tr. 101:8–20.

[559] *Id.* at 101:13–102:17.

[560] *Id.* at 102:17–103:18.

[561] *Id.* at 103:21–22.  Ms. Boylan also said that "You learn very quickly you can't say no.  You just try and, you know, gloss over something and disappear before it's time."  *Id.* at 33:23–34:2.

[562] *Id.* at 103:23–104:7.

[563] *Id.* at 103:23–106:9.  A former staff member spoke to Ms. Boylan after she made her allegations public, and originally indicated that the staff member recalled seeing her at the December 2016 holiday party.  The staff member said that upon reflection, the staff member cannot say with certainty that Ms. Boylan was at the holiday party.

[564] *Id.* at 106:24–107:3.

[565] *Id.* at 107:6–12.

[566] *Id.* at 107:12–14.

[567] Andrew Cuomo Tr. 92:5–94:15.

[568] Ex. 58.

[569] Boylan Tr. 88:12–19.

> was in an email and I think more than anything what was unsettl[ing] to me was that this was [] communicated to him by a woman on his staff . . . I've been sexually harassed throughout my career, but not in a way where the whole environment was set up to feed the predator and this and every interaction I had with the Governor and the culture felt like it was all to feed the predator.[570]

She added that:

> [I]t was deeply humiliating on some level.  I think a lot of people are, like, of course this happened to young women who have no power.  Well, I was really senior and I had worked my whole life to get to a point where I would be taken seriously and I wasn't being taken seriously and I worked so hard to be some little doll for the Governor of New York and that was deeply humiliating.  So I would just try to be as professional, focused, go with the flow, keep everyone happy as possible.[571]

Ms. Benton testified that she recalled the Governor saying Ms. Boylan looked like Ms. Shields.[572]  She did not recall the additional statements about Ms. Boylan looking like Ms. Shields's sister or the better looking sister, and testified that she could have been the one who added that part.[573]  The Governor's testimony was that he had told Ms. Boylan that she "had a clone" or something along those lines, without naming who Ms. Boylan resembled.[574]  The Governor told Ms. Benton later to tell Ms. Boylan to search Ms. Shields on the internet.[575]  The Governor denied having referred to Ms. Shields as his girlfriend.[576]  During his testimony, in response to the question, "Was [Ms. Shields] your girlfriend?" the Governor initially claimed there could be confusion over the meaning of the word "girlfriend" and the word "date."[577]  After some back and forth about the meaning of those common words, the Governor agreed that Ms. Shields was in fact a "woman who was a friend who [he] did see romantically for a period of time."[578]

The Governor testified that he would not have said Ms. Boylan was the better looking sister because he does not feel comfortable comparing the attractiveness of two women, but acknowledged that he could have said Ms. Boylan and Ms. Shields "could be sisters," as that was

---

[570] *Id.* at 89:18–90:17.

[571] *Id.* at 91:13–23.

[572] Benton Tr. 123:8–127:15.

[573] *Id.* at 124:4–127:22.

[574] Andrew Cuomo Tr. 66:23–67:8.

[575] *Id.* at 67:9–14.

[576] *Id.* at 67:20–67:23.

[577] *Id.* at 67:24–71:11.

[578] *Id.*

consistent with his recollection of saying "you could be clones."[579] He agreed during his testimony that women in the Executive Chamber might think he was "coming onto them" or "propositioning" them if he made comparisons about "who's prettier, better looking."[580]

On December 31, 2016, Ms. Boylan attended the opening of New York City's Second Avenue subway with her husband.[581]  Ms. Boylan recalled that those attending the event stood near the top of the stairs in the new subway station and the Governor came up the steps with his then-partner.[582]  Ms. Boylan was off to the side with her husband, and when the Governor saw them, he stopped walking up the stairs and went out of his way to go over to them to shake their hands.[583]  Ms. Boylan testified that he did not greet anyone else that way, and that he singled out Ms. Boylan and her husband out of everyone in attendance.[584]  Later that evening, Ms. Boylan's husband (to whom Ms. Boylan had spoken about the Governor's interactions with her) commented on how odd and awkward the encounter was, describing it as "one of the strangest things [he had] ever experienced."[585]

On Valentine's Day of 2017, while Ms. Boylan was still working as Chief of Staff for the ESD CEO, a staff member of the Executive Chamber presented her with a rose, which, at the time, the staff member identified as coming from the Governor.[586]  To Ms. Boylan's knowledge, no other ESD colleague received a rose.[587]  Ms. Boylan emailed the staff member, writing "Sorry you had to bring that all the way down for me.  Thank you though!  Happy Vday!"  The staff member responded, "Thank the chief executive!"[588]  Ms. Boylan described the experience as "creepy as hell."[589]

The staff member who had delivered the rose to Ms. Boylan testified that he did so at the request of Ms. Benton.[590]  He recalled Ms. Benton telling him to give roses to all the women on the 39th floor of the Executive Chamber's New York City office (where the Governor's office

---

[579] *Id.* at 72:13–75:8.

[580] *Id.* at 74:17–77:4.

[581] Boylan Tr. 155:2–23.

[582] *Id.* at 155:24–156:3.

[583] *Id.* at 156:6–13.

[584] *Id.* at 156:14–156:25.

[585] *Id.* at 157:5–8.

[586] Ex. 59; *see also* Boylan Tr. 113:11–20.

[587] Boylan Tr. 114:10–14.  At least one other staff member remembers receiving a flower with a note stating that it was from the Governor on Valentine's Day; this staff member said that all women working in the Capitol received the flowers. Morettoni Tr. 80:2–81:4.

[588] Ex. 59.

[589] Boylan Tr. 114:2.  Another time, Ms. Boylan recalled returning to her office to find a signed photo of the Governor placed on her desk.  Ms. Boylan said that she was alarmed and asked for a lock for her office door, but was not able to obtain one.  *Id.* 119:4–11, 120:3–5, 121:16–23.  According to one former staff member who had responsibilities for collecting and delivering photographs of people with the Governor on behalf of the Executive Chamber, it was not unusual for staff members to receive photographs of themselves with the Governor at events. Morettoni Tr. 108:3–109:16.

[590] Vicinanza Tr. 153:16–154:5.

was located), some of the women on the 38th, floor and Ms. Boylan (who was on another floor at the time).[591]  Ms. Benton testified that, every year that it has been done, she created the list of individuals who should receive roses on Valentine's Day.[592]  She said she probably shared these lists with the Governor.[593]  Ms. Benton testified she was the one who added Ms. Boylan to the recipient list in 2017.[594]  The Governor testified that a friend of his in public relations once recommended that he send roses only to women on the staff in the office on Valentine's Day, and that is why he did that.[595]  The Governor recalled asking Ms. Benton to start doing so, but he was not sure if this was still in practice.[596]  The Governor testified that he usually does not see the list of recipients of the roses.[597]  His understanding was that the top 20 or 30 women on the staff got a rose, and that Ms. Boylan was the only staff member on her floor to get a rose because there were no other senior staff members on her floor.[598]

In or around October 2017, Ms. Boylan flew with the Governor and a number of others back from an event in Western New York on the Governor's plane.[599]  She recalled sitting across from the Governor and next to Abbey Fashouer Collins, then the First Deputy Press Secretary to the Governor.[600]  Ms. Boylan testified that, at one point, the Governor said something to the effect of "let's play strip poker."[601]  Ms. Boylan said that she was stunned by the Governor's remark and responded with something sarcastic, like, "That is exactly what I was thinking."[602]  Ms. Boylan did not think he was "literally asking . . . to play" strip poker, but rather was doing it to "get a reaction."[603]  She thought it had "a sexual innuendo" and was "inappropriate."[604]

After Ms. Boylan wrote about this exchange in a Medium piece in February 2021, the Executive Chamber issued a statement attributed to individuals who were potentially on flights with Ms. Boylan and the Governor in October 2017 that:  "We were on each of these October flights and this conversation did not happen."[605]  But during our investigation, one of the individuals who joined the statement, Mr. Zemsky, testified that he in fact did recall the

---

[591] *Id.* at 153:22–154:7, 157:3–25.

[592] Benton Tr. 141:22–142:13.

[593] *Id.* at 141:22–142:13.

[594] *Id.* at 144:22–145:9.

[595] Andrew Cuomo Tr. 208:23–209:4.

[596] *Id.* at 209:5–209:11.

[597] *Id.* at 209:17–210:3.

[598] *Id.* at 210:4–15.

[599] Boylan Tr. 123:19–124:22; *see also* Lindsey Boylan, *My story of working with Governor Cuomo*, Medium (Feb. 24, 2021), https://lindseyboylan4ny.medium.com/my-story-of-working-with-governor-cuomo-e664d4814b4e.

[600] Boylan Tr. 124:23–125:2.

[601] *Id.* at 126:9–10.

[602] *Id.* at 127:18–19.

[603] *Id.* at. 127:3–7.

[604] *Id.* at 127:7–8.

[605] *Statement from Press Secretary Caitlin Girouard*, Office of the Governor (Apr. 24, 2021) https://www.governor.ny.gov/news/statement-press-secretary-caitlin-girouard.

Governor making a comment about "strip poker" on a plane.[606]  He testified that the Governor said "something like, 'Hey, want to play strip poker?'" and that the statement was "directed at Ms. Boylan."[607]

Mr. Zemsky explained that at the time he agreed to join the Executive Chamber's statement, he "was going through [his] memory of playing strip poker on the plane, talking about playing strip poker, anything like that," and he "didn't have the slightest inkling of that."[608]  He said that on February 24, 2021, he received a call from Ms. DeRosa's office and was connected to a conference call with Mr. Azzopardi, John Maggiore, Dani Lever (a former Communications Director), and perhaps someone else.[609]  Mr. Zemsky said that Ms. DeRosa said something like, "'Did the Governor want to play strip poker on a plane? . . . Lindsey Boylan said the Governor wanted to play strip poker' or 'Lindsey Boylan said the Governor invited her to play strip poker'" and then asked if everyone would agree to sign on to a statement denying that such a conversation happened.[610]  Mr. Zemsky responded that he needed time to consider the request.[611]

Mr. Zemsky then called Mr. Maggiore and asked if he had ever heard the Governor say anything like the "strip poker" comment.[612]  Mr. Zemsky testified that Mr. Maggiore said that in his 20 years of working with the Governor, he had never heard the Governor say something like the "strip poker" comment.[613]  Mr. Zemsky testified that he tried to imagine "how might a game of strip poker happen on this plane or how unusual that is" and so, at the time, had no recollection of the "strip poker" comment.[614]  Mr. Zemsky said that within 15 minutes of his call with Mr. Maggiore, Ms. DeRosa called Mr. Zemsky back to ask if he was okay with the statement, and he agreed to it.[615]  Mr. Zemsky explained that it was his understanding at the time that Ms. DeRosa was asking whether the Governor said the "strip poker" comment in such a way that he was asking to actually play strip poker, rather than just saying it in jest.[616]

Mr. Zemsky testified that after the Executive Chamber issued its statement denying the "strip poker" comment, he received a disparaging message from Ms. Boylan that he found "jarring" and "threatening."[617]  He then reread Ms. Boylan's description of the events in her Medium piece and "the way she kind of responded to the comment" and that "kind of struck a

---

[606] Zemsky Tr. 33:14–17.  Ms. Boylan did not recall that Mr. Zemsky was on the plane when the Governor made a comment about strip poker.  Boylan Tr. 125:9–14.

[607] Zemsky Tr. 33:18–23.

[608] Zemsky Tr. 39:22–40:6.

[609] *Id.* at 37:20–38:7, 41:19–25.

[610] *Id.* at 38:12–24.

[611] *Id.* at 38:24–39:2.

[612] *Id.* at 39:3–10.

[613] *Id.* at 39:11–15.

[614] *Id.* at 39:17–40:6.

[615] *Id.* at 44:19–45:13.

[616] *Id.* at 40:10–41:2.

[617] *Id.* at 53:13–21.

note of familiarity."[618]  Mr. Zemsky believed that he had not recalled the comment earlier because it was "a very different type of exchange from the one that I had been thinking about which was a, you know, serious, maybe even threatening or, you know, sincere game of strip poker."[619]  He said that the comment he recalled instead was "a facetious comment in jest," and "searching [his] recollection of those two very different things . . . brought [him] to very different conclusions."[620]

The other individuals who were part of the Executive Chamber's statement denying the strip poker conversation reaffirmed in their interviews with us that they never heard the Governor make any comment about "strip poker."[621]  The Governor denied having said to Ms. Boylan, "let's play strip poker" or words to that effect.[622]  The Governor went on further to testify that he does not remember "ever . . . saying" the words "strip poker" in his life.[623]

Ms. Boylan recalled traveling twice to Puerto Rico with the Governor in relation to recovery efforts following Hurricane Maria.[624]  Ms. Boylan testified that, on one such trip, she avoided sitting with the Governor and Ms. DeRosa at an event, but felt that the Governor purposefully sat where he could see her.[625]  Ms. Boylan testified that, after giving his remarks, the Governor approached her to take a picture and touched her back "not in a friendly way," but "in a sexual way."[626]  She stated:  "I feel like I know when I'm being touched in a weird way.  I just know.  I mean, it was—I would never do that to anyone, not even my husband."[627]

Near the end of her time in the Executive Chamber, Ms. Boylan was at the Executive Mansion in the main foyer area when the Governor's dog began to scratch her.[628]  Ms. Boylan testified that the Governor saw this and remarked, "Well, if I was the dog, I'd mount you too."[629]  Ms. Boylan said that in response:

> I think I kind of would laugh awkwardly or something.  I don't even
> know.  Things were so far gone past appropriate at that point and
> there was no reaction to his deeply inappropriate things and I didn't

---

[618] *Id.* at 54:22–55:8.

[619] *Id.* at 55:9–15.

[620] *Id.* at 55:15–22.

[621] Collins Tr. 110:8–11; Lever Tr. 347:15–348:12; Maggiore Tr. 91:2–21.

[622] Andrew Cuomo Tr. 197:22–198:1.

[623] *Id.* at 198:2–15.

[624] Boylan Tr. 116:25-117:4, 146:2–12.

[625] *Id.* at 117:2–12.

[626] *Id.* at 117:12–18.

[627] *Id.* at 118:21–119:3.

[628] *Id.* at 66:23–25.

[629] *Id.* at 67:3–4.

> want to create problems for myself and I didn't know what to do, so
> I would just try and not react.[630]

The Governor denied having made such a remark to Ms. Boylan, and said it was a "gross and vulgar statement" and he would not say that to "anyone under any circumstance.[631]

At around the same time, Ms. Boylan testified, the Governor kissed her at the close of a one-on-one meeting in his New York City office.[632]  Specifically, as Ms. Boylan walked by the Governor to leave, he stepped toward her and kissed her on the lips.[633]  Ms. Boylan said she was shocked by the kiss, said nothing, and just kept walking.[634]  The Governor testified he was sure that he had not kissed Ms. Boylan on the lips.[635]

Ms. Boylan testified that during her time working in the Executive Chamber, there was increasing tension between herself and senior staff.  Ms. Boylan said Ms. DeRosa would "scream" at her and "yell at [her] for illogical things."[636]  Ms. Boylan testified that there were a number of times when she tried to resign from the Executive Chamber.[637]  One of those attempts was in July 2018, after Ms. DeRosa yelled and cursed at Ms. Boylan.[638]  Ms. DeRosa did not dispute that she might have cursed on the phone with Ms. Boylan.[639]

Robert Mujica, the Director of the Division of the Budget, informed us that Ms. Boylan had in fact confided in him about her frustrations about her work at the Executive Chamber, including inability to access or speak directly with the Governor. He said that Ms. Boylan told him a few times that she was thinking about leaving the Chamber.  Mr. Mujica thought this was because she felt that there were too many obstacles in the way of her being able to get things done the way she wanted.

In January 2018, Ms. Boylan spoke with Alphonso David (former Counsel to the Governor) about a matter that was related to issues within the ESD and unrelated to the Governor.[640]  In the context of that discussion, Mr. David stated that Ms. Boylan said that she had not been subject to sex discrimination, harassment, or retaliation.

---

[630] *Id.* at 69:16–22.

[631] Andrew Cuomo Tr. 236:8–17.

[632] Boylan Tr. 148:6–152:2.

[633] *Id.* at 149:22–24.

[634] *Id.* at 149:24–150:13.

[635] Andrew Cuomo Tr. 222:25–223:15.

[636] Boylan Tr. 50:2–3.

[637] *Id.* at 190:24–191:10.

[638] *Id.* at 192:7–21.

[639] DeRosa Tr. 230:16–231:25.

[640] Boylan Tr. 163:15–24.

**Ms. Boylan's Departure from the Executive Chamber**

In September 2018, a conflict arose between Ms. Boylan and an assistant at ESD.  The issue was raised to the Executive Chamber, and Mr. David arranged for a meeting that was to be a "counseling session" during which that issue and others were to be addressed.[641]  Prior to this meeting, which occurred on September 26, 2018, Ms. DeRosa forwarded an email regarding Ms. Boylan to Mr. David, saying "pls create a file for lindsey / Pls put this in it."[642]  Mr. David responded, "We manage all allegations/claims using the same process and applying the same standard.  Accordingly, given that this was independently forwarded to counsel's office, we have already began compiling information regarding this and other allegations regarding this employee."[643]  Some of the internal memoranda and documents created by Mr. David and his team for and after this meeting ended up being the confidential documents that were released to reporters following Ms. Boylan's first allegation of sexual harassment against the Governor.  The memorandum summarizing this September 26, 2018 meeting noted that "Mr. David was clear that she was not being asked to resign, fired, or pushed out in any way."[644]  During the course of the meeting, Ms. Boylan "tendered her resignation voluntarily."[645]

Mr. David testified that, after Ms. Boylan resigned, she called and said that she wanted to come back to the Executive Chamber.[646]  He said that he told her it would be "complicated" and that there would need to be "corrective action" related to the complaints made about her.[647]  The Governor testified that Ms. Boylan called him to "intervene."[648]  The Governor said that he never called her back, pursuant to advice he received.[649]

Ms. DeRosa later reached out to Mr. David to request Ms. Boylan's "full file" following Ms. Boylan's tweets accusing the Governor of sexual harassment.[650]

**Public Allegations**

On December 5, 2020, Ms. Boylan tweeted, in part, "Most toxic team environment? Working for @NYGovCuomo" and "I tried to quit three times before it stuck . . . That environment is beyond toxic."[651]  On December 8, 2020, Ms. Boylan continued tweeting about her experience working at the Executive Chamber.  She said, in part, "you better believe I'll be listening to what I hear out there, @NYGovCuomo.  And if other women decide to come

---

[641] *Id.* at 183:16–90; David Tr. 212:24–217:11.

[642] Ex. 60.

[643] Ex. 60.

[644] Ex. 61.

[645] Ex. 61.

[646] David Tr. 217:12–218:6.

[647] *Id.* at 218:6–21.

[648] Andrew Cuomo Tr. 98:4–17.

[649] *Id.* at 99:5–12.

[650] Ex. 62.

[651] Ex. 63.

forward I will back them up and elaborate."[652]  And on December 13, 2020, Ms. Boylan tweeted, in part, "@NYGovCuomo sexually harassed me for years. Many saw it, and watched. I could never anticipate what to expect:  would I be grilled on my work (which was very good) or harassed about my looks.  Or would it be both in the same conversations?  This was the way for years."[653]  On February 24, 2021, Ms. Boylan detailed her allegations of sexual harassment in an article published on Medium.[654]  Since that time, Ms. Boylan has been active both publicly and privately in criticizing the Governor and those who support and defend him, including members of the public.

Members of the Governor's senior staff and others within the Executive Chamber questioned Ms. Boylan's motives and her credibility, noting that she was running for political office at the time she made her allegations.[655]  The Governor and Executive Chamber have suggested that Ms. Boylan made her allegations of sexual harassment in order to support her campaign and to retaliate against the Chamber for issuing an Executive Order changing the number of signatures required to get on the ballot and the time period for petitioning.[656]  They have pointed to text messages that Ms. Boylan sent to then–Communications Director Ms. Lever and Mr. Mujica in March 2020, which stated:  "Absolutely not helpful please relay that while we are ok, I see what the point is here and I will find ways to respond / Life is long / And so is my memory / And so are my resources."[657]  They have also emphasized that Ms. Boylan did not complain about the Governor's conduct at the time.[658]

Ms. Boylan testified that she did not tell anyone in the Executive Chamber about the incidents with the Governor at the time because "[t]his is a really senior position to have and it was humiliating and it made me feel like my accomplishments were undermined by having this kind of attention.  I didn't tell as many people as, you know, I might have otherwise."[659]  Referring to staff members in the Executive Chamber, Ms. Boylan added that she "couldn't trust that group of people."[660]  Ms. Boylan said that she never heard of anyone who made a complaint against the Governor, that they "would be destroyed before they even stepped out the door."[661]

Ms. Boylan testified that she did not say anything for a long time but finally decided to speak out:

---

[652] Ex. 64.

[653] Ex. 65.

[654] *See* Lindsey Boylan, *My story of working with Governor Cuomo*, Medium (Feb. 24, 2021), https://lindseyboylan4ny.medium.com/my-story-of-working-with-governor-cuomo-e664d4814b4e.

[655] Azzopardi Tr. 148:14–22; Andrew Cuomo Tr. 134:3–135:15; Maggiore Tr. 89:16–91:5.

[656] Andrew Cuomo Tr. 183:4–185:7, 200:25–201:4; DeRosa Tr. 537:2–12.

[657] There was a slight variation between the texts that the two recipients received.

[658] *See, e.g.*, Azzopardi Tr. 77:20–78:5; Andrew Cuomo Tr. 88:17–89:2.

[659] Boylan Tr. 96:11–15.

[660] *Id.* at 179:25–180:5.

[661] *Id.* at 182:12–17.

> [T]here's nowhere to go if you create [the Governor] as an enemy and I wasn't able to or strong enough to do it then and it really took hearing another woman's experience that was very much the same as mine where one I had more sympathy for myself in this dynamic because I had so much sympathy for her and then two, I felt so responsible for what had happened to her, so at this point, I'm still chugging along, thinking how do I get along in this world that belongs to this Governor and it took a very long time for me to change that, so that was where this was coming from.[662]

Ms. Boylan reached out to some women who were former colleagues from the Executive Chamber after making public her allegations regarding a toxic work environment and sexual harassment, to seek their support in corroborating her story. A couple of those individuals received communications from Ms. Boylan that they perceived as threatening, after they failed to respond in the way Ms. Boylan wanted them to.

Ms. Bennett confided in Ms. Boylan about her interactions with the Governor in December 2020, after seeing Ms. Boylan's tweets.[663] Ms. Bennett felt at times that Ms. Boylan was pushing her to go public with her allegations even though Ms. Bennett was not necessarily comfortable doing so at the time.[664] Ms. Bennett ultimately got comfortable—as noted above—and did decide to go public with her allegations.

**Assessment**

Most of the allegations that Ms. Boylan has made against the Governor are now essentially uncontested. For example, although the intent is in dispute, there is no serious question that (1) the Governor commented on Ms. Boylan's appearance, including comparing her to someone who was an ex-girlfriend; (2) the Governor on occasion touched Ms. Boylan on the waist, leg, and back; (3) the Governor gave Ms. Boylan a tour of his office that included the cigar box from President Clinton; (4) Ms. Boylan received a rose from the Governor for Valentine's Day; and (5) the Governor thought she did good work[665] and paid attention to her at events. While the Governor vehemently denied, and others did not recall, the "strip poker" comment, Mr. Zemsky testified under oath that he recalls the Governor making such a comment, independently corroborating Ms. Boylan. And with respect to the alleged kiss on the lips, although the Governor again denied it, he has admitted that, on occasion, he has kissed members of his staff on the lips.[666]

Thus, despite the intensity of the attacks on Ms. Boylan by the Governor and others within and outside of the Executive Chamber, and the refusal to even consider the possibility that she may have felt harassed, most of the factual allegations that Ms. Boylan has made are not

---

[662] *Id.* at 179:8–20.

[663] Bennett Tr. 248:11–18.

[664] *Id.* at 248:19–250:10.

[665] Andrew Cuomo Tr. 61:9–14.

[666] *Id.* at 218:17–226:11; *see also* Walsh Tr. 103:21–105:5.

disputed and those that are have corroboration, including in the allegations by the other complainants of similar conduct.  What the Governor disputes is his intent and the way in which he believes Ms. Boylan perceived the interactions.  Thus, regardless of whether Ms. Boylan may have had political or other personal motivation for making her allegations public, we find that the factual allegations she has made are credible and supported by the rest of the evidence in our investigation.

**v.    Alyssa McGrath**

Alyssa McGrath works in the Executive Chamber as an executive assistant, providing administrative assistance to certain assigned staff members of the Executive Chamber, and has been in that role since May 2018.[667]  Ms. McGrath currently works as an executive assistant to Christian Jackstadt, the Deputy Director of State Operations.[668]  Since approximately December 2018, Ms. McGrath also assisted the Governor, including by covering phone calls and other executive assistant functions on weekends at the Executive Mansion.[669]

During her time in the Executive Chamber, Ms. McGrath has had a number of interactions with the Governor during which the Governor asked questions about Ms. McGrath's personal life, including her marital status, and made sexually suggestive and gender-based remarks to her and in her presence.

In early 2019, Ms. McGrath was assisting the Governor at the Executive Mansion by herself when the Governor asked her whether she spoke Italian.[670]  Ms. McGrath replied that she did not speak Italian, although she is of Italian heritage.[671]  The Governor then said a short Italian phrase to Ms. McGrath and grinned at her.[672]  Ms. McGrath did not recognize the phrase, but when she consulted her parents, who are fluent in Italian, her father told her that the Governor's comment had been about how Ms. McGrath was beautiful.[673]  Ms. McGrath testified that she felt uncomfortable and surprised at learning this, especially given that this had also been one of the first times she had assisted the Governor at the Executive Mansion by herself.[674]  Since then, the Governor has, on a number of occasions, said things to her in Italian that she could not

---

[667] Alyssa McGrath Tr. 23:19–24:6.

[668] *Id.* at 27:1–3.

[669] *Id.* at 32:23–34:19, 37:1–38:4.  Over time, Ms. McGrath came to understand that she was expected to help staff the Governor whenever he was working out of Albany.  *Id.* at 34:7–19, 37:5–38:6, 40:7–23.

[670] *Id.* at 56:23–24.

[671] *Id.* at 57:9–12.

[672] *Id.* at 56:25–57:6.

[673] *Id.* at 57:18–25.  Ms. McGrath testified that she does know certain common words in Italian, such as "bella," due to the number of her family members who speak Italian, and confirmed that the Governor had not said the word "bella" as part of the phrase.  *Id.* at Tr. 57:7–17.  Ms. McGrath also told Executive Assistant #1 about Governor Cuomo's Italian comment. *Id.* at 58:22–60:5.  Ms. McGrath recalled Executive Assistant #1's response at the time as laughing off the Governor's comment, possibly with something like, "I can't believe he said that."  *Id.* at 60:25–61:3.

[674] *Id.* at 58:16–24.

understand.[675]  The Governor testified that he tried to speak to Ms. McGrath in Italian, but she did not seem to understand, and he did not recall speaking Italian to Ms. McGrath again afterwards.[676]

In early 2019, Ms. McGrath had another uncomfortable interaction with the Governor.[677] Because this was one of her first times working on a dictation assignment with the Governor, Ms. McGrath was nervous.[678]  On that day, she was seated slightly bent over her notepad and pen, ready to take dictation from the Governor, when she noticed the Governor had not spoken for an unusual amount of time.[679]  Ms. McGrath looked up at him, and saw that he was staring down into Ms. McGrath's shirt, which was a silk-like blouse that was loosely hanging off of her as she was slightly bent forward.[680]  After Ms. McGrath looked up and saw that the Governor had been looking in the area of her chest, the Governor asked her what was on her necklace, which was hanging between Ms. McGrath's breasts and the shirt.[681]  Ms. McGrath responded that her necklace had a pendant of the Virgin Mary and an Italian horn.[682]  Ms. McGrath understood the Governor's question about her necklace as confirmation that he in fact had been looking down her shirt, and she felt embarrassed, uncomfortable, and stressed.[683]  While the Governor moved on to the dictation assignment, Ms. McGrath felt conscious of her shirt for the remainder of the meeting and continuously tried to adjust it.[684]

Governor Cuomo testified that he did not recall ever looking down Ms. McGrath's shirt, and noted that he believed it was physically impossible to do so from across his desk.[685]  He did recall that Ms. McGrath was "very nervous when she came in," and acknowledged that he may have complimented her on her necklace "to sort of make her feel more at ease."[686]  The Governor did not recall the specific necklace in question, but noted that he may have asked Ms. McGrath whether she knew what the Italian horn meant.[687]

---

[675] *Id.* at 58:1–22, 61:18–62:7.  According to Ms. McGrath, these comments were often accompanied by a "smirk" from the Governor.  *Id.* at 61:24.

[676] Andrew Cuomo Tr. 482:9–483:7.

[677] Alyssa McGrath Tr. 62:18–64:2.

[678] *Id.* at 63:4–5.

[679] *Id.* at 63:14–18.

[680] *Id.* at 63:18–24.

[681] *Id.* at 63:18–64:2.

[682] *Id.* at 64:3–21.

[683] *Id.* at 64:6–11.

[684] *Id.* at 64:12–14.  At least one other witness testified about a similar incident, in which Governor Cuomo was clearly looking down another executive assistant's shirt and commented about her necklace.  Executive Assistant #1 Tr. 78:8–79:3.  Once the Governor left the room, the executive assistant reacted uncomfortably and asked the observing witness whether her shirt was too low.  *Id.* at 80:11–18.

[685] Andrew Cuomo Tr. 479:7–19.

[686] *Id.* at 479:15–80:13.

[687] *Id.* at 480:14–22.

Following this incident, Ms. McGrath told her close friend Executive Assistant #1 about the Governor's behavior.[688]  Ms. McGrath testified that she did not tell other Executive Assistants who assisted the Governor, however, because:

> I obviously want—I wanted to believe that I'm up there and helping out because of my good work.  And I felt like if I said that to them, not only would I be embarrassed.  I would, like, almost discredit myself . . . . I didn't want them to think that that was the reason why we were up there.  And, you know, they've already made comments here and there.  Like, "of course the Governor wants—he calls you guys on the weekends.  He wants pretty . . . faces around." . . . [T]hey would make comments like that.[689]

Ms. McGrath also did not feel comfortable telling anyone other than Executive Assistant #1 (with the exception of her parents concerning the Governor's Italian statement) about her interactions with the Governor, as she had been instructed by other staff in the Executive Chamber not to talk about anything related to the Governor to anyone who did not directly assist the Governor.[690]

Over time, the Governor developed a more personal and friendly relationship with Ms. McGrath and Executive Assistant #1, and they often assisted the Governor together.[691]  The Governor would engage in playful and flirtatious behavior with them, showing them special attention almost every time they spoke with him.[692]  As an example, Ms. McGrath noted that, "if he . . . came into a room and I had to be in there, and he would . . . say hello to me first, and only say hello to me."[693]  Ms. McGrath also testified that, at the annual holiday party, the Governor "would intentionally go up to [her and Executive Assistant #1] instead of us going up to him. And he would always want to take a picture with the two of us," even though "people are all like trying to get to him."[694]  Ms. McGrath recalled being "a little surprised that he came up to us out of . . . everyone there."[695]  Photographs of the Governor with Ms. McGrath and Executive Assistant #1 at holiday parties show the Governor holding both of them tight, with his hands on

---

[688] Alyssa McGrath Tr. 65:1–67:8.  Executive Assistant #1 corroborated hearing Ms. McGrath talk about this incident with the Governor.  Executive Assistant #1 Tr. 168:16–69:2.

[689] Alyssa McGrath Tr. 66:15–25.  Ms. McGrath felt objectified by such comments and found such comments to be uncomfortable, demeaning, and upsetting.  *Id.* at 67:3–8.

[690] *Id.* at 67:17–68:10.

[691] Our review of Blackberry PIN message from the PSU Troopers who send messages for those covering the Governor on weekends at the Mansion confirmed that both Ms. McGrath and Executive Assistant #1 covered the Governor at the Executive Mansion on a regular basis during the pandemic.

[692] Alyssa McGrath Tr. 86:7–13 ("How often was the Governor engaging in playful or flirtatious behavior with you?" / "Probably almost every time I saw him.").  Ms. McGrath also testified, "The way he acted with us was very different compared to [other Executive Assistants who assisted the Governor]."  *Id.* at 66:14–15.

[693] *Id.* at 86:11–13.

[694] *Id.* at 90:3–16.

[695] *Id.* at 94:3–9.

their sides right under their breasts.[696]  In one of the pictures, the Governor appears to be about to kiss Ms. McGrath on the forehead.[697]

During conversations with them, the Governor also asked Ms. McGrath and Executive Assistant #1 questions about their personal and marital lives.  For example, Ms. McGrath was informed by Executive Assistant #1 that the Governor had asked Executive Assistant #1 why Ms. McGrath was no longer wearing a wedding ring, and "wanted to know why . . . [and] specific details as far as what exactly happened."[698]  Executive Assistant #1 explained to the Governor that Ms. McGrath had separated from her husband, and then informed Ms. McGrath about the conversation afterwards.[699]  On another occasion, and as described above, the Governor asked Ms. McGrath whether she planned to "mingle" with men on a planned trip to Florida with Executive Assistant #1 and called the two women "mingle mamas" for the remainder of the day.  Ms. McGrath also recalled the Governor making a suggestive comment to her and Executive Assistant #1 when he saw the two women doing a stretch that was intended to relieve muscle pain in the groin area.[700]

In or around November 2020, when Governor Cuomo called the office and Ms. McGrath picked up the phone, the Governor commented on how Ms. McGrath had still retained her married name and told her that he preferred her maiden name.[701]  On this call, the Governor asked Ms. McGrath a series of questions about her personal life, including whether Ms. McGrath was seeing anyone, whether her ex-husband would pay child support, where her ex-husband worked and what her child custody arrangements were.[702]  Ms. McGrath testified that the conversation felt like an "interrogation," particularly because she had not told many people in the Executive Chamber any details about her divorce.[703]  One colleague who overheard Ms. McGrath's conversation with the Governor noticed the intensity of the conversation, and asked Ms. McGrath afterwards what the call had been about.[704]

On March 19, 2021, the New York Times published an article reporting on "a series of unsettling interactions" that Ms. McGrath had with Governor Cuomo.[705]  That same day, Ms. Garvey filed a report with GOER on behalf of Ms. McGrath.

---

[696] Photographs of Ms. McGrath and Executive Assistant #1 with the Governor are attached as Ex. 17, Ex. 18, Ex. 19, Ex. 20, Ex. 21, Ex. 22, and Ex. 23.

[697] Alyssa McGrath Tr. 95:15–24; Ex. 20.

[698] Alyssa McGrath Tr. 52:9–11.

[699] *Id.* at 51:11–52:13.

[700] *Id.* at 107:19–109:6.

[701] *Id.* at 101:16–102:8.

[702] *Id.* at 102:12–22.

[703] *Id.* at 103:16–23.

[704] *Id.* at 102:23–103:8.

[705] Jesse McKinley, *Cuomo Faces New Claims of Sexual Harassment From Current Aide*, N.Y. Times (Mar. 19, 2021, updated Apr. 7, 2021), https://www.nytimes.com/2021/03/19/nyregion/alyssa-mcgrath-cuomo-harassment.html.

**Assessment**

Based on her demeanor during her testimony, as well as the level of detail and consistency in the substance of her allegations and the corroboration from other individuals and documents, we found Ms. McGrath to be credible.  In fact, other than the allegation that he was looking down Ms. McGrath's shirt and the comment about stretching, the Governor recalled and did not deny the other interactions.  Rather, he painted his interactions with Ms. McGrath (and Executive Assistant #1) as his attempts to put the two women "at ease."[706]

> vi.   **Ana Liss**

Ana Liss was an Empire State Fellow who worked in the Executive Chamber from about September 2013 to September 2015.[707]  Ms. Liss explained that she had applied to the Empire State Fellowship out of an interest in government service, specifically economic development, and at the outset of the program, the fellows were told that "the ultimate goal was . . . to develop sufficient experience . . . [to] become deputy secretaries."[708]  She explained that "the Governor had developed a reputation" for championing economic development in upstate New York, where she was from, and she was excited for the opportunity "to play a role in this larger effort to make things better."[709]  She was initially assigned to work for a senior staff member handling economic development.[710]  After a couple months, beginning in or around November 2013, Ms. Liss was informed that Howard Glaser, the then Director of State Operations, wanted her "to go over and work in his office."[711]  Ms. Liss moved to Mr. Glaser's office, which was close to the Governor's office.[712]  She initially thought her assignment to work with Mr. Glaser was a promotion that would lead to increasing responsibility.[713]

Ms. Liss testified that she quickly came to feel that the Governor and his senior staff valued her for her appearance rather than her capabilities.[714]  She explained that while she worked on projects she was "really proud of," she was not "given enough work" and her projects were ad hoc.[715]  She testified that she felt as if "the only reason why [she was] sitting [t]here . . . . [was] because [she is] good looking and . . . otherwise, [she was] not serving any other purpose."[716]  A former colleague of Ms. Liss recalled that he formed the impression that Ms. Liss had been moved to sit closer to the Governor because she was a young, beautiful, blonde woman

---

[706] Andrew Cuomo Tr. 382:5–13 ("I'm more in the reciprocal business . . . I don't want to make you feel uneasy, you know."); *id.* at 479:12–480:22 (noting that Ms. McGrath was very nervous and he wanted to put her "at ease").

[707] Liss Tr. 14:2–12.

[708] *Id.* at 15–16; 17:23–25

[709] *Id.* at 19:12–20:16.

[710] *Id.* at 22:4–11.

[711] *Id.* at 25:8–11, 25:23–26:6.

[712] *Id.* at 26:10–12, 31:9–13, 32:5–33:9.

[713] *Id.* at. 42:25–44:24, 45:8–13.

[714] *Id.* at 46:8–20, 53:10–56:13.

[715] *Id.* at 53:7–56:13.

[716] *Id.* at 54:12–18, 59:19–24.

and that he understood that she was there to be eye candy.  Another former colleague said it was widely considered that Ms. Liss's office had been moved because of her appearance.

**Interactions with the Governor**

Ms. Liss testified that the Executive Chamber was an environment with "a lot [of] cursing and screaming."[717]  During her tenure, the Governor subjected her to unwelcome and non-consensual kissing, touching, and comments.[718]

Ms. Liss testified that she understood employees who angered the Governor faced outbursts from the Governor and his surrogates, involuntary reassignment, and even termination.[719]  She observed that the Governor was customarily aggressive and short-tempered with men and flirtatious with women.[720]  Ms. Liss referred to two male staff members in the Executive Chamber that she recalled were "subject to [the Governor's] abuse and ire[,]" including being "yelled at all the time[.]"[721]  She said "[e]verybody seemed to be afraid of him, and [she] was afraid of him too," although she did not experience his outbursts.[722]

Ms. Liss testified that upon meeting her, the Governor held her hand and gazed into her eyes in a manner that Ms. Liss felt was simultaneously "grandfatherly" and "somewhat flirtatious."[723]  She recalled that a longtime aide told her that the Governor liked her, which she interpreted to mean that her "appearance was attractive to the Governor, and that was a good thing for [her] ability to survive and stay there and that he was going to be friendly towards [her] and [she] didn't have to be worried or scared that [she] might be a target of anything negative."[724]  The aide recalled that she may have told Ms. Liss that the Governor seemed to like her.  On multiple occasions afterwards, the Governor kissed and touched Ms. Liss both in the office and at work parties, including a celebration in or around May 2014, after the passage of the budget.[725]  On that occasion, the Governor approached her, kissed her on the cheek, and slipped his hand around her lower waist.[726]  The Governor beckoned his photographer to take

---

[717] *Id.* at 29:18–22.

[718] *Id.* at 92:4–21, 95:20–97:6; *id.* at 98:15–99:5 (describing how the Governor looked at her during "the only time [she] ever directly had a professional interaction" with him "[l]ike he was just sizing [her] up, like up and down"); *id.* at 102:4–8.

[719] *Se,e e.g.*, *id.* at 38:16–39:3, 78:8–17.

[720] *Id.* at 119:3–121:2, 165:22–166:21.

[721] *Id.* at 83:4–9.

[722] *Id.* at 119:3–16.

[723] *Id.* at 77:5, 78:21–79:5.

[724] *Id.* at 77:13–78:4.

[725] *Id.* at 96:5–15, 102:4–8.

[726] *Id.* at 96:7–12, 104:10, 109:9–12, 196:4–8.

their picture.[727]  Ms. Liss produced that photograph from March 2015, which showed the Governor with his hand around her waist.[728]

Ms. Liss testified that in the following days, colleagues remarked on the interaction to Ms. Liss, including her former supervisor, who said "people [were] talking about it."[729]  Ms. Liss said that after the interaction, other younger staff communicated to Ms. Liss that the Governor's conduct toward her meant that he did not hate her.[730]  Ms. Liss said she felt "sort of icky because it sucked that [she] was nominally there on this Fellowship that was supposed to be recognizing [her] intellect and [her] credentials and [she] was supposed to be influencing policy according to this Fellowship program, but then like in practice, [she] was eye candy."[731]  She explained that up until around March 2021, the picture had served as "evidence that [she] worked for the Governor's Office" and "was around him and adjacent to him," and "[she] was proud of that."[732]  The picture had "[taken] on a different meaning" after the "broader dialogue started percolating from other women about their time working [in the Executive Chamber] and how toxic it was."[733]  She suggested that the Governor's pose in the picture, with his hand around her waist, diminished her by making their relationship "look[] less professional and more intimate."[734]

Ms. Liss said that the Governor frequently stopped by her office and interacted with her in a playful or flirtatious manner.[735]  On at least one occasion, the Governor "kissed [Ms. Liss's] hand and asked [her] if [she] had a boyfriend and kissed [her] cheek."[736]  Ms. Liss testified the Governor never asked permission to touch her, and his conduct was unwelcome.[737]  She felt that she would not say no to the Governor, in any event, because saying no could result in being ostracized or fired.[738]  Ms. Liss also testified that the Governor twice told her she looked lovely, once in the office and another time at a Father's Day party.[739]  She described the Governor's comment on the latter occasion not as overtly sexual or flirtatious, but instead as demeaning—he was "talking to [her] like she was a little girl almost."[740]  Both comments about her appearance were also unwelcome.[741]  Ms. Liss testified that the Governor almost always addressed her as

---

[727] *Id.* at 96:7–12, 104:10, 196:4–8, *see also* Ex. 66.

[728] Ex. 66 (photograph).

[729] Liss Tr. 109:20–110:2.  Ms. Liss's former supervisor did not recall this encounter.

[730] *Id.* at 82:22–83:3.

[731] *Id.* at 110:10–111:2.

[732] *Id.* at 105:21–106:7.

[733] *Id.* at 106:12–18.

[734] *Id.* at 109:2–16.

[735] *Id.* at 79:9–22.

[736] *Id.* at 76:22–77:1, 79:14–22.

[737] *Id.* at 165:4–8.

[738] *Id.* at 167:15–22, 168:22–24.

[739] *Id.* at 111:14–112:6.

[740] *Id.* at 112:9–17.

[741] *Id.* at 225:23–226:3.  Governor Cuomo's comments about Ms. Liss's appearance should be understood in the context of the broader Executive Chamber atmosphere.  Ms. Liss reiterated that she felt pressure to appear attractive

"sweetheart" or "darling," instead of by her name.[742]  She described this as demeaning.[743]  Ms. Liss also noted that the Governor never spoke with her about work or her professional experience.[744]

## Reporting the Governor's Conduct

Ms. Liss explained that the environment in the Executive Chamber deterred her from reporting the Governor's unwelcome conduct.  First, she was not aware of where or how she could complain.[745]  Ms. Liss testified that in "any other workplace environment," she would have rejected the advances from a boss, but that for "whatever reason in [the Governor's] office the rules were different."[746]  That is, the norm was that "you should just feel flattered" at the Governor's attention, which could at least insulate you against "get[ting] fired" or being treated like "a zero and a loser."[747]  Ms. Liss testified that, as a result, if she had complained, she would have been "laughed out of town." [748]  She understood that complaining would have been "a fool's errand" that would probably have come at the expense of her job.[749]

In or around December 2020, before Ms. Liss publicly shared her experience in the Executive Chamber, but after Ms. Boylan's initial tweets, Mr. Azzopardi called her to ask if she had been in contact with Ms. Boylan and to let him know if Ms. Boylan reached out.[750]  Ms. Liss testified that when she spoke out later, she was "fully expecting" that the Governor's team would "deny, deny, deny, character assassinate," because "that's the style of their communications operation" and because of the disclosure of the complaints against Ms. Boylan.[751]

In explaining the reason she nevertheless came forward to discuss her experience, Ms. Liss said:

> [W]hen I spoke up about all of this, I did so by and large because
> the other young women that had come forward with more egregious
> allegations weren't being believed and I believed them and I wanted

---

to the Governor. *Id.* at 116:4–117:8.  She said that a longtime aide told her that she should look attractive and she was told that the Governor prefers blonds.  *Id.* at 47:10–25.  Ms. Liss believed that this pressure was reinforced by senior women in the Executive Chamber who conformed to these standards, which Ms. Liss understood as indicating that appearing attractive to the Governor was critical to her career prospects.  *See, e.g.*, *id.* at 48:2–49:22, 115:21–118:22.

[742] *Id.* at 92:6–12, 99:21, 225:10–16.

[743] *Id.* at 92:12–13.

[744] *Id.* at 94:3–96:2.

[745] *Id.* at 81:6–25.  Ms. Liss testified she also did not report the unwelcome advances of two other men because she "didn't know where to go to ask for help." *Id.* at 143:2–144:5.

[746] *Id.* at 80:4–16.

[747] *Id.* at 81:6–25.

[748] *Id.* at 80:8–81:25.

[749] *Id.* at 88:3–12.

[750] *Id.* at 204:4–205:13.

[751] *Id.* at 214:25–215:23.

to share an account that was less egregious and spoke to the broader culture that allowed for the things that happened to them to happen to them. The tolerance for those micro flirtations, I guess, that would allow for him to act a certain way behind closed doors with women in more serious manners.[752]

The Governor testified that he did not remember Ms. Liss.[753]

**Assessment**

We found Ms. Liss to be credible in substance and in demeanor. Ms. Liss's testimony was corroborated in relevant part by photographs and other witnesses.

### vii.   <u>Kaitlin</u>

Kaitlin (whose last name is not public) is a former employee of the Executive Chamber. On December 12, 2016, Kaitlin attended a fundraiser for the Governor, which was hosted by Kaitlin's employer at the time, a lobbying firm.[754] At the conclusion of the event, the Governor met with the lobbying firm employees to thank them for their work. Kaitlin introduced herself to the Governor and extended her hand to offer a handshake, at which point the Governor pulled her by her hand and held her in a dance pose that was captured in photographs.[755] Kaitlin told the Governor they had met once before, when she was working for a former U.S. Congressman. The Governor responded, after he pulled her in close to his body to pose for the picture, that Kaitlin would be returning to government service because "he was going to have [her] work at the state level."[756]

Kaitlin was disturbed by the interaction and confused by the Governor's response to her introduction. She recalled that several of her colleagues who attended the event teased her afterwards because of the special attention she received that evening from him, saying that the Governor "had singled [her] out and paid attention to [her]."[757] They also noted "how uncomfortable" the encounter seemed.[758] Kaitlin also called her mother, two of her sisters and her roommate after the event, sharing that the Governor had "grabbed [her] and [that they] took those weird photos and that he said [she] was going to work . . . in government again, at the state level."[759]

---

[752] *Id.* at 86:18–87:13.

[753] Andrew Cuomo Tr. 481:3–16.

[754] Kaitlin testified that she may have met the Governor on one occasion prior to her interaction with the Governor on December 12, 2016, but this encounter was her first time speaking to the Governor. Kaitlin Tr. 22:2–9.

[755] Ex. 5.

[756] Kaitlin Tr. 21:8–25.

[757] *Id.* at 27:19–25.

[758] *Id.* at 25:25–26:4.

[759] *Id.* at 30:12–25.

The Governor recalled meeting Kaitlin at the fundraiser she described and posing for a picture in a dance pose with her, which he described as a "funny, entertaining pose," one that he "frequently" assumes for photographs.[760]   The Governor also acknowledged saying he would "steal" Kaitlin because the Chamber "need[ed] the best talent in state government."[761]   He recalled that "her bosses" had introduced Kaitlin as "a superstar."[762]

On December 21, 2016, nine days later, Kaitlin received a voice message inviting her to interview for a position in the Executive Chamber, at the Governor's request.[763]   Kaitlin said she did not share her contact information with any member of the Executive Chamber at the event where she had met the Governor, nor had she applied for or otherwise expressed any interest in joining the Executive Chamber to anyone.   Unbeknownst to Kaitlin, at the Governor's request, two of the Governor's senior staff members had located her contact information.[764]   Kaitlin said she sought advice from a number of people about whether she should attend the interview, including current and former colleagues.[765]   Kaitlin said she felt the opportunity had been made available to her "because of what [she] looked like," and she was therefore anxious that she might be subjected to conduct she deemed unprofessional and undesirable.[766]   Kaitlin specifically told her former supervisor and mentor, "I am not going to sleep with the Governor."[767]   She said her colleagues and mentors said that she of course should not, but if the Governor made her a job offer, particularly if she wanted a career around government, she could not refuse the offer.[768]   She also had some concerns about compensation, as she had been working two jobs to keep up with her student loan payments.[769]   Her colleagues told her that she should request a salary that matched or exceeded her combined compensation, taking into account both her salary at the lobbying firm and the supplemental wages she received from her work at a local restaurant on the weekends.[770]

Kaitlin ultimately decided to go to her interview at the Executive Chamber's New York City office and met with Ms. Benton and Ms. Walsh, who was the Assistant Director of Scheduling at the time.   During the interview, she recalled expressing her desire to receive an

---

[760] Andrew Cuomo Tr. 458:5–14.

[761] *Id.* at 459:6–10.

[762] *Id.* at 459:6–8.

[763] Kaitlin Tr. 30:5–9, 30:15–31:5.

[764] *See* Ex. 67 (On 12/13/2016, Jill DesRosiers sent a message to Stephanie Benton via Google Hangouts saying "can we ask if this is who he meant" and included a link to Kaitlin's company.  Mogul Tr. 297:19–299:2 ("Stephanie told me that . . . the Governor had met Kaitlin at some kind of an event.  Shortly after [a staff member] . . . announced that she was leaving and that the Governor though that Kaitlin might be good for that position to—they called it sitting on the desk.").

[765] Kaitlin Tr. 30:10–14, 36:19–22.

[766] *Id.* at 37:4–15.

[767] *Id.* at 38:25–39:9.

[768] Kaitlin explained that, "[e]verybody told me that I had to take the job.  If the Governor is asking for something, you don't say no to the Governor."  *Id.* at 39:12–14.

[769] *Id.* at 19:19–23, 32:19–24.

[770] *Id.* at 32:7–11.

annual salary of $120,000, to which Ms. Benton and Ms. Walsh laughed, saying "that's probably not going to happen[.]"[771]  Towards the end of the interview, Ms. DesRosiers joined.  Kaitlin said she believed the Governor was present in the Executive Chamber, but that he did not attend. Kaitlin testified that she was offered a position a few days later, at her requested salary of $120,000.[772]

**Interactions with the Governor**

Kaitlin recalled receiving very little guidance or direction from anyone once she joined the Executive Chamber.  She was simply instructed at some point by the Governor to act like a "sponge" and soak up knowledge, an instruction that evolved into the Governor giving her the nickname "sponge."[773]  Kaitlin testified that she found the nickname to be "embarrassing . . . , condescending [and] demeaning."[774]  The Governor acknowledged that he "may have" used the term "sponge" to refer to Kaitlin and agreed with her account of the origin of the nickname.[775] The Governor added that he recalled "[t]he staff" within the Chamber, particularly "junior staff," used the term "sponge" to refer to her.[776]  Senior staff members within the Chamber acknowledged referring to Kaitlin as "sponge" after hearing the Governor's use of the phrase as well.[777]

Kaitlin testified that the Governor often made comments about her appearance, as well as the appearance of others.  On days she rushed into the office, the Governor would comment on her lack of makeup or share his impression that she hadn't gotten "ready" for work that day and "didn't look right."[778]  The Governor testified that he didn't "remember saying anything like that."[779]  The Governor also commented on Kaitlin's clothing, including on one occasion when she wore a "black and red button down and a black skirt" and the Governor "said [she] looked like a lumberjack."[780]  The Governor said "[he] did not remember" commenting on her appearance, but that "[he] could have said that about a lumberjack shirt."[781]

---

[771] *Id.* at 42:15–23.

[772] *Id.* at 44:25–45:22.  Ms. Benton and Ms. Walsh did not recall who approved her salary although they both acknowledged that Kaitlin's compensation package was unusually high.  Benton Tr. 75:4–14 ("[s]he g[ot] a little more coming in the door than someone might."); Walsh Tr. 209:19–210:14 ("I believe [Kaitlin's salary] was 120.  I remember that [] because of the weekend job . . . [as] compare[d] to other people who had been in that same position . . . . [Kaitlin's salary was] . . . . [h]igher I would imagine").  The Governor denied being involved in the process of approving Kaitlin's salary.  Andrew Cuomo Tr. 460:22–23 ("I had nothing to do with her salary as far as I know").

[773] Kaitlin Tr. 77:14–17.

[774] *Id.* at 78:2–10.

[775] Andrew Cuomo Tr. 472:2–24.

[776] *Id.* at 472:2–473:8.

[777] DeRosa Tr. 689:2–13; DesRosiers Tr. 151:3–25; Walsh Tr. 154:18–155:3.

[778] Kaitlin Tr. 86:18–23.

[779] Andrew Cuomo Tr. 474:24–475:9.

[780] Kaitlin Tr. 83:14–24

[781] Andrew Cuomo Tr. 473:16–475:9.

On one occasion, when she first started working with the Governor, Kaitlin was exchanging Blackberry codes with the Governor and offered him her personal cell phone number.  Kaitlin testified that she "thought it was normal to give your boss your number" and noted that practically speaking, she "had to be [at the office] whenever the Governor was there, but before him . . . [and] assumed that he would want to get ahold of [her] . . . [since] that's how he would reach other people as well.  It wasn't uncommon for the Governor to have personal numbers for anybody."[782]  Kaitlin said the Governor responded by asking, in a suggestive way, why he would need her cell phone number.[783]  She understood the Governor to be insinuating that she "was coming onto [him] based on the look he gave [her] and the tone in his voice when he asked why he would need [her] personal number."[784]  Kaitlin testified that she was embarrassed with this insinuation because it "was not [her] intention."[785]

On another occasion, Kaitlin testified that the Governor called her into his office and asked her to search for car parts on eBay for him.  She thought it was a strange request since she felt the Governor was capable and best situated to search for the car parts himself.[786]  She testified that she walked into the Governor's office and stood at the Governor's desk to conduct the searches on his computer as he requested.[787]  While she stood at the Governor's desk, he sat in his chair "directly behind" her "backside[.]"[788]  There was a writing desk behind the Governor such that the two of them were between desks in close proximity.[789]  Kaitlin recalled feeling anxious because she was standing with her backside to the Governor in a skirt and heels, with him sitting close behind.[790]  She felt that the request for assistance was a pretext to be close to her and watch her from behind.[791]  The Governor testified that he was sure he "asked [Kaitlin] to come help [him] with the computer on occasion" and recalled an incident "where [Kaitlin] was bent over the computer and [he] was sitting behind her[,]" noting that Kaitlin was bent over "a little bit because . . . the computer is . . . desk level" and the Governor "had to look at the screen [] to tell her what to click."[792]

Kaitlin also testified that the Governor once showed her his office in the Capitol.  She said the Governor took her into what was referred to as a "war room."[793]  She testified that she was shaking because they were alone together and that she tried to ask questions about random items in the room to ease her nerves.  Kaitlin said "there was no reason for [her] to be given this

---

[782] Kaitlin Tr. 80:13–81:13.

[783] Id. at 81:9–13.

[784] Id. at 81:14–25.

[785] Id. at 81:16.

[786] Id. at 99:3–6.

[787] Id. at 97:22–98:6.

[788] Id. at 100:10–14, 100:23–25.

[789] Id. at 101:15–19.

[790] Id. at 102:20–103:2.

[791] Id. at 97:22–103:23.

[792] Andrew Cuomo Tr. 468:5–10, 477:8–478:18.

[793] Kaitlin Tr. 106:4–14.

tour, for [her] to be in that room . . . [i]t was an odd situation and then that room was very cold and [the Governor] was close to [her], standing next to [her] and it's a big space."[794]  Kaitlin said the Governor eventually "just left" the room.[795]

Kaitlin also testified that the Governor would ask her sometimes to do things that would make her uncomfortable, in the sense that he was overly aggressive, including asking her to send threatening emails to commissioners of agencies who had done things he did not like, and ask them if they liked their job and wanted to keep it.[796]

On occasion, the Governor would ask her about how the "mean girls" were treating her. Kaitlin testified that the Governor used the term "mean girls," to refer to certain members of the senior staff that included Ms. DeRosa, Ms. Benton, Ms. Walsh, Ms. DesRosiers, and Andrew Ball.  Kaitlin told the Governor that he was right, that they were mean, but said she could handle it because she had grown up with two sister who were mean.[797]

Over time, Kaitlin felt that she fell out of favor with the Governor, noting that she "wasn't going on as many trips with him [or] staffing him" as often.[798]  And she also recalled that "the mean girls . . . . started to be short with" her as well.[799]  She was then moved to sit farther away from the Governor to work with another staff member in a different part of the office.  Her sense was that she was "being moved between roles because . . . . [the Governor's] inner circle" did not like her.[800]  Some senior staff members in the Executive Chamber testified that Kaitlin did not perform well in her role within the Executive Chamber, including one staff member who said she "felt [Kaitlin's job performance] was lacking at times" and that Kaitlin did not "necessarily love the role."[801]  The Governor testified that Kaitlin "did not work out on the telephone" and that he "asked her a number of times to please learn how to transfer a call . . . [b]ut she just didn't work out."[802]

---

[794] Id. at 104:5–107:17.

[795] Id. at 107:9–13.

[796] Id. at 113:24–114:17.

[797] Id. at 71:11–23, 121:22–24.  The Governor denied using the term "mean girls" or talking to Kaitlin about the "mean girls."  Andrew Cuomo Tr. 464:3–12.  Ms. DeRosa testified that she "hear[d] the governor use the term 'mean girls'" and that "any time he felt [Ms. DeRosa, Mr. Ball, Ms. Benton, Ms. Lever, Ms. DesRosiers, and Ms. Walsh] weren't being inclusive, or [that they] should be more inclusive, he would say: 'Stop being the mean girls.'"  DeRosa Tr. 482:20–484:17.  Ms. DeRosa said she told the Governor to stop using the term, explaining that "[she] hate[s] that term" and the Governor "never used it again . . . in her presence."  DeRosa Tr. 485:4–15.  Ms. DesRosiers also testified that the Governor "definitely used" the term and that she told him "[she is] not a mean girl" that she "hate[s] when [he] say[s] that," and that she wanted him to "cut it out"—however, the Governor continued to use the term.  DesRosiers Tr. 131:12–133:18.

[798] Kaitlin Tr. 121:22–24.

[799] Id. at 71:24–72:9.

[800] Id. at 120:18–121:13.

[801] Walsh Tr. 214:10–16.

[802] Andrew Cuomo Tr. 475:10–476:3.

**Leaving the Executive Chamber**

After about a year of working in the Executive Chamber, Ms. DesRosiers approached Kaitlin about transferring to another state agency, noting that "what they were doing was not fair to [her]."[803]  Kaitlin understood this to mean that Ms. DesRosiers thought it was unfair that Kaitlin had been asked to leave her job at a lobbying firm to come to the Executive Chamber to perform administrative tasks and have very little substantive work.[804]

Kaitlin ultimately ended up taking a role at a different State agency that Ms. DesRosiers had offered.[805]  She noted that she later learned from a senior member of that agency that she had been "pushed onto" that agency by the Executive Chamber.[806]

Kaitlin testified that she was initially asked at the new agency to split her time between an internal team and an assignment supporting an individual who worked with the Executive Chamber in a liaison capacity.[807]  She was very hesitant to assume a role that required exposure to the Executive Chamber, and when her interviewers raised this possibility to her, she cried in the interview and explained that she did not want to interact with the Governor.[808]  Kaitlin testified that her interviewers promised that they would try to limit her interactions with the Governor.[809]  One of Kaitlin's interviewers shared that Kaitlin told him she had a very difficult experience working in the Executive Chamber and that she was open about the fact that she did not want to interact with the Governor.

Kaitlin testified that at the new agency, her interactions with the Governor were in fact limited and that she returned to the Executive Chamber's New York City office on only two or three occasions.[810]  On one such occasion, Kaitlin walked into the building and emerged on the 38th floor and became physically distressed.  She said her supervisor responded to the sight of her shaking by asking her what was wrong and whether she was okay.  Kaitlin shared with her supervisor that she had had extremely negative experiences in the Executive Chamber and cited the incident with the eBay search, as well as some of the Governor's comments about her appearance.[811]

---

[803] Kaitlin Tr. 125:20–126:4.  Ms. DesRosiers, who helped Kaitlin transfer into the state agency where she currently works, testified that she learned at some point that "Kaitlin . . . wanted to leave the Chamber" and had "a conversation with [Kaitlin] about what she was interested in doing in government.  DesRosiers Tr. 155:9–15.  DesRosiers said she did not recall whether Kaitlin explained why she wanted to leave the Chamber, but that she generally "remember[ed] [Kaitlin] being unhappy."  *Id.* at 156:5–10.

[804] Kaitlin said the senior staff member thought it was unfair that the Executive Chamber staff members had "brought [her] on and then pushed [her] off . . . and [that she] didn't have a real job."  Kaitlin Tr. 127:25–128:15.

[805] *Id.* at 132:12–20.

[806] *Id.* at 134:20–135:7.

[807] *Id.* at 139:5–13.

[808] *Id.* at 132:12–20.

[809] *Id.* at 139:20–23.

[810] *Id.* at 139:23–140:6.

[811] *Id.* at 140:7–14.

**Reporting Governor Cuomo's Conduct**

Kaitlin testified that she has never characterized her experience working in the Chamber as sexual harassment because she did not want to think of herself as a victim.[812]  But she was moved by Ms. Boylan's public allegations of sexual harassment against the Governor in December 2020, and retweeted and shared messages of support on her private Twitter account.[813]  Shortly after that, she received indications that staff members within the Executive Chamber were beginning to pay increasing attention to her.  She received notifications on LinkedIn that Ms. Lacewell and Ms. Walsh had viewed her profile.[814]  She also received a phone call from a former staff member with whom she had worked.[815]  She did not perceive it to be a genuine call to check in on her well-being, but rather a fishing expedition on behalf of the Executive Chamber.[816]

Kaitlin's instinct was correct.  The former staff member testified that she called Kaitlin—and surreptitiously recorded the call—at the insistence of Ms. DeRosa, who "was looking for information about if [Kaitlin] was working with Lindsey [Boylan] or if she had allegations against the Governor."[817]  The former staff member testified that she felt pressured by the incessant calls and texts from Ms. DeRosa reiterating the request that she call Kaitlin.[818]  The former staff member explained that she was deeply regretful after she made the call, and said that Ms. DeRosa instructed her to tell Kaitlin during the call that reporters had called asking about Kaitlin's tweets in support of Ms. Boylan.[819]  That was something Ms. DeRosa acknowledged she asked her to say, but in fact "there was nothing specific to Kaitlin" as far as reporter outreach at the time.[820]  Mr. Cohen, Mr. David, and Ms. Lacewell were also involved in the discussions about calling and recording the call between the former staff member and Kaitlin.[821]

Following that call from the former staff member and the LinkedIn notifications, Kaitlin decided to notify her immediate supervisor that she believed she might be retaliated against by the Executive Chamber for speaking out in support of Ms. Boylan in a public forum.[822]  Kaitlin testified that she feared she would be fired from her state agency role and that her future career prospects in public service would be limited as a result, but she wanted to be transparent with her supervisor.  Kaitlin said her supervisor told her that she would not be fired, but Kaitlin insisted

[812] *Id.* at 158:11–22.

[813] *Id.* at 147:3–7.

[814] *See, e.g.*, Ex. 68.

[815] The transcript of the call between the former staff member and Kaitlin is attached as Ex. 69.

[816] Kaitlin Tr. 153:17–20.

[817] Collins Tr. 219:3–8.  Ms. DeRosa testified that she called the former staff member and asked her to call Kaitlin because Ms. DeRosa "thought there was a politically calculated movement afoot that was being driven by [Alessandra] Biaggi and [Lindsey] Boylan, and that Kaitlin was part of it."  DeRosa Tr. 612:2–7.

[818] Collins Tr. 220:20–23, 224:18–226:6, 230:11–16.

[819] Collins Tr. 238:25-240:4, 220:4-19.

[820] DeRosa Tr. 613:18–24.

[821] Cohen Tr. 298:24–301:12; Collins Tr. 241:8–23; Lacewell Tr. 195:20–199:23.

[822] Kaitlin Tr. 154:16–155:23.

they inform his supervisor as well, so that she would not be caught off guard if the Executive Chamber tried to contact her.[823]  Kaitlin felt that her immediate supervisor was being naïve about the prospect for retaliation, but she was grateful for his support.[824]

Kaitlin subsequently approached the senior supervisor and explained that she wanted to take responsibility for her tweet and cautioned that her tweet may cause the Executive Chamber to reach out.  Kaitlin said the senior supervisor shared with her that she knew (from her predecessor) that Kaitlin had come from the Executive Chamber at the request of the Chamber because her role within the Chamber was not working out.[825]  Kaitlin's senior supervisor recalled that Kaitlin shared more details about her experience working in the Executive Chamber, including the way she was hired and her experience of being summoned by the Governor to search for car parts on his computer while he sat behind her.

Based on her conversation with Kaitlin, the senior supervisor said that she believed that Kaitlin may have experienced sexual harassment so she reached out to Ms. Garvey and an attorney at the state agency.[826]  The senior supervisor informed us that Ms. Mogul and Ms. Lacewell called her in response to the email she sent Ms. Garvey and she reported Kaitlin's statements to them, although she did not reach out to GOER.[827]  Ms. Mogul testified that she understood from the senior supervisor that Kaitlin said the Executive Chamber was "a difficult work environment and . . . . that Kaitlin said that she thought some of her difficulty with the Governor related to her physical appearance."[828]  Ms. Mogul further testified that she understood that Kaitlin "was concerned that she was going to lose her job, that she expressed that explicitly and said that she had come to [her supervisor] hoping that [her supervisor] could help her keep her job" in light of the "tweets she had tweeted in support of Ms. Boylan" and in light of the possibility that she was considering "making a legal claim against the Governor[.]"[829]  Ms. Mogul testified that she felt she needed more information about Kaitlin's allegations and reached out to Kaitlin's direct supervisor.[830]  She also followed up with the senior supervisor and an attorney at that state agency to state that they could tell Kaitlin that, "so long as she was truthful, that . . . it was the . . . State policy that there could be no retaliation."[831]  Ms. Mogul learned that after the two relayed Ms. Mogul's message to Kaitlin, Kaitlin had "wept with relief and thanked them for the call."[832]

---

[823] *Id.*

[824] *Id.* at 155:20.

[825]  *Id.* at 134:24–135:7.

[826] The state agency has asserted privilege over the substance of this communication.

[827] This state agency has taken the position that it was not the obligation of a state agency to report sexual harassment through the normal reporting channels (*e.g.*, contacting GOER) if the alleged conduct occurred outside the time frame of the employee's employment at the agency and at a different agency.

[828] Mogul Tr. 311:19–312:15.

[829] *Id.* at 314:1–20.

[830] *Id.* at 327:18-21, 330:6-7.

[831] *Id.* at 324:22–325:16.

[832] *Id.* at 325:20–326:2.

After his call with Ms. Mogul, Kaitlin's immediate supervisor reached out to Kaitlin to relay Ms. Mogul's impression that Kaitlin had retained counsel in order to assert a sexual harassment claim against the Governor and to inform Kaitlin that he told Ms. Mogul that she was "a great employee.[833]  Kaitlin was deeply troubled by what she believed to be misinformation passed on to Ms. Mogul.[834]  After consulting with her direct supervisor and the state agency attorney who had communicated with Ms. Mogul, Kaitlin reached out directly to Ms. Mogul to clear up the confusion and conveyed both that she had not retained counsel and that she had not made any allegations of sexual harassment.[835]  Ms. Mogul did not follow up at all or ask about any of the factual allegations made by Kaitlin, including the story relayed to her about the search for car parts.[836]

**Assessment**

We found the level of detail and consistency provided in Kaitlin's account, her demeanor, and the circumstances of Kaitlin's allegations to be credible.  A number of key details were corroborated by other witnesses and documentary evidence, including the audio recording of her call with the senior staff member.  Her account of events was also corroborated by her colleagues at the State agency where she now works who observed, among other things, the visible distress she felt whenever she returned to the Executive Chamber's New York City offices.

viii.   **State Entity Employee #1**

State Entity Employee #1 is an employee of a State-affiliated entity created by State legislation, who made allegations of inappropriate conduct by the Governor.

**Interaction with the Governor**

State Entity Employee #1 alleged that, on a Saturday in September 2019, the Governor touched her butt in an unwelcome manner during a work event.  That day, State Entity Employee #1 attended an event for her work that was also attended by the Governor.[837]  As a part of the event, the Governor gave a brief speech and was accompanied by a small crowd of relevant individuals from the agencies participating in the event.[838]

Following his speech, the Governor grabbed State Entity Employee #1's arm and asked her for a photograph.[839]  State Entity Employee #1 posed for a photograph with the Governor, along with her supervisor.[840]  State Entity Employee #1 testified that the Governor stood between

---

[833] *Id.* at 349:14–15.  Both of Kaitlin's supervisors at her state agency said that Kaitlin is diligent and hard working.

[834] Kaitlin Tr. 162:9–21.

[835] Mogul Tr. 352:4–353:23.

[836] Kaitlin Tr. 166:3–167:6; Mogul Tr. 353:24–355:9.

[837] State Entity Employee #1 Tr. 21:6–11.

[838] *Id.* at 24:19–25:12.

[839] *Id.* at 26:25–27:1.

[840] *Id.* at 25:15–22, 26:20–25.

State Entity Employee #1 and her supervisor, with the Governor's arms around State Entity Employee #1.[841]

During the time in which their photographs were being taken, the Governor "took his hand and double tapped the area where [State Entity Employee #1's] butt and [her] thigh meet," and then moved his fingers upward to "kind of grab that area between [her] butt and [her] thigh."[842]  According to State Entity Employee #1, the Governor did not say anything when he grabbed her, and they stepped away from each other soon after.[843]

State Entity Employee #1 testified that she understood the Governor's actions to be intentional.[844]  Though she wished it were not the case, "[she] knew from the moment that that occurred that that wasn't normal, that's not something that has ever happened to [her] in a professional setting."[845]

State Entity Employee #1 testified that she immediately shared what had happened with her supervisor, who had also been in the photographs with the Governor.[846]  State Entity Employee #1's supervisor did not respond, so she repeated herself.[847]  Her supervisor still did not respond, but another attendee who was close by seemingly heard what State Entity Employee #1 had said, because he laughed uncomfortably.[848]  State Entity Employee #1 did not say anything more about the incident during the event and has not interacted with the Governor since.[849]

State Entity Employee #1 testified that she "was really shocked" by the Governor grabbing her butt.[850]  As she explained:

> I felt deflated and I felt disrespected and I felt much like smaller and almost younger than I actually am because kind of the funny part of it all is I was making this project happen.  So we were there because, you know, the work that I had been doing and have continued to do . . . so it was just very, yeah, a moment of like, disempowerment.[851]

---

[841] *Id.* at 25:15–22, 29:17–18.

[842] *Id.* at 27:8–21.

[843] *Id.* at 27:24–28:4.

[844] *Id.* at 43:5–10.

[845] *Id.* at 43:13–17.

[846] *Id.* at 27:24–28:11.

[847] *Id.* at 28:11–17.

[848] *Id.* at 28:14–29:4.

[849] *Id.* at 30:1–8.

[850] *Id.* at 44:3–4.

[851] *Id.* at 44:18–45:1.

State Entity Employee #1 identified certain photographs that were taken that day, including one photograph with the Governor taken, she believed, prior to the time the Governor grabbed her butt.[852]

**Reporting the Governor's Conduct**

After the September 2019 event, State Entity Employee #1 sent messages to her siblings and mother about what had happened.[853]  She provided us with screenshots of the messages.  She also told some friends later that evening what had happened.[854]  The following day, at her friends' suggestion, she wrote down what the Governor had done and emailed it to herself.[855]  State Entity Employee #1 provided a copy of that document, which was consistent with her testimony.[856]

The week following the incident, State Entity Employee #1 followed up again with her supervisor and asked if she had heard State Entity Employee #1's report that the Governor touched her butt.[857]  State Entity Employee #1's supervisor acknowledged that she had heard State Entity Employee #1, but she proceeded to ask questions focusing on the Governor's intent.[858]  State Entity Employee #1 understood that her supervisor likely would not take any action.[859]

State Entity Employee #1 next went to her employer's human resources staff member and posed "hypothetical questions" about how to handle a situation where an external leader "inappropriately touched someone."[860]  The human resources staff member described the reporting and investigation process, and she also encouraged State Entity Employee #1 to report if anything had occurred.[861]  State Entity Employee #1 testified that she did not report the incident at the time in part because of the personal and professional repercussions.[862]  She explained that "it felt very scary to report something against someone who has so much power so—and [she] very much felt like the burden and impact was going to be . . . fully on [her].  Like [she] was going to perhaps have [her] career impacted" and that being publicly identified in connection with the incident was "incredibly intimidating."[863]

---

[852] *Id.* at 30:16–21, 31:20–25.

[853] *Id.* at 34:1–6.

[854] *Id.* at 33:1–18.

[855] *Id.* at 37:9–23.

[856] *See* Ex. 4 (email from State Entity Employee #1 to herself).

[857] State Entity Employee #1 Tr. 41:23–42:6.

[858] *Id.* at 42:13–43:4.

[859] *Id.* at 45:13–19.

[860] *Id.* at 46:6–15.

[861] *Id.* at 46:4–47:4.

[862] *Id.* at 47:10–48:6.

[863] *Id.* at 47:7–19.  Around the same time that she spoke with the human resources staff member, State Entity Employee #1 told one of her colleagues about the incident.  *Id.* at 48:7–49:11.

State Entity Employee #1 told some additional friends about the Governor touching her inappropriately.[864]  In one text exchange in April 2020, State Entity Employee #1 said:  "as people celebrate Cuomo so much right now. [*sic*] It's v conflicting as some [*sic*] who has been inappropriately touched by him to 'stand with him' . . . we should have so much more and it sucks 'accepting' less from men."[865]

Earlier this year, State Entity Employee #1 spoke with another colleague about what happened with the Governor.[866]  State Entity Employee #1 now has a different supervisor.[867] State Entity Employee #1's supervisor at the time of the incident told the State Entity's general counsel around March 2021 that the Governor grabbed [State Entity Employee #1's] "ass" at an event.  The general counsel told State Entity Employee #1's new supervisor, who told State Entity Employee #1 around March 16, 2021 that she had heard about the Governor inappropriately touching State Entity Employee #1.[868]  State Entity Employee #1 discussed what had happened at the event with her supervisor.[869]

State Entity Employee #1 explained that she decided to report the Governor's conduct to us because:

> [T]here were other people that were sharing their story and I very much—I could help support that there's a pattern to what was occurring and to legitimize that this is happening.  I wanted to support those other people.  So I didn't want it to impact my job.  I hope that it doesn't impact me much more but I very much was cognizant that I experienced something that could support individuals who maybe experience something of greater frequency or something, you know, more extreme and if I could do that I felt that it was my responsibility to do that.[870]

We interviewed State Entity Employee #1's current supervisor, as well as the organization's general counsel, and two colleagues in whom she confided.  They all described what she had told them about her interactions with the Governor in a manner consistent with State Entity Employee #1's testimony.  We interviewed one of the friends to whom State Entity Employee #1 reported the incident the evening it had occurred.  The friend also corroborated State Entity Employee #1's testimony.

---

[864] *Id.* at 49:16–52:9.

[865] *Id.* at 52:10–53:9.

[866] *Id.* at 53:25–55:7.

[867] *Id.* at 21:3.

[868] *Id.* at 56:3–10.

[869] *Id.* at 58:25–60:15.

[870] State Entity Employee #1 Tr. 63:7–24.

The Governor testified that he could not recall the event and denied that he touched anyone on the butt at the event.[871]

**Assessment**

We find State Entity Employee #1's allegation that the Governor grabbed her butt without her consent to be credible.  She testified about the incident with a compelling level of detail in a consistent manner.  Her written description of the incident, in an email to herself composed the day after the incident, matched her testimony, as did messages she sent to friends and family recounting the key details.  Additionally, we interviewed multiple co-workers and a friend, all of whom corroborated that State Entity Employee #1 had told them the key details of the incident in a manner consistent with her testimony.

### ix.  <u>State Entity Employee #2</u>

State Entity Employee #2 is a former Director at the New York State Department of Health and a doctor.[872]

On March 17, 2020, State Entity Employee #2 performed a live demonstration of a COVID-19 nasal swab on the Governor during a televised press conference.  Prior to the press conference, State Entity Employee #2 conducted a run-through of the nasal swab with the Governor.  She first indicated to the Governor that he should be seated for the nasal swab.[873] The Governor responded that he was going to stand because it looked better.[874]  State Entity Employee #2 tried to persuade the Governor that he needed to be seated, given that State Entity Employee #2 needed to be able to reach the Governor for the nasal swab.[875]  The Governor then pointed at State Entity Employee #2's heeled boots, and said something along the lines of, "You will be fine with those on."[876]

As part of the run-through, State Entity Employee #2 performed a nasal swab on the Governor to ensure she could reach him during the press conference.  Prior to the nasal swab, the Governor asked State Entity Employee #2 to make sure she didn't "go so deep that [she] hit [his] brain."[877]  State Entity Employee #2 promised that she would be "gentle but accurate."[878]  The Governor responded, "[G]entle but accurate[, I've] heard that before."[879]  State Entity Employee #2 testified that she changed the subject at that point because she understood the Governor's

---

[871] Andrew Cuomo Tr. 490:17–491:19.

[872] State Entity Employee #2 Tr. 14:16–21, 16:9–13.

[873] *Id.* at 157:10–158:15.

[874] *Id.*

[875] *Id.*

[876] *Id.*  State Entity Employee #2 shared this incident with a colleague on a phone call following the press conference.

[877] *Id.* at 158:19–159:17.

[878] *Id.*

[879] *Id.* at 159:18–23.

comment to be a joke of an implied sexual nature.[880]  She "just wanted to move on, . . . , and do [her] work."[881]  State Entity Employee #2 testified that she interpreted the Governor's comment to have a sexual undertone that was inappropriate, and that the Governor would not have made that same comment to a physician who was a man.[882]

State Entity Employee #2 testified that throughout this run-through, the Governor was behaving in a flirtatious manner, including by standing very close to State Entity Employee #2 and speaking in a deeper tone.[883]  The Governor also appeared to be gazing at her throughout, to the point where the Governor appeared to tune out and had to ask State Entity Employee #2 to repeat herself.[884]

During the live televised press conference, State Entity Employee #2 appeared on camera attired in full personal protective equipment, including a face shield and gown.  When he stood up and walked toward State Entity Employee #2 for the nasal swab, the Governor said to State Entity Employee #2, "Nice to see you, Doctor—you make that gown look good."  His remark was in front of the press and livestreamed publicly, as well as captured as a video recording.[885]

Following the press conference, State Entity Employee #2 waited in the foyer with a security guard so that the press could not question her about the Governor's comment.[886]  State Entity Employee #2 testified that she was worried the press would try to bring her into the public sphere, which she had no desire to enter.[887]

Colleagues who spoke to State Entity Employee #2 immediately following the press conference recalled how State Entity Employee #2 was shocked that the Governor had made such a comment on national television.  They also recalled State Entity Employee #2's concern that the Governor's comment would take away from the important public health service State Entity Employee #2 was trying to perform.  State Entity Employee #2's colleagues remembered State Entity Employee #2 saying that the Governor's comments were inappropriate and had made her feel uncomfortable.

Toward the conclusion of her testimony, State Entity Employee #2 shared the following about why she decided to speak with us about her experience with the Governor:

> I felt that in my situation it was very, very brief.  I did not have typical interactions with the Governor and I felt I had a lot of professional opportunities otherwise.  I felt that in my professional

---

[880] *Id.* at 160:20–161:2.

[881] *Id.* at 161:19–22.

[882] *Id.* at 161:10–18.

[883] *Id.* at 161:3–9, 174:16–176:23.

[884] *Id.* at 176:24–177:14.

[885] *See, e.g.*, NBC News, *Gov. Cuomo Demonstrates 'How Easy' It Is To Take The Coronavirus Test*, YouTube (May 17, 2020), https://www.youtube.com/watch?v=9usnMvlp3ZY.

[886] *Id.* at 185:5–186:3.

[887] *Id.* at 172:10–16.

> standing I should share these facts, whatever they are, in order to
> support if there are any other women[,] and I can't say there are or
> not, who are saying they have been put in an uncomfortable
> position[,] or if there is any sexual harassment, that you have the
> facts that you might need.[888]

Similarly, one of State Entity Employee #2's colleagues recalled State Entity Employee #2 saying she felt obligated to report the Governor's comments, because if the Governor had felt so comfortable making comments of this nature to an established physician in State Entity Employee #2's position, he could easily be making similar or worse comments to younger women.

The Governor testified that he did not recall saying anything specific to State Entity Employee #2 prior to the press conference, including any statement using the phrase "gentle and accurate."[889]  The Governor did not dispute his public comment during the press conference.[890]

**Assessment**

We found State Entity Employee #2 to be credible both in demeanor and substance. What the Governor said to her during the press conference was captured on film and therefore is fully corroborated.  Moreover, a number of State Entity Employee #2's colleagues who spoke to her immediately following the event corroborated State Entity Employee #2's experience and her reaction to the Governor's conduct.

### B.  Other Complainants

A number of women outside State government have also made allegations, whether publicly or for the first time through this investigation, of sexual harassment (and other forms of misconduct) by Governor Cuomo.

### i.  Virginia Limmiatis

In May 2017, Virginia Limmiatis attended a conservation event in upstate New York, at which the Governor gave a brief speech.[891]  Ms. Limmiatis wore a shirt that had the name of her employer, the Energy Company (which was involved in the event), printed across the chest.

After the formal program, Ms. Limmiatis joined a rope line to meet the Governor.[892] When the Governor reached her, Ms. Limmiatis held out her hand for a handshake.[893]  The Governor walked up close to Ms. Limmiatis and pressed his first two fingers of his right hand on

---

[888] *Id.* at 192:22–193:8.

[889] Andrew Cuomo Tr. 494:15–495:10.

[890] *Id.* at 493:22–494:3.

[891] Limmiatis Tr. 18:24–20:7, 22:9–12.

[892] *Id.* at 28:22–29:19.

[893] *Id.* at 30:21–31:3.

each letter of the Energy Company's name printed across the chest of Ms. Limmiatis' shirt.[894] The Governor pressed his fingers on each letter before sliding his fingers to the next letter, while saying "[Energy Company] I know you."[895]  The Governor leaned in so his cheek was touching Ms. Limmiatis' cheek, and said something along the lines of, "I'm going to say I see a spider on your shoulder."[896]  Ms. Limmiatis looked down to see that there was no spider or bug on her, but the Governor brushed his hand in the area between her shoulder and breast below her collarbone.[897]  Ms. Limmiatis testified that she was too shocked and appalled during the interaction to say anything, and understood the Governor knew he had "done something wrong and that he had to create a cover story."[898]  The Governor continued down the rope line and Ms. Limmiatis looked around to see if anyone else had noticed, but it appeared no one had.[899]

Shortly after the rope line had dispersed, Ms. Limmiatis approached three other attendees of the event, and told them about the Governor's conduct.[900]  One of those three attendees, Attendee #1, provided a declaration to us in which he attested that Ms. Limmiatis told him the Governor had "dragged his finger across the logo" on her shirt, which Attendee #1 saw firsthand was at breast-level.[901]  Attendee #1 further attested that Ms. Limmiatis shared that the Governor exclaimed he knew the Energy Company and said "something about brushing a bug off of [Ms. Limmiatis'] shirt."[902]  Attendee #1 attested that what Ms. Limmiatis shared "made an impression on [him] because of how upset Ms. Limmiatis looked and acted."[903]

Shortly after the event, Ms. Limmiatis returned to her office and told her boss what had occurred.[904]  Ms. Limmiatis' boss did not raise the option of reporting what had happened to the Energy Company or the Executive Chamber, and Ms. Limmiatis did not independently pursue these options because there was "trepidation and fear . . . how do you explain to someone what the Governor did in public, such an egregious act, heinous act.  I was very fearful . . . how does someone believe that this happened to me."[905]

---

[894] *Id.* at 31:4–32:10.

[895] *Id.*

[896] *Id.* at 32:11–33 :20.

[897] *Id.* at 33:4–11, 33:21–34:5.

[898] *Id.* at 32:24–24, 57:21–58:3.

[899] *Id.* at 34:9–21.  Subsequent to Ms. Limmiatis' testimony, we obtained photographs of the event from the Executive Chamber and conducted follow-up interviews with Ms. Limmiatis.  Ms. Limmiatis identified the photographs as almost certainly being from the May 24, 2017 event, and explained that it was difficult for her to even review the photographs because they brought a flood of negative emotions about the incident, including shame.

[900] *Id.* at 35:22–37:15.

[901] Ex. 71 at ¶ 9.

[902] *Id.*

[903] *Id.*  We interviewed Attendee #1, who recounted the events in a manner consistent not only with his declaration, but also with Ms. Limmiatis' testimony.  We also interviewed the two additional attendees Ms. Limmiatis testified she had spoken to at the event.  Both attendees corroborated Ms. Limmiatis' testimony.  However, unlike Attendee #1, these two attendees did not recall Ms. Limmiatis being outwardly upset at the event.

[904] Limmiatis Tr. 40:21–41:6.

[905] *Id.*

Within a day or two of the incident, Ms. Limmiatis confided in her sister, who has provided a declaration attesting to details consistent with Ms. Limmiatis' testimony.[906]

Ms. Limmiatis testified that when the Governor touched her, she was "absolutely humiliated.  It's very difficult even talking about it.  I was absolutely profoundly humiliated and appalled.  I was in shock.  Very negative feelings is the best way to describe it."[907]  The Governor denied any recollection of the event or any of the conduct alleged by Ms. Limmiatis.[908]

At the conclusion of her testimony, Ms. Limmiatis read the following prepared statement into the record:

> Nothing would prepare me for May [ ], 2017, a day that, for me, was the culmination of a lot of hard work with the team at [Energy Company].
>
> The day started with excitement and joy, but quickly turned into something ugly because of the actions of the Governor.
>
> I was there as a professional to do my work.  The Governor turned a sincere gesture of simply extending my hand as an expression of gratitude for the State's partnership into a moment of profound shame and humiliation . . . .  He did not respect me as a professional and a contributor to the project . . . .
>
> I want to tell the governor that  this is not about cancel culture.  This is about consequences.
>
> My coming forward is a direct result of the Governor's March 3[, 2021] press conference in which he said, "I never touched anyone inappropriately."
>
> He is lying again.  He touched me inappropriately.  I am compelled to come forward to tell the truth.
>
> I do not know how to report what he did to me—I didn't know how to report what he did to me at the time and was burdened by shame, but not coming forward now would make me complicit in his lie, and I won't do it.
>
> I am a cancer survivor.  I know an oppressive and destructive force when I see it.  Thank you.[909]

---

[906] Ex. 72 at ¶ 9; Limmiatis Tr. 41:22–42:14.

[907] Limmiatis Tr. 35:11–15.

[908] Andrew Cuomo Tr. 491:20–493:2.

[909] Limmiatis Tr. 56:22–58:21.

**Assessment**

We found Ms. Limmiatis to be credible both in demeanor and the substance of her allegations.  Her allegations were substantially corroborated by individuals whom Ms. Limmiatis spoke to contemporaneously about her experience.

## ii.   Anna Ruch

On Saturday, September 14, 2019, Anna Ruch attended the wedding of Gareth Rhodes, a senior aide to the Governor.  Ms. Ruch was a close friend of the bride.  The wedding took place at a restaurant in New York City, and the Governor officiated. Ms. Ruch had not met the Governor prior to the wedding.  Shortly after the ceremony ended, one of her friends pointed out that the Governor was approaching them and suggested that they try to take a picture with him.

Ms. Ruch said that when the Governor reached them she thanked him for saying nice things about her friends.  She stated that the Governor shook her hand and then quickly moved his hand to her back, touching her bare skin on a place where there was cutout in the dress. Ms. Ruch stated that she felt very uncomfortable so she immediately grabbed the Governor's wrist and removed his hand from her back. The Governor denied having ever put his hand on her bare back, or that Ms. Ruch pushed his arm away.  The Governor said that he would have remembered if someone had pushed his arm away.[910]

Ms. Ruch said that the Governor remarked, "wow, you're aggressive."  She recalled thinking "why is he saying that" and stammering words to the effect of "I dunno" in an expression of discomfort. Ms. Ruch said that the Governor immediately cupped her face in his hands and said, "can I kiss you?"  The Governor did not recall saying "May I kiss you" to Ms. Ruch but said this is a phrase he has started to use more recently.[911] Ms. Ruch stated that she felt distraught and uncomfortable so she did not respond but tried to move away and turned her face as the Governor kissed her left cheek.

Ms. Ruch had handed her phone to one of her friends, who photographed the encounter. Ms. Ruch produced the photos and identified them in her interview.  They show the Governor with his hands on her face and Ms. Ruch twisting away.  Ms. Ruch's facial expression appears to show discomfort.  Ms. Ruch said that three of her friends watched the encounter, and that the Governor did not speak to or touch them.

Ms. Ruch stated that she felt shocked, angry, and embarrassed that the Governor touched and kissed her in a public place within moments of meeting her and without her consent.  She said that she was appalled and angry that the Governor so comfortably, swiftly, and publicly treated her the way he did. Ms. Ruch said that she looked for the Governor later on at the wedding to tell him how upset she was, but did not find him.  Ms. Ruch and her friend also recounted that a stranger who overheard them talking about the incident in the women's bathroom remarked that the Governor had done something similar to her.

---

[910] Andrew Cuomo Tr. 484:3–10.

[911] *Id.* at 484:14–18.

That night, Ms. Ruch told several people what happened.  Ms. Ruch did not believe the bride and groom witnessed the incident and said that she avoided saying anything to the bride during the wedding.  Ms. Ruch said, however, that after exchanging pleasantries with Mr. Rhodes at the wedding she told him, in sum and substance, "your boss is a creep," and that he appeared shocked and apologetic.  Mr. Rhodes did not recall the exchange, but did recall learning of the incident from friends in the weeks after the wedding, long before Ms. Ruch shared her allegations publicly in March 2021.

Two days after the interaction with the Governor, Ms. Ruch texted her friend a picture of Ms. Ruch and the Governor, "This fucking guy / I'm so pissed / I lost the photographers [sic] card but don't want the photo of us on the wedding photos. Yuck," accompanied by a vomit emoji.[912]

On February 28, 2021, Ms. Ruch posted pictures of the interaction with the Governor on her Instagram story, writing "Slid his hand on my lower back which I promptly removed and then he proceeded to grab my face with both hand and asked if he could kiss me, laid one on my cheek, and then told me *I* was aggressive."[913]  On March 1, 2021, a New York Times article detailing Ms. Ruch's allegations was published.[914]

**Assessment**

Ms. Ruch was credible both in her demeanor and in the substance of her allegations. Pictures taken as the Governor held Ms. Ruch's face and kissed her corroborate her general description of what the Governor did.[915]

## II.   The Governor's and the Executive Chamber's Response to Allegations

Since the public allegations of sexual harassment began to emerge, the Governor and Executive Chamber have responded in various ways that have been relevant to our investigation. For example, as set forth in greater detail below, six months after Ms. Bennett reported the Governor's conduct to senior-level Executive Chamber staff, when Ms. Boylan alleged in December 2020 that the Governor had sexually harassed her, the Executive Chamber responded by, among other things, (1) releasing to the press confidential files relating to complaints made against Ms. Boylan, (2) drafting a letter disparaging Ms. Boylan and circulating it to a number of current and former members of the Executive Chamber for their consideration (although not ultimately releasing it publicly), (3) reaching out to various current and former members of the

---

[912] Ex. 73.

[913] Ex. 74.

[914] Matt Flegenheimer & Jesse McKinley, *Cuomo Accused of Unwanted Advance at a Wedding: 'Can I Kiss You?'*, N.Y. Times (Mar. 1, 2021).

[915] Other individuals have described being grabbed in the face and being kissed on the cheeks by the Governor that made them feel uncomfortable.  Sherry Vill, a complainant whom we interviewed, described an incident on May 28, 2017 when the Governor visited her home following flooding that took place in the area, during which the Governor grabbed her face and kissed her on the cheek.  Perhaps sensing her discomfort, Ms. Vill informed us that he said something along the lines of "That's what Italians do—kiss both cheeks."  She also told us that the Governor told her she was "beautiful."

Executive Chamber regarding a more positive message of support (that also was not released), and (4) reaching out, through certain trusted former members of the Executive Chamber, to identify any former staff members who might be supportive of Ms. Boylan and might themselves be in a position to make allegations against the Governor.

Following the publication of Ms. Bennett's allegations in February 2021, members of the Executive Chamber (particularly those who had been involved in taking Ms. Bennett's report of the issues she had with the Governor in June 2020) advised the Governor to express contrition and a recognition that he may have had inappropriate conversations with Ms. Bennett and that he may have made her and others feel uncomfortable. The Governor initially appeared to take that advice in his public appearances and statements, although, over time, he appears to have changed the tone to one of denial and defiance. In addition, our investigation showed that part of the Executive Chamber's plan from shortly after the launch of our investigation, and prior to any substantive interviews or testimony, was to take aim at and attack the investigation and those tasked with conducting it.

A. **The Release of Confidential Files Relating to Ms. Boylan**

On December 9, 2020, Ms. DeRosa shared with Mr. David and Ms. Lacewell tweets that Ms. Boylan posted that day describing the Governor as "one of the biggest abusers of all time."[916] Ms. DeRosa reached out to Mr. David in a text to say that she needed to see Ms. Boylan's "full file."[917] Mr. David, former Counsel to the Governor but at the time President of the Human Rights Campaign, responded that Ms. Mogul should be able to provide the file for the time when Ms. Boylan worked in the Chamber, and Ms. Lacewell confirmed that Ms. Mogul had the file.[918] On December 11, Mr. David sent to Mr. Azzopardi files relating to his investigation into and counseling of Ms. Boylan shortly before her departure from the Executive Chamber ("Confidential Files") that he had retained and taken with him when he left the Executive Chamber.[919] Mr. David testified that he kept with him a copy of Ms. Boylan's files because it "may have been the only instance where [he] was actually involved in a counseling of an employee when [he] was in the Executive Chamber."[920]

On December 13, 2020, just hours after Ms. Boylan tweeted that the Governor had sexually harassed her, Mr. Azzopardi sent the Confidential Files to David Caruso of the Associated Press, Dana Rubinstein of the New York Times, and Bernadette Hogan of the New York Post, along with a statement from Press Secretary Caitlin Girouard that "[t]here is simply no truth to these claims."[921] The Confidential Files consisted of (1) a September 20, 2018 memorandum to Mr. David regarding "Confidential Personnel Matter"; (2) a September 26, 2018 memorandum to Mr. David labeled "Draft, privileged and confidential - Attorney Client Privileged Communication / Intra-Agency Communication / Memo to File"; and (3) a September

[916] Ex. 62.
[917] Ex. 62.
[918] *Id.*
[919] Ex. 75.
[920] David Tr. 61:15–66:11, 82:19–83:8.
[921] Ex. 61.

30, 2018 email from Mr. David labeled "Privileged and confidential / Attorney client communication / Attorney work product."[922]

The Confidential Files discussed complaints against Ms. Boylan.  Witnesses involved in disclosing the Confidential Files testified that the complainants' names were redacted with Wite-Out before they were sent to reporters.[923]

Mr. Azzopardi also sent the Confidential Files to Ed McKinley of the Times Union[924] and David Caruso of the Associated Press, among others, on the same day.[925]  Earlier on December 13, Mr. Azzopardi had sent the Confidential Files to former Executive Chamber staff, Josh Vlasto, Mr. Bamberger, Ms. Lever, and Steve Cohen.  At the direction of Ms. DeRosa or Mr. Azzopardi, Mr. Bamberger and Ms. Lever coordinated with some of the reporters who received the documents to let them know that the Executive Chamber would be sending them.[926]

The next day, on December 14, Mr. Azzopardi sent the documents to Zack Budryk of The Hill, Marcia Kramer of CBS, and Zack Fink of NY1 News.[927]  On December 15, at the direction of Ms. DeRosa or Mr. Azzopardi, Mr. Vlasto sent the documents to Mike Gartland of the New York Daily News.[928]

Ms. DeRosa testified that Mr. Vlasto (former Chief of Staff to the Governor) had first proposed releasing the Confidential Files to respond to the tweets Ms. Boylan sent before December 13.[929]  Ms. DeRosa weighed whether to disclose the Confidential Files at that time and sought different opinions.[930]  Ms. Mogul's view was that Ms. Boylan "was trying to bait a reaction out of the Executive Chamber and [Ms. Mogul] thought the Chamber should not react."[931]  According to Ms. DeRosa, Mr. Azzopardi had also been against releasing the Confidential Files because years earlier, a senior member of the Executive Chamber had read someone's personnel file on the radio "and it was a disastrous public relations move."[932]  Ms. DeRosa made the decision to disclose the Confidential Files on December 13, the day

---

[922] *Id.*

[923] Azzopardi Tr. 85:21–86:5; Vlasto Tr. 177:22–179:3.

[924] Based on an audio tape of a recorded call between Ms. DeRosa and Peter Ajemian with Casey Seiler and Brendan Lyons at the Times Union on March 13, 2021, Mr. Lyons said that at the Times Union did not want the Confidential Files sent to them, but the Executive Chamber did so anyway.  Ex. 76 (transcript of call).  The audio of the call is also publicly available at https://vimeo.com/582254025/6904a32412.  In her testimony, Ms. DeRosa stated that the "Times Union took [Ms. Boylan's] personnel file."  Ms. DeRosa testified that she did not think that the Times Union did not want to receive the personnel file.  DeRosa Tr. 585:7–17.

[925] Ex. 61.

[926] Bamberger Tr. 97:2–20, 106:13–25; Lever Tr. 303:20–305:3; Ex. 77; Ex. 78; Ex. 79.

[927] Ex. 80, Cover Page (without attachment); Ex. 81, Cover Page (without attachment); Ex. 82, Cover Page (without attachment).

[928] Vlasto Tr. 157:3–162:24; Ex. 83, Cover Page (without attachment).

[929] DeRosa Tr. 532:19–533:10.

[930] *Id.* at 535:8–536:15.

[931] Mogul Tr. 186:12–187:10.

[932] DeRosa Tr. 534:4–25.

Ms. Boylan tweeted that the Governor had sexually harassed her, because Ms. Boylan's tweets had gotten "more and more escalating" and the group's view was that they had "made a mistake by not doing something earlier."[933]

Mr. Azzopardi testified that the Executive Chamber had disclosed the Confidential Files "in order to correct demonstrably false information" about the circumstances of Ms. Boylan's departure from the Chamber.[934]  According to him, Ms. Boylan had made public statements on Twitter and in the New York Post that "she left because of a toxic workplace, and she tried to quit three times until it actually stuck."[935]  He told Bernadette Hogan of the New York Post, David Caruso of the Associated Press, and Jimmy Vielkind from the Wall Street Journal that Ms. Boylan "got fired after being confronted," and they asked him to prove it.[936]  He provided the Confidential Files to prove his claim.[937]  The Confidential Files, however, state that Ms. Boylan resigned voluntarily.[938]  In fact, one of the memoranda that Mr. Azzopardi released noted, under the heading "Ms. Boylan's Resignation," that "[d]uring the meeting Mr. David was clear that she was not being asked to resign, fired, or pushed out in any way.  In no uncertain terms he said that she was simply being counseled in response to the complaints that have been made about her from multiple sources."[939]  Ms. Lacewell, Ms. Lever, and Mr. Zemsky confirmed during their testimony that Ms. Boylan had tried to resign from the Chamber more than once.[940]

The Executive Chamber also justified the release of the Confidential Files as correcting the allegedly "false" statement in Ms. Boylan's December 13 tweet that her work was "very good."[941]  But the Governor himself testified that, based on his observations of the quality of Ms. Boylan's work, he "thought she was very good," and that Mr. Zemsky also thought she was "very good."[942]

Mr. Vlasto testified that he had supported disclosing the Confidential Files as long as it was legally permissible because the Confidential Files provided "relevant context for the reporters," "given that Lindsey [Boylan] was making accusations of harassment."[943]  Similarly, Ms. Mogul told us that Ms. Boylan had "cast herself as being a victim of a toxic work environment," and the Confidential Files "spoke to" Ms. Boylan's role "in the environment and

---

[933] *Id.* at 537:2–538:12.

[934] Azzopardi Tr. 84:15–85:2.

[935] *Id.* at 79:10–91:12.

[936] *Id.* at 84:15–85:2.

[937] *Id.*

[938] Ex. 61 ("Further, she has notified practically all state employees and many external stakeholders of her voluntary resignation, which was accepted.").

[939] Ex. 61; *see also* David Tr. 216:6–217:11.

[940] Lacewell Tr. 92:7–93:21; Lever Tr. 84:14–19; Zemsky Tr. 70:5–21.

[941] Garvey Tr. 107:17–108:11.

[942] Andrew Cuomo Tr. 61:2–14.

[943] Vlasto Tr. 134:11–22.

her contribution to an unhealthy work environment for some of the people that she worked with."[944]

Ms. DeRosa had sought advice from Ms. Mogul and Ms. Lacewell about whether it was permissible to release the Confidential Files, and she had asked them to consult with GOER.[945] Michael Volforte, Director of GOER, testified that Ms. Mogul and Ms. Lacewell asked him generally about whether or not the Chamber could release a "personal history folder," which is a file that is kept generally for each state employee and includes information about hiring, promotions, and if the employee is the subject of disciplinary action or counseling.[946]  They did not show him the files that they were considering releasing, never discussed the actual documents that they were considering releasing, and never identified Ms. Boylan or any particular individual as the subject of their inquiry.[947]  Ms. Mogul, during her testimony, denied that the Confidential Files are "personnel records"[948] or even that they are "confidential," on the basis that if they had been the subject of a FOIL request, "they may well have had to be released."[949]  Ms. Mogul also testified that she had concluded that the Confidential Files were not privileged either.[950]  According to Ms. DeRosa and Ms. Mogul, they did not discuss whether releasing the Confidential Files could be considered retaliation.[951]  The Confidential Files were shared with various people who were outside of the Executive Chamber and not State employees, including Mr. Cohen, Mr. Vlasto, and Mr. Bamberger, without any discussion of whether that was appropriate or permissible.[952]

According to Ms. DeRosa, she only notified the Governor about releasing the Confidential Files to the press after the Executive Chamber did so, because she wanted to protect him from any criticism.[953]  The Governor testified that he did not recall having been in any conversation about disclosing the Confidential Files, and that he only learned about it after the fact from the press.[954]  Mr. Azzopardi testified that as to "allegations against the [Governor's] personal conduct," he did not think "anything went out the door without [the Governor's] knowledge."[955]  Mr. Vlasto, the Governor's former Chief of Staff who did not work for the Executive Chamber at the time, assumed that the Governor had approved the disclosure of the

---

[944] Mogul Tr. 180:17–181:2.

[945] DeRosa Tr. 543:2–13.  The Executive Chamber asserted privilege over the substance of the discussions with GOER.  Mogul Tr. 177:23–178:6; Volforte Tr. 132:15–133:23.

[946] Volforte Tr. 132:15–135:20.

[947] Id. at 134:2–21, 148:12–17.

[948] Mogul Tr. 179:19–21.

[949] Id. at 179:2–15.  She confirmed that the Chamber had not released the Confidential Files in response to FOIL requests.  Id. at 180:2–8.

[950] Id. at 181:15–182:14.

[951] DeRosa Tr. 543:20–23; Mogul Tr. 178:7–15.

[952] DeRosa Tr. 581:13–584:9.

[953] Id. at 551:20–554:23, 556:5–12.

[954] Andrew Cuomo Tr. 115:18–116:3, 117:5–118:25.

[955] Azzopardi Tr. 33:24–34:3.

Confidential Files.[956]  Mr. Vlasto's view was that if Ms. DeRosa had made the decision to disclose the information, it was "safe to say" that the decision "was consistent with what the Governor wanted or had been discussed with him and he approved it."[957]  Mr. Bamberger, the Governor's former Communications Director who did not work for the Executive Chamber at the time, also testified that the Governor is "a very hands-on Governor," and this is particularly true for press issues (except television).[958]

The author of one of the documents in the Confidential Files wrote in a diary entry on March 8, 2021:

> When Azzo[pardi] released my 2018 HR type memo about the Lindsay's exit counseling session I was surprised and not surprised at the same time.  I knew that senior staff had the documents and my files from that time, but I was not told it was going to the press until after it was out.  Also I thought it was attorney client privilege and I assumed I would have been told if the Governor decided to waive that privilege.  I also was kind of surprised because I didn't think it was a great rebuttal to what she was saying—the counseling session didn't have anything to do with sexual harassment (there was none alleged at the time) . . . I was however not prepared for how widely my memo went out—I was dismayed when my memo was picked up in papers literally around the world and domestically—this was not how I wanted to find my name in People Magazine.[959]

## B.  Letters in Response to Ms. Boylan's Allegations and in Support of Governor

Following Ms. Boylan's tweet alleging sexual harassment against the Governor, beginning around December 15, 2020, the Governor and a group of advisors worked on a draft letter or op-ed.[960]  The letter was to be sent by former Executive Chamber staff members who had worked with Ms. Boylan and the Governor.  The various drafts of this letter included complaints against Ms. Boylan that were part of the Confidential Files.  The drafts also discussed alleged interactions between Ms. Boylan and male colleagues other than the Governor.  The letter denied the legitimacy of Ms. Boylan's allegations, impugned her credibility, and attacked her claims as politically motivated (including with theories about connections with supporters of President Trump and a politician with an alleged interest in running for Governor).

Ms. Benton and Ms. DeRosa testified that the Governor wrote the first draft of the letter by hand and that Ms. Benton typed it up.[961]  Others, including Ms. DeRosa, Ms. Mogul, and

---

[956] Vlasto Tr. 139:2–13.

[957] *Id.* at 139:17–25.

[958] Bamberger Tr. 205:8–206:7.

[959] Ex. 14.

[960] Benton Tr. 194:8–25; DeRosa Tr. 632:17–20, 669:7–23.

[961] Benton Tr. 194:8–25; DeRosa Tr. 632:17–20.

Mr. Cohen, commented on early drafts of the letter.[962]  The Governor testified that he did not "remember handwriting any document" but he "participated in drafts."  According to the Governor, he did not know if he started the letter or if "someone else started it and then [he] chimed in."[963]

Ms. DeRosa's understanding was that the letter would be in response to Ms. Boylan's sexual harassment allegations.[964]  She told the Governor that she thought the letter would backfire, in part because the draft included information that was based on hearsay and secondhand sources and "it would be really hard to get anyone to sign it."[965]  The Governor directed Ms. DeRosa to seek input from "some of the folks on the team."[966]  He asked her to send the draft to Roberta Kaplan (an attorney at the firm Kaplan Hecker & Fink LLP, and now counsel to Ms. DeRosa with respect to our investigation), Mr. Cohen, and Ms. Lacewell, as well as Ms. Mogul.[967]  Ms. DeRosa also sent the draft to Mr. David, Mr. Vlasto, Ms. Lever, and Ms. Walsh.[968]  According to Ms. DeRosa, Ms. Kaplan read the letter to the head of the advocacy group Times Up, and both of them allegedly suggested that, without the statements about Ms. Boylan's interactions with male colleagues, the letter was fine.[969]  Ms. DeRosa testified that Mr. Cohen initially thought the letter was not a good idea, but he later took the position that with some edits it would be acceptable.[970]  Mr. Cohen "spent some time reworking" the letter.[971]  Ms. Mogul thought releasing the letter was a "horrible idea."[972]  At Ms. DeRosa's request, she tried to fact check the letter,[973] but she was unable to find factual support for parts of the letter.[974]  The others whom Ms. DeRosa consulted agreed that the letter was an overreaction.[975]  Ms. DeRosa reported back to the Governor that Ms. Kaplan and the head of Times Up thought the letter was okay with some changes, as did Mr. Cohen, but everyone else thought it was a bad idea.[976]

---

[962] DeRosa Tr. 677:13–18.  Ms. DeRosa testified that she had included the complaints from the Confidential Files in the draft letter.

[963] Andrew Cuomo Tr. 153:8–12.

[964] DeRosa Tr. 669:1–6.

[965] *Id.* at 635:18–36:20.

[966] *Id.* at 648:4–6.

[967] *Id.* at 648:7–10.

[968] *Id.* at 648:11–23.

[969] *Id.* at 656:19–658:10.

[970] *Id.* at 651:12–652:1.

[971] Cohen Tr. 90:22.

[972] Mogul Tr. 203:19–23.

[973] DeRosa Tr. 652:10–653:5.

[974] Mogul Tr. 198:22–35, 200:4–201:7.

[975] DeRosa Tr. 653:15–655:17, 659:15–20.

[976] *Id.* at 661:6–12.

Ms. DeRosa testified that in response to her report about the different views on the letter, the Governor suggested that they see if they could get some people to sign it.[977]  Initially, the letter had been drafted to be from Ms. Lever, Cathy Calhoun, and Mr. David, whom Ms. DeRosa had thought would be inclined to sign a letter.[978]  All of these individuals were contacted about potentially signing onto this letter.  Ms. Lever declined to sign the letter.[979]  Mr. David testified that he told Ms. DeRosa that he was not signing the letter but was willing to reach out to others to see if they would sign it.[980]  Later versions of the letter simply identified "former senior staff members" of the Executive Chamber more generally as the signatories.

Ms. DeRosa, Mr. David, Ms. Lacewell, and Mr. Bamberger sent or read drafts of the letter to a number of other former Executive Chamber staff members to ask them to sign it or to seek their help in getting others to sign it.[981]  Although the letter was ultimately never published, over a dozen people inside and outside the Chamber saw drafts of the letter, including eventually a reporter from the New York Post.[982]  According to Ms. DeRosa, when it looked like the letter might not be published, part of the letter was also communicated to a reporter at the New York Daily News.[983]  Several people whom the Governor's advisors asked to sign the letter were uncomfortable with what it said about Ms. Boylan.  Ms. Lever suggested that the letter amounted to "victim shaming."[984]  Ms. Walsh remarked that "this entire thing is castigating her" and "why[?] this is just attacking."[985]  She suggested to Ms. DeRosa on December 16 that instead of attacking Ms. Boylan, a better alternative would be to prepare a statement discussing positive experiences of working with the Governor.[986]  She sent Ms. DeRosa a model for such a statement.[987]

Ms. DeRosa convened a call with the Governor, Mr. Vlasto, and other advisors. Mr. Vlasto expressed the group's consensus that the original letter that the Governor had drafted

---

[977] Id. at 661:25–662:7.

[978] Id. at 635:2–7.

[979] Lever Tr. 325:14–17.

[980] David Tr. 251:5–252:2.  In a text message on December 16, Ms. DeRosa told other former staff members whom she had asked to sign the letter that Mr. David said he would sign the letter "if we need him."  Ex. 84.  Ms. DeRosa testified that Mr. David initially said he would not sign the letter but later said he would if needed.  DeRosa Tr. 656:5–12.

[981] David Tr. 263:14–265:3.

[982] Vlasto Tr. 281:15–25; DeRosa Tr. 657:14–659:14, 696:15–697:3; Ex. 85.  Ms. DeRosa confirmed that individuals who were not part of "a close group of advisors" received drafts of the letter.  DeRosa Tr. 673:1–675:24, 690:23–691:9.

[983] DeRosa Tr. 642:2–643:16 (Ms. DeRosa testified she asked Mr. Vlasto to convey the substance of a part of the letter to Denis Slattery).

[984] Lever Tr. 325:7–10.

[985] Ex. 86.

[986] Ex. 87; Walsh Tr. 258:10–24.

[987] Ex. 87.

was a bad idea.[988]  The Governor accepted the group's view.[989]  Ms. DeRosa testified that it was also implied during the call that the letter could be considered retaliatory.[990]  The Governor testified that because there was no consensus on the draft letter, he and his advisors "wound up doing nothing."[991]  He drew a comparison with Abraham Lincoln's apparent practice of handwriting a long response to an article that infuriated him and then crumpling up the response and throwing it out.[992]  The Governor testified that, like Lincoln, the writing process was cathartic for him.[993]

On December 17, Ms. DeRosa sent Mr. Cohen, Ms. Lacewell, Mr. David, and Mr. Vlasto the more positive model statement that Ms. Walsh had shared.[994]  Later that day, Ms. Benton sent a draft of a statement that was supposed to come from women.[995]  The statement described positive experiences of working with the Governor and described him as "strong tough respectful inclusive and effective."[996]  Mr. Azzopardi testified that he and Ms. Lacewell drafted the statement.[997]

According to contemporaneous emails, the Governor wanted to get 50 signatories for the statement.[998]  Ms. DeRosa and Ms. Benton were involved in coming up with a list of women who had worked for the Governor at some point, to ask them to sign the statement.[999]  In an email exchange on December 17, 2020, Ms. Benton wrote to Ms. Lacewell, copying Ms. DeRosa, with a long list of names of current and former staff members, stating:  "[s]o this is progress.  How do we get him 50 plus names.  Would be great to keep his mind on this path."[1000]  Ms. Lacewell, Mr. David, and Ms. Benton worked on asking the women to sign the statement.[1001]  One woman, who worked in the Chamber at the time, told us that she declined to sign the statement because she did not believe the Chamber was an inclusive and supportive environment, and instead thought it was abusive and toxic.

---

[988] DeRosa Tr. 663:25–665:8.

[989] *Id.* at 669:16–23.

[990] *Id.* at 665:14–666:18.  Other witnesses testified that they did not consider whether the letter could be retaliatory. *See, e.g.*, David Tr. 252:8–22 (He doesn't think he considered whether the letter was retaliatory because Ms. Boylan was no longer a Chamber or State employee.).

[991] Andrew Cuomo Tr. 152:5–10.

[992] *Id.* at 152:11–17.

[993] *Id.* at 152:18–22.

[994] Ex. 88.

[995] Ex. 89.

[996] Ex. 89.

[997] Azzopardi Tr. 168:6–15.

[998] Ex. 89.

[999] DeRosa Tr. 700:10–701:9.

[1000] Ex. 89.

[1001] Ex. 89; Ex. 90; Ex. 91.

### C.  Outreach to Determine Which Former Staff Members Might Be Supportive of Ms. Boylan

The Governor's circle of advisors also engaged in efforts to determine which former Executive Chamber staff members might be supportive of Ms. Boylan and also might have their own allegations of harassment.[1002]  In mid-December 2020, Ms. DeRosa and Ms. Benton asked certain former Executive Chamber staff members to contact others to find out if they had been speaking with the press about the allegations against the Governor and report back. Ms. DeRosa and Ms. Benton also asked certain former Executive Chamber staff members to find out if Ms. Boylan had reached out to others.[1003]  The former staff members conveyed what they learned to Ms. DeRosa or Ms. Benton.

For example, as discussed above, after Kaitlin posted a tweet in support of Ms. Boylan on December 13, 2020,[1004] Ms. DeRosa insisted that a former Chamber staff member call Kaitlin to find out if Kaitlin was working with Ms. Boylan, had her own allegations against the Governor, or was talking to reporters.[1005]

### D.  Expressions of Contrition, Followed by Denials and Defiance

As additional allegations of sexual harassment against the Governor surfaced in the spring of 2021, the Governor's team of advisors from within and outside the Chamber had ongoing and regular discussions about how to respond to the allegations publicly.[1006]  The group included the Governor, senior Executive Chamber staff Ms. DeRosa, Mr. Azzopardi, Peter Ajemian (the Governor's Director of Communications at the time), Ms. Mogul, and Ms. Garvey.[1007]  It also included Ms.  Lacewell, Jefrey Pollock, Lis Smith, Mr. Cohen, Mr. Vlasto, Mr. Bamberger, and Ms.  Lever, as well as the Governor's brother Chris Cuomo.[1008]  Mr. Pollock has a public affairs firm, and the Governor is one of his clients.[1009]  Ms. Smith was self-employed as a political consultant.[1010]  Mr. Cohen is a lawyer and was a self-employed consultant while serving on ESD's Board of Directors at the time.[1011]  Mr. Vlasto and Mr. Bamberger worked at a public relations firm.[1012]  Ms. Lever worked at a technology company.[1013]  The Chamber did not retain, in any official or formal way, any of these outside

---

[1002] Ms. Benton claimed that the purpose was to make former employees aware that Ms. Boylan had been reaching out to former staffers in an effort to gather support for her allegations.  Ms.  Benton Tr. 241:10–14.

[1003] Benton Tr. 240:16–241:15, 251:6–25; Walsh Tr. 273:4–274:2.

[1004] Ex. 92 ("Keep talking, Lindsey.  Men like him should not be in positions of power.").

[1005] DeRosa Tr. 613:3, 614:11–13; Collins Tr. 216:6–23, 218:6–219:16, 220:4–221:6, 237:2–8.

[1006] See, e.g., Ex. 70; Ex. 93; Ex. 94; Ex. 95; Ex. 96.

[1007] See, e.g., Ex. 70; Ex. 93; Ex. 94; Ex. 95; Ex. 96; Azzopardi Tr. 32:3–15, 36:2–17.

[1008] See, e.g., Ex. 70; Ex. 93; Ex. 94; Ex. 95; Ex. 96; Azzopardi Tr. 32:3–15, 36:2–17, 37:16–25.

[1009] Pollock Tr. 22:12–23:21.

[1010] Smith Tr. 23:13–18.

[1011] Cohen Tr. 200:2–5.

[1012] Bamberger Tr. 51:4–17; Vlasto Tr. 52:3–5.

[1013] Lever Tr. 17:22–24.

advisors or compensate them for their advice.[1014]  Mr. Azzopardi testified that the outside advisors were "people who have been with us for a long time who we could trust."[1015]  He also explained, "when you feel like you're in battle you turn to those you trust."[1016]

According to internal documents and communications obtained during the investigation, it appears that the Governor's advisors, including Mr. Pollock and Chris Cuomo, counseled him to express contrition after the press published Ms. Bennett's allegations.[1017]  On February 27, 2021, the date when the first article about Ms. Bennett's allegations appeared, the Governor issued a press release saying that he never "intend[ed] to act in any way that was inappropriate."[1018]  The next day, he issued another press release saying that he "never intended to offend anyone or cause any harm."[1019]  He explained in the press release:

> I now understand that my interactions may have been insensitive or too personal and that some of my comments, given my position, made others feel in ways I never intended.  I acknowledge some of the things I have said have been misinterpreted as an unwanted flirtation.  To the extent anyone felt that way, I am truly sorry about that.[1020]

Ahead of a press conference on March 3, 2021, a group of advisors, including Ms. DeRosa, Ms. Smith, Mr. Pollock, Mr. Azzopardi, Mr. Ajemian, Ms. Benton, Ms. Mogul, and Ms. Lacewell, met in the Executive Mansion on March 2 and March 3 to prepare the Governor.[1021]  Ms. Mogul testified that the general consensus was that the Governor had "screwed up" and needed to show contrition.[1022]  As Ms. Mogul explained, "the Governor needed to project contrition"[1023] and "this was really about him needing to go out there and really express that he knew he had screwed up."[1024]  At the press conference, the Governor said during his remarks:

> I now understand that I acted in a way that made people feel uncomfortable.  It was unintentional, and I truly and deeply apologize for it.  I feel awful about it, and frankly, I am embarrassed

---

[1014] Andrew Cuomo Tr. 124:1–125:11; Azzopardi Tr. 38:1–39:8.

[1015] Azzopardi Tr. 39:14–16.

[1016] *Id.* at 102:22–103:5.

[1017] Ex. 97; Ex. 98; Ex. 99; Ex. 100; Ex. 101.

[1018] *Statement from Governor Andrew M. Cuomo*, Office of the Governor (Feb. 27, 2021), https://www.governor.ny.gov/news/statement-governor-andrew-m-cuomo-208.

[1019] *Statement from Governor Andrew M. Cuomo*, Office of the Governor, (Feb. 28, 2021), https://www.governor.ny.gov/news/statement-governor-andrew-m-cuomo-209.

[1020] *Id.*

[1021] Smith Tr. 201:19–202:5; Mogul Tr. 52:12–18.

[1022] Mogul Tr. 59:12–18, 62:6–8.

[1023] *Id.* at 59:12–18.

[1024] *Id.* at 62:6–8.

> by it.  That's not easy to say, but that's the truth.  But this is what I
> want you to know, and I want you to know this from me directly.  I
> never touched anyone inappropriately.  I never touched anyone
> inappropriately.  I never knew at the time that I was making anyone
> feel uncomfortable.  I never knew at the time I was making anyone
> feel uncomfortable.  And I certainly never ever meant to offend
> anyone, or hurt anyone, or cause anyone any pain.[1025]

During the press conference, a group of advisors sent reactions and comments in a group chat that included Ms. DeRosa (who was on the dais with the Governor), Ms. Smith, Mr. Pollock, Mr. Azzopardi, Mr. Ajemian, Ms. Lacewell, and Ms. Mogul.[1026]  Ms. Smith testified that she and Mr. Pollock "were texting with Melissa [DeRosa] in realtime" about how they thought the press conference was going and to pass on "any pointers [Ms. DeRosa] could give to [the Governor] while they were up there together."[1027]  At one point, Mr. Pollock texted, "And now he is not sounding contrite so let's get back to that."[1028]  Ms. Smith added, "Tone is not contrite."[1029]

The Governor said, during the question and answer session at the press conference:

> It doesn't matter my intent.  What matters is if anybody was
> offended by it.  And I could intend no offense, but if they were
> offended by it, then it was wrong.  And if they were offended by it,
> I apologize.  And if they were hurt by it, I apologize.  And if they
> felt pain from it, I apologize.  I apologize.  I did not intend it.  I didn't
> mean it that way, but if that's how they felt, that's all that matters,
> and I apologize.[1030]

Following the press conference, the Governor's group of advisors discussed the "spin" from the press conference.[1031]  Ms. DeRosa texted that she thought the spin was "getting back to work" and "full throated emotional apology."[1032]

On March 9, the date that the press reported Executive Assistant #1's allegations, one of the Governor's former consultants texted Ms. DeRosa, "I think he needs to say he is going to

---

[1025] *New York Gov. Andrew Cuomo COVID-19 Press Conference Transcript March 3: Addresses Sexual Harassment Allegations*, Rev (Mar. 3, 2021), https://www.rev.com/blog/transcripts/new-york-gov-andrew-cuomocovid-19-press-conference-transcript-march-3-addresses-sexual-harassment-allegations.

[1026] Smith Tr. 257:11–258:19; Ex. 99.

[1027] Smith Tr. 258:4–6.

[1028] Ex. 99.

[1029] Ex. 100.

[1030] *New York Gov. Andrew Cuomo COVID-19 Press Conference Transcript March 3: Addresses Sexual Harassment Allegations*, Rev (Mar. 3, 2021), https://www.rev.com/blog/transcripts/new-york-gov-andrew-cuomocovid-19-press-conference-transcript-march-3-addresses-sexual-harassment-allegations.

[1031] Ex. 102.

[1032] *Id.*

counseling for his tendency to be aggressive and to reacclimate how he interacts with people. AG report may find no offense but will find inappropriate behavior so why not get out ahead of this now.  So the pattern of all these allegations is addressed with this effort for counseling and training."[1033]  The former consultant testified that she told the Governor in a phone call that she thought "he should apologize and go to counseling."[1034]  The Governor "said he didn't disagree, but that his advisors, the team, thought that he should announce something like that later.  Not the apology, but counseling."[1035]  During his testimony, Chris Cuomo explained that there was discussion about remedial measures the Chamber should take in light of the sexual harassment allegations, but some people had taken the position that "they should just wait."[1036]  When asked about any remedial measures during his testimony, the Governor testified that the Chamber is "talking to people about" them.[1037]

Soon after March 9, the general tone and strategy appeared to shift and grow more defiant.  On March 12, the Governor declared at a press conference, "I never harassed anyone.  I never abused anyone.  I never assaulted anyone."[1038]  In a March 16 text message from Mr. Vlasto to his colleagues, he noted that "Steve [Cohen] told me this morning they are asking him to spread oppo on Joon Kim.  Don't think we want to be getting down with that crowd."[1039]  In fact, Mr. Vlasto testified that the Governor had asked him to "take over the politics and press operation in leading the response to the assembly and all of [the] investigations,"[1040] but that he had declined in part because of personal reasons and also because he did not believe in the "style" the Governor and his advisors were adopting, which he believed to be more negative than it should be.[1041]  Mr. Cohen testified that he did not recall anyone asking him to do "opposition research," but he did note that there may have been discussions from the start of our investigation about the Attorney General's motivations and the backgrounds of the attorneys selected for the investigation and what they would say if the investigative findings were not favorable.[1042]

### E.  Melissa DeRosa Directs Larry Schwartz to Call County Executives

As more complainants went public with allegations of sexual harassment, public calls for the Governor's resignation grew and a number of public officials joined that call.  Others stated publicly that any judgment should await the results of the investigation.  It was around this time in early March that  Ms. DeRosa called Larry Schwartz, former Secretary to the Governor who

---

[1033] Ex. 103.

[1034] Former Consultant Tr. 85:2–7.

[1035] *Id.* at 85:9–12.

[1036] Christopher Cuomo Tr. 188:3–190:15.

[1037] Andrew Cuomo Tr. 499:24–500:6.

[1038] *New York Gov. Andrew Cuomo COVID-19 Press Conference Transcript March 12*, Rev (Mar. 12, 2021), https://www.rev.com/blog/transcripts/new-york-gov-andrew-cuomo-covid-19-press-conference-transcript-march-12.

[1039] Ex. 104.

[1040] Vlasto Tr. 243:7–23.

[1041] *Id.* at 247:15–248:7.

[1042] Cohen Tr. 382:11–383:13, 386:10–21; *see also* Christopher Cuomo Tr. 163:15–22; 168:16–21.

was serving as the State's COVID-19 "Vaccine Czar" at the time, and asked him to join a conference call.[1043]  On the call, Ms. DeRosa asked Mr. Schwartz to reach out to Democratic County Executives to ascertain their positions on whether the Governor should resign in light of the sexual harassment allegations.[1044]  Mr. Schwartz testified that he agreed to make the calls because Ms. DeRosa, the Secretary to the Governor, had asked.[1045]  At the time, Mr. Schwartz's sole official responsibility related to COVID-19 vaccine administration and distribution and he was in regular contact with county officials on this subject.  In that regard, as the State's Vaccine Czar, Mr. Schwartz was perceived by County Executives to have significant authority over the speed and volume of vaccinations that the Counties were receiving at a time when demand exceeded supply.  Mr. Schwartz testified that the vaccine distribution he oversaw was "formula driven."[1046]  We found that the County Executives we interviewed reasonably felt that Mr. Schwartz had significant authority and influence over supplemental vaccine requests and other issues like the location of vaccine sites, at a time when County officials urgently wanted to get vaccines to their constituents.

Mr. Schwartz's calls to the County Executives started shortly after Ms. Bennett's allegations were made public.  Mr. Schwartz recalled starting off his calls to County Executives along the lines of, "I'm not calling you about vaccines, I'm calling because you've taken a public position calling for an independent investigation by the Attorney General's office and you're going to wait for the outcome of that investigation.  Is that still your position?"[1047]  Mr. Schwartz testified that he did not ask any County Executive to change or maintain any position.[1048]  Mr. Schwartz testified that to the best of his recollection, he never brought up the topic of vaccines on these calls.[1049]  Mr. Schwartz called Ms. DeRosa to report back to her what the County Executives had said.[1050]

One Democratic County Executive ("County Executive #1") received a phone call from Mr. Schwartz on March 2, 2021.  According to County Executive #1, and consistent with Mr. Schwartz's testimony, Mr. Schwartz began the call by noting, "I'm not calling about the vaccine."  Mr. Schwartz then presented the Executive Chamber's position that this investigation should be permitted to play out before reaching conclusions.  County Executive #1 understood the call to contain an implicit threat linking access to vaccines for County Executive #1's county, which County Executive #1 had been working with Mr. Schwartz and others in the Executive Chamber to obtain, with County Executive #1's position on the allegations regarding the Governor.  County Executive #1 described himself as "stunned" and unsettled by Mr. Schwartz's call.

---

[1043] Schwartz Tr. 188:9–189:21.

[1044] *Id.*

[1045] *Id.* at 187:22–188:25.

[1046] *Id.* at 104:3–105:13.

[1047] *Id.* at 198:3–17, 200:9–17.

[1048] *Id.* at 204:17–205:11.

[1049] *Id.* at 214:6–9.

[1050] *Id.* at 196:9–17.

Two weeks after Mr. Schwartz had made his first round of calls, Ms. DeRosa asked him to make another round of calls to the County Executives to check in on their positions. Mr. Schwartz again made these calls and reported back to Ms. DeRosa.[1051]

On March 7, 2021, a few minutes after County Executive #1 had discussed potential vaccination sites in County Executive #1's county with another staff member of the Executive Chamber, Mr. Schwartz called County Executive #1 again and said, "We hope you can continue to hold your position in terms of the investigation," which County Executive #1 understood to be a request not to call for the Governor's resignation but instead wait for the end of the investigation. County Executive #1 informed us that he found the calls from Mr. Schwartz, someone he did not know well and whose only interaction with him was in the context of vaccines, to be stunning, and that he read implicit threats into the calls. None of the other County Executives we interviewed found the calls from Mr. Schwartz to be threatening. Only two County Executives stated that the topic of vaccines came up (other than Mr. Schwartz's statement at the beginning of the call that it was not about vaccines), and of those, one said that he raised the topic, not Mr. Schwartz.

Mr. Schwartz testified that to his recollection, none of the County Executives expressed discomfort during his calls.[1052] He also emphasized the formulaic nature of vaccine distribution decisions using outside consultants. Mr. Schwartz nevertheless testified that he now understands the "optics problem" of his making the calls to the County Executives while being responsible for vaccine administration and distribution, and it would have been "better and smarter" for someone else to make the calls.[1053] Ms. DeRosa testified that it did not cross her mind that the County Executives might feel some pressure in receiving a call from Mr. Schwartz, whose only role in the government at that time was the administration and distribution of vaccines.[1054]

## III.   **The Culture and Practices of the Executive Chamber Under Governor Cuomo**

The alleged sex-based harassment by the Governor did not occur in a vacuum, and the allegations of women who have worked in the Executive Chamber cannot be understood or assessed without the context of the overall workplace culture. Over the course of our investigation, most witnesses not in the Governor's inner circle provided a consistent narrative as to the office culture of the Executive Chamber, describing it as "toxic" and full of bullying-type behavior, where unflinching loyalty to the Governor and his senior staff was highly valued. It became clear during our interviews with the complainants and other witnesses that the overall work culture and environment was relevant to important aspects of our findings, including how the Governor appeared to believe he never behaved inappropriately, as well as the complainants' willingness, delay, and sometimes refusal to report inappropriate conduct within the Executive Chamber.

---

[1051] *Id.* at 206:4–209:24.

[1052] *Id.* at 210:3–211:4.

[1053] *Id.* at 211:10–18.

[1054] DeRosa Tr. 831:12–833:9.

*First*, witnesses, particularly women working as junior staff members and executive assistants as well as members of the State Police's PSU, consistently described a work environment that normalized the Governor's flirtatious behavior, and some noted that the special attention was a better alternative to the otherwise tense, stressful and "toxic" experience in the Executive Chamber.  The Governor's more intimate behavior with women working in the most senior roles of the Executive Chamber, according to many witnesses, served to underscore the value of the Governor's attention to those women working in more junior positions.  We heard that, as a result, women faced a strong incentive to remain quiet and avoid objecting to Governor Cuomo's behavior, even if they felt uncomfortable and at times even "completely violated"[1055] by his conduct.  *Second*, we found that the staff of the Executive Chamber, as well as members of the PSU, understood that loyalty to the Governor was highly valued, sometimes as much if not more so than the duties and obligations of one's work, while any complaints or disagreements with the Governor could, and often did, lead to negative consequences.  Such an environment created powerful incentives for employees to maintain their silence and a positive outward demeanor rather than risk being perceived as critical of the Governor or his loyal senior staff. *Finally*, the Executive Chamber's failure to ensure a clear and consistent understanding and enforcement among its staff of the policies and procedures regarding sexual harassment in the workplace exacerbated the difficulties that women already faced in reporting and addressing sexual harassment.

As the 2016 Select Task Force on Sexual Harassment of the Equal Employment Opportunity Commission[1056] ("EEOC") concluded, workplaces with "significant power disparities can be a risk factor" for sexual harassment, because "low-status workers may be particularly susceptible to harassment, as high-status workers may feel emboldened to exploit them."[1057]  The Task Force further concluded, "[l]ow-status workers may be less likely to understand internal complaint channels, and may also be particularly concerned about the ramifications of reporting harassment (e.g., retaliation or job loss)."[1058]  Meanwhile, "senior management may be reluctant to challenge the behavior of their high value employees, and the high value employees, themselves, may believe that the general rules of the workplace do not apply to them."[1059]

We find the Task Force's conclusions to be particularly relevant to the Executive Chamber.  Executive Chamber employees often did not know how to make a complaint and

---

[1055] Trooper #1 Tr. 92:5–12, 139:18–25.

[1056] The Select Task Force was a group of outside experts—academics, lawyers, advocacy groups, and  organized labor—impaneled to examine harassment in the workplace, including its causes and effects, and what could be done better to prevent it.  *See* Feldblum, Chai R. & Lipnic, *Select Task Force on the Study of Harassment in the Workplace*, Equal Employment Opportunity Commission (June 2016), https://www.eeoc.gov/select-task-force-study-harassment-workplace.

[1057] *Id.*

[1058] *Id.*

[1059] *Id.*; *see also* Vicki Schultz, *Reconceptualizing Sexual Harassment, Again,* 128 Yale L.J. Forum 22, 29 (2018) ("It is not only the gendered nature of the hierarchy that fuels harassment: it is also the nature of the hierarchy itself. Harassment is fueled by employment systems that give higher-ups unchecked, subjective authority to make or break other people's careers on their own subjective say-so, without the use of objective criteria or external oversight to constrain their judgments." ).

faced significant disincentives that discouraged them from speaking up about any potential harassment perpetuated by the Governor.[1060]  Their supervisors were senior staff who were loyal to the Governor, and in many cases received special attention and treatment from the Governor. As a result, complainants often delayed—and even waited until they exited the Executive Chamber—to raise their allegations against the Governor (as a number of complainants did).  Or, in the case of Executive Assistant #1, she intended to take her experiences of harassment by the Governor "to the grave," until her reaction to allegations of sexual harassment regarding the Governor revealed her distress to her colleagues.[1061]

## A.  Normalization of the Governor's Sexual or Other Sex-/Gender-Based Conduct as a Preferred Alternative to Poor Treatment

We found a range of observations and experiences related to the Governor's conduct and the culture and practices of the Executive Chamber from former and current staff and advisors of the Governor, as well as employees of other State agencies (including the PSU) who worked closely with the Governor or members of his staff.  As a general matter, however, it became clear that the Governor's behavior toward women, particularly those in the Executive Chamber, exhibited certain tendencies that normalized flirtatious, suggestive or other gender- or sex-based conduct that make it difficult for women to object to or report such conduct.[1062]

### i.  Governor Cuomo's Flirtatious, Suggestive, and Other Gender- or Sex-Based Conduct

During the course of our investigation, we encountered substantial evidence of recurring conduct by the Governor that was suggestive or sexual in nature or otherwise gender- or sex-based and potentially offensive.

In addition to his comments regarding Ms. Boylan and other complainants' beauty detailed above, we found numerous other instances in which the Governor commented on the attractiveness of women, including women in the Executive Chamber.  For example, on one occasion, before a woman on staff walked into his office, the Governor commented to two male staff members, "[y]ou'll see why we hired her."  One of the men in the room at the time interpreted the  Governor to mean that the staff member's looks played a role in her being hired for the Chamber. Another woman on the staff felt (much like how Ms. Boylan had described during her testimony) that the Governor always made a point to talk to her at events or stared at

---

[1060] Indeed, many witnesses throughout our investigation expressed concern (and in some instances, outright fear) that cooperating with our investigation would lead to retribution from the Executive Chamber or the Governor and negative consequences as a result.

[1061] Executive Assistant #1 Tr. 182:23–24.

[1062] We obtained substantial evidence of the overall culture within the Executive Chamber through the interviews we conducted with many current and former employees.  Unlike the complainants whose allegations are described in greater detail in this Report and from whom we obtained sworn testimony because we were relying on their allegations to form the basis of our conclusion that the Governor sexually harassed a number of them, we did not take sworn testimony from all of the witnesses who made allegations about the general toxicity or inappropriateness of the culture.  Thus, there are fewer cites to transcripts of testimony for these witnesses who provided this type of background information to us during our investigation, although, as noted below, there was a general consistency in the description of the culture.

her "in a creepy way" from across the room.  During one event, the Governor walked up to the staff member to ask about her last name; the staff member told the Governor that she was Italian, to which the Governor responded, "I don't know what you are, but you're beautiful."  The staff member felt weird and uncomfortable with the Governor's attention, but was told by other staff in the Executive Chamber that it was good the Governor liked her.  One former employee told us that women had told him that the Governor had made them feel like "prey," as the Governor's gaze would linger on them, seemingly taking in their whole bodies, and then he would hold eye contact with the women for longer than expected.

Witnesses also observed that the Governor often touched people, more frequently women, and often without permission.  While many witnesses observed the Governor regularly touch his constituents or other members of the public at events, including with hugs, kisses on the cheek, and by placing his arms around people's shoulders or waists during photographs, as he did with a number of the complainants, we found that the Governor's conduct sometimes went beyond these regular displays of public affection.  For example, at a fundraising event on December 9, 2015, the Governor approached a woman, asked to take a picture with her, and then rubbed a tattoo she had on her arm, causing the woman to feel uncomfortable.[1063]  A former member of the PSU reported that, at a staff holiday party in or around December 2018, before posing for a photograph with the then-current PSU member and his wife, the Governor reached out and physically peeled off the wife's name tag that was just underneath her breast.  After the photograph was taken, the Governor began to walk away, and then turned back to hand the name tag to the former PSU member, saying something to the effect of, "[y]ou might want this—I could get in trouble."  The PSU member said he and his wife both felt that the Governor's conduct was odd and inappropriate.

This type of behavior extended to members of the Executive Chamber outside of large events.  Similar to the allegations of some of the complainants detailed above, one staff member noted that the Governor often stopped by her desk to grab and hold her hand as if he were going to shake it, but then continued holding her hand.  The staff member became unsettled and flustered during these interactions and often blushed.  She felt that her reaction was "part of the point" of the Governor's behavior.  The staff member also noted that, on occasion, the Governor put his arm around her, which made her feel "small" and uncomfortable, even as she tried to maintain a professional demeanor to signal that she was not interested in any flirtatious or other non-professional interactions with the Governor.

Other witnesses in addition to the complainants reported to us specific instances in which the Governor made a comment or joke that seemed sexual or suggestive in meetings with Executive Chamber staff.  One former staff member recalled hearing the Governor repeatedly make a joke about how the young bull runs down the hill to have sex with one bull and the old bull walks down the hill to have sex with all of them—meaning that it is better to slow down and get a lot of things done.  The Governor denied recollection of this.  On another occasion, in the spring of 2016, the Governor spotted a bottle on an Executive Assistant's desk labeled "Skinny Bunny," with an accompanying image of rabbit ears.  After learning the Executive Assistant was drinking Skinny Bunny tea in an attempt to help lose weight in advance of her wedding, the Governor asked the Executive Assistant if she was trying to look like a "Playboy bunny."  Two

---

[1063] *See* Ex. 105 (photographs of the Governor holding the woman's arm at the same event in question).

witnesses also recounted that during a meeting, the Governor looked at his Emmy statue, which he had won in November 2020 and put in his Albany office, and said something to the effect of, "look at her figure. Isn't she buxom?"[1064]   In December 2020 or in January 2021, the Governor was meeting with members of his staff to discuss a meeting with the White House related to COVID-19, when the Governor expressed disappointment that he did not have any "catchy one-liners" in his speech, and said something to the effect of, "You need to give me some catchy one-liners.  Come up with a line like, 'you're having sex without the orgasm.'"[1065]

There have been media reports of pressure for women in the Executive Chamber to wear makeup, dresses, and heels because that is what the Governor likes.[1066]  While many staff described a general expectation to dress professionally, particularly during public events or when Governor Cuomo was in the office, we found that expectations for women related to wearing dresses or high heels were not at the direction of the Governor or his senior staff.[1067]

A number of former and current Executive Chamber staff, particularly the senior staff, as well as State Troopers on the PSU, denied having witnessed or experienced any conduct by the Governor that could be characterized as sexual or otherwise inappropriate.  Some of these witnesses, including the Governor himself, also explained certain of his behavior, such as kissing people on the cheek or grabbing someone's face before kissing the person on the cheek, as "old fashioned" or "traditional" behavior representative of his age and background, including his Italian heritage.  Specifically, while the Governor denied ever saying some of the specific things identified above, he also did not dispute that he sometimes commented on staff members' appearance and attire, used terms of endearment (such as "honey," "darling" or "sweetheart") and gave people hugs and kisses on the cheek and forehead, although he testified that more "recently," because of "shifting norms," he has changed his behavior—though "there are times" when he "slips."[1068]  However, the Governor disputed the way in which his conduct has been interpreted by others.

The evidence in our investigation has also shown that the Governor exhibited a close and sometimes physical intimacy with his senior staff.  Staff members in the Executive Chamber observed that the Governor regularly spoke with one senior staff member in "baby voices," or called her "baby, sweetie, and honey," while other witnesses recalled seeing the Governor kiss the same senior staff member on the cheek or engage in other somewhat intimate behavior in a private setting.  One former senior staff member who is a woman acknowledged that the Governor had occasionally kissed her on the lips.[1069]  The Governor testified that "there may be

---

[1064] The Governor denied joking about his Emmy statue.  Andrew Cuomo Tr. 506:19–507:6.

[1065] The Governor denied any recollection of making this statement.  *Id.* at 506:3–14.

[1066] *See, e.g.*, Brian M. Rosenthal & Luis Ferré-Sadurní, *For Some Women, Working for Cuomo Is the 'Worst Place to Be,'* N.Y. Times (Mar. 12, 2021), https://www.nytimes.com/2021/03/12/nyregion/cuomo-women-toxic-workplace.html.

[1067] Collins Tr. 129:20–24; Kaitlin Tr. 49:5–12.

[1068] *See, e.g.*, Andrew Cuomo Tr. 63:2–66:9 (commenting on people's appearance); *id.* 81:3–84:22 (hugging and kissing staff); *id.* 87:3-22 (would not be surprised if he has kissed staff members on the forehead); *id.* 242:18–243:16 (may have used endearing terms); *id.* 443:25–444:24 (kissed and hugged Troopers); *id.* 83:9–24 ("shifting norms"); *id.* 243:22–16 ("there are times that I slip").

[1069] Walsh Tr. 104:2–105:9.  She testified that she did not feel uncomfortable during these kisses.  *Id.* at 105:21–25.

an occasion where a staff member kissed [him] on the lips," but noted that he "kiss[es] on the cheek as a rule."[1070]  Another senior staff member admitted to sitting on the Governor's lap during an event for certain members of the Executive Chamber and heads of State agencies,[1071] while the Governor noted he "wouldn't be surprised, at a social event or something," if "somebody may have sat on [his] lap," including the senior staff member in question,[1072] or if he had held hands with certain women on his staff.[1073]  A senior staff member also recalled the Governor lying down on a couch with his head on a staff member's lap.[1074]  None of these senior staff reported feeling uncomfortable with this behavior.

A number of witnesses we spoke to informed us that all of this behavior led to a sense among staff members in the Executive Chamber that personal attention from the Governor, even if flirtatious or unrelated to their work and despite what they may feel, was not only normal, but to be valued.  One former staff member said that the Governor would make comments on women's attractiveness and sexual innuendos to his inner circle, and felt as though she needed to be a part of those conversations to do her job.

### ii.  The Alternative:  "Extremely Toxic, Extremely Abusive" Behavior

While the many former and current employees of the Executive Chamber we interviewed described a range of experiences working in the Executive Chamber, many—particularly junior staff members—consistently described a toxic culture and "abusive environment" within the Executive Chamber.  One former staff member felt that crying at one's desk was common and normal within the office, while another felt that supervisors went out of their way to "make people feel stupid."  Another former staff member noted that there was always an "element of fear," and people were always "looking behind their backs."  Witnesses also described an environment in which supervisors would "blow mistakes out of proportion," such that staff members faced constant fear and anxiety.  Two former staff members compared the dynamics of the Executive Office to an abusive relationship, with one noting that staff members could face intense criticism and then make an "amazing" achievement, which seemingly then enabled staff members to face the next cycle of mistreatment.  Yet another staff member described the Executive Chamber as a mix between the *West Wing* and *The Devil Wears Prada*, noting that the Governor's senior staff consists of "big personalities" who are "comfortable using power" and who maintain a "culture of fear and intimidation" in the Executive Chamber.  One former senior staff member noted in a text exchange after some of the sexual harassment allegations became public that "[h]opefully when this is all done people will realize the culture—even outside the

---

[1070] Andrew Cuomo Tr. at 218:17–222:3.

[1071] Benton Tr. 208:6–209:14.

[1072] Andrew Cuomo Tr. 167:15–169:5.

[1073] Andrew Cuomo Tr. 507:23–508:4.

[1074] Benton Tr. 216:20-218:19.  The Governor testified that he lies down because of a bad back and that a staff member could have been sitting near his head when he was lying down on a couch in the office.  Andrew Cuomo Tr. 226:12-229:1.

sexual harassment stuff—is not something you can get away with … you can't berate and terrify people 24/7."[1075]

Rather than reject such behavior, according to many witnesses, the Governor appears to have personified it.[1076]  Members of the Executive Chamber, as well as members of the PSU, recalled observing the Governor yelling at staff or PSU members for perceived mistakes, including "screaming" at his senior staff during meetings.  One woman on staff recalled that the Governor would become angry at her if he deemed her work less than perfect, and felt that the Governor tried to humiliate her.  Another former staff member recalled the Governor calling him "stupid" and an "idiot," and at least on one occasion saying, "Why don't I do my job *and* your job, because you obviously cannot do your job?"[1077]  As Ms. Bennett noted:

> If you got yelled at in front of everyone, it wasn't any special day . . . It was controlled largely by [the Governor's] temper, and he was surrounded by people who enabled his behavior, like surrounded by Yes Men . . . of this is what he wants, this is what he gets, and that mood and that anger definitely ruled the office and then trickled down, which is why it was like more stressful where I sat [near the Governor's office].[1078]

Ms. McGrath, during her time assisting in the Front Office, also testified she had witnessed the Governor "scream" at others, including at members of his senior staff, and that she had been told by other Executive Assistants to "just tune it out . . . and just try to, like, don't pay attention to it because it happens fairly often."[1079]

Staff members often felt particular anxiety focused on the Governor's mood and treatment, rather than their work.  A former senior staff member recalled a conversation with Mr. Cohen, who explained that when the Governor was upset, he expected his staff members to reflect his displeasure, and so when senior staff members yelled at others within the Executive Chamber, it was because the Governor expected them to do so.  Another senior staff member of a state agency said that she never raised concerns about the Governor's behavior, which she described as inappropriate and derogatory, because she was afraid of both personal retaliation and negative implications for her team's work and her agency's agenda.  In particular, she cited an instance where she spearheaded a major policy initiative and, after an encounter where the Governor yelled at her, she was removed from any speaking role at the announcement ceremony.

Some of the former and current staff members of the Executive Chamber, however, denied that the Executive Chamber had a toxic environment.[1080]  Certain witnesses

---

[1075]  Ex. 12.

[1076]  Some witnesses believed that senior staff often channeled their aggressive and hostile behavior from Governor Cuomo himself.  We did not find sufficient evidence to support or refute this belief conclusively.

[1077]  Bamberger Tr. 273:7–275:12.

[1078]  Bennett Tr. 82:8–23.

[1079]  Alyssa McGrath Tr. 45:19–46:12.

[1080]  Azzopardi Tr. 130:2–23; DeRosa Tr. 214:10–22; Lacewell Tr. 289:11–17.

acknowledged that the Governor was demanding and could make it clear when he was unhappy, but did not go so far as to describe his behavior as toxic, abusive, or unreasonable. Others, often former or current senior staff, acknowledged that they had experienced, at least on occasion, raised voices, "belittling" emails and other forms of aggressive conduct, but justified such behavior by emphasizing the importance of the work they were performing in the Executive Chamber, describing their work as "life or death" or noting their belief that State government "should be that way," given the importance of the work.[1081]

However, given the volume and consistency of the evidence developed during our investigation, we find that many, especially more junior employees, felt the environment was toxic and abusive. As a former senior staff member who had previously worked for a Presidential administration noted, it was possible to work with professionalism and respect in a high-stakes and stressful environment, as she had in the White House previously, but the way the Executive Chamber was run was "no way to run a State."

Within this context, as noted above, some women who worked in the Executive Chamber, particularly junior staff members and executive assistants, described their understanding that the alternative to special and flirtatious attention from the Governor was being subjected to "extremely toxic, extremely abusive" treatment from the Governor and others in the Executive Chamber.[1082] Many of the complainants described being uncomfortable with the Governor's flirtatious advances while also perceiving such behavior as a sign that they were favored—and spared from being yelled at, ignored, or otherwise mistreated by the Governor instead. Ms. Boylan, for example, noted that observing the Governor's hostile behavior toward others planted that fear of the alternative: "I would say that was his 'if he liked you' toxicity. For most people, when you [are] around, you saw the 'if-he-hated you' toxicity" in how he treated others.[1083] Ms. Bennett also testified, "I felt really uncomfortable" during some conversations with the Governor, "but . . . I also was acutely aware that I did not want him to get mad."[1084] As Ms. McGrath explained:

> [W]hat makes it so hard to describe every single inappropriate
> incident is the culture of the place. On the one hand, he makes all
> this inappropriate and creepy behavior normal and like you should
> not complain. On the other hand, you see people get punished and
> screamed at if you do anything where you disagree with him or his
> top aides.[1085]

---

[1081] *See, e.g.*, Ex. 13 ("The odd part about these workplace stories / It's not even close to what it was really like to work there day to day / It was so much worse / The abuse and mind games / But for me it never really bothered me. It was part of the deal").

[1082] Bennett Tr. 82:7–21.

[1083] Boylan Tr. 80:7–13.

[1084] Bennett Tr. 173:24–174:16; *see also* Executive Assistant #1 Tr. 79:21–25 ("I think that he definitely knew what he was doing and it was almost as if he would do these things and know that he could get away with it because of the fear that he knew we had.").

[1085] Alyssa McGrath Tr. 199:17–200:2.

Many other staff members also expressed the sense that they were left to choose between one type of negative attention—one that might hurt their careers and ability to focus on meaningful work—or another type of negative attention—one that might make them personally uncomfortable.  This made it difficult for staff members to resist or object to the Governor's favorable attention, even when unwanted.  One woman on the Executive Chamber staff noted that, because the Governor was a difficult person and boss, she did not want him to be upset with her and felt that any sign that the Governor was happy with her made her work easier, and expressed her ambivalence as:  "he seemed to like me, so that's something, I guess."

**B.**  **Focus on Secrecy, Loyalty, and Fear of Retaliation**

Witnesses reported that the Executive Chamber under Governor Cuomo cultivated an environment that was highly protective of the Governor, above all else.  For example, many witnesses reported on what appeared to be an intense focus on secrecy.  Ms. McGrath, for example, testified that she was instructed not to discuss anything about the Governor's interactions with anyone outside of the Executive Chamber,[1086] to the point that she was afraid to say anything about the Governor to anyone.[1087]  And, as noted above, Trooper #1 was instructed by her supervisor to make sure conversation with the Governor (including his questions about why she wore black and did not wear a dress) "stays in truck," which Trooper #1 interpreted to mean that the conversation should not leave the Governor's car.[1088]

The Governor himself enforced this secrecy with a number of the complainants.  He instructed Executive Assistant #1 not to show anyone (other than Ms. McGrath) the selfie they had taken together, and "was so firm . . . that . . . [she] was just terrified" to share the photograph.[1089]  At another time, the Governor directed Executive Assistant #1, who was close friends with Ms. McGrath, "don't tell Alyssa anything . . . [a]nything  that I do. . . . because you know I don't trust her."[1090]  The Governor also instructed Trooper #1, in December 2019, not to tell her friend, another Trooper in the PSU, anything that the Governor said to Trooper #1, and followed up with, "[a]s a matter of fact, don't tell anyone about our conversations."[1091]

Loyalty and service to the Governor were often expected to continue even after employees had left the Executive Chamber and no longer had an official role there, with many former staff members being asked to assist the Governor long after their departure from his administration and State government.  This was exemplified by the Executive Chamber's response to the allegations of sexual harassment against the Governor where a number of former staff members of the Executive Chamber (*e.g.*, Mr. Cohen, Ms. Lacewell, Mr. David, Mr. Vlasto, Mr. Bamberger, and Ms. Lever) and other individuals associated with the Governor's political

---

[1086] *Id.* at 59:9–60:1.

[1087] *Id.* at 68:2–10.

[1088] Trooper #1 Tr. 58:5–60:16.

[1089] Executive Assistant #1 Tr. 120:9–18, 128:5–18.

[1090] *Id.* at 179:2–13.  Later, following Ms. Boylan's public allegations of sexual harassment in December 2020, the Governor also told Executive Assistant #1, "you don't talk about anything with anyone else, right[?] . . . [Y]ou know, people talk around here. . . . I could  get in a lot of  trouble."  *Id.* at 134:22–136:6.

[1091] Trooper #1 Tr. 84:23–85:4.

campaigns were enlisted to assist the Governor and the Executive Chamber in responding to Ms. Boylan's and others' allegations, including those made by current and former members of the Executive Chamber.[1092]  One former senior staff member observed, "[E]veryone sort of jokes that the [G]overnor's office is like Hotel California.  You never really leave."[1093]

Witnesses also described a fear of retaliation or other negative action if they were to disagree with or complain about the Governor or his close advisors.  Several State employees, including those outside of the Executive Chamber, told us that they believed their careers in New York State government would be over if they were to cross the Governor or senior staff, including by reporting any misconduct.  One former Executive Chamber employee testified that he was concerned about his ability to work in New York State politics were he to disobey any directive by the senior staff or Governor.[1094]  One State entity employee was advised by her colleagues to "leave with as little fuss as possible" and "not make waves," because "the Governor could destroy [her] career and [she] would never find a job in the state again."  Similarly, Executive Assistant #1 testified that she believed it "was almost as if he knew he could get away with it because, if we were to say anything to anyone, he wasn't the one that was going to get in trouble or go anywhere—it was going to be us."[1095]

We found these concerns were not without basis.[1096]  Witnesses spoke of a wide range of negative action taken by the Executive Chamber and the Governor following any disagreement or complaint by employees, ranging from being "cut out of the loop"[1097] or "iced out" to being asked to leave the Executive Chamber.  This was true even for members of the PSU, a unit within a separate State agency under the direction of the Superintendent of the New York State Police.  Trooper #1 testified, for example, that she had heard "horror stories about people getting kicked off the detail or transfer[red] over like little things."[1098]  A former PSU member ("Former Trooper #1") also reported that he was transferred out of the PSU after a series of heated interactions with the Governor, which were seemingly set off by Former Trooper #1 asking the Governor about his schedule for the purposes of performing his PSU duties.[1099]  Former Trooper #1 was told by his supervisor that he had done nothing wrong, but that the Governor had requested his removal.  The Governor recalled that Former Trooper #1 had asked the Governor about his schedule and the Governor had referred Former Trooper #1 to the scheduler, but denied recollection of why Former Trooper #1 had left the PSU.[1100]  Another former PSU member reported that he transferred out of the detail after the Governor had become upset with him for supposedly failing to timely pick up and transport one of the Governor's daughters, although the

---

[1092] *See, e.g.*, David Tr. 251:19–252:7, Lever Tr. 259:10–261:16.

[1093] Lever Tr. 369:20–370:5.

[1094] Ball Tr. 50:22–51:21.

[1095] Executive Assistant #1 Tr. 79:21–80:5.

[1096] Trooper #1 Tr. 93:24–94:3.

[1097] Ball Tr. 50:22–51:21.

[1098] Trooper #1 Tr. 93:24–94:3.

[1099] This was corroborated by other former and current members of the PSU, including a fellow PSU member who was present during one of the arguments and the former PSU member's former supervisor.

[1100] Andrew Cuomo Tr. 449:2–15.

former PSU member was told by his supervisor that he had done nothing wrong.  Governor
Cuomo testified that he did not recall asking that a member of the PSU should be transferred out
of the unit, and instead stated that, "[I]f there was a Trooper who . . . did something weird or
unprofessional[, the Governor] may have noted that to someone."[1101]  But regardless of what role
the Governor may have personally played in State Trooper personnel decisions, we found the
perception was widespread within the PSU (including with Trooper #1) that upsetting him or his
senior staff (even on minor issues) could result in serious professional harm.

## C. <u>Poor Enforcement of Sexual Harassment Training and Reporting Mechanism</u>

Executive Chamber staff also faced greater difficulties in reporting unwelcome conduct
by the Governor due to a poor understanding of the policies and procedures for identifying and
reporting sexual harassment within the Executive Chamber, which was exacerbated by an
inconsistent enforcement of the policies and procedures for reporting sexual harassment—
particularly if the alleged conduct was carried out by the Governor or his senior staff.

The handbook for employees of New York State agencies (the "Employee Handbook")
reflects the legal requirement that GOER investigate all complaints of sexual harassment in State
agencies, including the Executive Chamber.[1102]  Members of the Executive Chamber, including
the Governor, are also required to take an annual sexual harassment prevention training.[1103]
According to the Director of GOER, the sexual harassment training can be completed online, by
reviewing a PDF, or by receiving the training in person in a group; the Executive Chamber
maintains a record of each employee's completion or certification of the sexual harassment
training.[1104]  A person taking the sexual harassment training for another member of the Executive
Chamber does not comply with the latter person's obligation to complete the training.[1105]

In practice, however, we found that the Governor and members of the Executive
Chamber's understanding of these policies and procedures related to sexual harassment in the
workplace varied widely.  Many members of the Executive Chamber, particularly the more
junior members of the Executive Chamber, did not recall the contents of any trainings on sexual
harassment, much less the Chamber's policies on the issue.[1106]  Relatedly, several Executive
Chamber staff members reported not knowing how to report an allegation of sexual harassment.
Multiple witnesses testified that they were unfamiliar with GOER, the agency designated to
investigate potential employee misconduct.  One witness testified that she would not have felt

---

[1101] *Id.* at 447:6–453:5, 470:18–472:1.

[1102] *See* Ex. 8 at 41–42 (Employee Handbook); *see also* Volforte Tr. 52:23–53:13 (confirming that the Employee Handbook's policies apply to the Executive Chamber).

[1103] Volforte Tr. 70:17–73:2 (Governor is not an "employee," but is subject to the training requirement).  The annual training was not required in 2020 (due to the COVID-19 pandemic); therefore, the last sexual harassment training in the Executive Chamber was in 2019.  *See, e.g.*, *id.* at 73:6–21.

[1104] *See id.* at 67:6–68:16, 69:19–70:16.

[1105] *Id.* at 68:17–69:18.

[1106] Liss Tr. at 81:6–12.

empowered to report an allegation of sexual harassment because she did not know if there was any reporting mechanism within the Chamber.

More senior staff of the Executive Chamber varied in their understanding of the Executive Chamber's policies and procedures on sexual harassment. Certain members of the senior staff—including current and former counsels to the Governor—correctly recalled the reporting mechanisms within the Executive Chamber noted above.[1107] While some recalled taking annual trainings on sexual harassment, the Governor himself testified that he did not recall specifically taking the annual sexual harassment training in any year other than 2019. And in fact, 2019 is the only year when the Executive Chamber was able to produce any record of the Governor taking the sexual harassment training, despite our request for all such records going back to 2013. The attestation of compliance for 2019 was not signed by the Governor, but signed by Ms. Benton on his behalf.[1108] One former staff member also incorrectly recalled that she was not required to report allegations to GOER.[1109] Another former staff member explained her belief that allegations of sexual harassment should be reported to the Chamber's counsel's office and that "[t]hey sort of handled all of that[,]" including any further discussions with GOER.[1110] Yet another former staff member, when asked if she was aware of any reporting procedure for sexual harassment allegations during her time in the Chamber, answered: "I was not."[1111] Even the Director of Administrative Services, someone who many members of the Executive Chamber designated as someone they would consider reporting allegations of sexual harassment, seemed to have a mistaken understanding of the reporting requirements. She stated that an employee could report sexual harassment to a supervisor, herself, *or* GOER, but that she did not know what a supervisor would have to do if they received such a complaint. The Director of Administrative Services also explained that, if she received a complaint of sexual harassment, she would direct the employee to the Employee Handbook and complaint form, and then call Mr. Volforte, the Director of GOER, to ask advice on whether she had handled the situation correctly. She acknowledged this was not the prescribed process. Importantly, she did not tell us that she would be required to report any allegation of sexual harassment to GOER, but rather would need to research the process for how to handle the situation if it ever arose. As a matter of fact, at least as of December 5, 2019, based on records received from the Executive Chamber, it appears the levels of compliance with the sexual harassment training requirement among senior staff remained sparse.

The lack of a common and consistent understanding within the Executive Chamber of the policies and procedures regarding sexual harassment translated to inconsistencies in enforcing such policies and procedures, including—ultimately—in relation to potential allegations of sexual harassment regarding the Governor. We did not find, for example, that the Executive Chamber generally referred allegations of potential misconduct to GOER, as required. Indeed, Ms. Lacewell, who was often consulted on a range of issues including on sexual harassment, testified that because the Director of GOER was appointed by the Governor, GOER might not be

---

[1107] David Tr. 43:7–22, 54:5–55:15.

[1108] *See, e.g.*, Andrew Cuomo Tr. 21:25–22:15; Bennett Tr. 269:24–270:10; Benton Tr. at 106:12–18.

[1109] Lever Tr. 224:3–19, 228:12–23.

[1110] Walsh Tr. 162:20–163:15.

[1111] Collins Tr. 91:4–10.

able to effectively investigate any allegations involving the Governor.[1112]  Aside from a couple of instances in which a member of the Executive Chamber reported allegations of potential misconduct (at a different State agency) to GOER, as required,[1113] our investigation indicated that potential misconduct was, at best, investigated internally within the Executive Chamber.  In one example, when a staff member reportedly called Ms. DeRosa a "bitch," an investigation into whether other individuals within the Executive Chamber had had negative experiences working with the same staff member was conducted within the Executive Chamber, and the staff member was "mov[ed] off the floor" where he had originally sat.[1114]  Ms. DeRosa confirmed that this employee was transferred because she did not feel comfortable working with him, and noted that the employee received counseling.[1115]

No allegations of sexual harassment by the Governor had ever been reported to GOER prior to the recent allegations of sexual harassment becoming public.  It was only on March 11, 2021, after this investigation had begun, that the Executive Chamber finally made a referral to GOER reporting an allegation of potential misconduct by the Governor, on behalf of Executive Assistant #1.

*          *          *

In addition to the deterrents that women faced in reporting allegations of sexual harassment by the Governor resulting from the culture and practices of the Executive Chamber, the lack of clear understanding and enforcement of the sexual harassment policies and procedures—particularly the mechanism for reporting potential sexual harassment—within the Chamber exacerbated the difficulty that employees experienced in having their allegations of sexual harassment heard and addressed, and their rights protected.

---

[1112] Lacewell Tr. 73:14–76:2.

[1113] In one of those instances, an attorney within the Executive Chamber appropriately instructed the complainant in question to formally report her allegations (which involved potential racially and sexually harassing conduct by that person's supervisor) to GOER.  When she learned that the complainant had shared her allegations with the general counsel of the State agency of her employment but had not filed a report with GOER, the Executive Chamber attorney submitted a referral to GOER, which then investigated the allegations.

[1114] DesRosiers Tr. 316:12–316:22, 318:10–319:4, *see also* DeRosa Tr. 142:24–143:18.

[1115] DeRosa Tr. 141:1–144:25.

## RELEVANT LAW

### I.  Background

Title VII of the Civil Rights Act of 1964 ("Title VII") "outlaw[s] discrimination in the workplace on the basis of . . . sex."[1116]  In 1986, the United States Supreme Court recognized that Title VII's prohibition on sex discrimination prohibits gender-based harassment in the workplace.[1117]  Like federal law, the New York State Human Rights Law (the "NYSHRL"),[1118] forbids workplace harassment.[1119]

### II.  Gender-Based Harassment

A gender-based hostile work environment[1120] is actionable under federal law when "the workplace [i]s permeated with discriminatory intimidation that [i]s sufficiently severe or pervasive to alter the conditions of her work environment."[1121]  "[A] plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions."[1122]  The Second Circuit Court of Appeals has "repeatedly cautioned against setting the bar [for hostile work environment claims] too high, noting that . . . the test is whether the 'harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.'"[1123]

To be unlawful, the employee must perceive the environment to be hostile or abusive, but there is "no need for [the work environment]  . . . to be psychologically injurious."[1124]  "Title VII comes into play before the harassing conduct leads to a nervous breakdown.  A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological

---

[1116] *Bostock v. Clayton Cty., Georgia,* 140 S. Ct. 1731, 1737 (2020).

[1117] *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986).  Congress abrogated the states' sovereign immunity for claims brought under Title VII.  *See Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976). Sex discrimination also violates the Fourteenth Amendment of the United States Constitution.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).  Therefore, "public employees aggrieved by discrimination in the terms of their employment may bring suit under 42 U.S.C. § 1983 against any responsible persons acting under color of state law."  *Id.*  This includes claims for gender-based harassment.  *See Raspardo v. Carlone*, 770 F.3d 97, 119 (2d Cir. 2014); *Annis v. Cty. of Westchester, N.Y.,* 36 F.3d 251, 255 (2d Cir. 1994). "Once the 'color of state law' requirement is met, [a § 1983 claim] parallels a Title VII claim."  *Vega*, 801 F.3d at 87.

[1118] N.Y. Exec. Law § 290 *et seq*.

[1119] *See Ananiadis v. Mediterranean Gyros Prod., Inc*., 54 N.Y.S.3d 155, 158 (2d Dep't 2017).

[1120] Gender-based harassment claims are typically grouped into two categories: (1) hostile work environment claims; and (2) quid pro quo claims. Given the nature of the conduct in dispute, we focus our discussion on the principles applicable to gender-based hostile work environment claims. Sexual propositions that do not result in a tangible employment action sufficient to support a quid pro quo claim may nevertheless be conduct supporting a hostile work environment claim.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998).

[1121] *Petrosino v. Bell Atl*., 385 F.3d 210, 221 (2d Cir. 2004) (citation omitted).

[1122] *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphasis in original).

[1123] *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (citation omitted) (emphasis in original).

[1124] *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22 (1993).

well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers."[1125]

Determining whether conduct is sufficiently "severe or pervasive" requires one to assess "the totality of the circumstances" rather than isolated instances of misconduct.[1126] "[N]o single factor is required," but factors commonly considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[1127]

Examples of "workplace conduct that may be actionable . . . include [u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature."[1128] "Direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment . . . "[1129] Although "[w]hen entering a workplace, reasonable people expect to have their autonomy circumscribed in a number of ways[,] . . . giving up control over who can touch their bod[ies] is usually not one of them."[1130] Harassing conduct, however, "*need not be*

---

[1125] *Id.*

[1126] *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997); *accord Redd*, 678 F.3d at 176 ("The objective hostility of a work environment depends on the totality of the circumstances, viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by its target." (internal quotation marks, citation, and ellipsis omitted)). Hostile work environment claims can cover conduct that occurs before the applicable statutes of limitations so long as an act contributing to the hostile work environment occurs within the limitations period. *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011) (citation omitted); *accord Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, (2002).

[1127] *Redd*, 678 F.3d at 175 (quoting *Harris*, 510 U.S. at 23).

[1128] *Id.* at 179–81 (concluding that a reasonable jury could find conduct sufficiently severe or pervasive where supervisor "brushed against" or felt employee's breasts on three occasions); *Bailey v. Sheehan*, No. 1:16-CV-1370 (GTS/CFH), 2019 WL 3975453, at *1 (N.D.N.Y. Aug. 22, 2019) (denying summary judgment where, *inter alia*, plaintiff's supervisor "asked her to spend the night with him" at a company party); *Rice v. Smithtown Volkswagen*, 321 F. Supp. 3d 375, 388 (E.D.N.Y. 2018) (concluding that allegations of a "pattern of overt and unwanted solicitation of sexual intercourse" stated a harassment claim); *Morris v. New York City Health & Hosp. Corp.*, No. 09-CV-5692 (MKB) (ST), 2018 WL 4762247, at *11 (E.D.N.Y. Sept. 30, 2018) (explaining that a "reasonable person would find an unwelcome attempted kiss, an invitation to dinner, and attempted touching to the groin to be severe, physically threatening, and humiliating"); *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 380 (S.D.N.Y. 2006) (denying motion to dismiss hostile work environment claim where manager "initiated unwelcome conversations with [plaintiff and others] about their sex lives"); *Wahlstrom v. Metro-North Commuter R.R. Co.*, 89 F. Supp. 2d 506, 521 (S.D.N.Y. 2000) (finding that attempts to touch and kiss plaintiff may constitute a hostile work environment where "the physical contact between the parties was neither harmless nor accidental").

[1129] *Redd,* 678 F.3d at 180. In addition to violating relevant discrimination laws, certain physical conduct may violate state tort laws for battery. *See Walia v. Vivek Purmasir & Assocs., Inc.*, 160 F. Supp. 2d 380, 393-94 (E.D.N.Y. 2000); *S.R. ex rel. M.R. v. Turnbull*, No. 1:12 C 1052(MEA), 2013 WL 1285411, at *3 (S.D.N.Y. Mar. 28, 2013); *Black v. ESPN, Inc.,* 139 N.Y.S.3d 523 (Table), 2021 WL 668760, at *7 (N.Y. Sup. Ct. N.Y. Cty. 2021), and assault, *see S.R.*, 2013 WL 1285411, at *4; *Black*, 2021 WL 668760, at *7.

[1130] *Redd*, 678 F.3d at 179 (internal quotation marks and citation omitted); *Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 307-08 (S.D.N.Y. 2016) (concluding that allegations of plaintiff's supervisor often rubbing plaintiff's shoulders, stroking her face, and engaging in other acts of unwanted touching "plausibly allege[d] a pattern wherein [the supervisor] asserted physical power over [plaintiff] without her consent").

*motivated by sexual desire*,' . . . so long as it was motivated by gender."[1131]  To establish a claim, one need not be able to "recount each and every instance of abuse,"[1132] or "give every detail" to each specific unwanted encounter. [1133]

As the "crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim."[1134]  Similarly, conduct that an employee learns of secondhand may also support her claim.[1135]  The "totality of the circumstances" also includes harassing conduct that takes place outside of the physical workplace.[1136]  Even if harassing conduct is directed at both men and women, the conduct may still be found to discriminate on the basis of sex.[1137]  As harassing conduct need not be sexual or motivated by sexual desire,[1138] differential treatment of members of different sexes is sufficient to establish a harassment claim.[1139]

Not all the conduct underlying a sexual harassment claim, however, need be expressly tied to gender.  "[F]acially neutral incidents may be included among the 'totality of the circumstances' . . . so long as" there is a basis for "conclud[ing] that they were, in fact, based on sex."[1140]  This can be shown, for example, when "'the same individual' engaged in 'multiple acts of harassment, some overtly sexual and some not'" or if abuse follows denial of a harasser's sexual advances.[1141]

---

[1131] *Kaytor v. Elec. Boat Corp*., 609 F.3d 537, 547 (2d Cir. 2010) (citation omitted).

[1132] *Pucino*, 618 F.3d at 119–20.

[1133] *Redd*, 678 F.3d at 182.

[1134] *Redd*, 678 F.3d at 175 (internal quotation marks, citation, and alteration omitted)).

[1135] *See Torres v. Pisano*, 116 F.3d 625, 633 (2d Cir. 1997) ("The fact that many of [supervisor's] statements were not made in [plaintiff's] presence is, in this case, of no matter; an employee who knows that her boss is saying things of this sort behind her back may reasonably find her working environment hostile.").

[1136] *See, e.g., Tuli v. Brigham & Women's Hosp*., 656 F.3d 33, 41 (1st Cir. 2011); *Parrish v. Sollecito*, 249 F. Supp. 2d 342, 350-51 (S.D.N.Y. 2003).

[1137] *Kaytor*, 609 F.3d at 549 (citation omitted) (finding genuine issue of material fact as to whether hostile work environment was gender-based and rejecting employer's argument that harasser made threatening and graphic comments to "at least one other male employee" in addition to the female plaintiff); *see also Petrosino*, 385 F.3d at 222 ("The fact that much of this offensive material was not directed specifically at [plaintiff]—indeed, her male co-workers would likely have traded sexual insults . . . —does not, as a matter of law, preclude a jury from finding that the conduct subjected [plaintiff] to a hostile work environment based on her sex.").

[1138] *See Kaytor*, 609 F.3d at 547 (citation omitted); *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80-81 (1998).

[1139] *See Oncale*, 523 U.S. at 80–81 ("A . . .  plaintiff may . . ., of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."); *see also Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001) ("[T]his court has found workplace situations discriminatory under a hostile work environment theory where the conduct at issue, though lacking any sexual component or any reference to the victim's sex, could, in context, reasonably be interpreted as having been taken on the basis of plaintiff's sex.").

[1140] *Kaytor*, 609 F.3d at 547 (brackets omitted).

[1141] *Id.* at 548 (citation omitted); *see, e.g., Johnson*, 224 F. Supp. 3d at 308–09.

Although a harasser's professed intent may bear on whether his conduct was based on gender,[1142] one is not required to present "direct evidence of her harasser's motivation for discrimination against her" or to prove that "her harasser's intent was to create a discriminatory environment."[1143] "Regardless of what a harasser's intention is, if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof" that the conduct is because of sex and sufficiently severe or pervasive to alter her work environment, the claim will survive.[1144]

Courts, therefore, long have "rejected the notion that a harasser's innocent intent will defeat liability . . ."[1145] This includes justifications of innocent intent based on one's upbringing.[1146] The law is not designed "to protect harassers who fail to recognize the hostile or abusive nature of their comments and actions,"[1147] and assessment of "the totality of circumstances and the context of the alleged harassment does not mean that . . . long-standing or traditional hostility toward women . . . excuse[s] . . . harassment."[1148] Focusing the inquiry on the alleged harasser's intent would "reinforc[e] the prevailing level of discrimination," and "[h]arassers could continue to harass merely because a particular discriminatory practice was

---

[1142] *See, e.g.*, *Kaytor*, 609 F.3d at 548.

[1143] *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001); *see Harris*, 510 U.S. at 19, 22-23 (vacating dismissal of harassment claim despite alleged harasser's contention that he was only joking and his apology for such conduct); *Meritor*, 477 U.S. at 65 (defining sexual harassment as conduct that "has the purpose *or effect of* . . . creating an intimidating, hostile or offensive working environment" (internal quotation marks omitted) (quoting 29 C.F.R. § 1604.11(a)(3)) (emphasis added)).

[1144] *Abramson*, 260 F.3d at 278-79 (internal citations omitted) (quoting *Harris*, 510 U.S. at 21; *see also Martin v. Howard Univ.*, No. 99-1175 (TFH), 1999 WL 1295339, at *5 (D.D.C. Dec. 16, 1999) ("Whether or not [the harasser] intended his behavior to be abusive or threatening is irrelevant . . ."), *aff'd*, 275 F. App'x 2 (D.C. Cir. 2008).

[1145] *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 827 (7th Cir. 2003). *See, e.g.*, *Gallagher v. Delaney*, 139 F.3d 338, 343-45, 347-48 (2d Cir.1998) (holding that a jury could conclude that harasser's gift-giving, meal invitations, and notes, when considered in connection with other conduct, constituted a hostile work environment), *abrogated on other grounds by Ellerth*, 524 U.S. 742; *Batten v. Glob. Contact Servs., LLC*, No. 15-CV-2382(NG)(SJB), 2018 WL 3093968, at *5 (E.D.N.Y. June 22, 2018) (denying summary judgment on hostile work environment claim based on single incident during which supervisor tightly hugged employee from behind for more than ten seconds and  rejecting the employer's characterization of the incident as "casual contact that might be expected among friends"); *Manzo v. Sovereign Motor Cars, Ltd.*, No. 08-CV-1229, 2009 WL 3151094, at *4 (E.D.N.Y. Sept. 29, 2009) (denying summary judgment where, among other things, supervisor admitted during an internal investigation that he asked plaintiff to his hotel room to tell him a "bedtime story" but that he made the statement "in the context of joking"); *Ackerman v. Nat'l Fin. Sys.*, 81 F. Supp. 2d 434, 435 (E.D.N.Y. 2000) (denying summary judgment on harassment claim where alleged harasser was "overly friendly; sent [plaintiff] cards; sent [plaintiff] a toy; took [plaintiff] on a meaningless trip . . .; made suggestions of a more intimate relationship; and was constantly around [plaintiff]").

[1146] *See, e.g.*, *Carosella v. U.S. Postal Serv.*, 816 F.2d 638, 641 (Fed. Cir. 1987) (finding sufficient evidence supporting administrative finding that postal service employee sexually harassed his subordinate despite employee's justifications based on his intent, including, *inter alia,* "[i]'m an Italian[;] I have a bad habit of maybe grabbing people by the arm or touching them in the back or something like that whether it's a female or male." (ellipses and brackets omitted)).

[1147] *Abramson*, 260 F.3d at 278.

[1148] *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999).

common . . . "[1149]  Instead, the "rapidly changing and conflicting views of appropriate gender relationships in the workplace" should be considered.[1150]

The standard applied to hostile work environment claims under the NYSHRL is significantly lower.[1151]  "[T]he federal severe or pervasive standard of liability" does not "appl[y] . . . , and the severity or pervasiveness of conduct is relevant only to . . . damages."[1152] "[L]iability is . . . determined simply by the existence of differential treatment (*i.e.*, unwanted gender-based conduct)."[1153]  Accordingly, there is a violation of the NYSHRL if the employee is "treated less well at least in part 'because of her gender.'"[1154]  However, even under the current state standard, the law does not "operate as a 'general civility code.'"[1155]  Thus, an employer may avoid liability if it is able to prove affirmatively that the conduct about which the employee is complaining is nothing more than "petty slights or trivial inconveniences."[1156]  Considering this standard, "even a single comment [or action] may be actionable in the proper context."[1157]

## A.  <u>Employer Liability</u>

"Under Title VII, an employer's liability for such harassment may depend on the status of the harasser."[1158]  If the harasser is an employee's supervisor and the "harassment culminates in a tangible employment action" (*e.g.*, a quid pro quo situation), "the employer is strictly liable."[1159]

---

[1149] *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991).

[1150] *Gallagher*, 139 F.3d at 343.

[1151] *See Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27 (1st Dep't 2009). Until recently, the NYSHRL standard for hostile work environment claims tracked the principles applied to hostile work environment claims under Title VII. *See, e.g., Father Belle Cmty. Ctr. v. New York State Div. of Hum. Rts. on Complaint of King*, 642 N.Y.S.2d 739 (4th Dep't 1996).  The NYSHRL, however, was amended in 2019, effective October 11, 2019, to eliminate the "severe or pervasive" requirement, *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51 (S.D.N.Y. 2020), which brought the NYSHRL standard in line with that under the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8–101 *et seq*.  As the standards under the NYSHRL and NYCHRL are now in agreement, we cite cases concerning application of the NYCHRL as reference for understanding NYSHRL legal obligations.

[1152] *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013).

[1153] *Williams*, 61 A.D.3d at 76; *see Suri v. Grey Glob. Grp., Inc.*, 83 N.Y.S.3d 9, 14 (1st Dep't 2018) ("In *Williams* we . . . dispensed with the need for much of the nomenclature that has accreted over the years in gender discrimination jurisprudence, such as 'sexual harassment' and 'quid pro quo,' and instead focused on 'the existence of differential treatment' in connection with 'unwanted gender-based conduct.'").

[1154] *Mihalik*, 715 F.3d at 110 (emphasis omitted) (quoting *Williams*, 61 A.D.3d at 39, 40 n.27).

[1155] *Williams*, 61 A.D.3d at 79 (quoting *Oncale* 523 U.S. at 81).

[1156] *Id*. at 80.

[1157] *Mihalik*, 715 F.3d at 113; *see, e.g., Feldesman v. Interstate Hotels LLC*, No. 16 Civ. 9352 (ER), 2019 WL 1437576 (S.D.N.Y. Mar. 31, 2019) (denying summary judgment where plaintiff alleged that coworker made various comments about her body and appearance); *Kaplan v. New York City Dep't of Health & Mental Hygiene*, 142 A.D.3d 1050–51 (2nd Dep't 2016) (vacating dismissal where plaintiff alleged that her supervisor rubbed his hand back and forth over his groin and inner thigh while making sexual noises).

[1158] *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

[1159] *Id*.  A "supervisor" is one "the employer has empowered . . . to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote,

Likewise, if the harasser is the "proxy/alter ego" of the employer, there is also strict liability, and the "employer [is held] liable in its own right for [the] wrongful harassing conduct."[1160] "In *Faragher*, the Supreme Court suggested that presidents, owners, proprietors, partners, corporate officers, and supervisors with a high position in the management hierarchy are the types of officials who can be considered an organization's alter ego."[1161]   Under the NYSHRL, the employer is strictly liable for the harassment of all supervisors or managerial employees.[1162]

Because an employer faces civil liability for harassers who do not meet these tests, when it is aware of harassment and fails to act, "management has a good reason to press [an] investigation" and "prevent recurrence or expansion."[1163]   An employer's imperative to investigate is particularly strong considering the risks that unremedied harassment poses to other employees.[1164]   Accordingly, "[p]rudent employers will compel harassing employees to cease all such conduct and will not, even at a victim's request, tolerate inappropriate conduct that may, if not halted immediately, create a hostile environment."[1165]

## B. Executive Chamber Policy

These legal standards are consonant with the Executive Chamber's own equal employment policies.[1166]

The Executive Chamber's policy states that "[s]exual harassment includes unwelcome conduct which is either of a sexual nature, or which is directed at an individual because of that individual's sex when," *inter alia*, "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment, even if the reporting individual is not the intended target of the sexual harassment."[1167]   The policy clarifies that "[a]ctions that may constitute sexual harassment based upon a hostile work environment may include, but are not limited to, words, signs, jokes, pranks, intimidation or physical violence which are of a sexual nature, or which are directed at an

---

reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance*, 570 U.S. at 431 (citations omitted).

[1160] *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 52 (2d Cir. 2012) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 789-92 (1998)).   Where the harasser is not an alter-ego of the employer and his harassment does not culminate in an adverse action, the employer may invoke an affirmative defense under Title VII known as the Faragher/Ellerth defense. *See Vance*, 570 U.S. at 424.

[1161] *Townsend*, 679 F.3d at 54 (citation omitted); *see also Donohue v. Finkelstein Mem'l Libr.*, 987 F. Supp. 2d 415, 425 (S.D.N.Y. 2013).

[1162] *See Zarzewska v. New School*, 14 N.Y.3d 469, 479–81 (2010); *Chauhan v. MM Hotel Mgmt. LLC*, No. 18-CV-5963(DRH)(SIL), 2019 WL 6118006, at *6 n.7 (E.D.N.Y. Nov. 18, 2019).

[1163] *Malik v. Carrier Corp.*, 202 F.3d 97, 106 (2d Cir. 2000).

[1164] *See, e.g., Torres*, 116 F.3d at 639 ("[T]here may be cases in which a supervisor or co-worker is harassing a number of employees, and one harassed employee asks the company not to take action. In those cases, the employer's duty to other employees would take precedence . . . .").

[1165] *Malik*, 202 F.3d at 106.

[1166] In or about 2011, New York formulated comprehensive equal employment policies for employees in state executive branch agencies, including the executive chamber. *See, e.g.*, Volforte Tr. at 52:5–53:13.

[1167] Ex. 8 at 11–12 (Employee Handbook).

individual because of that individual's sex," as well as "any unwanted verbal or physical advances, sexually explicit derogatory statements or sexually discriminatory remarks made by someone which are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation, or which interfere with the recipient's job performance."[1168]  Pursuant to the policy, "[s]exual harassment need not be severe or pervasive to be unlawful" and the underlying conduct need only be "more than petty slights or trivial inconveniences."[1169]

Pursuant to the policy, any employee who experiences or observes sexual harassment should complain promptly to GOER.[1170]  Employees may also report "such conduct to a supervisor, managerial employee, or personnel administrator," who should request that the complaining employee file a written complaint with GOER.[1171]  If the complaining employee does not file a complaint with GOER, the supervisor or other individual who received the oral complaint must file a complaint with GOER on his own.[1172]  "Furthermore, any supervisory or managerial employee who observes or otherwise becomes aware of conduct of a sexually harassing nature must report such conduct so that it can be investigated."[1173]  This is true "even if the individual who complained requests that it not be reported" and [f]ailure to comply with the duty to report may result in disciplinary and/or administrative action."[1174]  Once informed of a complaint, GOER must "initiate an investigation and recommend prompt and effective remedial action where appropriate."[1175]

## III.  **Retaliation**

Federal and state law prohibit retaliating against an employee because she complains about conduct that she reasonably believes violates the law, including complaints about gender-based harassment.[1176]  Protection against retaliation extends to both current and former employees.[1177]

---

[1168] Ex. 8 at 12.

[1169] *Id.*

[1170] *Id.* at 13.  Since December 2018, GOER has been "responsib[le] for conducting investigations of all employment-related discrimination complaints."  *Id.* at 1.

[1171] *Id.* at 13.

[1172] *Id.*

[1173] *Id.*

[1174] *Id.* at 41–42.

[1175] Ex. 8 13.

[1176] *See Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013) (Title VII); *Vega*, 801, 802 F.3d at 82 (holding that "a state employee may bring a retaliation claim under § 1983"); *Clayton v. Best Buy Co.*, 48 A.D.3d 277, 278, 851 (App. Div. 2008) (NYSHRL prohibits retaliation); *see also Kaytor*, 609 F.3d at 554–56; *Gregory*, 243 F.3d at 701.

[1177] *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (holding that former employees are "employees" for the purposes of Title VII's anti-retaliation provisions and, therefore, a "former employe[e] ... may bring suit against his former employer for postemployment actions allegedly taken in retaliation" for protected activity); *see also Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) ("[P]laintiffs may be able to state a claim for retaliation, even though they are no longer employed by the defendant company . . . .").

## A.  **Elements of a Claim**

To demonstrate a presumption of retaliation, one must establish:  (1) "protected participation or opposition"; (2) "that the employer was aware of this activity"; (3) that the employer took adverse action"; and (4) "that a causal connection exists between the protected activity and the adverse action."[1178]

To succeed on a retaliation claim, an employee "need not establish that the conduct she opposed was actually a violation of [the law], but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful."[1179]  As the inquiry focuses on the reasonableness of the complaining employee's belief, an employer's belief that a complaint was made in bad faith does not relieve it of liability for its retaliatory actions.[1180]

### i.  **Protected Activity**

"'Protected activity' includes opposition to a discriminatory employment practice or participation in any investigation, proceeding, or hearing."[1181]  Oppositional conduct encompasses "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges."[1182]  "When an employee communicates to her employer a belief that the employer has engaged in . . .  a form of employment discrimination, that communication' virtually always constitutes" protected activity.[1183]  "[P]rotected activities are not limited to complaints involving discrimination against the complainant herself, but also extend to complaints of discrimination on behalf of other employees and complaints of discriminatory practices generally . . . ."[1184]

---

[1178] *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir. 2006); *accord Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks omitted).

[1179] *Summa*, 708 F.3d at 126 (internal quotation marks and citation omitted).

[1180] *See, e.g.*, *Sanders v. Madison Square Garden, L.P.*, 525 F. Supp. 2d 364, 367 (S.D.N.Y. 2007) ("If an employer were permitted to fire employees who protested alleged illegal discrimination, simply because the employer believed the complaints were unfounded or malicious, the employees' protection would be illusory."); *Ayala v. Summit Constructors, Inc.*, 788 F. Supp. 2d 703, 722 (M.D. Tenn. 2011) (upholding jury verdict in favor of plaintiff on retaliation claim despite employer's president's opinion that plaintiff's complaint was false and brought in bad faith).

[1181] *Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 680–81 (2d Cir. 2009).

[1182] *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *see, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 563 (S.D.N.Y. 2013) (explaining that an employee has engaged in protected activity when "her employer was aware of her complaint and that it 'understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.'" (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir. 1998))).

[1183] *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009) (citing 2 EEOC Compliance Manual §§ 8–II–B(1), (2), p. 614:0003 (Mar. 2003) (emphasis in original)).

[1184] *Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015).

## ii.  __Knowledge__

To establish that an employer has knowledge of the employee's protected activity, "[n]othing 'more is necessary than general corporate knowledge.'"[1185]  An employee need not "show that the particular individuals who carried out an adverse action knew of the protected activity."[1186]  This prong is satisfied when the existence of the employee's protected activity is communicated to a high-level official or supervisor.[1187]

## iii.  __Adverse Action__

The antiretaliation laws protect[] an individual not from all retaliation, but from retaliation that produced an injury or harm."[1188]  An adverse action for purposes of a retaliation claim is any action that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."[1189]  An adverse action need not affect "the terms or conditions of employment."[1190]  Rather, "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."[1191]  However, the law does not protect against the "petty slights or minor annoyances that often take place at work and that all employees experience."[1192]  "Whether a particular [action] is materially adverse depends upon the circumstances . . . , and [an employer's actions] should be judged from the perspective of a reasonable person in the [employee]'s position, considering all the circumstances."[1193]  "[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable."[1194]  Blacklisting an employee, disseminating confidential or sensitive information concerning an employee, or making undesirable public statements about an employee can constitute adverse actions.[1195]

---

[1185] *Summa*, 708 F.3d at 125–26 (2d Cir. 2013) (citation omitted)); accord *Papelino*, 633 F.3d at 92; *Henry v. Wyeth Pharms., Inc.,* 616 F.3d 134, 147–48 (2d Cir. 2010).

[1186] *Henry*, 616 F.3d at 148.

[1187] *See, e.g.*, *Zann Kwan*, 737 F.3d at 844; *Summa*, 708 F.3d at 125-26; *Barnett v. Nat'l Passenger R.R. Corp. (Amtrak)*, No. 17 Civ. 2682 (KPF), 2018 WL 6493098, at *11 (S.D.N.Y. Dec. 10, 2018) (collecting cases), *aff'd sub nom. Barnett v. Nat'l R.R. Passenger Corp. (Amtrak)*, 799 F. App'x 82 (2d Cir. 2020).

[1188] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

[1189] *Hicks*, 593 F.3d at 169 (internal quotation marks omitted) (quoting *White*, 548 U.S.at 67).

[1190] *Id*.

[1191] *White*, 548 U.S. at 67.

[1192] *Id.* at 68.

[1193] *Id.* at 71 (internal citation and quotation marks omitted).

[1194] *Hicks*, 593 F.3d at 165.

[1195] *See, e.g.*, *Noonan v. Kane,* 698 F. App'x 49, 54 (3d Cir. 2017) (concluding that plaintiffs sufficiently pled First Amendment retaliation claim predicated on, *inter alia*, threats to release private e-mails and to disclose selective damaging or embarrassing information to humiliate and impugn plaintiffs); *Lore v. City of Syracuse*, 670 F.3d 127, 167 (2d Cir. 2012) (upholding jury verdict on retaliation claim predicated on negative public statements about plaintiff); *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 178–79 (2d Cir. 2005) (concluding that employer's false statement to plaintiff's prospective employer potentially leading to denial of employment could constitute an

iv. **Causation**

Causation is established if an employee's protected activity was the "but for" cause of the adverse employment action.[1196] "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the [adverse action] would not have occurred in the absence of the retaliatory motive."[1197] There can be "multiple 'but-for' causes, each one of which may be sufficient to support liability."[1198] "Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity."[1199]

Direct evidence may include statements by the employer that "show retaliatory animus against [an employee] for [her] complaints."[1200] Temporal proximity, if close enough, may be sufficient in isolation to establish the requisite causal connection.[1201]

---

adverse action); *Wanamaker*, 108 F.3d at 466 ("[P]laintiffs may be able to state a claim for retaliation, even though they are no longer employed by the defendant company, if, for example, the company 'blacklists' the former employee" or "wrongfully refuses to write a recommendation to prospective employers[.]" (internal citations omitted); *Kiernan v. Town of Southampton*, No. 14-CV-1831 (SJF) (AKT), 2015 WL 1258309, at *13 (E.D.N.Y. Mar. 17, 2015) (denying dismissal of a First Amendment retaliation claim predicated on disclosure of plaintiff's confidential personnel records); *see also Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (holding that supervisor's posting of plaintiff's EEO complaint on employer's intranet site for plaintiff's coworkers to access could constitute an adverse action); *Franklin v. Loc. 2 of the Sheet Metal Workers Int'l Ass'n*, 565 F.3d 508, 521 (8th Cir. 2009) (denying summary judgment where union publicized the names of those who filed EEOC charges against the union and the union's associated legal costs); *cf. Hughes v. Twenty-First Century Fox, Inc*., 304 F. Supp.3d 429, 441, 449 (SDNY 2018) (concluding that releasing statement to the press that, *inter alia*, neither named complainant nor maligned her character was not retaliatory); *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 262 (5th Cir. 2014) (in whistleblower case finding supervisor telling peers that plaintiff had reported their conduct to the SEC was adverse action as it sent message that co-workers should shun him, particularly where plaintiff was criticized for not being more of a "team player"); *Mogenhan*, 613 F.3d at 1166 (retaliation where plaintiff's supervisor posted her EEO complaint on the intranet where other employees could access it); *Shafer v. Am. Univ. in Cairo*, No. 12-CV-9439 (VEC), 2014 WL 3767007, at *16 (S.D.N.Y. July 31, 2014) (finding adverse action where Dean announced that he was recording faculty meeting because plaintiff filed an EEOC charge; Dean's actions "sent a clear signal to [plaintiff] and to the other faculty members present that complaints about discrimination will be met with hostility and will turn the complaining faculty member into a pariah").

[1196] *See Wolf v. Time Warner, Inc.,* 548 F. App'x 694, 695 (2d Cir. 2013).  There is uncertainty whether the "but for" causation standard or a relaxed motivating factor causation standard applies to retaliation claims brought under the NYSHRL. *See Gordon v. City of New York*, No. 14-CV-6115 (JPO), 2018 WL 4681615, at *16 n.10 (S.D.N.Y. Sept. 28, 2018).

[1197] *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

[1198] *Id.* at 846 n.5.

[1199] *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018).

[1200] *Kazolias v. Ibew Lu 363*, 806 F.3d 45, 49-50 (2d Cir. 2015).

[1201] *See, e.g.*, *Zann Kwan*, 737 F.3d at 845 (concluding that "[t]he three-week period from [plaintiff's] complaint to her termination is sufficiently short to make a prima facie showing of causation"); *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 110 (2d Cir. 2010) (finding causation established where retaliatory discharge occurred "within a month" of protected activity); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 555 (2d Cir. 2001) (explaining that five months was "not too long" to support inference of causal connection)

### B. **Employer's Rationale and Pretext**

In response to a presumptive case of retaliation, an employer may "articulate a legitimate, non-retaliatory reason" for its action.[1202]  Assuming the employer does so, the employee can rebut that explanation with evidence demonstrating that the employer's proffered explanation is pretextual.[1203]  An employee does so by submitting evidence "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."[1204]  As there may be multiple "but for" factors for an adverse action, one need not prove that the employer's professed rationale is false and did not play any role in the adverse action.[1205]

### C. **Executive Chamber Policy**

The Executive Chamber's equal employment policies again are in agreement with this legal standard.  The policy prohibits retaliation against "any individual who has filed a complaint, testified or assisted in any discrimination complaint investigation, or opposed any discriminatory practices forbidden by the Human Rights Law, federal anti-discrimination laws or pursuant to the anti-discrimination provisions of" the policy.[1206]  "Even if a discrimination complaint is not substantiated as a violation . . . , the individual is protected if they filed a discrimination complaint, participated in a discrimination-related investigation, or opposed discrimination with [a] good faith belief that the practices were discriminatory on the basis of a protected class status."[1207]  "The adverse action does not need to be job related or occur in the workplace."[1208]  Rather, the policy's prohibition on retaliation encompasses "any action, more than trivial, that would have the effect of dissuading a reasonable person from making or supporting an allegation of discrimination."[1209]

---

[1202] *Id*. at 845.

[1203] *Id*.

[1204] *Id.* at 846.

[1205] *See, e.g.*, *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 227 (2d Cir. 2014) (explaining that a "jury could . . . conclude that, despite [plaintiff]'s negative performance reviews, his firing was 'more likely than not based in whole or in part on discrimination'").

[1206] Ex. 8 at 39.

[1207] *Id.*  The Director of GOER testified that GOER takes retaliation very seriously, and if it finds that someone engaged in retaliation, it will seek the termination of his employment.  *Joint Public Hearing To Examine Sexual Harassment Issues In The Workplace*, 2019 Leg. at 232:15–19 (N.Y. 2019) (Testimony of Michael Volforte, Director of NYS Governor's Office of Employee Relations), https://www.nysenate.gov/transcripts/public-hearing-05-24-19-nys-senate-sexual-harassment-workplace-finaltxt ( "Volforte Leg. Testimony").

[1208] Ex. 8 at 39.

[1209] *Id.*

### D.  **Individual Liability**

#### i.  **Section 1983**

"Under § 1983, an individual defendant may be held liable . . . if he or she was 'personally involved' in the deprivation of the [employee]'s rights."[1210]  One is personally involved when she (1) "participated directly in the alleged constitutional violation"; (2) "after being informed of the violation through a report or appeal, failed to remedy the wrong"; (3) "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom"; (4) "was grossly negligent in supervising subordinates who committed the wrongful acts"; or (5) "exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring."[1211]

#### ii.  **NYSHRL**

Under the NYSHRL, an employee may be held individually liable if he personally engages in conduct that violates the NYSHRL.[1212]  The NYSHRL also subjects those who aid and abet conduct that violates the NYSHRL to individual liability.[1213]  Aider and abettor liability extends to those who "actually participate[] in the conduct giving rise to a discrimination claim."[1214]  "[A]n individual need not himself take part in the primary violation" to be liable.[1215]  An aider and abettor also need not have a specific intent to discriminate and "may incur . . . liability in connection with a primary violation of another employee, not just that of the employer."[1216]  Aider and abettor liability extends to those who are not employees so long as they participate in the unlawful conduct.[1217]  "[F]ailure to investigate [discriminatory acts] can constitute 'active participation' to support an 'aiding and abetting' claim."[1218]

---

[1210] *Burhans v. Lopez*, 24 F. Supp. 3d 375, 381 (S.D.N.Y. 2014) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)); *see Feingold*, 366 F.3d at 159.

[1211] *Burhans*, 24 F. Supp. 3d at 381 (ellipsis omitted) (quoting *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir. 2013)).

[1212] *See Moazzaz v. MetLife, Inc.,* No. 19-CV-10531 (JPO), 2021 WL 827648, at *15 (S.D.N.Y. Mar. 4, 2021) (citing *Doe v. Bloomberg, L.P.,* 36 N.Y.3d 450, 459, 167 N.E.3d 454, 460 (2021)).

[1213] *See* N.Y. Exec. Law § 296(6); *Malena*, 886 F. Supp. 2d at 367.

[1214] *Feingold*, 366 F.3d at 157 (internal quotation marks and citation omitted); *see Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 658-59 (E.D.N.Y. 2015).

[1215] *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 395 (S.D.N.Y. 2019).

[1216] *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch.*, *LLC*, 470 F. Supp. 2d 345, 363 (S.D.N.Y. 2007).

[1217] *See, e.g.*, *Heskin v. Insite Advertising, Inc.*, No. 03 Civ. 2598 (GDB)(AJP), 2005 WL 407646, at *25 (S.D.N.Y. Feb. 22, 2005) (holding that individual who harassed plaintiff and asked that she be fired could be individually liable, even though he worked for a different company); *Dunson v. Tri-Maint. & Contractors, Inc.,* 171 F. Supp. 2d 103, 114-16 (E.D.N.Y. 2001) (concluding that independent contractors could be aiders and abettors).

[1218] *Delisi v. Nat'l Ass'n of Pro. Women, Inc.*, 48 F. Supp. 3d 492, 496 (E.D.N.Y. 2014).

## THE INVESTIGATION'S CONCLUSIONS

I.  **The Governor Engaged in Conduct that Constituted Sexual Harassment Under Federal and State Law**

As detailed above in our factual findings section, we conclude that the Governor, on multiple occasions, engaged in conduct and conversations that were offensive and sexual in nature that constituted sex-based harassment.  Specifically, with respect to physical contact with complainants, we find that the Governor engaged in the following forms of offensive touching, among others:

**Executive Assistant #1**

- On November 16, 2020, the Governor hugged Executive Assistant #1 and then reached under her blouse and grabbed her breast.

- On multiple occasions in 2019 and 2020, the Governor engaged in close and intimate hugs with Executive Assistant #1 during which he, on occasion, grabbed her butt.

- On December 31, 2019, the Governor took a "selfie" with Executive Assistant #1, during which he put his hand on and then rubbed and grabbed her butt.

**Trooper #1**

- On one occasion in an elevator, the Governor ran his finger down the center of Trooper #1's back from the top of her neck down the center of her spine, while saying, "hey you."[1219]

- At an event on September 23, 2019, the Governor touched Trooper #1 on the stomach, running his hand across it from her belly button to her right hip while she was holding a door open for him.

**State Entity Employee #1**

- In September 2019, at an event in New York City where the Governor spoke and then took pictures with certain of the attendees, the Governor grabbed the butt of an employee of a State entity while having his picture taken with the employee.

**Women Not Employed by the State**

- There were complainants whose allegations are not of workplace harassment (because they were not employed by the State) who nonetheless were subjected to the Governor's unwelcome, offensive, and physical conduct.

  o In May 2017, at an event where the Governor spoke and then greeted attendees, the Governor pressed and ran his fingers across the chest of

---

[1219] Trooper #1 Tr. 87:20–88:9.

Virginia Limmiatis (who was attending the event for her job), while reading the name of her company (which was written across the chest).

o  On the evening of September 14, 2019, at the wedding of one of his senior aides, the Governor approached a guest, Anna Ruch, and put his hand on her back in an area where there was a cutout in the dress.  After Ms. Ruch grabbed his wrist and removed his hand from her back, the Governor remarked, "wow, you're aggressive" and then proceeded to cup her face with his hands and kiss her after asking "can I kiss you?"

**Hugs, Kisses, and Other Touching**

- Over the years, the Governor has hugged and kissed staff members in ways that made them uncomfortable or were unwelcome, including kissing Executive Assistant #1 at least once on the lips, kissing Ms. Boylan on the lips on one occasion, kissing Trooper #1 on the cheek in the presence of her colleague, a man, while she was working on the Governor's protective detail, kissing various staff members (including Executive Assistant #1 and Ms. McGrath) on the cheeks and forehead, and engaging in uncomfortably close hugs with Executive Assistant #1.

- The Governor also regularly touched staff members in ways that made them uncomfortable, including touching their arms, legs, and back, kissing their hands, squeezing their waists for pictures as Executive Assistant #1, Ms. Boylan, Ms. Liss, Ms. McGrath, and Kaitlin, among others, have described.[1220]

In addition to the physical touching outlined above, we find that the Governor regularly engaged in conversation and conduct with Executive Chamber staff members and other State employees that were offensive and gender-based.  Those conversations include, among others, the following:

**Charlotte Bennett**

- Over the course of a number of conversations, the Governor made inappropriate and offensive comments of a sexual nature to Ms. Bennett, including:  (1) in talking about potential girlfriends for him, telling her that he would be willing to date someone who was as young as 22 years old (knowing that she was 25 at the time); (2) asking her whether she had been with older men; (3) saying to her during the pandemic that he was "lonely" and wanted to be "touched;"[1221] (4) telling her that he wanted to ride his motorcycle into the mountains with a woman; (5) asking whether she was monogamous and what she thought about monogamy; (6) joking about the size of his

---

[1220] Ms. Liss and Kaitlin have said that they have come forward to support and corroborate the other women.  Liss Tr. 127:6–11, 206:8–11; Kaitlin Tr. 147:3–7, 158:11–17.  Although the conduct they endured occurred too long ago for them to assert civil claims in court, we find that the conduct did constitute sexual harassment and does corroborate other women's allegations.  We also note the EEO Policy applicable to the Executive Chamber has no limitations period.

[1221] Bennett Tr. 166:20–167:9; Ex. 2; Ex. 3.

hands; (7) telling her that she should get a tattoo on her butt where it could not be seen; and (8) asking whether she had any piercings other than in her ears.

- The Governor also had detailed conversations with Ms. Bennett about her experiences with sexual assault, and did so in a way that—on certain occasions—made her feel extremely uncomfortable, as if he were "grooming" her.[1222]

**Trooper #1**

- When Trooper #1 informed the Governor that she was getting married, the Governor asked her why she would want to get married, because "it always ends in divorce, and you lose money, and your sex drive goes down."[1223]

- On another occasion, after he had become single again, the Governor discussed with Trooper #1 age differences in relationships, joking that she was "too old"[1224] for him. He then asked her what age difference for him and a girlfriend she thought would be acceptable to the public. When she asked what criteria he was looking for in a girlfriend, in order to deflect the conversation, the Governor said he was looking for someone who "can handle pain."[1225]

- In September 2018, when told by Trooper #1 that she would be going to Albany for her sister's wedding, the Governor made Trooper #1 uncomfortable by offering her a tour of the Governor's Mansion, "unless it [was] against protocols."[1226]

- In August 2019, the Governor asked Trooper #1 why she did not wear a dress, to which Trooper #1 stated that she would have nowhere to put her gun. The Governor also asked her why she only wore dark colors and on another occasion told her that her suit made her look like an "Amish person."[1227]

**Lindsey Boylan**

- On a number of occasions, the Governor commented on Ms. Boylan's attractiveness, including comparing her appearance to that of an ex-girlfriend and on another occasion saying that she was more attractive than various actresses.

- The Governor made comments and paid so much attention to Ms. Boylan that Mr. Zemsky, the CEO of ESD and Ms. Boylan's supervisor at the time, told her that

---

[1222] Bennett Tr. 111:20–112:2, 113:3–2.

[1223] Trooper #1 Tr. 85:8–14.

[1224] Trooper #1 Tr. 102:24–103:10.

[1225] Trooper #1 Tr. 103:14–104:11.

[1226] Trooper #1 Tr. 77:12–18.

[1227] Trooper #1 Tr. 128:9–11.

he thought the Governor had a "crush" on her and asked her if she wanted him to intervene in some way.[1228]

- On one occasion around 2017, when they were on an airplane, the Governor stated jokingly to Ms. Boylan, "let's play strip poker," to which Ms. Boylan responded in a sarcastic way to deflect the comment.  Mr. Zemsky has testified that he recalled hearing this comment.[1229]

**Executive Assistant #1 and Alyssa McGrath**

- The Governor had several conversations with Executive Assistant #1 about her personal life and her relationships, including, as described below, calling her and Ms. McGrath "mingle mamas"[1230] and inquiring multiple times about whether she had cheated on or would cheat on her husband and asking her to help find him a girlfriend.

- The Governor on a number of occasions asked Ms. McGrath about her personal life, including her marital status and divorce, saying that he wanted to "go out"[1231] with Ms. McGrath and Executive Assistant #1 when they went out together.

- On one occasion, the Governor asked whether Ms. McGrath would tell on Executive Assistant #1 if she were to cheat on her husband during a trip to Florida and then called them "mingle mamas"[1232] for the rest of the day.

- On another occasion, the Governor stared down Ms. McGrath's loose shirt and then commented on her necklace (which was inside her blouse) when Ms. McGrath looked up.

**Kaitlin**

- After Kaitlin joined the Executive Chamber, the Governor instructed her to act like a "sponge" to soak up knowledge and then proceeded to call her by the name "sponge," a name that she found humiliating.[1233]

---

[1228] Zemsky Tr. 28:12–20.

[1229] *Id.* at 33:14–37:14.

[1230] Executive Assistant #1 Tr. 95:9–16.

[1231] Alyssa McGrath Tr. 105:16–24.

[1232] *Id.* at 50:15–52:3.

[1233] Kaitlin Tr. 77:14–17.

- The Governor commented on her appearance on a number of occasions, including saying that an outfit she wore made her look like a "lumberjack"[1234] and asking on days she did not wear makeup, whether she "didn't get ready"[1235] for work.

- On one occasion, the Governor asked Kaitlin to look up car parts on eBay on his computer while he sat directly behind her in his office, making her feel uncomfortable because she was wearing a skirt and heels.

**Ana Liss**

- During the years that Ana Liss worked as an aide in the Executive Chamber from 2013 to 2015, the Governor addressed her almost exclusively as "sweetheart" or "darling."[1236]

- On occasion, the Governor kissed her on the cheeks and hand, touched and held her hands, and slid his hand around her lower waist.

- The Governor commented on her appearance and asked her whether she had a boyfriend.

**State Entity Employee #2**

- In preparing for a press conference on March 17, 2020 during which he was to receive a live COVID-19 nasal swab, the Governor made a joke about the manner in which State Entity Employee #2 would handle the test saying, "gentle but accurate[, I've] heard that before."[1237] State Entity Employee #2 felt that the Governor intended to convey a joke of an implied sexual nature. Then, at the press conference, in front of all of the press and cameras, the Governor stated, "nice to see you, Doctor—you make that gown look good."[1238] State Entity Employee #2 found the exchange with the Governor inappropriate and one that would not have been made to a physician who was a man.

We conclude the above-described conduct—both the unwelcome and inappropriate touching, as well as the suggestive jokes and comments—constituted sexual harassment that created a hostile work environment for State employees.

*First*, the direct contact with intimate body parts—including the touching of Executive Assistant #1's breast, the grabbing and touching of the butts of various women (including Executive Assistant #1 and State Entity Employee #1), and the Governor's touching of Trooper

---

[1234] *Id.* at 83:20–24.

[1235] *Id.* at 84:14–16.

[1236] Liss Tr. 99:17–24.

[1237] State Entity Employee #2 Tr. 159:18–20.

[1238] *Andrew Cuomo New York May 17 COVID-19 Press Conference Transcript*, Rev (May 17, 2020), https://www.rev.com/blog/transcripts/andrew-cuomo-new-york-may-17-covid-19-press-conference-transcript.

#1's stomach and back—unquestionably amounted to sexual harassment.[1239]  In fact, the law provides that "[d]irect contact with an intimate body part constitutes one of the most severe forms of sexual harassment."[1240]  The Governor denies or states that he does not recall any of these allegations of physical contact, but we find (as discussed above) that the credible evidence establishes that the Governor in fact touched these complainants in the way they have described. Those incidents amount to conduct that clearly constitutes sexual harassment.

*Second*, the Governor's numerous comments of a sexually suggestive nature—including discussions about age differences in partners at the same time as the Governor asked about finding a girlfriend (Ms. Bennett and Trooper #1), the criteria for the girlfriend being someone who "can handle pain"[1241] (Trooper #1), experiences with and views about monogamy (Ms. Bennett), whether an employee had been with an older man (Ms. Bennett), feeling "lonely" and wanting to be "touched"[1242] (Ms. Bennett), the attractiveness of the employee and comparing her to an ex-girlfriend (Ms. Boylan), wanting to go out with two assistants and calling them "mingle mamas"[1243] (Executive Assistant #1 and Ms. McGrath), whether an aide would be willing to cheat on her partner (Executive Assistant #1 and Ms. McGrath), playing "strip poker"[1244] (Ms. Boylan), putting a tattoo on the butt as opposed to the shoulder (Ms. Bennett), and locations of piercings other than the ears (Ms. Bennett)—individually and collectively constitute unlawful sexual harassment.  We find these comments—some of which the Governor denied, others of which he claimed were merely misinterpreted—to be, by any reasonable measure, gender-based, offensive, and harassing.  The law provides that comments such as these need not have been overtly sexual or motivated by sexual desire,[1245] although we find that these specific comments were plainly of a sexual nature.  And the Governor's intent need not have been to harass the complainants, if the effect was the creation of a hostile work environment, which these comments unquestionably did.[1246]  The law is clear that these types of sexually suggestive comments—if made as a "joke" or otherwise—particularly when part of a pattern of comments and conduct, as it was with the Governor, constitute unlawful sexual harassment.[1247]

---

[1239] We understand that certain criminal authorities, including the Albany Police Department, have been alerted to the most egregious allegations of physical touching, including the groping of Executive Assistant #1.  While concluding that the Governor engaged in unlawful sexual harassment, we do not reach in this report a conclusion as to whether the conduct amounts to or should be the subject of criminal prosecution.

[1240] *Redd v. New York Div. of Parole*, 678 F.3d 166, 180 (2d Cir. 2012).

[1241] Trooper #1 Tr. 103:14–104:11.

[1242] Bennett Tr. 166:20–167:9.

[1243] Executive Assistant #1 Tr. 95:9-16; Alyssa McGrath Tr. 50:15–52:3.

[1244] Zemsky Tr. 33:14–37:14.

[1245] *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir 2010).

[1246] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

[1247] *See, e.g.*, *Manzo v. Sovereign Motor Cars, Ltd.*, No. 08-CV-1229, 2009 WL 3151094, at *4 (E.D.N.Y. Sept. 29, 2009) (denying summary judgment where, among other things, supervisor admitted during an internal investigation that he asked plaintiff to his hotel room to tell him a "bedtime story" but that he made the statement "in the context of joking"); *Ackerman v. Nat'l Fin. Sys.*, 81 F. Supp. 2d 434, 437–38 (E.D.N.Y. 2000) (denying summary judgment on harassment claim where alleged harasser was "overly friendly; sent [plaintiff] cards; sent [plaintiff] a toy; took [plaintiff] on a meaningless trip . . .; made suggestions of a more intimate relationship; and was constantly around [plaintiff]").

The complainants—not surprisingly—said that these types of suggestive comments made them feel "very uncomfortable," "deeply humiliat[ed]," "unsettled," taken "advantage of," "uncomfortable," and "creeped out."[1248]  For the recipients of these inappropriate comments and jokes from the Governor, we find the Governor indeed created a hostile work environment.[1249]

*Third*, we find that under the totality of the circumstances, even the Governor's less overtly sexual comments that were nonetheless gender-based, also created a hostile work environment.  Although the Governor (and certain of his senior staff) sought to downplay what the evidence has revealed as frequent gender-based comments and conduct by the Governor as simply "old fashioned"[1250] or "cultural,"[1251] neither explains nor justifies his behavior, nor makes it non-harassing.  For example, referring to female staff as "honey," "sweetheart," and "darling,"[1252] kissing staff members on the forehead and some of the senior staff on the lips, holding them tightly around the waist for pictures and other occasions, allowing senior staff members to sit on his lap at official functions, and lying down with his head on the lap of staff members who are women we find, based on our interviews with numerous Executive Chamber employees, did in fact create a hostile work environment for many staff who were women.  As a matter of law, claiming that the gender-based behavior is simply a function of being old-fashioned or culturally more affectionate is not a defense to sexual harassment.[1253]  As Ms. McGrath succinctly put it, the Governor "makes all this inappropriate and creepy behavior normal."[1254]  Ms. Liss experienced the work environment similarly, stating:

> [F]or whatever reason, in his office, the rules were different.  It was just, you should view it as a compliment if the Governor finds you aesthetically pleasing enough . . . so even though it was strange and uncomfortable and technically not permissible in a typical workplace environment, I was in this mindset that it was the twilight zone and . . . the typical rules did not apply.[1255]

What these witnesses—and many others—described is not just old-fashioned, affectionate behavior, it was sexual harassment.

---

[1248] Bennett Tr. 133:8–19; Boylan Tr. 89:25–91:23; Executive Assistant #1 Tr. 114:23–115:4; Trooper #1 Tr. 76:22–25.

[1249] Ms. McGrath testified that because of the overall environment of the Executive Chamber, it was "hard to describe every single inappropriate incident" that had occurred.  Alyssa McGrath Tr. 199:17–23.

[1250] Andrew Cuomo Tr. 242:22–243:3.

[1251] *Id.* at 81:13.

[1252] *Id.* at 242:22–243:3.

[1253] *See, e.g.*, *Carosella v. U.S. Postal Serv.*, 816 F.2d 638, 641 (Fed. Cir. 1987) (finding sufficient evidence supporting administrative finding that postal service employee sexually harassed his subordinate despite employee's justifications based on his intent, including, *inter alia*, "I'm an Italian[;] I have a bad habit of maybe grabbing people by the arm or touching them in the back or something like that whether it's a female or male" (ellipses and brackets omitted)).

[1254] Alyssa McGrath Tr. 199:17–200:2.

[1255] Liss Tr. 80:11–22.

## II.    The Executive Chamber's Failure to Report and Investigate Allegations of Sexual Harassment Violated Their Own Internal Policies

We conclude that the Executive Chamber failed to follow its own policies and procedures related to sexual harassment in responding to several of the complaints.  These failures by the Executive Chamber when allegations of harassment potentially implicated the Governor, in our view, were a symptom of an overall culture that allowed the Governor's harassing behavior to occur and enabled it to continue.

We find that the problem did not rest with the Executive Chamber's written policies, which were robust and consistent with the requirements of New York State law, but in the Executive Chamber's failure to follow them.  Specifically, as noted above, the policies properly explained what constitutes sexual harassment and set forth the obligation of supervisory personnel to report possible harassment to GOER, even if the target of the harassment does not wish to file a complaint.[1256]  In August 2018, the Governor himself issued Executive Order 187 (incorporated by reference into the State's sexual harassment policies), which required all investigations into employment-related complaints by employees of all agencies and departments over which the Governor has executive authority to be conducted by GOER.[1257]  The stated purpose of the Executive Order was to "promote the effective, complete and timely investigation of complaints of employment-related protected class discrimination."[1258]  The goal was to achieve "more independent investigations."[1259]  The policies were not followed with respect to the allegations of misconduct against the Governor until after our investigation began and public scrutiny was focused on allegations of sexual harassment against the Governor.

### A.    The Executive Chamber's Handling of Charlotte Bennett's Complaint

The handling of Ms. Bennett's complaint illustrates the deficiencies in the Executive Chamber's response to allegations against the Governor.  Ms. Bennett went to Ms. DesRosiers on June 10, 2020, to tell her about her recent interactions involving conversations of a sexual nature with the Governor that made Ms. Bennett so uncomfortable she no longer wanted to interact with him.[1260]  Ms. DesRosiers did not ask Ms. Bennett follow up questions at that time— including not asking her what about her interactions with the Governor specifically had made her uncomfortable—nor did she explain to Ms. Bennett the policies of the Chamber, including that she would be protected from retaliation for making a complaint.[1261]  Instead, Ms. DesRosiers told Ms. DeRosa and Ms. Mogul about her conversation with Ms. Bennett and arranged a transfer for Ms. Bennett within days.[1262]  Ms. DesRosiers, Ms. DeRosa, and Ms. Mogul did not take any

---

[1256] Ex. 8.

[1257] *No. 187: Ensuring Diversity and Inclusion and Combating Harassment and Discrimination in the Workplace,* New York State (Aug. 3, 2018), https://www.governor.ny.gov/news/no-187-ensuring-diversity-and-inclusion-and-combating-harassment-and-discrimination-workplace.

[1258] *Id.*

[1259] Volforte Leg. Testimony 208:15–21.

[1260] Bennett Tr. 202:21–204:25; DesRosiers Tr. 222:15–21.

[1261] Bennett Tr. 203:23–204:10; DesRosiers Tr. 225:20–226:4, 227:3–23.

[1262] Bennett Tr. 205:10–12, 207:21–208:20; DesRosiers Tr. 223:4–9, 231:9–233:4, 235:7–22.

other action at that time.  On June 29, 2020, Ms. Bennett told a group of junior staff members about some of her inappropriate and sexually suggestive interactions with the Governor and became very upset in their presence.[1263]  The next day, on June 30, one of those staff members told Ms. DesRosiers about what Ms. Bennett had said.[1264]  Ms. DesRosiers then advised Ms. DeRosa and Ms. Mogul about what the junior staff member reported.[1265]  As a result, it was not until more than two full weeks after Ms. Bennett had first raised the issue and had already been transferred to a new position in which she did not have to interact with the Governor did they decide that they needed to interview Ms. Bennett.[1266]  Ms. DesRosiers got in touch with Ms. Bennett and pulled her into a meeting that day.[1267]

On the evening of June 30, 2020, Ms. Bennett spoke with Ms. DesRosiers and Ms. Mogul.[1268]  Her description of her interactions with the Governor, memorialized in detailed contemporaneous notes taken by Ms. DesRosiers and Ms. Mogul, is consistent with the account she later shared publicly and reflect the plainly sexually suggestive comments that Ms. Bennett has reported publicly and to us.[1269]  Ms. DesRosiers noted that Ms. Bennett became emotional when discussing what had happened to her, and that she "was tearing up" during the conversation.[1270]  Ms. Bennett expressed fear of what would happen if the Governor knew she had told anyone.[1271]  Ms. DesRosiers and Ms. Mogul found Ms. Bennett to be credible.[1272]  Ms. Mogul told the Governor and Ms. DeRosa about her conversation with Ms. Bennett, although it is unclear whether she conveyed the details of Ms. Bennett's allegations.[1273]

On July 1, 2020, a staff member sent Ms. Bennett a copy of the Executive Chamber's EEO Policy.[1274]  The staff member later told Ms. Bennett that Ms. Mogul had asked him for a copy on that day.[1275]  Ms. Mogul testified that she reviewed the policy and also consulted with Alphonso David, who at that point did not work for the Executive Chamber and had not worked

---

[1263] Bennett Tr. 109:7–110:16; DeRosa Tr. 13–20.

[1264] DesRosiers Tr. 242:14–243:11.

[1265] Id. at 246:3–8..

[1266] Id. at 236:9–21, 245:25–246:8.

[1267] Bennett Tr. 215:13–17.

[1268] Id. at 216:6–24.

[1269] As detailed above, there are a few additional incidents she remembered later, sometimes after her contemporaneous text messages refreshed her recollection.

[1270] DesRosiers Tr. 254:14–17; Mogul Tr. 104:11–14; Ex. 2; Ex. 3.

[1271] Bennett Tr. 227:17–228:13; Ex. 2; Ex. 3.

[1272] DesRosiers Tr. 228:22–23; Mogul Tr. 60:2–4.

[1273] Mogul Tr. 88:10–89:10.  The Governor testified that at the time he was told that Ms. Bennett supposedly reported only that he did not sexually harass or make inappropriate advances, that she considered him a friend and mentor, and that he was "paternalistic." Andrew Cuomo Tr. 174:13–17.  Such a description is inconsistent with the detailed description memorialized in Ms. DesRosiers' and Ms. Mogul's notes about the parts of the conversation that had made Ms. Bennett so uncomfortable she did not want to even interact with the Governor any more.

[1274] Bennett Tr. 222:17–21.

[1275] Id. 229:3–7.

for the State for almost a year.[1276]  Ms. Mogul testified that she determined that she did not have to report Ms. Bennett's concerns to GOER, even though the policy on its face required that any supervisor who becomes aware of conduct of a "sexually harassing nature" must report it to GOER.[1277]  Ms. Mogul decided that rather than reporting Ms. Bennett's concerns to GOER, she would do her own screening first to determine if what Ms. Bennett described constituted unlawful sexual harassment.[1278]  She concluded it did not, although she believed and acknowledged in her testimony that some of the Governor's conduct was inappropriate.[1279]  In doing so, rather than looking at the "totality of the circumstances," she parsed each comment or incident.[1280]  She also failed to acknowledge the breadth of the definition of harassment.[1281]  For example, as for the discussion about the lowest age cut-off for the Governor's potential girlfriend, Ms. Mogul stated that was not harassment because it was not sexually explicit.[1282]  When the Governor forcefully said to Ms. Bennett, "you were raped, you were raped, you were raped," that was purportedly about sexual violence, not sex.[1283]  And when Ms. Bennett initially discussed her history of sexual assault with the Governor, that too did not count, because Ms. Bennett said that at the time of the conversation she did not find it unwelcome.[1284]  She characterized the Governor calling Ms. Bennett "Daisy Duke,"[1285] a commonly understood sex symbol (as any quick internet search would reveal), as merely a reference to her wearing shorts.[1286]

On July 1, 2020, Ms. Bennett got in touch with Ms. DesRosiers to follow up on the prior night's call; Ms. DesRosiers patched in Ms. Mogul.[1287]  Ms. Bennett said that after reading the policy, it seemed that the Governor's behavior would have to be reported to GOER and an investigation conducted (as any reasonable reading of the policy would indicate).[1288]

[1276] Mogul Tr. 80:12–20.  *Cf.* David Tr. 80:6–7.

[1277] Mogul Tr. 131:3–10; Ex. 8 (Employee Handbook).

[1278] Ms. Mogul, unlike GOER's investigators, has no training in conducting such investigations and did not do anything other than speak with Ms. Bennett.  Mogul Tr. 77:3–78:6, 136:9–14.

[1279] *Id.* at 115:6–19.  In his testimony, the Governor also implied the policy required each manager with knowledge of such conduct to first determine if it actually constituted sexual harassment.  Andrew Cuomo Tr. 46:16–49:1.

[1280] In determining whether conduct is "severe or pervasive" one must examine "the totality of the circumstances" rather than isolated instances of misconduct.  *See Perry*, 115 F.3d at 150–51.

[1281] Ms. Mogul had an alternate theory of why she did not report to GOER—that the Governor had discussed with Ms. Bennett the assault of someone close to him and Ms. Mogul was concerned for the privacy of that assault victim.  Mogul Tr. 433:6–23.  Of course, she could have reported Ms. Bennett's complaint without revealing that information.

[1282] *Id.* at 116:25–117:11.  Ms. Mogul denied that Ms. Bennett had conveyed that the Governor asked her if she had been involved with older men.  *Id.* at 122:18–23.  The Governor admits he asked Ms. Bennett the question and that she did not answer it.  Andrew Cuomo Tr. 309:4–310:15.

[1283] Mogul Tr. 118:11–13.

[1284] *Id.* at 97:5–14.

[1285] *Id.* at 143:12–144:8.

[1286] *Id.*

[1287] Bennett Tr. 216:4–21; DesRosiers Tr. 68:10–17.

[1288] Mogul Tr. 104:25–105:5.

Ms. Bennett told us during her testimony that she did not want that to happen, she was scared to even see the Governor in the hallway, and was "just terrified," as she had "no concept of how far" senior staff would "go to protect [the Governor] and didn't want to find out."[1289]  Ms. Mogul told her that Ms. Mogul was very familiar with the policy and had reviewed the law, and that they did not need to report it because Ms. Bennett had taken action to stop the Governor's offensive conduct before it crossed a line.[1290]  On July 1, Ms. Bennett expressed her appreciation to Ms. DesRosiers and Ms. Mogul; she was relieved she did not have to deal with possible retaliation.[1291]  Ms. Bennett testified that in responding to Ms. Mogul and Ms. DesRosiers she was trying to be as agreeable as possible and convey to the Governor and the Executive Chamber that she was not a threat.[1292]

Given the legal standard under state law and the sexual harassment policy, we conclude that the purported determination by Ms. Mogul, Ms. DesRosiers, and Ms. DeRosa—and others informed of Ms. Bennett's allegations at the time—that the comments reported by Ms. Bennett did not constitute sexual harassment, or were not even of a "sexually harassing nature" under the policies, was wrong.  Indeed, the Governor himself signed a bill just one year earlier changing New York State law to eliminate the requirement that the conduct be "severe or pervasive" to constitute actionable sexual harassment, a standard that he declared "absurd."[1293]  But even if the standard had still been the higher "severe or pervasive" one (which under state law, it was not), an effective policy encourages survivors and requires managers to report conduct of a potentially harassing nature so that it can be investigated such that a proper determination can be made and that illegal harassment is not allowed to persist.[1294]  The Director of GOER testified that GOER investigates all allegations of discrimination, even a single sexual comment or joke.[1295]

We also conclude that it is not a fair reading of the Executive Chamber policy that counsel or any supervisor to whom allegations are reported should serve a screening role in the way that Ms. Mogul, Ms. DesRosiers, Ms. DeRosa, and others did.  The Executive Order and the policy make it mandatory for GOER to investigate all allegations of a sexually harassing nature.[1296]  The Executive Chamber's policy requirement that GOER be involved in issues of

---

[1289] Bennett Tr. 227:11–228:9.

[1290] *Id.* at 224:16–20; Mogul Tr. 130:3–131:10; Ex. 2.

[1291] *Id.* at 225:13–226:2.

[1292] *Id.*

[1293] *See* Assemb. B. A8421, Gen. Assemb., 2019-2020 Leg. Sess. (N.Y. 2019); *Governor Cuomo Signs Legislation Enacting Sweeping New Workplace Harassment Protections*, Office of Governor Andrew Cuomo (Aug. 12, 2019), https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-enacting-sweeping-new-workplace-harassment-protections.

[1294] Ex. 8 (Employee Handbook); *see* Chai R. Feldblum & Victoria A. Lipnic, Report of the Co-Chairs of the EEOC Select Task Force on the Study of Harassment in the Workplace, Part Three, C; Volforte Leg. Testimony 260:4–8.

[1295] Volforte Leg. Testimony 214:1–9, 236:11–22.

[1296] *See* Ex. 8; *No. 187: Ensuring Diversity and Inclusion and Combating Harassment and Discrimination in the Workplace,* New York State (Aug. 3, 2018), https://www.governor.ny.gov/news/no-187-ensuring-diversity-and-inclusion-and-combating-harassment-and-discrimination-workplace; Volforte Leg. Testimony 218:10–225:4, 228:11–18, 229:10–11.  Although GOER's policy leaves open the possibility that the agency itself may conduct the investigation pursuant to the agency's procedures, as the Governor admitted, the Executive Chamber does not have an alternative policy for investigating harassment complaints.  *See* Andrew Cuomo Tr. 46:11–15.

potential sexual harassment is designed to avoid exactly what occurred with respect to Ms. Bennett.  And while the Governor appoints the Director of GOER and that person reports to the Governor's senior staff, we do not believe that was a sufficient reason not to involve GOER in Ms. Bennett's allegations, as Ms. Lacewell, the Superintendent of the Department of Financial Services who also was consulted regularly on sexual harassment issues by the Executive Chamber, suggested in her testimony.[1297]  At a minimum, GOER would have provided a more objective and experienced view on how to handle Ms. Bennett's allegations, which is exactly why the EEO Policy had been changed by the Executive Order to refer complaints to GOER.[1298] While no one can state how, if at all, the Governor's conduct would have changed had formal action been taken in response to Ms. Bennett's complaint,[1299] we note that it was about five months later that the Governor groped the breast of Executive Assistant #1.

## B.  The Executive Chamber's Handling of Other Complaints

Similarly, but for different reasons, we find that the Executive Chamber did not follow its policy and refer Ms. Boylan's December 2020 allegation of sexual harassment to GOER.  No one in the Executive Chamber took Ms. Boylan's complaint seriously—characterizing it immediately as "crazy,"[1300] and "made [] up," The Executive Chamber did not even consult or consider the EEO Policy with respect to Ms. Boylan despite at least Ms. DeRosa and Ms. Mogul being aware that Ms. Bennett had made credible claims about the Governor's conduct just six months earlier.[1301]  Ms. Mogul shared the information about Ms. Bennett with Ms. Lacewell and Mr. Cohen as well, who also immediately discounted Ms. Boylan's sexual harassment allegations as politically motivated.[1302]  The main focus of this team of current and former senior staff members and other trusted confidantes was not on determining the truth of Ms. Boylan's assertions or whether there may be a pattern of inappropriate conduct by the Governor that could be emerging (in light of Ms. Bennett's prior allegations), but on protecting the Governor.  They simply assumed the allegation false and focused on attacking and neutralizing Ms. Boylan by distributing disparaging information about Ms. Boylan to the press and conducting outreach to

---

[1297] GOER set up a process to retain an outside law firm to investigate if a GOER employee complains of discrimination or harassment.  Volforte Leg. Testimony 256:25–257:16.  *Cf.* Lacewell Tr. 74:2–22.

[1298] GOER has experienced staff conduct investigations and has a standard process for conducting investigations, which includes interviewing the parties and witnesses and requesting and reviewing documents, including emails. Volforte Leg. Testimony 210:15–23, 212:4–5, 223:9–13, 244:22–245:11, 246:13–247:7.

[1299] At some point, possibly in June or July 2020, they took steps to prevent the Governor from meeting alone with junior staff members who were women, but did so, according to Ms. Mogul and Ms. DeRosa, to protect the Governor from allegations of harassment.  Mogul Tr. 254:6–17; DeRosa Tr. 423:3–21.  Ms. Mogul also testified that in December 2020 she asked another attorney on staff to start conducting informal exit interviews. Mogul Tr. 252:18–25.

[1300] DeRosa Tr. 524:15.

[1301] *Id.* at 342:7–18; Mogul Tr. 79:11–14.

[1302] Mogul Tr. 82:6–14, 208:3–12.

former staff members to determine whether there might be any other women who might share negative information about the Governor.[1303]

Ms. Mogul testified that after talking to senior staff members about other women who might have had concerns about the Governor's conduct, she determined that she needed to follow up only with Kaitlin.[1304]  Kaitlin came to the attention of the Executive Chamber because she tweeted in support of Ms. Boylan and because, after she discussed these tweets and her experiences with the Governor with the head of the agency for which she was working, the head of the agency and its general counsel reached out to attorneys in the Chamber.[1305]  Ms. Mogul spoke with the head of the agency and its general counsel multiple times, and sometimes with Ms. Lacewell.[1306]  The head of the agency and the general counsel conveyed that Kaitlin had shared with them the details of incidents with the Governor that had made her uncomfortable, including how she was hired and the incident when the Governor asked her to help him look up car parts while seated behind her, and said she had retained an attorney to possibly pursue a sexual harassment claim.[1307]  They also conveyed that Kaitlin was worried about losing her job.[1308]  Kaitlin was scared after seeing that Ms. Lacewell checked her LinkedIn page and after a former colleague called Kaitlin out of the blue to tell her that reporters were asking about her and tried to get her to agree that Kaitlin had not experienced sexual harassment by the Governor.[1309]  When Kaitlin found out the Executive Chamber was told she was claiming sexual harassment and had retained an attorney, she became very upset and told the head of her agency that she was not claiming sexual harassment, had not hired an attorney, and wished to convey that to the Chamber.[1310]  Ms. Mogul spoke to Kaitlin with Kaitlin's supervisor.[1311]  When Kaitlin told Ms. Mogul that she was not claiming sexual harassment and had not hired an attorney, Ms. Mogul did nothing more.  She did not ask Kaitlin about any of the incidents Kaitlin had shared with the head of her agency.[1312]  Ms. Mogul did not report the specific allegations Kaitlin had made to GOER, did not tell Kaitlin that she could make a report to GOER, and did not tell Kaitlin about protection from retaliation.[1313]  As with Ms. Bennett, upon learning that the target of the harassment was not taking action, the Executive Chamber considered the matter resolved.

---

[1303] Morettoni Tr. 228:14–20; Walsh Tr. 273:8–11.  Ms. Benton claimed that the purpose was to make former employees aware that Ms. Boylan had been reaching out to former staff members in an effort to gather support for her allegations.  Benton Tr. 241:10–14.

[1304] Mogul Tr. 218:10–17.

[1305] DeRosa Tr. 608:2–11, 624:15–625:8.

[1306] Lacewell Tr. 178:10–183:6; Mogul Tr. 307:7–324:16.

[1307] Mogul Tr. 311:19–313:19, 331:2–5.

[1308] Id. at 314:9–12.

[1309] Kaitlin Tr. 147:9–148:11, 152:6–153:12; Ex. 69.

[1310] Kaitlin Tr. 162:2–164:6.

[1311] Id. at 164:7–11; Mogul Tr. 339:2–3.

[1312] Kaitlin Tr. 164:8–165:9; Mogul Tr. 339:2–6, 353:24–354:6, 354:18–355:9.  Ms. Mogul testified that Kaitlin seemed upset and she did not want to "cross-examine" her.  Mogul Tr. 354:8–17.

[1313] Kaitlin Tr. 166:3–166:18; Mogul Tr. 357:10–21.

The Executive Chamber's failure to report any allegations against the Governor to GOER prior to March of this year or to take any meaningful action in response thereto in relation to the Governor himself stands in contrast to how the Executive Chamber handled a rumor about a former staff member who was accused of referring to Ms. DeRosa as a "bitch," where although GOER was not notified, action was swift and resolute.[1314]  According to Ms. DesRosiers, after Ms. DeRosa heard that this staff member had referred to her as a "bitch" the Executive Chamber investigated promptly by asking his subordinates if they had had any negative interactions with him[1315] and transferred him out of his role.[1316]  Ms. DeRosa confirmed that this employee was transferred because Ms. DeRosa told Ms. Garvey and Ms. Mogul that she did not feel comfortable working with him, and further stated that the employee received counseling on his behavior.[1317]

The Executive Chamber has also changed how it handles such allegations since March 2021.  Unlike how Ms. Bennett, Ms. Boylan, and Kaitlin's allegations were handled in June and December 2020, when the Executive Chamber learned first of Executive Assistant #1's allegations and then Ms. McGrath's, Ms. Garvey filed complaints on their behalf with GOER.  In sum, as the Executive Chamber now seems to recognize, the Executive Chamber's EEO Policy makes clear that allegations of potential sexual harassment must be reported to GOER for an investigation.

## III.  The Response to Lindsey Boylan's Allegation of Sexual Harassment Constituted Unlawful Retaliation

We conclude that the Executive Chamber engaged in prohibited retaliation against Ms. Boylan in response to the allegation she made on December 13, 2020 that the Governor had sexually harassed her.  Unlawful retaliation occurs when an employer takes an adverse action against an employee or former employee (one that would dissuade a reasonable worker from making or supporting a charge of discrimination) because that person made a good faith complaint (formal or informal) of unlawful discrimination or harassment.[1318]  We find that this occurred with respect to Ms. Boylan.

As detailed above, the incidents Ms. Boylan later described in her Medium article and her testimony have largely been admitted and corroborated.  Under both federal and State law, Ms. Boylan is protected from retaliation so long as she had a "good faith, reasonable" belief that the conduct about which she complained constituted unlawful harassment.[1319]  The Governor and some of his senior staff questioned at the time (and continue to question) Ms. Boylan's motivations, claiming that she made her allegations of sexual harassment for political reasons, *i.e.*, to bolster her political campaign, or generally to be vindictive or retaliatory herself.  But retaliation is unlawful regardless of whether the employer believes the complainant is acting with

[1314] DesRosiers Tr. 315:21–316:21.

[1315] *Id.*

[1316] *Id.* at 318:19–318:23.

[1317] DeRosa Tr. 141:1–144:25.

[1318] *Hicks*, 593 F.3d at 164.

[1319] *Summa*, 708 F.3d at 126.

a good faith belief that she was harassed.[1320]  Even if Ms. Boylan decided to go public with the allegations when she did with the hope of boosting her profile during her political campaign,[1321] it does not justify, as a matter of law, an employer taking what amounts to retaliatory action.  In addition, whatever her motivations for making the allegation, it does not alter our finding that she also had a good faith belief that the Governor's conduct constituted sexual harassment.

Ms. Boylan engaged in conduct protected by the civil rights laws when she tweeted in December 2020 that the Governor sexually harassed her.  Social media is a well-recognized forum for engaging in protected activity.[1322]  That Ms. Boylan had left the Executive Chamber before December 13, 2020 is also not relevant because the law—and the State's sexual harassment policy—protects former employees such as Ms. Boylan from retaliation.[1323]  Despite a number of Executive Chamber witnesses' claims that their retaliatory actions were in response to other claims made by Ms. Boylan, it is undisputed that the Executive Chamber did not take the actions we find retaliatory after Ms. Boylan's earlier negative tweets regarding the Executive Chamber, including tweets in which she described the Chamber as "toxic,"[1324] but rather acted only and immediately after her December 13, 2020 tweet alleging the Governor sexually

---

[1320] *See Sanders*, 525 F. Supp. 2d at 367.

[1321] Ms. Boylan testified that after her tweets, Ms. Bennett reached out to her and told her that she had been harassed as well, Boylan Tr. 208:3–209:2, which was corroborated not only by Ms. Bennett's testimony, Bennett Tr. 248:11–249:5, but by a Twitter direct message from Ms. Bennett to Ms. Boylan sent on December 8, 2020.  It reads:

> Thank you for speaking up about Gov.  I just left last month (the privilege of being able to leave is so real—currently unemployed) after two years in the chamber.  I was his assistant and senior briefer (two sep roles for little $, couldn't even afford to move out of my parents' house even though I held two positions).  The verbal abuse, intimidation and living in constant fear were all horribly toxic—dehumanizing and traumatizing.  And then he came onto me.  I was scared to imagine what would happen if I rejected him, so I disappeared instead.  My time in public service ended because he was bored and lonely.  It still breaks my heart.  Thank you for sharing truth that others are scared to share.  I am still healing.  It is nice to hear that I am not alone.

Ex. 55.  Ms. Boylan testified that hearing about Ms. Bennett motivated her to gather her thoughts and tell her full story.  Boylan Tr. 209:3–18.  Whether Ms. Boylan was in fact motivated by learning about Ms. Bennett, raising the profile of her political campaign, or some combination of both (or some other reason altogether), because we find that she had a good faith reasonable basis for her allegation of sexual harassment, it is not relevant to our ultimate determination.

[1322] *See Sumner*, 899 F.2d at 209 (protected activity includes acts such as writing critical letters to customers); *Kane v. Fin. Am. Reverse, LLC*, 2018 WL 2001810, at *4 (S.D. Ind. Apr. 30, 2018) (Facebook post is protected activity); *see also Crawford*, 555 U.S. at 276 ("opposition" means to "[t]o resist or antagonize ...; to contend against; to confront; resist; withstand") (quoting Webster's New Int'l Dictionary 1710 (2d ed. 1957)).

[1323] The Executive Chamber has argued in a written submission to us that, in order to constitute retaliation against a former employee, there must be some connection to current or prospective employment.  However, the Supreme Court has explicitly held that anti-retaliation protections extend "beyond workplace-related or employment related retaliatory acts and harms."  *White*, 548 U.S. at 67.  The Executive Chamber has relied on cases that pre-date *White*, or lower court cases that rely on outdated law.  *See, e.g., Marchuk v. Faruqi & Faruqi LLP*, 100 F. Supp. 3d 302, 311 (S.D.N.Y. 2015) (relying on *Galabaya v. New York City Bd. of Educ.*, 202 F.3d 636 (2d Cir. 2000), a case the Second Circuit has repeatedly held does not apply to retaliation claims, *see Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 43–44 (2d Cir. 2019)).

[1324] Ex. 63 (Ms. Boylan Dec. 5, 2020 tweets).

156

harassed her.[1325]  In fact, senior staff within the Executive Chamber acknowledged that they had debated responding to Ms. Boylan's tweets regarding the toxicity of the Executive Chamber but decided not to.  They only changed their view after Ms. Boylan tweeted that the Governor sexually harassed her.[1326]  In response to Ms. Boylan's tweet, several current and former Executive Chamber employees engaged in a flurry of communication, the Confidential Files about Ms. Boylan drafted by Mr. David were retrieved from counsel's office, Mr. Azzopardi hunted for Wite-Out to redact the names of other employees from the Confidential Files (while leaving Ms. Boylan's name), and Mr. Azzopardi began transmitting the documents to reporters.[1327]  They also asked reporters to hold off writing a story until they had received the documents.[1328]  This frenzied activity occurred only and immediately after Ms. Boylan made the allegation of sexual harassment.

The actions taken by the Executive Chamber in (1) leaking to the press confidential records relating to an internal investigation into Ms. Boylan on unrelated issues, and then (2) disseminating the substance of the disparaging letter or op-ed drafted by the Governor to numerous people outside the Chamber who were not previously aware of the substance therein, is the type of conduct that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."[1329]  Making negative statements generally about a complainant or releasing sensitive confidential information can constitute retaliation.[1330]  Here, the files and draft letter contained such sensitive, confidential information and were prominently marked "Privileged and Confidential" throughout.  Indeed, Ms. Boylan described the actions as the "destroy Lindsey phase" of the Executive Chamber's response,[1331] launched after her allegation of sexual harassment.  Not surprisingly, these actions also sent a chilling message to other would be complainants.  As Executive Assistant #1, who personally observed the retaliatory activity, noted after Ms. Boylan's tweet alleging sexual harassment:

> I would be in the room when they were actively trying to discredit her. They were actively trying to portray a different story of it. Trying to make her seem like she was crazy and wanting to get her personnel file out. That was the first time that I had seen someone

---

[1325] *See Zann Kwan*, 737 F.3d at 845 (finding a three-week gap between protected activity and an adverse action to suffice for causation).

[1326] Azzopardi Tr. 80:14–81:1; DeRosa Tr. 533:3–542:17.

[1327] Executive Assistant #1 Tr. 128:23–130:19, 133:2–10; Vlasto Tr. 187:12–188:14; Ex. 61; Ex. 77; Ex. 106.

[1328] Ex. 78.

[1329] *Hicks*, 593 F.3d at 69 (quoting *White*, 548 U.S. at 57).  The Executive Chamber has argued to us that because Ms. Boylan was not in fact deterred from further protected activity, its actions cannot constitute retaliation. However, "[i]f the employer's action would be reasonably likely to deter protected activity, it can be challenged as retaliation even if it falls short of its goal." *EEOC Enforcement Guidance on Retaliation and Related Issues*, EEOC-CVG-2016-1 (August 25, 2016), *citing Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir. 1997); *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 754 (3d Cir. 1997) ("[A]n employer who retaliates cannot escape liability merely because the retaliation falls short of its intended result.").

[1330] One of the attorneys who participated in the drafting of one of the leaked personnel memoranda noted surprise that a memorandum she thought was protected by attorney-client privilege (and clearly marked so) was leaked without her knowledge and was "dismayed" at its broad dissemination.  Ex. 14.

[1331] Boylan Tr. 210:23–211:6.

157

publicly come out and saying something against him and sexually
harassing them and them going behind the scenes and trying to
discredit her.[1332]

Those involved in the decision to release the document tried to justify their actions by
claiming that the leaked Confidential Files did not specifically address Ms. Boylan's sexual
harassment allegation made on December 13, 2020, but rather her December 5, 2020 tweet that
she had "tried to quit three times before it stuck."[1333]  But, as long as Ms. Boylan's December 13
tweet accusing the Governor of sexual harassment was a determining factor in the Executive
Chamber's decision to release the personnel file and circulate the draft letter—which we find to
be the case—such action is unlawful.  That the Executive Chamber might have had other reasons
for taking their actions does not make it lawful.[1334]  The timing and testimony ties the response
clearly to the sexual harassment tweet—in other words, had the sexual harassment tweet not
occurred, the Executive Chamber would not have engaged in its retaliatory activity.
Ms. DeRosa, the person who decided to release the Confidential Files, testified that while there
was discussion about whether to release the documents before December 13, 2020, she decided
not to release them previously.  But as soon as she saw the December 13 sexual harassment
tweet, she had the documents sent to reporters.[1335]

Further, the Executive Chamber witnesses are not correct that the released files establish
that Ms. Boylan's pre-December 13 tweets were "false."[1336]  A number of them have taken the
position that the pre-December 13 tweets were false in the following respects:  (1) that
Ms. Boylan tweeted that she resigned after trying to resign three prior times, and suggested that
her resignation was tied to the "toxic" work environment; and (2) that she did not sign the
document they asked her to sign when she left, giving the impression that she was asked to sign a
non-disclosure agreement.  In discussing his reason for releasing the documents to the press,
Mr. Azzopardi claimed that Ms. Boylan had been fired, and in fact told reporters that she "had
been fired after being confronted" about complaints.[1337]  However, the evidence shows that
Ms. Boylan did in fact resign, even if her resignation was not prompted by a sexual harassment
incident and even if it was prompted by being confronted with certain complaints made against
her.  Those involved in the meeting that prompted Ms. Boylan's resignation said that the purpose
of the meeting was to obtain her response to the issues that had been raised, not fire her.[1338]  In
fact, the memorandum that was released to the press specifically stated, under the header
"Ms. Boylan's Resignation" that "[d]uring the meeting Mr. David was clear that she was not
being asked to resign, fired or pushed out in any way. In no uncertain terms he said that she was
simply being counseled in response to the complaints that have been made about her from

---

[1332] Executive Assistant #1 Tr. 128:25–129:10.

[1333] Azzopardi Tr. 79:1–81:23.

[1334] There can be multiple "but for" causes so long as the adverse action would not have been taken absent the
protected activity.  *Zann Kwan*, 737 F.3d at 846 & n.5.

[1335] DeRosa Tr. 522:16–542:17.

[1336] *See, e.g.*, Azzopardi Tr. 81:18–21; Cohen Tr. 111:16–23.

[1337] Azzopardi Tr. 84:13–85:6.

[1338] Mr. David testified that when Ms. Boylan responded to the allegations by saying that she resigned, they told her
that they were not asking her to resign.  David Tr. 216:15–24.

multiple sources."[1339]  There is also evidence that Ms. Boylan had resigned, or at least walked out, on prior occasions and that senior staff members urged her to return to work.[1340]  For example, Ms. DeRosa admitted that in July 2018, a couple months before Ms. Boylan resigned, Ms. Boylan left the office and Ms. DeRosa called her to ask her to return.[1341]  Mr. Zemsky also recalled a time when Ms. Lacewell called him saying that Ms. Boylan had resigned and asking if he would call her and convince her to stay.[1342]

Executive Chamber witnesses also justified the release of the memoranda as correcting the allegedly "false" statement in Ms. Boylan's December 13 tweet that her work was "very good."[1343]  But the Governor himself testified that, based on his observations of the quality of Ms. Boylan's work, he "thought she was very good," and that Mr. Zemsky also thought she was "very good."[1344]  And in any event, the memoranda that they released did not relate to or discuss the quality of her substantive work, but rather her interactions with her colleagues and compliance with agency protocols.

The final allegation the Executive Chamber claims it was correcting in releasing the confidential documents was Ms. Boylan's statement in her December 5 tweet that she did not sign "whatever they told her to sign when she left."[1345]  The leaked personnel memoranda do not relate to the paperwork, if any, that attended the end of Ms. Boylan's employment, so the claim that releasing the confidential memoranda countered that part of Ms. Boylan's tweet also lacks credibility.  More importantly, it is clear from the timing and from Ms. DeRosa's and Mr. Azzopardi's testimony (as well as common sense and the other factual circumstances) that the December 13 "sexual harassment" tweet was the impetus for the release of the personnel file.[1346]

Significantly, those involved in releasing the Confidential Files specifically stated that they gave no thought to whether their actions constituted retaliation.[1347]  Some stated that they consulted with lawyers and that Ms. Mogul and Ms. Lacewell spoke with the Director of GOER, and then asserted privilege over all of those conversations during our investigation.[1348]  But those involved testified that they did not consider the question of retaliation at all, and the Director of GOER testified that he was never shown the memoranda, told the type or substance of the

---

[1339] Ex. 61.

[1340] DeRosa Tr. 228:12–238:12; Zemsky Tr. 70:5–21.

[1341] DeRosa Tr. 228:12–238:12.  When the Executive Chamber was debating how to respond to an upcoming press story about that particular incident in March 2021, Ms. Garvey cautioned that responding about a true incident by attacking Ms. Boylan's workplace conduct could constitute unlawful retaliation.  Cohen Tr. 78:18–82:6; Ex. 107; Ex. 108; Ex. 109; Ex. 110.

[1342] Zemsky Tr. 70:5–21.

[1343] Garvey Tr. 107:17–108:11.

[1344] Andrew Cuomo Tr. 61:2–14.

[1345] Ms. Garvey testified that she did not know if there was any exit paperwork in Ms. Boylan's file and had not looked into it.  Garvey Tr. 109:3–110:8.

[1346] DeRosa Tr. 533:3–542:17.

[1347] *Id.* at 543:20–22; Mogul Tr. 178:7–15; Vlasto Tr. 140:2–141:14.

[1348] Azzopardi Tr. 86:6–87:14; DeRosa Tr. 542:23–543:13.

specific documents being released, or told the circumstances.  He was just asked general questions about disclosing "personnel records."[1349]  The Director of GOER testified that the release of "documents concerning an investigation against Ms. Boylan for complaints that had been made against Ms. Boylan" would potentially violate the employee handbook.[1350]  To the extent any individual involved in the decision to release the Confidential Files seeks to claim that their actions were lawful because they consulted with the other counsel, they will need to disclose the actual advice given—and because those involved testified that they did not consider the question of retaliation, we do not find it credible that legal advice was sought or relied on as to the question of retaliation.[1351]  In any event, regardless of the involvement of counsel, we find that the result of the Executive Chamber's release of the Confidential Files related to Ms. Boylan constituted unlawful retaliation.

We also find that the draft letter or op-ed attacking Ms. Boylan—particularly when combined with the release of the confidential internal records to the press—constitutes retaliation.  There were several iterations of the letter, the first of which a number of witnesses have testified was drafted by the Governor.[1352]  The letter attacked Ms. Boylan for alleged conduct at work and for alleged interactions with men other than the Governor, as well as postulating various political conspiracies.  While this letter or op-ed was not published,[1353] it was sent to or read to a variety of people outside the Executive Chamber, either to get their advice on its contents or to ask the recipient to agree to sign the statement.[1354]  At Ms. DeRosa's direction, Ms. Mogul tried to fact-check the letter and was unable to find support for many of its allegations.[1355]  The draft was written with a few purported authors included, among them Mr. David.  Mr. David testified that he did not agree to have his name attached to the statement because he did not know if the statements in it were true and he did not think it was a good response.[1356]  He nonetheless agreed to read it and convey its substance to other former employees to see if they would sign it.[1357]  Contemporaneous documents reflect that some of those reviewing the letter thought it was a terrible idea, with some noting that it was victim shaming.[1358]  Ms. DeRosa testified that the Governor nonetheless strongly advocated releasing

---

[1349] Volforte Tr. 132:8–144:21.

[1350] *Id.* at 153:25–154:14.

[1351] *Cf. Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 562–63 (SDNY 2008), *aff'd*, 344 F. App'x 628 (2d Cir. 2009) (rejecting defense based on undisclosed advice of counsel).

[1352] Benton Tr. 194:18–25; DeRosa Tr. 632:17–20.  The Governor did not specifically recall drafting the first draft of the letter, but testified that he was involved in drafting the proposed letter or op-ed.  Emails among those involved in its drafting show that various drafts came from the email account of Ms. Benton, which many, including the Governor and Ms. Benton, have acknowledged indicates the Governor's involvement in the draft.  Benton Tr. 353:22–356:16.

[1353] As the letter and op-ed were not publicly released, we will not provide further details of the disparaging contents of the document and have redacted portions of documents that reveal the substance.

[1354] *See, e.g.*, Benton Tr. 226:3–9; Lacewell Tr. 154:22–155:13.

[1355] DeRosa Tr. 652:13–653:14; Mogul Tr. 198:22–202:16.

[1356] David Tr. 262:19–263:4.  Ms. DeRosa testified that while initially Mr. David said he would not sign the letter, he later said, "If you need me to, I will."  DeRosa Tr. 656:5–18.

[1357] David Tr. 263:11–265:3.

[1358] *See, e.g.*, Ex. 111; *see also* DeRosa Tr. 645:11–646:14, 651:12–655:17, 657:3–13, 659:15–20.

the statement, over numerous objections, and directed that they try to get people to agree to sign;[1359] the Governor denies doing so.[1360]  Ms. DeRosa directed Mr. Vlasto to provide part of the information from the letter to a reporter,[1361] and the New York Post ultimately obtained a copy.[1362]  While not as widely disseminated as the personnel memoranda, the malicious statements about Ms. Boylan were shared widely enough that they could dissuade a reasonable person from speaking out.  Thus, we find the drafting and sharing of this op-ed or letter, particularly combined with the other actions taken against Ms. Boylan, including the dissemination of the Confidential Files to the press, constituted unlawful retaliation.

## IV.   The Culture and Environment of the Executive Chamber Contributed to the Conditions that Led to Sexual Harassment and the Problematic Responses to Allegations of Harassment

Many witnesses interviewed during our investigation—and certainly the complainants who worked in the Executive Chamber—raised the challenging and difficult culture and environment in the Executive Chamber as a factor that heavily impacted their interactions with the Governor and his senior staff.  Other than a handful of senior staff within the Governor's closest inner circle, most of the current and senior staff described a work environment that they found to be extremely tense, fearful, and intimidating.  Witnesses also often used the words "toxic" and "abusive."

Although some explained and justified this culture as a function of the importance of the work and the Governor's perfectionist nature—and certainly those appear to have been contributing factors—much of what we learned during our investigation about the Executive Chamber's culture could not be explained or justified by those circumstances alone.  For example, many current and former Chamber employees described:  (1) a pattern and culture of bullying, intimidation, and retaliation that appeared to not only to be condoned, but expected and even promoted as an effective management technique and as evidence of strength and commitment; (2) a common understanding, based on personal and collective experiences, that disagreements with the Governor and the senior staff could, and did, result in severe, negative consequences; and (3) an intense and overriding focus on secrecy and loyalty that meant that any and all perceived acts of "disloyalty," including criticism of the Governor or his senior staff, would be met with attacks of a personal and professional nature.

We found in our investigation that experiences with this culture of intimidation and retribution were not limited to those within the Executive Chamber.  Many witnesses, including those who worked at other New York State agencies, including the New York State Troopers and elsewhere, described interactions that they perceived to be threatening and bullying to the extreme.  Indeed, most witnesses—again, other than those with close ties to the Chamber's

---

[1359] DeRosa Tr. 661:20–662:7.

[1360] The Governor testified that he followed the example of Abraham Lincoln, who would write out long responses to negative press and then throw the response away, and that it was merely cathartic.  Andrew Cuomo Tr. 152:11–22.  In light of the numerous drafts circulated among numerous people, as well as Ms. DeRosa's testimony, the Governor's explanation is not credible.

[1361] DeRosa Tr. 642:2–643:16.

[1362] *See, e.g.*, Ex. 85.

leadership—expressed concern and fear that providing any negative information to us in our investigation would lead to harm and retribution.  Their trepidation arose from the way in which they observed the Executive Chamber respond to anyone who might do or say anything that was damaging to the Governor.  Their fear was exacerbated by the recognition that, as Governor of New York, he remained extremely powerful and that he was known to have a "vindictive" nature.[1363]  As Ms. Bennett explained after she raised her complaint to senior staff, "I was scared even to see him in the hallway, which was a rare occurrence any way.  I was honestly—I was just terrified . . . I feel like I sat next to senior staff as they worked and I have no concept of how far they'd go to protect him and didn't want to find out."[1364]

This culture of fear, intimidation, and retribution co-existed in the Executive Chamber with one that accepted and normalized everyday flirtations and gender-based comments by the Governor.  As Ms. McGrath noted, "he makes all this inappropriate and creepy behavior normal and like you should not complain."[1365]  Ms. Liss put it this way, "I thought it was weird but typical of him . . .  [F]or whatever reason in his office the rules were different.  It was just, you should view it as a compliment if the Governor finds you aesthetically pleasing enough . . . It was like we were in a different decade."[1366]  In fact, the Governor himself admitted that he was "a little old fashioned," and had been changing his behavior "recently" because of "shifting norms," but "there are times" when he still slips.[1367]  A number of our complainants noted how this confluence of fear and flirtation affected how they received and responded to the Governor's conduct and contributed to the overall hostile work environment.  As Executive Assistant #1 described her reaction after the Governor groped her breast:

> I knew what just went on, I knew and he knew too that that was wrong.  And that I, in no way, shape or form, invited that nor did I ask for it . . . Who am I going to tell?  My supervisor was Stephanie Benton . . . the Governor's right-hand person and if I told her I was going to be asked to go somewhere else or transferred to [another] agency.  And the sad part of this whole thing, I actually like my job.  I was proud to work, especially during this pandemic.[1368]

Trooper #1 noted that the Governor had "a habit of being creepy and flirtatious" and no one can say anything because for fear that they will be "retaliated against . . . .  And everybody, for the most part, gets promoted because they're in the good graces of the Governor.  So if they stay quiet or give him information, they'll get promoted, or something good will happen to them.  That's just like the culture again in PSU."[1369]

---

[1363] Trooper #1 Tr. 139:8–9 ("Everyone knows he's very vindictive.").

[1364] Bennett Tr. 228:2–9.

[1365] Alyssa McGrath Tr. 199:17–200:2.

[1366] Liss Tr. 80:6–81:5.

[1367] Andrew Cuomo Tr. 83:12–19, 242:18–243:16.

[1368] Executive Assistant #1 Tr. 145:18–146:15.

[1369] Trooper #1 Tr. 81:20–22, 139:19–140:6.

As noted above, the Executive Chamber's response to the allegations of sexual harassment not only confirmed and informed the complainants' fears, but also evidenced the influence of the culture of fear and normalization.  When Ms. Bennett raised her complaints in June 2020—by any measure serious and disturbing—the Executive Chamber's reaction was to find a way not to report it or to do any investigation.  Instead, they kept the incident secret (although informing the Governor), moved Ms. Bennett to a position where she would not need to interact with the Governor, and put in measures to keep the Governor from being alone with junior staff members who are women.  Even that protective measure, the senior staff noted, was in their minds, to protect the Governor.  No one expressed concern about protecting young staff members from what were (at a minimum) plainly inappropriate comments from the Governor.[1370]  Knowing what we now know about the Executive Chamber's culture, we recognize that it would have taken courage for anyone (even within the senior staff) to report Ms. Bennett's allegations to GOER, and anyone who did so would likely have faced risk of retribution from the Governor and those closest to him.  But no one appears to have even seriously considered such a step; they found a way to justify not reporting it.

Similarly, six months after Ms. Bennett had made credible allegations of inappropriate and sexual comments by the Governor, the Executive Chamber reacted to Ms. Boylan's public allegation of sexual harassment with an effort to disparage her and protect the Governor.  Focusing exclusively on what they perceived to be political motivations and a retaliatory intent on her part—no one appears to have questioned, even for a moment, whether any of the Governor's interactions with Ms. Boylan may have been unwelcome and offensive.  The reaction again—we believe informed by the overall culture of the Executive Chamber—was to protect and attack.

We also find it revealing and consistent with the Executive Chamber's overall approach that, when faced with allegations of sexual harassment brought against the Governor, the inner circle of confidantes brought in to control and direct the response included a number of individuals with no official role in the Executive Chamber.  For example, in response to the sexual harassment allegations, the Governor and the Executive Chamber actively consulted Ms. Lacewell, Mr. Cohen, Ms. Smith, Mr. Bamberger, Mr. Vlasto, Ms. Lever, Mr. Pollock, Mr. David, and Chris Cuomo.  Ms. Lacewell at the time did not have any official role in the Executive Chamber; she had a full-time job heading a separate state agency as the Superintendent of the Department of Financial Services.  The rest were not State employees at all, although Mr. Cohen had a role on the Board of ESD at the time.  Some had never served in the Executive Chamber, and others, like Mr. Cohen, had not served there in a decade.  None of them was officially retained in any capacity by the Executive Chamber or any of the individuals involved.[1371]  Nonetheless, they were regularly provided with confidential and often privileged information about state operations and helped make decisions that impacted State business and employees—all without any formal role, duty, or obligation to the State.

---

[1370] DeRosa Tr. 422:25–423:21; Mogul Tr. 256:18–25.

[1371] The Governor claimed that although he has never had to pay Mr. Cohen for the legal services he has received over the last ten years, one day, he may get a large bill for Mr. Cohen's services.  Andrew Cuomo Tr. 123:2–125:24 ("We kid about the bill, when the bill comes due . . . [Cohen] has not yet sent me a bill. But he threatens the bill is going to be very large when it comes.").

The common thread among all of these individuals was a proven, personal loyalty to the Governor.  Their inclusion in the deliberations and the significant role they had in decision-making reflect how loyalty and personal ties were valued as much, if not more, than any official function or role in State government.  And because they did not have any formal position within the Executive Chamber, they could not reasonably have been relied upon to protect its interests as an institution or the interest of its current and former employees (including some who were complainants or witnesses), especially if those interests did not align with the Governor's personal interests.  A result of this dynamic is that State employees who are not part of this inner circle of loyalists would rightfully believe—and did believe—that any complaint or allegation about the Governor would be handled by people whose overriding interest is in protecting the Governor, over the interests of any potential complainant, any witness with relevant information that might be damaging to the Governor, or any supervisor whose obligation it was to report allegations of misconduct by the Governor.

We find that all of these aspects of the Executive Chamber's culture—*e.g.*, the use of fear, intimidation and retribution, the acceptance of everyday flirtation and gender-based comments by the Governor as just "old fashioned," the overriding focus on loyalty and protecting the Governor and attacking any detractors, and the reliance on loyal confidantes regardless of their official role in State government (or lack thereof)—contributed to creating an environment where the Governor's sexually harassing conduct was allowed to flourish and persist.  It also interfered with the Executive Chamber's ability—and responsibility—to respond to allegations of sexual harassment in a proper way by taking them seriously, reporting them, and having GOER investigate them.  Instead, whether driven by fear or blinded by loyalty, the senior staff of the Executive Chamber (and the Governor's select group of outside confidantes) looked to protect the Governor and found ways not to believe or credit those who stepped forward to make or support allegations against him.

## CONCLUSION

Upon completion of our independent investigation into allegations of sexual harassment brought against Governor Andrew Cuomo and the surrounding circumstances, we have reached the conclusion that the Governor sexually harassed a number of State employees through unwelcome and unwanted touching, as well as by making numerous offensive and sexually suggestive comments.  We find that such conduct was part of a pattern of behavior that extended to his interactions with others outside of State government.

We also find the Executive Chamber's response to allegations of sexual harassment violated its internal policies and that the Executive Chamber's response to one complainant's allegations constituted unlawful retaliation.  In addition, we conclude that the culture of fear and intimidation, the normalization of inappropriate comments and interactions, and the poor enforcement of the policies and safeguards, contributed to the sexual harassment, retaliation, and an overall hostile work environment in the Executive Chamber.